LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
E-mail: info@glancylaw.com
         lglancy@glancylaw.com
         mmgoldberg@glancylaw.com
         rprongay@glancylaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHSLTROM & GROSS LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com

*Attorneys for Plaintiff*

*[Additional Counsel on signature page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT RAHIMI, Individually and on Behalf of All Other Persons Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| TESLA MOTORS, INC., ELON MUSK, and DEEPAK AHUJA, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Robert Rahimi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tesla Motors, Inc. ("Tesla" or the "Company"); analysts' reports and advisories about the Company; press coverage regarding the Company and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased Tesla securities between May 10, 2013 and November 6, 2013, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components. The company also provides services for the development and sale of electric powertrain systems and components, to other automotive manufacturers. It markets and sells its vehicles through Tesla stores, as well as via the Internet.  As of March 31, 2013, the company operated a network of 32 stores in North America, Europe, and Asia. Tesla was founded in 2003 and is

headquartered in Palo Alto, California. Tesla claims to use proprietary technology and state-of-the-art manufacturing processes to create one of the safest vehicles on the road today.

3.      Tesla currently offers two vehicles for sale to customers, the Model S which has been in production since 2012, and the Model X, which will be delivered to customers beginning 2014. Regarding the Model S, Tesla proclaims on the homepage of its website that the Model S is, "THE SAFEST CAR IN AMERICA," and has widely touted both its government safety test results as well as the additional testing independently performed by Tesla itself to ensure that all parts of the Model S registered a 5 star safety score, even if they had previously scored lower in government tests.  Tesla has also issued consistently positive statements about its ability to execute on Model S production and Model X introduction goals critically necessary for the Company's profitability in the face of declining revenues from other sources.

4.      It therefore came as a shock to investors when a Model S's battery pack caught fire and burst into flames on a road in Washington state on October 2, 2013. A video of the Model S smoldering on the roadside was widely circulated, followed by press reports of the difficulties encountered by firefighters in battling the persistent blaze, which destroyed the car.  While Tesla initially denied that the car's lithium-ion battery pack had ignited the fire, it later reversed course and admitted that the battery pack was indeed the source of the blaze after being punctured by road debris encountered during normal driving conditions.

5.      The same day, Tesla had been downgraded by analyst Ben Kallo of Robert W. Baird & Company, who pointed to significant execution risks for Tesla.  In the wake of the Model S fire, additional reports were issued indicating that Tesla would need to divert substantial amounts of capital, otherwise needed for Model S production and Model X introduction, to research, development, and potential redesign and that Tesla faced the daunting prospect of a recall in the event of another fire incident.

6.      On the negative news, Tesla stock declined $12.05 per share - or more than 6% - to close at $180.95 per share on October 2, 2013, only to shed another $7.64 per share (or 4.2%) to close at $173.31 per share on October 3, 2013, on exceptionally high trading volume for both trading days.

7.      Thereafter, Defendants engaged in a purposeful campaign to downplay the safety incident and buoy Tesla's stock price.  It benefitted from the inability of federal regulators to send investigators to the scene of the car fire, due to a federal government shutdown.  Regulators were reliant upon Tesla to supply information about the crash, and as a result, opted not to initiate a formal investigation.

8.      When a second Model S fire occurred in Mexico, Tesla blamed it on the car's rate of speed and its crash through a barrier and into a tree.  Once again, Tesla's stock price fell, this time dropping $7.32 (4.3%) on heavy volume to close at $162.86 on October 28, 2013.  Once again, federal regulators did not investigate the fire, as their jurisdiction does not extend outside the country.

9.      Yet again, Defendants sought to reassure the markets as to the safety of the Model S and to buoy the Company's stock price.  It closed at $176.81 on November 5, 2013.

10.      However, Tesla's stock price was hammered by two days of successive negative news reports in early November 2013.  On November 5, 2013, after hours, the Company announced its Q3 2013 results, which failed to meet analyst expectations on key metrics, including a disappointing rate of vehicle deliveries.  On November 7, 2013, Tesla confirmed a third Model S fire, this one bearing a remarkable resemblance to the first inferno – caused by impact with road debris during normal driving conditions.  Once again, for the third time, the Model S was engulfed in flames and destroyed.

11.      As a result of this news, on November 6, 2013, the Company's share price opened at $154.81 - $22.00 (12.44%) lower than its prior day's closing price.  It continued to decline on November 6 and 7, 2013, closing at $139.77 on November 7, 2013.  The decline was so precipitous that on November 6, 2013, it triggered NASDAQ's "circuit breaker" that slows short-selling.

3

12.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose material information, including among other matters: (1) Tesla's statements about the Model S's highest safety rating and its lack of prior fire incidents were materially misleading, due to undisclosed puncture and fire risks in its lithium ion battery pack; (2) the Model S, the Company's only production vehicle for sale, suffered from material defects which caused the battery pack to ignite and erupt in flames under certain driving conditions; (3) Tesla's future sales, its Model X introduction, and its stock price were extremely vulnerable to the inherent risk posed by the Model S's design flaws in its undercarriage and battery pack; (4) Tesla was unable to maintain a level of automobile deliveries sufficient to satisfy analyst concerns and compensate for other declining revenue streams; and, (5) as a result of the foregoing, Tesla's public statements were materially false and misleading at all relevant times.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Tesla stock, Plaintiff and other Class members have suffered significant losses and damages.   Today, the stock is down $55.50 (28.7%) from its Class Period high of $193.37 on September 30, 2013, translating into a loss of over $6.5 billion in market capitalization in six weeks.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as the Company is headquartered in this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the attached certification, purchased Tesla securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures and events.

19.     Defendant Telsa is a Delaware corporation with its headquarters located at 3500 Deer Creek Road, Palo Alto, California 94304.  The common stock is traded on the NASDAQ under the ticker symbol "TSLA."

20.     Defendant Elon Musk ("Musk") has served as the Company's Chief Executive Officer throughout the Class Period.

21.     Defendant Deepak Ahuja ("Ahuja") has served as the Company's Executive Vice President and Chief Financial Officer throughout the Class Period.

22.     The Defendants Musk and Ahuja are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components, including lithium-ion batteries. Tesla also provides services for the development of electric powertrain systems and components, and sells electric powertrain components to other automotive manufacturers. It markets and sells its vehicles through Tesla stores, as well as over the Internet. As of March 31, 2013, the company operated a network of 32 stores in North America, Europe, and Asia. Tesla Motors, Inc. was founded in 2003 and is headquartered in Palo Alto, California.

24.     During Q2 2013, Tesla raised over $1 billion through the issuance of 4.5 million shares of common stock and $660 million of convertible debt.

### Materially False and Misleading
### Statements Issued During the Class Period

### False and Misleading Statements Regarding Tesla's Operations

25.     Each quarter, Tesla generates revenues from sales of its flagship Model S and by collection of payments related to Zero Emissions Vehicle (ZEV) credits.  ZEV credits are awarded for sales of electric vehicles by numerous states, chief among them California.  Tesla is able to trade its ZEVs to larger, more traditional auto manufacturers that otherwise cannot meet annual electric vehicle sales mandates of these states.  Each ZEV that Tesla sells can generate thousands of dollars of revenues.

26.     However, as the major auto manufacturers ramp up production of their own electric vehicles, the revenues that Tesla can generate from the generation and sale of ZEVs has begun to rapidly diminish.  Thus, to maintain or grow overall revenues, in the face of declining ZEV sale revenues, Tesla needed increase the volume of Model S cars that it markets.

27.     This reality is reflected in Tesla's second quarter 2013 earnings letter to shareholders, dated August 7, 2013 and signed by Defendants Musk and Ahuja (the "Q2 2013 Earnings Letter")

6

which was signed by Defendants Musk and Ahuja and which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Defendant Ahuja.  In the Q3 2013 Earnings Letter, Tesla stated:

> Q2 revenues were $551 million on a non-GAAP basis and $405 million on a GAAP basis. While deliveries increased by 5% from Q1, overall revenues were flat due to an expected drop in ZEV credit revenue. ZEV credit Tesla Supercharger revenue fell to $51 million this quarter from $68 million last quarter.

Thus, while having grown Q2 2013 revenues generated by car sales by 5%, Tesla was unable to grow overall revenues, due to shrinking ZEV revenues.

28.      As such, investors rely upon the Company for a candid and truthful assessment of its ability to execute its non-ZEV revenue growth strategy, which involved increased sales of its Model S through ramped up production and introduction and sales of its next generation Model X.  Any inability to deliver on those points would adversely impact the Company's prospects and stock price.

29.      On May 10, 2013, Tesla filed a quarterly report with the SEC for the period ended March 31, 2013 on a Form 10-Q signed by Defendants Musk and Ahuja (the "Q1 2013 10-Q").  The Q1 2013 10-Q also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Musk and Ahuja, stating that the financial information contained in it was accurate and disclosed any material changes to Tesla's internal control over financial reporting.  The Q1 2013 10-Q reported quarterly automobile sales of $555 million and net income from operations of $11.2 million.

30.      In the Q1 2013 10-Q, Tesla stated regarding the Model S:

> In 2012, we completed the development of Model S, established our manufacturing capabilities at the Tesla Factory, launched Model S and ramped up our production rate. By the end of 2012, we had successfully increased production volume to over 400 vehicles per week and we have continued to consistently produce at or above this rate during the first quarter of 2013. ***We expect that this production level will allow us to achieve our goal of 21,000 Model S deliveries worldwide in 2013 and thereby significantly increase automotive sales***, as compared to 2012.

> In our efforts to make Model S available to a wider range of customers, we commenced delivery of cars equipped with the lower priced, 60 kWh battery pack during the first quarter of 2013. At the same time, due to lower than expected demand for Model S with the 40 kWh battery pack, we announced that the 40 kWh battery pack would not be produced. Since some customers had already configured their vehicles with the 40 kWh

battery pack, we offered to deliver a vehicle with a 60 kWh battery pack that would be limited to 40 kWh by on-board firmware.

We have delivered over 7,500 Model S vehicles solely to customers in North America. *We plan to start European deliveries of the Model S this summer and Asian deliveries later in 2013*.

* * *

*In 2013, we plan to spend approximately $200 million in capital expenditures as we conclude the majority of our investment in the Tesla Factory and Model S tooling*.

31.     In the Q1 2013 10-Q, Tesla stated regarding the Model X:

In February 2012, we revealed an early prototype of the Model X crossover as the first vehicle we intend to develop by leveraging the Model S platform. *We currently plan to start production of Model X in late 2014. Our ability to develop and introduce the Model X in this timeframe is based partially on our expectations of leveraging the Model S platform*.

32.     On August 7, 2013, Tesla distributed the Q2 2013 Investor Letter, signed by Defendants Musk and Ahuja, which stated, "we expect production to increase from Q2" and "we plan to deliver slightly over 5,000 Model S vehicles in Q3, and remain on plan to deliver 21,000 vehicles worldwide for 2013."

33.     In the Q2 2013 Investor Letter, Tesla stated regarding the Model S:

Significant cost improvements were achieved as a result of execution of our roadmap including redesigning many elements of Model S for greater ease of manufacturing, economies of scale and supply chain improvements. *Importantly, we were able to make nuanced improvements to the car at the same time, as reducing cost does not count if it makes a product worse*.

34.     In the Q2 2013 Investor Letter, Tesla stated regarding the Model X:

R&D expenses are expected to increase significantly in Q3 as we *accelerate product development efforts on Model X*, Model S right hand drive, and localization of Model S for international markets.

35.     On August 9, 2013, Tesla filed a quarterly report with the SEC for the period ended June 30, 2013 on a Form 10-Q signed by Defendants Musk and Ahuja (the "Q2 2013 10-Q"). The Q2 2013 10-Q also contained signed SOX certifications by Defendants Musk and Ahuja stating that the financial

information contained in it was accurate and disclosed any material changes to Tesla's internal control over financial reporting.  The Q2 2013 10-Q reported automobile sales of $401 million, resulting in a net loss of $30 million.

36.     In the Q1 2013 10-Q, Tesla stated regarding the Model S:

We have recently increased our production rate from 400 vehicles per week at the beginning of the second quarter to an average of 500 vehicles per week. ***We expect that this production level will allow us to achieve our goal of 21,000 Model S deliveries worldwide in 2013 and thereby significantly increase automotive sales***.

* * *

In our efforts to make Model S available to a wider range of customers, we commenced delivery of cars equipped with the lower priced, 60 kWh battery pack during the first quarter of 2013. At the same time, due to lower than expected demand for Model S with the 40 kWh battery pack, we announced that the 40 kWh battery pack would not be produced. Since some customers had already configured their vehicles with the 40 kWh battery pack, we offered to deliver a vehicle with a 60 kWh battery pack that would be limited to 40 kWh by on-board firmware. During the second quarter of 2013, we delivered such vehicles to customers which had a slightly unfavorable impact on our gross margin. We have substantially completed the deliveries of these vehicles.

37.     In the Q1 2013 10-Q, Tesla stated regarding the Model X:

In February 2012, we revealed an early prototype of the Model X crossover as the first vehicle we intend to develop by leveraging the Model S platform. ***We currently plan to start production of Model X in late 2014. Our ability to develop and introduce the Model X in this timeframe and cost efficiently is dependent upon our expectations of leveraging the Model S platform.***

* * *

Our research and development expenses are expected to increase significantly in the third quarter as we accelerate product development efforts on Model X, Model S right hand drive, and localization of Model S for international markets.

* * *

We expect that our current sources of liquidity, including cash, cash equivalents, together with our current projections of cash flow from operating activities, will continue to provide us with adequate liquidity based on our current plans. These capital sources will enable us to fund our ongoing operations, continue research and development projects, including those for our planned Model X crossover and future products, establish and expand our stores, service centers and Supercharger network and to make the investments in tooling and manufacturing capital required to introduce Model X.

9

38.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Tesla's business, operations, products, and prospects. The statements from the Q1 2013 10-Q, the Q2 2013 Investor Letter, and the Q2 2013 10-Q set forth above were false and/or misleading statements and/or failed to disclose material information, including the following: (1) that Tesla's planned growth of Model S sales and planned introduction of the Model X were susceptible to execution risks; (2) that Tesla's planned growth of Model S sales and planned introduction of the Model X were vulnerable to the costs and expenses that would arise in the event of a major safety incident in the Model S; (3) that the Model S was at risk of a major safety incident during normal driving conditions, due to design flaws in its undercarriage and lithium-ion battery pack; (4) that the occurrence of a safety incident related to this design flaw would jeopardize that Tesla's planned growth of Model S sales and/or planned introduction of the Model X; and (5) that Tesla is unable to generate sufficient automobile deliveries to satisfy analyst expectations and to compensate for declining ZEV-related revenues.

**False and Misleading Statements Regarding Safety of Tesla's Cars**

39.     On August 19, 2013 the Company issued a press release, in which it touted the Model S as having achieved the "Best Safety Rating Of Any Car Ever Tested."  The press release boasted that the Model S had achieved a "new combined record of 5.4 stars" in National Highway Traffic Safety Administration ("NHTSA") testing.

40.     Specifically, after touting the Model S's scores in a variety of tests conducted by the NHTSA, the press release expressly represented that the Company had redundantly tested the Model S to determine its weakest points and to improve them *all* so that no part of the vehicle would score under 5 stars in a safety rating.  To wit:

> The above results do not tell the full story.  It is possible to game the regulatory testing score to some degree by strengthening a car at the exact locations used by the regulatory testing machines.  After verifying through internal testing that the Model S would achieve a NHTSA 5-star rating, ***Tesla then analyzed the Model S to determine the***

*weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured*.

41.     In other words, Tesla claimed to have gone over the Model S with a fine tooth comb to identify its "weakest points" and did not stop testing until they had ***all*** achieved a perfect 5 star score. This statement did not exclude from this assertion the Model S's undercarriage, its battery pack, or the parts of the car encasing and protecting the battery pack.  Nor did it warn that, despite such analysis and testing, the Model S's battery pack was susceptible to puncture, explosion, and fire if road debris was struck during normal driving conditions.

42.     The press release also made specific representations as to the safety and reliability of the Model S's battery pack, stating:

> The Model S lithium-ion battery did not catch fire at any time before, during, or after NHTSA testing.  It is worth mentioning that no production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite several high speed impacts.

None of these statements cautioned investors that the Model S was at risk of a battery pack puncture during normal driving conditions that could ignite a fire that would destroy the vehicle.

43.     In a series of interviews in September, Defendant Musk continued to tout the safety of the Model S.  For instance:

a.     In a September 4, 2013 interview, Defendant Musk said that the Model S's safety rating is very important to him, because his family and friends drive the car and "I really couldn't live with myself if there is something I could have done to save them and I didn't do it."

b.     In a September 7, 2013 interview, Defendant Musk said that, at Tesla, "safety has to be top of the line."

44.     In none of his interviews did Defendant Musk qualify his statements by warning that the Model S was vulnerable to a battery pack puncture during normal driving conditions that could ignite a fire that would destroy the vehicle.

11

45.     In a September 14, 2013 "Tesla Motors Investor Presentation," Tesla again touted the Model S as being the "Safest Car Ever Tested by NHTSA," with a "5 Star Across the Board NHTSA Safety Rating."   The presentation did not warn that the Model S was vulnerable to a battery pack puncture during normal driving conditions that could ignite a fire that would destroy the vehicle.

46.     Throughout, and to this day, Tesla has displayed on the front page of its corporate website the description "The Safest Car In America" and touting a "5 Star Rating In All Categories."

47.     Despite promising to consumers and investors the highest level of safety for its vehicles, Tesla's Model S had a highly dangerous design defect, an undercarriage or exterior weakness that would permit road debris to puncture the car's battery pack during normal driving conditions, igniting the battery and engulfing the car in a difficult-to-extinguish blaze that would ultimately destroy the car altogether.   Despite this serious defect, Defendants allowed the Model S to be sold to consumers and marketed to the public as the safest car ever tested, after not only standard testing by NHTSA but also supplemental testing by Tesla to ensure that any part of the car that had scored less than perfectly on the NHTSA test later registered a perfect score.

48.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Tesla's business, operations, products, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose material information, including the following: (1) Defendants' public statements about the Model S's highest safety rating and its lack of prior fire incidents were materially false and misleading, due to undisclosed puncture and fire risks in its undercarriage and lithium-ion battery pack; (2) Defendants' statements about Tesla having retested every weakness in the Model S until they all registered a perfect score were materially false and misleading, due to undisclosed puncture and fire risks in its undercarriage and battery pack; (3) the Model S, the Company's only production vehicle for sale, suffered from material defects which caused the undercarriage and battery pack to be punctured, to

ignite, and to erupt in flames under normal driving conditions, thereby destroying the car; (4) Tesla's future sales, its Model X introduction, and its stock price were extremely vulnerable to the inherent risk posed by the Model S's design flaws in its faulty undercarriage and battery packs; and, (5) as a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE

49.     After informing investors for months regarding the high level of safety for the Model S through a variety of channels - including interviews by CEO Musk and the Company's financial statements, corporate presentations, and press releases - the investing public was shocked to learn that a Model S battery pack had burst into flames, and forced its driver to abandon the vehicle on the side of a major highway in Washington State on October 2, 2013.  News reports carried to investors the story of the battery fire, and a shocking video and photos of a Model S smoldering on the shoulder of a major highway was widely circulated.

50.     Not surprisingly, the Model S that burst into flames was totally destroyed, after firefighters encountered significant difficulty extinguishing the blaze.  Indeed, firefighters had to employ a jack to turn the burning Model S onto its side, then cut a hole into the undercarriage to apply water directly into the burning battery.  After the car reignited, they had to employ chemical fire extinguishers.

51.     At first, Tesla admitted that the burning car was a Model S, but initially denied that the fire had originated in the battery pack.  After the press reported firefighters' trouble extinguishing the blaze, which accelerated when doused with water and reignited after initial extinguishment, Tesla later admitted that the fire arose in the car's battery pack.  Tesla has stated that road debris struck during routine driving conditions penetrated the undercarriage and battery pack, thereby causing the fire.

52.     This dangerous situation was a partial corrective event for Defendants' fraud regarding the Model S's safety record and the safety of its undercarriage and lithium-ion battery pack.

13

53.     The same day, October 2, 2013, analyst Ben Kallo of Robert W. Baird & Company, downgraded Tesla to "Neutral" from "Outperform," citing a variety of "execution risk" concerns. Pointing to a potential shift in investor sentiment, Mr. Kallo questioned the Company's ability to deliver on its production and sales strategy, stating:

> Tesla has several significant milestones over the next 18 months including continued production ramp and the introduction of the Model X. We believe solid execution on both of these fronts is already priced into the stock, and any hiccups in execution present stock price risk in the near to intermediate term.

54.     Given Tesla's need to overcome declining ZEV sale revenues, the revelation that an analyst closely monitoring its stock questioned the Company's ability to deliver on Model S sales, production, and Model X introduction goals was jarring.  This analyst report and downgrade was a partial corrective event for Defendants' fraud regarding Tesla's production ramp up, its ability to increase Model S sales, and its ability to timely introduce the Model X.

55.     On the preceding news, Tesla's stock plummeted.  Tesla's stock declined $12.05 per share - or more than 6% - to close at $180.95 per share on October 2, 2013, on volume of 20,724,600 shares. The stock continued its decline the following day, shedding $7.64 per share or 4.2% to close at $173.31 per share on October 3, 2013, on volume of 23,782,200 shares.  The trading volume both days was double the average over the preceding three months.

56.     On October 3, 2013, the New York Times published an article entitled "Car Fire a Test for High-Flying Tesla," which quoted a battery consultant as saying that the case shielding around the Model S's lithium-ion battery might not have been strong enough to keep the impact with road debris from causing a short circuit.  The article also quoted Karl Brauer, an analyst with Kelley Blue Book, as noting, "It's a relatively innocuous occurrence to hit something in the road.  But in this case there's a fire, and a fire that's difficult to put out."

57.     The MIT Technology Review also published an article on October 3, 2013 entitled "What the Tesla Battery Fire Means for Electric Vehicles," which highlighted the bad news for Tesla, including the research and design challenges regarding the Model S's lithium-ion battery.  It stated:

> [T]he fire illustrated once again how difficult lithium ion battery fires are to put out. Firefighters thought they had it put out, but it reignited. There are a couple of schools of thought among battery experts about why this happens. In a battery fire, the main thing that's burning is the liquid electrolyte, which burns best when it's exposed to air. One school of thought is that even in the absence of air there other oxidants within the battery that can create and sustain a fire. It's thought that the battery electrodes themselves can release oxygen, fueling the fire from within. If this is the case, all firefighters can do is to work to keep the fire from spreading and wait for the reactants to burn up.

> Other research suggests that this isn't the case. Instead, what might happen is that even once the fire is put out, the cells stay very hot and keep releasing more electrolyte in the form of vapor. Once firefighters turn off the water and oxygen can once more come into contact the vapor, it can reignite.

> It seems clear that we need to do more tests and learn the best ways to put out battery fires, especially as battery-powered cars proliferate.

> The second negative is that the accident raises questions about how well protected the battery is. The Tesla battery spreads out over most of the floor of the car. Contrast that to the battery on the Chevy Volt, which is tucked up inside the car, actually taking up space within the passenger compartment to keep it out of harm's way. Was the piece of metal that the driver ran into huge, and likely to cause serious damage to any sort of car? Or was it something you wouldn't think twice about running over in a conventional car? Is the Model S particularly vulnerable to road debris?

58.     An October 6, 2013 Seeking Alpha article bore the title "Will Tesla Design New Vehicles In Time To Prevent More Devastating Battery Fires?" and posited that Tesla faces potential legal liabilities in the billions of dollars if the fire described above were to occur again in another Tesla vehicle.   The article cited the low-to-the-ground location of the battery and poor design of Tesla's vehicles as grounds for a federal government investigation.  Predicting that Tesla will have to spend a lot of its cash hiring designers and lawyers, it contained this grave assessment of the Company's prospects:

> In conclusion, we believe that Tesla may need to design a number of new vehicles, while allowing customers to give back their old ones if this issue re-occurs a number of times. Does Tesla have the ability to withstand a vehicle recall? It is unclear if they have any

15

strategy or new designs that would replace current inherently unsafe battery location. This scenario will cause major losses for shareholders. Investors are certainly not pricing this scenario in and the company has very little back-up plan when something like this goes wrong unless they release new designs.

59.     Faced with this array of cash-draining challenges, highlighted in the above-quoted articles from October 3-6, 2013, Tesla's ability to execute on its ramp up, Model S production, and Model X introduction plans was in grave danger.  The Model X was in equal jeopardy to the Model S, as its design is based on the Model S, as stated by Tesla in its public filings.  These revelations corroborated the corrective disclosure made by Robert W. Baird & Company analyst Ben Kallo on October 2, 2013 based on the "execution risks" facing Tesla.

**DEFENDANTS' ADDITIONAL FALSE AND MISLEADING STATEMENTS**

60.     To quell these concerns, and to perpetuate the fraud, Defendants embarked on a misinformation campaign that included rendering additional false and misleading statements.  In an October 4, 2013 blog post on Tesla's corporate website, linked to Tesla's corporate Twitter account and Defendant Musk's personal Twitter account the same day, Defendant Musk characterized the Model S fire incident as follows (with emphasis added):

Earlier this week, a Model S traveling at highway speed struck a large metal object, causing significant damage to the vehicle. A curved section that fell off a semi-trailer was recovered from the roadway near where the accident occurred and, according to the road crew that was on the scene, appears to be the culprit. ***The geometry of the object caused a powerful lever action as it went under the car, punching upward and impaling the Model S with a peak force on the order of 25 tons.*** <u>***Only a force of this magnitude***</u> *** would be strong enough to punch a 3 inch diameter hole through the quarter inch armor plate protecting the base of the vehicle***.

The Model S owner was nonetheless able to exit the highway as instructed by the onboard alert system, bring the car to a stop and depart the vehicle without injury. A fire caused by the impact began in the front battery module – the battery pack has a total of 16 modules – but was contained to the front section of the car by internal firewalls within the pack. Vents built into the battery pack directed the flames down towards the road and away from the vehicle. …

16

It is important to note that the fire in the battery was contained to a small section near the front by the internal firewalls built into the pack structure. At no point did fire enter the passenger compartment.

61.     In addition, Defendant Musk touted the Model S's safety as compared to traditional gasoline-powered automobiles, stating (with emphasis added):

Had a conventional gasoline car encountered the same object on the highway, the result could have been far worse. A typical gasoline car only has a thin metal sheet protecting the underbody, leaving it vulnerable to destruction of the fuel supply lines or fuel tank, which causes a pool of gasoline to form and often burn the entire car to the ground. In contrast, the combustion energy of our battery pack is only about 10% of the energy contained in a gasoline tank and is divided into 16 modules with firewalls in between. As a consequence, the effective combustion potential is only about 1% that of the fuel in a comparable gasoline sedan.

The nationwide driving statistics make this very clear: there are 150,000 car fires per year according to the National Fire Protection Association, and Americans drive about 3 trillion miles per year according to the Department of Transportation. That equates to 1 vehicle fire for every 20 million miles driven, compared to 1 fire in over 100 million miles for Tesla. ***This means you are 5 times more likely to experience a fire in a conventional gasoline car than a Tesla***!

For consumers concerned about fire risk, there should be absolutely zero doubt that it is safer to power a car with a battery than a large tank of highly flammable liquid.

62.     Defendant Musk even went so far as to allocate blame for the fire on the standard operating procedures employed by first responders, while downplaying the significant difficulties they encountered in extinguishing the blaze, stating:

When the fire department arrived, they observed standard procedure, which was to gain access to the source of the fire by puncturing holes in the top of the battery's protective metal plate and applying water. For the Model S lithium-ion battery, it was correct to apply water (vs. dry chemical extinguisher), ***but not to puncture the metal firewall, as the newly created holes allowed the flames to then vent upwards into the front trunk section of the Model S***. Nonetheless, a combination of water followed by dry chemical extinguisher ***quickly*** brought the fire to an end.

63.     Defendant Musk also published an email exchange with the driver of the Model S that burned.  In it, Jerome Guillen, VP WW Sale and Service, stated in relevant part (with emphasis added):

We are following this case extremely closely and we have sent a team of experts to review your vehicle. ***All indications are that your Model S drove over large, oddly-shaped metal object which impacted the leading edge of the vehicle's undercarriage and rotated into the underside of the vehicle ("pole vault" effect). <u>This is a highly uncommon occurrence</u>***.

Based on our review thus far, we believe that the Model S performed as designed by limiting the resulting fire to the affected zones only. ***Given the significant intensity of the impact, which managed to pierce the 1/4 inch bottom plate (<u>something that is extremely hard to do</u>), the Model S energy containment functions operated correctly***. In particular, the top cover of the battery provided a strong barrier and there was no apparent propagation of the fire into the cabin. This ensured cabin integrity and occupant safety, which remains our most important goal.

64. Defendant Musk's remarks were able to buoy Tesla's stock price, assisted in part by the fact that the NHTSA was unable to send an investigator to the accident scene, due to the government shutdown in early October.

65. When the NHTSA announced on October 22, 2013 that it was looking into the Model S fire, Defendants once again sought to quell investor concerns by perpetuating the fraud and issuing additional false and misleading statements.

66. Defendant Musk gave an interview on Bloomberg TV on October 24, 2013, in which he reiterated his prior explanations for the Model S fire and downplayed the incident.  Among other things, he stated that a large metal object pierced the six millimeter armor plate on the Model S and that it took several minutes for a few modules in the battery pack to catch fire and burn.  He touted the fact that there were no injuries and that the car owner bought another Model S.

67. Once again, Defendant Musk's remarks served to buoy Tesla's stock price.

68. Later the same day, the NHTSA announced that, in reliance upon data provided by Tesla and after consulting with Tesla, it had opted not to open a formal investigation of the Model S fire. NHTSA had been unable to send its own investigators to the fire scene to gather evidence due to the government shutdown.

18

69.     These statements by Defendants were false and misleading for the same reasons set forth above regarding their earlier safety-related statements.  Specifically, throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Tesla's business, operations, products, and prospects, in that Defendants made false and/or misleading statements and/or failed to disclose material information, including: (1) Defendants' public statements about the Model S's highest safety rating and its lack of prior fire incidents were materially false and misleading, due to undisclosed puncture and fire risks in its undercarriage and lithium-ion battery pack; (2) Defendants' statements about Tesla having retested every weakness in the Model S until they all registered a perfect score were materially false and misleading, due to undisclosed puncture and fire risks in its undercarriage and battery pack; (3) the Model S, the Company's only production vehicle for sale, suffered from material defects which caused the undercarriage and battery pack to be punctured, to ignite, and to erupt in flames under normal driving conditions, thereby destroying the car; (4) Tesla's future sales, its Model X introduction, and its stock price were extremely vulnerable to the inherent risk posed by the Model S's design flaws in its faulty undercarriage and battery packs; and, (5) as a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

70.     Moreover, Defendant Musk's statements on October 24, 2013 were materially false and misleading due to his failure to disclose that a second Model S fire had already taken place nearly a week before, as discussed below.

**MORE TRUTH EMERGES**

71.     On October 28, 2013, media outlets reported that a second Tesla Model S fire had occurred on October 18, 2013 in Merida, Yucatan Peninsula, Mexico.  Once again, a video surfaced of a Model S engulfed in flames, with sporadic explosions occurring, and photos were widely circulated.

72.     This second fire served as a partial corrective disclosure.  On this news, Tesla's stock price dropped $7.32 (4.3%) on heavy volume to close at $162.86 on October 28, 2013.

73.     In the wake of these reports, a Tesla spokeswoman said, "We were able to contact the driver quickly and are pleased that he is safe."  She touted the Model's safety and blamed the fire on the vehicle's rate of speed and its crashing through a concrete barrier and into a tree.  Once again, Tesla was able to avoid an NHTSA investigation, this time due to the fact that the Model S fire occurred outside of the United States, and therefore outside its jurisdiction.

74.     Tesla's stock closed at $176.81 on November 5, 2013.

75.     November 5, 2013, after the market close, Tesla released its third quarter 2013 results in an earnings letter to shareholders (the "Q3 2013 Earnings Letter") that was signed by Defendants Musk and Ahuja and  was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Defendant Ahuja.  Reported GAAP revenues of $431 million were lower than analyst expectations of $554.33 million, and its loss of 32 cents per share ($38.5 million) was worse than analyst expectations of 25 cents per share.  Moreover, while disclosing that its ZEV revenues had fallen over 80% – from $51 million in Q2 2013 to just $10 million in Q3 2013 – Tesla reported disappointing results in the form of 5,500 deliveries and an increase in gross margins excluding ZEV credits from 14% to just 21%.

76.     The market reacted swiftly and negatively, reflecting concern that Tesla cannot increase its deliveries sufficiently to overcome the decline in its ZEV revenues.  A sampling of analyst and financial press coverage is illustrative:

a.     Ben Kallo, of R.W. Baird, explained that investors wanted to see higher deliveries, stating "[Investors] want to see the outlook for deliveries for 2013 raised.  And we didn't get the number [sic] that were out there, the whisper number."

b.     The 5,500 deliveries disappointed analysts.  The Financial Times reported that analysts had predicted deliveries as high as 7,000, with a low end range of 5,500 – 5,700.  CNBC reported that

analysts had predicted 5,700 – 5,750 deliveries. Analysts at Wedbush, Barclays, and Deutsche Bank had predicted deliveries of 5,850, 5,820, and 5,850, respectively.

c.     The Wall Street Cheat Sheet reported that Tesla's outlook for Q4 2013 profits to be "about consistent" with Q3 2013 was lower than analyst expectations.

d.     Stifel analyst James Albertine said that even Tesla's non-GAAP adjusted numbers fell short of his expectations, and he questioned its strategy for broader market appeal. He warned clients in a note, "Competition is also looming, so development time will come under pressure, which could drive operational mis-steps."

77.     On this news, Tesla's stock opened on November 6, 2013 at $154.81, which was $22.00 (or 12.44%) lower than its previous day's closing price. In other words, another $2 billion in Tesla's market capitalization evaporated in a matter of minutes.

Tesla's stock continued its decline during November 6, 2013 on heavy volume, falling another $3.65 to close at $151.16. Indeed, it fell far and fast enough to trigger the NASDAQ "circuit breaker" that slows short-selling that could artificially accelerate a stock's decline.

78.     In the morning of November 7, 2013, Tesla confirmed that a third fire in its flagship Model S had occurred, this time in Smyrna, Tennessee, the previous afternoon. This was Tesla's third Model S fire in just five weeks.

79.     According to local authorities, during normal driving conditions, the Model S in question hit a metal object in the roadway, though to be a tow hitch, which damaged the car's undercarriage and ignited a fire in the battery pack. Rutherford County Fire Chief Larry Farley said that the blaze was so hot and intense that "it pretty much just melted [the vehicle] to the road." Once again, the fire damage totally destroyed the Model S.

80.     Notably, the purported cause of this third Model S fire – road debris struck during normal driving usage – is precisely the same cause articulated by Tesla for the first fire in Washington.

As reported by Yahoo! Automotive, this raises a "troubling comparison" for Tesla, which has only 19,000 Model S vehicles on the road. It quoted Clarence Ditlow, director of the Center for Auto Safety as stating, "To have one instance of fire from road debris is a fluke. To have two road debris fires in a vehicle population that small is highly unusual." By contrast, a spokesman for Nissan, which has hold nearly 70,000 Leaf electric vehicles, stated that, to date, "there have been no fires involving the Nissan Leaf, either through extensive and extreme testing or in the real world." A spokeswoman for General Motor, whose Chevy Volt uses a gas-powered engine to recharge a lithium-ion battery pack, stated that, "to GM's knowledge the Volt has not experienced a fire on the road," despite 50,000 vehicles sold. Yahoo! Automotive reported that no other automobile maker has reported a fire connected to an electric vehicle. The Model S carries up to three times the stored electrical energy as the Volt and up to five times that of the Leaf.

81.     Press coverage regarding the third Model S fire also discussed a complaint by shopping website Edmunds.com, which said that its 2013 Model S – which has less than 11,000 road miles – was "making an ominous noise under acceleration and deceleration. It originates from the rear of the car and seems to be getting worse." Tesla replaced the drive unit on the Edmunds.com car, but declined to disclose what caused it. It also replaced the driver door mechanism for another problem. Afterward, Edmunds.com's vehicle testing manager, Mike Schmidt, said, "We're not sure what to think about the fact that both of these repairs were completed with just one overnight stay. Maybe the dealer is really on the ball. Maybe the supply chain is short. Or maybe the parts are readily available because they've seen these [problems] before."

82.     After opening on November 7, 2013 at $144.08 due to the continued decline based upon its earnings announcement the day prior, on news of this third Model S fire, Tesla's stock declined further, to close at $139.77 on heavy volume, a decline of $11.39 (7.53%) from its closing price on November 6, 2013.

83.     As a result of Defendants' wrongful acts and omissions, and the resultant declines in the market value of Tesla stock, Plaintiff and other Class members have suffered significant losses and damages.   Today, the stock is down $55.50 (28.7%) from its Class Period high of $193.37 on September 30, 2013, translating into a loss of over $6.5 billion in market capitalization in six weeks.

84.     The story continues to unfold.  Mr. Ditlow, director of the Center for Auto Safety, was quoted by Bloomberg as saying that the NHTSA "absolutely has to investigate" the third Tesla Model S fire.  He added, "It appears there's inadequate shielding on the bottom of these vehicles.  Road debris is a known hazard to the undercarriage of vehicles."  He elaborated that a potential fix for the Model S "is not rocket science.  Probably the simplest task Tesla has is putting a strong steel shield on the bottom of the car."  The New York Times quoted him as saying, "They just need a better shield."

85.     According to multiple media outlets, the NHTSA issued a statement in the wake of the third Model S fire, indicating that "NHTSA will contact the local authorities who are looking into the incident to determine if there are vehicle safety implications that merit agency action."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tesla securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

87.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tesla securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

proposed Class. Record owners and other members of the Class may be identified from records maintained by Tesla or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

88. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

89. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

90. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tesla;

- whether the Individual Defendants caused Tesla to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Tesla securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

91. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FRAUD ON THE MARKET PRESUMPTION

92.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Tesla securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Tesla securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

93.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

### No Safe Harbor

94.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

95.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

96.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

**Scienter**

97.     At all relevant times, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Among other things, Tesla has stated that it specifically retested the Model S and purported to do so until all points on the vehicle, including the weakest, registered a perfect 5 star safety test score.

98.     Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Model S's design flaws and/or Tesla's true operations and financial condition from the investing public and supporting the artificially inflated price of its securities.

99.     As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

100.     During the Class Period, Defendants had motive to commit securities fraud. Specifically, during Q2 2013, Tesla raised over $1 billion through the issuance of $410.5 million of common stock (4.5 million shares) and $660 million of 1.50% convertible senior notes.  Tesla used roughly $450 million of the offering proceeds to repay, early, the totality of its Department of Energy loan principal and interest, plus an early repayment fee.

101.     Moreover, Defendants' scienter is demonstrated by their statements in the wake of the NHTSA's 5-star rating on the Model S.  Tesla stated that it had "analyzed the Model S to determine the

weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured." Such supplemental testing had to have specifically included evaluation of the Model S's undercarriage and battery pack. In that case, either Defendants knew of the weaknesses and design defects in the Model S's undercarriage and battery pack when they spoke then and thereafter about the car's safety, or, worse, they recklessly failed to identify and evaluate such weaknesses and defects due to the woeful inadequacy of their testing and evaluation program.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

102. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tesla securities; and (iii) cause Plaintiff and other members of the Class to purchase Tesla securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

105.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tesla securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tesla's finances and business prospects.

106.    By virtue of their positions at Tesla, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

107.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Tesla, the Individual Defendants had knowledge of the details of Tesla's internal affairs.

108.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tesla.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tesla's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and

misleading reports, releases and public statements, the market price of Tesla securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Tesla's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased Tesla securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

109.    During the Class Period, Tesla securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Tesla securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Tesla securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Tesla securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

110.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

112.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.    During the Class Period, the Individual Defendants participated in the operation and management of Tesla, and conducted and participated, directly and indirectly, in the conduct of Tesla's business affairs.   Because of their senior positions, they knew the adverse non-public information regarding Tesla's operational and safety issues.

114.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tesla's financial condition and results of operations, and to correct promptly any public statements issued by Tesla which had become materially false or misleading.

115.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace during the Class Period concerning Tesla's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tesla to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Tesla within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tesla securities.

116.    Each of the Individual Defendants, therefore, acted as a controlling person of Tesla.   By reason of their senior management positions and/or being directors of Tesla, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tesla to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised

control over the general operations of Tesla and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

117.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tesla.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

[The rest of this page is intentionally left blank]

# DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   November 8, 2013

**GLANCY BINKOW & GOLDBERG LLP**

By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHSLTROM & GROSS LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:     (212) 661-1100
Facsimile:     (212) 661-8665
Email:  jalieberman@pomlaw.com

-and-

Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:     (312) 377-1181
Facsimile:     (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN GEWIRTZ & GROSSMAN LLC**
Peretz Bronstein, Esq.
60 East 42nd Street
Suite 4600
New York, NY 10165-0006
Telephone:  (212) 697-6484
Facsimile:  (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiff*

## Certification of Plaintiff
## Pursuant to Federal Securities Laws

1.   I, Robert Rahimi, make this declaration pursuant to Section 101 of the Private Securities Litigation Reform Act of 1995 as required by Section 21D (a) (2) of Title I of the Securities Exchange Act of 1934.

2.   I have reviewed a Complaint against Tesla Motors, Inc. ("Tesla"), and authorize a filing of a comparable complaint on my behalf.

3.   I did not purchase my Tesla securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under Title I of the Securities Exchange Act of 1934.

4.   I am willing to serve as a representative party on behalf of a class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my purchases and sales in Tesla securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as follows:

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

8.   The matters stated in this declaration are true to the best of my current knowledge, information and belief.

I declare under penalty or perjury that the foregoing is true and correct.

Executed_____ 11/7/13 _____
       **(Date)**

_____
**(Signature)**

_____
Robert Rahimi

**(Type or Print Name)**

**Summary of Purchases and Sales**

**TESLA MOTORS (TSLA)**                         **Rahimi, Robert**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 05/29/2013 | PUR | 180 | $110.5000 |
| 05/31/2013 | SLD | 10 | $102.7601 |
| 06/05/2013 | SLD | 30 | $92.0001 |
| 07/09/2013 | SLD | 140 | $123.5000 |
| 07/11/2013 | PUR | 138 | $125.8799 |
| 07/11/2013 | PUR | 142 | $122.7500 |
| 07/11/2013 | PUR | 142 | $123.0000 |
| 07/11/2013 | SLD | 142 | $123.2500 |
| 07/11/2013 | SLD | 142 | $123.0000 |
| 07/12/2013 | PUR | 368 | $128.3499 |
| 07/12/2013 | PUR | 367 | $128.5799 |
| 07/12/2013 | PUR | 368 | $127.5599 |
| 07/12/2013 | SLD | 368 | $128.3101 |
| 07/12/2013 | SLD | 367 | $128.8001 |
| 07/12/2013 | SLD | 368 | $127.7901 |
| 07/12/2013 | SLD | 138 | $125.2000 |
| 08/06/2013 | PUR | 253 | $142.1537 |
| 08/06/2013 | SLD | 253 | $142.0314 |
| 08/06/2013 | SLD | 523 | $142.2658 |
| 08/07/2013 | PUR | 500 | $137.8237 |
| 08/07/2013 | PUR | 500 | $137.9775 |
| 08/07/2013 | PUR | 500 | $140.6750 |
| 08/07/2013 | SLD | 400 | $134.2100 |
| 08/07/2013 | SLD | 500 | $138.4122 |
| 08/07/2013 | SLD | 500 | $135.9304 |
| 08/08/2013 | PUR | 173 | $157.1473 |
| 08/08/2013 | PUR | 173 | $156.9444 |
| 08/08/2013 | PUR | 173 | $157.2400 |
| 08/08/2013 | PUR | 173 | $157.1300 |
| 08/08/2013 | PUR | 176 | $154.6000 |
| 08/08/2013 | PUR | 176 | $154.0459 |
| 08/08/2013 | PUR | 177 | $153.2744 |
| 08/08/2013 | PUR | 173 | $155.7459 |
| 08/08/2013 | PUR | 173 | $156.4173 |
| 08/08/2013 | SLD | 173 | $154.6171 |
| 08/08/2013 | SLD | 173 | $157.5400 |
| 08/08/2013 | SLD | 173 | $157.6700 |
| 08/08/2013 | SLD | 173 | $157.3400 |

TESLA MOTORS (TSLA)                                    Rahimi, Robert

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| 08/08/2013 | SLD | 176 | $154.8056 |
| 08/08/2013 | SLD | 176 | $154.4500 |
| 08/08/2013 | SLD | 177 | $152.8169 |
| 08/08/2013 | SLD | 173 | $152.2884 |
| 08/08/2013 | SLD | 173 | $157.4900 |
| 08/08/2013 | SLD | 100 | $154.2440 |
| 08/09/2013 | PUR | 357 | $153.2994 |
| 08/09/2013 | PUR | 357 | $153.3544 |
| 08/09/2013 | PUR | 354 | $154.4559 |
| 08/09/2013 | PUR | 357 | $153.3809 |
| 08/09/2013 | PUR | 356 | $153.8001 |
| 08/09/2013 | SLD | 357 | $153.4800 |
| 08/09/2013 | SLD | 357 | $153.5000 |
| 08/09/2013 | SLD | 354 | $154.6500 |
| 08/09/2013 | SLD | 357 | $153.5500 |
| 08/09/2013 | SLD | 356 | $153.6000 |
| 08/13/2013 | PUR | 450 | $149.7878 |
| 08/13/2013 | PUR | 523 | $145.4200 |
| 08/13/2013 | SLD | 450 | $147.8469 |
| 08/19/2013 | PUR | 815 | $146.6997 |
| 08/19/2013 | PUR | 823 | $145.4900 |
| 08/19/2013 | PUR | 820 | $145.9307 |
| 08/19/2013 | PUR | 825 | $144.7177 |
| 08/19/2013 | SLD | 815 | $146.9000 |
| 08/19/2013 | SLD | 823 | $145.6900 |
| 08/19/2013 | SLD | 820 | $145.7500 |
| 08/19/2013 | SLD | 825 | $145.1655 |
| 08/20/2013 | PUR | 288 | $149.1899 |
| 08/20/2013 | SLD | 288 | $149.5038 |
| 08/21/2013 | PUR | 808 | $149.9970 |
| 08/21/2013 | SLD | 393 | $147.1000 |
| 08/22/2013 | SLD | 415 | $153.5500 |
| 08/23/2013 | PUR | 695 | $159.2500 |
| 08/23/2013 | PUR | 190 | $158.6342 |
| 08/23/2013 | PUR | 770 | $159.2500 |
| 08/23/2013 | PUR | 769 | $159.5000 |
| 08/23/2013 | PUR | 769 | $159.5000 |
| 08/23/2013 | PUR | 771 | $159.0000 |

TESLA MOTORS (TSLA)                                     **Rahimi, Robert**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 08/23/2013 | PUR | 771 | $159.0000 |
| 08/23/2013 | SLD | 695 | $159.4000 |
| 08/23/2013 | SLD | 190 | $159.6300 |
| 08/23/2013 | SLD | 770 | $159.5000 |
| 08/23/2013 | SLD | 769 | $159.7500 |
| 08/23/2013 | SLD | 769 | $159.7500 |
| 08/23/2013 | SLD | 771 | $159.2500 |
| 08/23/2013 | SLD | 771 | $159.2500 |
| 08/26/2013 | PUR | 750 | $168.3857 |
| 08/26/2013 | PUR | 745 | $170.7500 |
| 08/26/2013 | PUR | 753 | $168.9000 |
| 08/26/2013 | PUR | 168 | $167.7500 |
| 08/26/2013 | PUR | 168 | $167.7500 |
| 08/26/2013 | PUR | 757 | $168.0000 |
| 08/26/2013 | SLD | 168 | $168.1000 |
| 08/26/2013 | SLD | 363 | $165.8009 |
| 08/26/2013 | SLD | 745 | $172.7500 |
| 08/26/2013 | SLD | 753 | $169.1000 |
| 08/26/2013 | SLD | 589 | $168.5000 |
| 08/26/2013 | SLD | 168 | $168.1000 |
| 08/26/2013 | SLD | 168 | $167.7500 |
| 08/30/2013 | SLD | 12 | $169.2100 |
| 09/16/2013 | SLD | 375 | $170.5000 |
| 09/17/2013 | PUR | 790 | $165.0000 |
| 09/17/2013 | SLD | 790 | $165.5000 |
| 09/18/2013 | PUR | 803 | $166.5000 |
| 09/18/2013 | PUR | 800 | $166.8500 |
| 09/18/2013 | PUR | 803 | $166.4050 |
| 09/18/2013 | PUR | 803 | $166.5000 |
| 09/18/2013 | PUR | 808 | $165.5000 |
| 09/18/2013 | SLD | 803 | $166.6500 |
| 09/18/2013 | SLD | 803 | $166.2500 |
| 09/18/2013 | SLD | 800 | $167.0000 |
| 09/18/2013 | SLD | 803 | $166.6000 |
| 09/18/2013 | SLD | 808 | $166.0000 |
| 09/19/2013 | PUR | 760 | $178.7500 |
| 09/19/2013 | PUR | 700 | $178.7500 |
| 09/19/2013 | PUR | 770 | $176.2853 |

**TESLA MOTORS (TSLA)**                    **Rahimi, Robert**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 09/19/2013 | PUR | 775 | $176.1000 |
| 09/19/2013 | PUR | 775 | $175.9000 |
| 09/19/2013 | PUR | 780 | $174.9000 |
| 09/19/2013 | PUR | 780 | $173.7500 |
| 09/19/2013 | PUR | 780 | $173.9000 |
| 09/19/2013 | SLD | 760 | $179.0000 |
| 09/19/2013 | SLD | 700 | $179.1000 |
| 09/19/2013 | SLD | 770 | $177.0000 |
| 09/19/2013 | SLD | 775 | $176.2500 |
| 09/19/2013 | SLD | 775 | $176.1000 |
| 09/19/2013 | SLD | 780 | $175.2000 |
| 09/19/2013 | SLD | 780 | $174.2500 |
| 09/19/2013 | SLD | 780 | $174.3500 |
| 09/20/2013 | PUR | 790 | $183.5000 |
| 09/20/2013 | PUR | 790 | $183.6000 |
| 09/20/2013 | SLD | 790 | $183.3000 |
| 09/20/2013 | SLD | 790 | $184.0000 |
| 09/23/2013 | PUR | 323 | $183.2000 |
| 09/23/2013 | PUR | 326 | $181.3000 |
| 09/23/2013 | PUR | 332 | $178.0500 |
| 09/23/2013 | PUR | 332 | $178.0000 |
| 09/23/2013 | PUR | 320 | $184.5000 |
| 09/23/2013 | SLD | 332 | $178.2000 |
| 09/23/2013 | SLD | 326 | $182.3000 |
| 09/23/2013 | SLD | 332 | $178.1500 |
| 09/23/2013 | SLD | 320 | $178.0000 |
| 09/24/2013 | SLD | 163 | $177.8700 |
| 09/24/2013 | SLD | 160 | $179.6000 |
| 10/02/2013 | PUR | 142 | $189.2120 |
| 10/14/2013 | SLD | 9 | $179.5800 |
| 10/31/2013 | PUR | 240 | $160.8500 |
| 10/31/2013 | PUR | 240 | $160.9000 |
| 10/31/2013 | PUR | 240 | $158.0000 |
| 10/31/2013 | PUR | 245 | $156.5000 |
| 10/31/2013 | PUR | 247 | $156.0000 |
| 10/31/2013 | SLD | 13 | $160.0300 |
| 10/31/2013 | SLD | 240 | $162.0000 |
| 10/31/2013 | SLD | 240 | $158.5000 |

TESLA MOTORS (TSLA)                                    Rahimi, Robert

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 10/31/2013 | SLD | 245 | $157.0000 |
| 10/31/2013 | SLD | 247 | $157.2607 |
| 11/05/2013 | PUR | 145 | $177.0000 |
| 11/05/2013 | SLD | 65 | $154.7700 |