LIONEL GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone: (310) 201-9150
Facsimile: (888) 773-9224
Email:   lglancy@glancylaw.com
         mmgoldberg@glancylaw.com
         rprongay@glancylaw.com

***Liaison Counsel for Lead Plaintiff,***
***Plaintiffs and the Proposed Class***

**POMERANTZ LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:   jalieberman@pomlaw.com
         mltuccillo@pomlaw.com

***Lead Counsel for Lead Plaintiff,***
***Plaintiffs and the Proposed Class***

*[Additional Counsel on signature page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TESLA MOTORS, INC. SECURITIES LITIGATION | )<br>)<br>)<br>)<br>) |

**Case No. 3:13-CV-05216-CRB**

**JURY TRIAL DEMANDED**

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

## SECOND AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Kazim Acar ("Lead Plaintiff"), along with Plaintiffs William Landrum and Dr. Pankaj Modi, MD, Ph.D. (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, interviews of confidential witnesses; review of the Defendants' public documents, conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tesla Motors, Inc. ("Tesla" or the "Company"); analysts' reports and advisories about Tesla; press coverage regarding Tesla; Tesla's stock chart; and other pertinent information readily obtainable on the Internet.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants and their immediate family members who purchased Tesla securities between August 19, 2013 and November 17, 2013, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against Tesla and certain of its top officials.

2.     Headquartered in Palo Alto, California, Tesla was incorporated on July 1, 2003 and taken public on June 29, 2010.  Tesla's raison d'être is to demonstrate the commercial viability and mass appeal of electric automobiles, and thereby sell them in sufficient quantities to become profitable.  Its website touts its founding "by a group of intrepid Silicon Valley engineers who set

out to prove that electric vehicles could be awesome."  In the process, Tesla constantly pursued its own path, divorced from the now-customary approaches taken by well-established automobile companies over the past century.  In its words, "A Silicon Valley approach means we move fast and constantly innovate.  The critics said it couldn't be done, yet we are here, taking nothing for granted.  We challenge custom and question tradition."

3.     Following the financial crisis, Defendant Musk, a Tesla co-founder, gained operational control over Tesla, adding the role of CEO in October 2008 to his titles of Chairman and "Product Architect."  In this capacity, he oversaw daily operations as Tesla ramped up production of its first vehicle, the Roadster, which it had launched in 2008, and as it accelerated the development of its second vehicle, the Model S, which it later launched in 2012.  Notably, Musk lacks an advanced engineering degree or any background in the automobile industry, having instead made his mark (and considerable fortune) primarily as a tech company entrepreneur.

4.     To date, few Tesla vehicles have actually been sold worldwide, relative to the fleets of other, more-established automobile manufacturers. Only 2,500 Roadsters were sold over the four-year period from 2008-2012.   Roadster production ended in January 2012.   Tesla began delivering Model S vehicles in June 2012.  By August 7, 2013, just before the beginning of the Class Period, Tesla had only sold roughly 13,000 Model S cars.  By December 31, 2013, after the Class Period ended, the number had only risen to 25,000 Model S vehicles sold.  Tesla will not have production design prototypes for its next generation vehicle, the Model X, before the end of 2014, and none will be delivered before spring of 2015, at the earliest.

5.     Despite this exceedingly limited track record, by summer 2013, Tesla began touting the Model S's performance in certain government-sanctioned safety testing.  Specifically, the U.S.

2
SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

Department of Transportation's National Highway Traffic Safety Administration ("NHTSA") gave the Model S a Five-Star Rating in limited crash testing in or about early August 2013.

6.     From this point forward, Defendants began a campaign of false and misleading statements designed to convince the market that the Model S was literally the safest car in existence.  Among other things, Defendants misrepresented the government safety test results, twisting them so that it appeared the Model S had earned the title "Safest Car In America" by outscoring other five-star automobiles and achieving a record composite score, when neither was true.  They misrepresented the low height and configuration of the Model S battery pack as enhancing the vehicle's safety, without disclosing its very significant vulnerabilities for high-intensity fires as introduced into the marketplace.  They misrepresented that Tesla had independently ensured through rigorous testing that *all* parts of the Model S were five-star safe, stating, "After verifying through internal testing that the Model S would achieve a NHTSA 5-star rating, ***Tesla then analyzed the Model S to determine the weakest points on the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured***."[1]

7.     Perhaps most egregiously, they continuously misrepresented Tesla's and the Model S's history of fire incidents, which included *at least three* very significant fires requiring first responder intervention.  Two were spontaneous ignitions of batteries, while another was a Tesla crash test that spiraled into an out-of-control blaze, attributed by the fire department to "failure of equipment or heat source," the intensity of which shocked Tesla's own engineers.  Yet, Defendant Musk falsely stated, "***Throughout all our crash tests, throughout all similar incidents with vehicles on the road, never once has there been a fire***."  When a Model S fire later occurred during Class Period, a Tesla spokesperson falsely stated, "***This is the first fire***."  Moreover, in

downplaying that fire, Defendants omitted to disclose that a *second* Model S fire had already occurred (though it had not yet been publicly reported) abroad.  By the time a third Model S fire occurred during the Class Period, under nearly identical circumstances as the first, Defendants were still falsely representing purportedly low probabilities of such fires while denying that a recall was necessary.  Meanwhile, Tesla's stock price was getting pummeled.

8.     Lead Plaintiffs' investigation, including extensive interviews of numerous confidential witnesses ("CWs"), has revealed that these statements were knowingly false and misleading when made.  CW statements and incident reports reveal that Tesla's car batteries experienced multiple, significant, and at times spontaneous, high-intensity fires while in the development phase, at Tesla's facilities, which Tesla sought to conceal, even from Tesla employees.  These prior incidents demonstrated to Defendants that Tesla's car batteries posed significant fire hazards that needed to be addressed by *uncompromised* measures to reduce fire risk so as to ensure both vehicle integrity and passenger safety.

9.     Yet, entering the Class Period, Tesla faced significant proof-of-concept hurdles for its all-electric vehicles, an inability to re-tap capital and debt markets yet again (it had just raised $1 billion in May 2013), and rapidly declining revenues from Zero Emissions Vehicle ("ZEV") credits it sells to other automakers so that they can satisfy California requirements to produce a certain number of zero-emission vehicles.  In this context, CWs describe an intense, top-down drive at Tesla to meet aggressive, unrealistic production goals and timelines.  According to these CWs, to meet Defendant Musk's artificially-determined timelines, Tesla employees were worked relentlessly, cars were put into production with non-production demo parts, and inadequate time was afforded to certain pre-sale testing that is routine in the automobile industry.  These CWs report

---

[1] As used herein, all ***bold underline*** text signifies emphasis added, unless otherwise indicated.

that, amid this frenetic pacing, Defendant Musk also dictated that the Model S needed to meet an arbitrarily-set range of 300 miles per battery charge.  Once set, this standard required Tesla's engineers to prioritize measures that extended the Model S's range (*e.g.*, higher-energy batteries, reduced weight, lowered drag) but that compromised its vehicle integrity and safety.

10.     According to CWs, Defendant Musk was involved in all key engineering decisions, despite lacking an advanced engineering degree or automobile industry background.   These witnesses report that, under Defendant Musk's close oversight and direction, Tesla decided to: (a) adopt high-energy batteries while keeping the same undercarriage materials and configurations as had been designed for lower-energy batteries, (b) jettison protective coatings that had encased the individual batteries of the Roadster, (c) program the Model S so that its driving height (and thus its drag) lowered at highway speeds, and (d) forego use of additional undercarriage plating (which would add weight).  These decisions were driven primarily by concerns as to battery range, yet they compromised the Model S's vehicle integrity and its safety, rendering it more vulnerable to catastrophic damage from a road debris puncture of the undercarriage that could cause a hard-to-extinguish, high-intensity battery fire.

11.     These risks were unknown to Lead Plaintiff and the Class members, until a series of corrective events pummeled Tesla's share price.  First, investors were shocked when a Model S was completely destroyed on October 2, 2013, due to an undercarriage puncture and high-intensity battery pack fire caused by a collision with road debris in Washington State.  A video of the Model S smoldering on the roadside was widely circulated, followed by press reports of difficulties encountered by firefighters in battling the persistent blaze.  While Tesla initially denied that the car's battery pack had ignited the fire, it later reversed course and admitted that the battery pack

was indeed the source of the blaze after being punctured by road debris encountered during normal driving conditions.  Due to a government shutdown, federal regulators did not investigate this fire.

12.     On the negative news, Tesla stock declined $12.05 per share - or more than 6% - to close at $180.95 per share on October 2, 2013, only to shed another $7.64 per share (or 4.2%) to close at $173.31 per share on October 3, 2013 amid scathing press coverage of the fire, on exceptionally high volume both days.

13.     In seeking to reverse Tesla's falling stock price, Defendants downplayed this incident in a series of false and misleading statements that failed to disclose Tesla's prior battery fires.  Worse, Defendant Musk gave several interviews, during which he discussed and downplayed this Model S fire –without ever disclosing that *another* Model S had been consumed by flames on October 18, 2013 in Mexico.  A CW who had purchased the Model S in question confirmed that Tesla was aware of this fire immediately and had sent a team to inspect the vehicle before Defendant Musk spoke.  Armed with the data, Defendant Musk apparently determined, unilaterally, that this fire was not relevant to investors due to the circumstances under which it arose.  He was wrong.  When the market finally learned of it, on October 28, 2013, Tesla's shares plummeted, dropping $7.32 (4.3%) on heavy volume to close at $162.86.  Once again, however, federal regulators did not send an inspection team, as the fire occurred outside their national jurisdiction.

14.     Defendants thereafter continued their campaign to understate the risk of catastrophic damage to Tesla's Model S fleet from undercarriage puncture due to debris strikes.  However, on November 7, 2013, yet *another* Model S was destroyed by a high-intensity battery fire after road debris punctured its undercarriage under normal driving conditions, this time in Tennessee.  Once again, Tesla's stock price fell, closing at $139.77, down $4.42 (3.06%) from its opening price of $144.19, on heavy volume.

15.     This time, however, federal regulators did open an investigation.  Shortly after, Defendants effectively admitted the vulnerabilities of the Model S as it had been introduced to the marketplace when, on November 18, 2013, Tesla issued an over-the-air software update that lifted the Model S's driving height at highway speeds and expanded the Model S's warranty to cover damage from battery fires.

16.     On this news, Tesla's stock price was hammered, closing at $121.58 on November 18, 2013, down $13.87 from its prior trading day close of $135.45 on November 15, 2013 on heavy volume of over 23 million shares.

17.     This marks the end of the Class Period.  Still in spin control, however, Defendants at the same time falsely claimed that they had requested that regulators open their investigation, a claim that the NHTSA outright denied.  Fearing a potential "recall" of the Model S, which would have been massively damaging for an automobile company so young that had already done three prior recalls, Tesla took the additional post-Class-Period step of offering to retrofit all prior-sold Model S's with reinforced undercarriage plating, which would become standard on all future-sold vehicles.  While the price inflation from the Class Period had by that point been fully alleviated, this later admission corroborates Lead Plaintiffs' allegations.  Only after these remedial measures were taken by Tesla did the NHTSA close its investigation – *without any finding that a safety-related defect does not exist* and with the express reservation of rights to take further action if warranted.

18.     At all relevant times throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Tesla's business, operations, and prospects. Specifically, Defendants' false and misleading statements and/or material omissions included, *inter alia*, (a) misrepresenting Model S's safety rating, (b) misrepresenting that

Tesla had conducted independent testing that verified that the weakest points on the Model S were five-star safe, (c) misrepresenting Tesla's and the Model S's history of fires and omitting to disclose Tesla's numerous prior fire incidents, (d) misrepresenting that the Model S's battery pack contributed to its safety while omitting to disclose its significant vulnerabilities to road debris impact, puncture, and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds.  Defendants made similar misstatements and omissions about the three Model S fires that occurred during the Class Period; moreover, in downplaying the first such fire, they failed to disclose that the second such fire had already occurred.  Defendants also failed to disclose that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Tesla stock directly and proximately caused thereby, Lead Plaintiff and other Class members have suffered significant damages in excess of $1 billion in the aggregate.

**JURISDICTION AND VENUE**

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as Tesla is headquartered in this District.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

23.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

24.     Lead Plaintiff Kazim Acar, as set forth in his attached, updated certification, purchased Tesla securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures and events.

25.     Plaintiffs William Landrum and Dr. Pankaj Modi, MD, Ph.D., as set forth in their attached certifications, purchased Tesla securities at artificially inflated prices during the Class Period and have been damaged upon the revelation of the alleged corrective disclosures and events.

26.     Defendant Tesla is a Delaware corporation with its headquarters located at 3500 Deer Creek Road, Palo Alto, California 94304.  The common stock is traded on the NASDAQ under the ticker symbol "TSLA."

27.     Defendant Elon Musk ("Musk") has served as Tesla's Chief Executive Officer throughout the Class Period.  Defendant Musk has a pair of bachelor's degrees from the University of Pennsylvania – one in physics and one in economics from the Wharton School.  He began a Ph.D. program in applied physics at Stanford, but left the program after just two days to pursue entrepreneurial ventures.  He then made his fortune starting technology companies during the late 1990's and early 2000's.  His early ventures included Zip2, a web software company that developed a "city guide" for the newspaper publishing industry, and X.com and PayPal, a pair of online email payment companies.  In 2002, he and a rocket propulsion engineer co-founded his third company,

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

SpaceX, to develop, manufacture, and operate launch vehicles and spacecraft.   None of these ventures afforded Defendant Musk any experience in the automobile industry.

## RELEVANT NON-PARTIES

28.   Peter Rawlinson was Tesla's Vice President and Chief Engineer from 2009 until January 2012, reporting directly to Defendant Musk.   Before working at Tesla, Rawlinson was formerly chief engineer at U.K.-based sports-car maker Group Lotus Plc and head of vehicle engineering at consultancy Corus Automotive.   On information and belief, Rawlinson holds eighty percent (80%) of the patents filed by Tesla for the Model S and has pertinent information regarding the designs considered, rejected, and implemented in the Model S and the decision-making that led to those outcomes.

## NON-PARTY CONFIDENTIAL WITNESSES

29.   Lead Plaintiffs' investigation included interviews with numerous confidential witnesses ("CWs"), each of which spoke freely, based on personal knowledge, of the topics alleged herein.   Such CWs included the following persons.

30.   CW1 was Director of Vehicle and Chassis Engineering at Tesla from January 2010 to January 2012.   CW1 was part of the senior management team responsible for engineering designs of the Model S and ensuring that it satisfied safety standards.   CW1 directly reported to Tesla's Vice President and Chief Engineer, Rawlinson, and regularly interacted, on at least a weekly basis for several hours at a time, with Defendant Musk.

31.   CW2 worked as a Dimensional Engineering Manager at Tesla from December 2009 to January 2011, with responsibility for ensuring that parts were engineered to fit together properly during the manufacturing process of the Model S.   CW2 worked directly on the Model S, including

its battery encasement.  CW2, along with other engineers, met regularly with Defendant Musk to discuss safety design and engineering.

32.     CW3 was an Electronics Engineer at Tesla from June 2009 to July 2013, reporting to Tesla's Senior Manager of Service Engineering and Technical Training and to Tesla's Vice President of Worldwide Services.  In this capacity, CW3 served as the lead engineer in the service organization at Tesla.  He designed and developed electronic instrumentation for diagnostic use by Tesla service technicians when working on Model S cars.  He also trained service technicians in how to work on the Model S, and he himself worked directly on the Model S.

33.     CW4 was a Tesla engineer who worked on the crash worthiness of the Model S and analysis of crash test results from 2009 to March 2013.  CW4 initially reported directly to Rawlinson.  After Rawlinson's departure, CW4 reported to an Engineering Manager.  CW4 has firsthand knowledge of the government safety testing that was done on the Model S.

34.     CW5 was a senior CAD designer at Tesla from October 2005 to April 2013, in which capacity he reported to a Senior Program Manager, Powertrain Hardware Engineering. CW5's job was to edit and refine computer models done by engineers and to make drawings of the models for production.  CW5 worked mainly on drawings of the battery pack and power train system for the Model S.

35.     CW6 was a Manager of the Powertrain and Validation Lab at Tesla's Palo Alto headquarters complex from March 2011 to October 2011, managing the building in which tests of the Model S powertrain took place.  He reported to the Director of Battery Technology.

36.     CW7 was Director of Vehicle Validation and Quality from June 2007 to November 2012, during which time he worked with Rawlinson and Rawlinson's team on the Model S.  During the last four months of his tenure at Tesla, he reported directly to Defendant Musk.

37.     CW8 was Manager of Global Logistics at Tesla from August 2010 to May 11, 2012, in which capacity he reported to Tesla's Director of Logistics.  CW8's job was to arrange the logistics for shipping parts from suppliers that were needed for production of the Model S.  CW8's last day at Tesla was just before the Model S entered into production.

38.     CW9 was a Project Manager at Tesla from June 2011 to September 2012, whose job was to manage the warehouse of supplier parts coming into Tesla's Fremont, California factory.  In that capacity he handled all of the material and parts that entered the Fremont factory.  He reported to Tesla's Manager of Production Control.

39.     CW10 was a Vehicle and Battery Technician at Tesla from November 2008 to September 2012, reporting to a Tesla Regional Service Manager.  In that capacity, he worked on helping engineers build the Model S prototypes and then worked as a service technician on the Model S cars.

40.     CW11 was a service technician at Tesla from March 2013 to November 2013, whose job was to respond to customer issues and repair customers' Tesla vehicles.  He had direct, personal knowledge of Tesla's methods for tracking and responding to mechanical and electrical problems that arise in Tesla vehicles.

41.     CW12 was a manufacturing technician on the Model S production line at Tesla's Fremont, California plant from November 2012 to January 2014, who reported to an End of Line Supervisor.  Part of CW12's job was to inspect the Model S cars at the end of the production line to ensure that they were meeting quality standards.  He also helped diagnose problems in the production line and on the Model S.

42.     CW13 was a Program Manager at Transistor Devices, Inc. a/k/a TDI Power, located in Hackettstown, New Jersey, a third party supplier that supplied Tesla with a DC power invertor

for the Model S, from March 2011 to August 2013.  His work in the automobile industry included a roughly 10-year tenure with Ford Motor Company, as well as working with Chrysler and Tesla while at TDI.  CW13 had some dealings with Tesla engineers, including its "top engineer," *i.e.* Rawlinson.

43.     CW14 is a Tesla customer who purchased the Model S that was destroyed in the second Class Period fire discussed *infra*, which occurred in Mexico.  CW14's statements regarding that incident, as discussed herein, are based upon his firsthand personal knowledge.

44.     Numerous CWs stated that they were unable to disclose additional relevant information to Lead Plaintiff, in whole or in part, due to the terms of a Non-Disclosure Agreement ("NDA") and concerns at the steps Tesla would take if they responded truthfully to Lead Plaintiff's questions.  Such NDAs, and Tesla's *in terrorem* use thereof, whether express or implied, have thus far posed an obstacle to Lead Plaintiff's conducting a fulsome investigation into the factual circumstances giving rise to the instant action and the securities fraud alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Tesla's Business Model

45.     Headquartered in Palo Alto, Tesla was formed by Silicon Valley entrepreneurs in 2003 with the goal of developing, marketing and selling fully electric automobiles through a think-outside-the-box approach.  Defendant Musk became involved with Tesla through its Series A investment round.  By October 2008, Tesla was controlled by Defendant Musk, who, despite any prior background in the automobile industry, added the title CEO to his titles of Chairman and "Product Architect."

46.     Tesla designs, manufactures, markets, and thus far has sold just two fully electric vehicles – the Roadster and the Model S.  In addition, it designs, manufactures and sells electric

vehicle powertrain components to more traditional automobile manufacturers for use in their own electric fleets.  Specifically, Tesla has provided development services and powertrain components to Daimler AG for its Smart fortwo, A-Class, and B-Class electric vehicles.  Tesla also developed a full electric powertrain system for Toyota Motor Corporation for use in its RAV4EV.

47.     Tesla concedes that its proprietary electric vehicle powertrain system is the foundation of its entire business.  *See, e.g.,* Form 10-K for the period ended December 31, 2012 ("2012 10-K").  This system was developed for the Roadster, modified for the Model S, and will be used in Tesla's future electric vehicles, including the Model X.  *Id.*  Simply put, any material defect or critical vulnerability to this electric powertrain system, if exposed, would pose a massive, possibly existential threat to Tesla's reputation and business prospects as a fledgling automobile corporation.

**Tesla's Scant Sales And Lack Of Profitability**

48.     At all relevant times, Tesla was very much a start-up company, competing in a field of well-established titans.  During the entire period 2008 - 2012, Tesla had only managed to sell 2,500 Roadsters.  From June 2012 through August 7, 2013, Tesla had only sold roughly 13,000 of its flagship Model S vehicles.  Heading into the Class Period, Tesla had never reported a net profit on its audited GAAP financial statements.

49.     Thus, to fund operations, Tesla was dependent upon two sources of capital: (i) funds raised through accessing the capital and debt markets and (ii) ZEV credit payments.  However, as the Class Period began, both of these sources had been fully tapped, such that it was incumbent upon Tesla to ramp up sales as Tesla's only remaining source of cash.

50.     Tesla was simply not in position to raise more funds from equity or debt offerings during the Class Period.  In May 2013, Tesla completed a public offering of stock, selling 3.9

million shares for total cash proceeds of $355.5 million.  The same month, Tesla issued $660 million aggregate principal amount of 1.50% convertible senior notes due 2018 in a public offering, for net proceeds of $648 million.  Upon closing its offerings of common stock and notes, Tesla repaid $451.8 million to settle all outstanding principal, interest, and prepay penalty obligations owed to the Department of Energy on a politically controversial loan facility originated in January 2010.  These offerings were on top of Tesla's October 2012 public offering of 7.96 million shares of common stock for total cash proceeds of $222.1 million.

51.     Simultaneously, Tesla's long-time revenue stream from ZEV credits was drying up as the Class Period began.  ZEV credits are awarded for sales of electric vehicles by numerous states, chief among them California.  Tesla was able to trade its ZEVs to larger, more traditional auto manufacturers that otherwise could meet annual electric vehicle sales mandates of these states. Each ZEV that Tesla sold could generate thousands of dollars of revenues.  However, as the major auto manufacturers began to ramp up production of their own electric vehicles, the revenues that Tesla could generate from the generation and sale of ZEVs had begun to rapidly diminish.

52.     This reality was reflected in Tesla's second quarter 2013 earnings letter to shareholders, dated August 7, 2013 and signed by Defendants Musk (the "Q2 2013 Earnings Letter"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K.  In the Q2 2013 Earnings Letter, Tesla stated:

> While deliveries increased by 5% from Q1, overall revenues were flat due to an expected drop in ZEV credit revenue. ZEV credit Tesla Supercharger revenue fell to $51 million this quarter from $68 million last quarter.

Thus, even with Q2 2013 sales revenues rising 5%, Tesla was unable to grow its overall revenues, due to rapidly shrinking ZEV revenues, which declined 25%.

53.     In light of these realities, in order to ensure its survival, Tesla simply had to increase the sales volume of the Model S going into the Class Period.  With only 15,500 vehicles sold over the preceding five years, however, it could not afford a major glitch in the Model S, its *only* product available for sale.  Any such problem would have a huge impact on Tesla's prospects, its stock price, and its ability to establish proof of concept regarding its electric vehicles.

**Tesla's Significant Pre-Class-Period Operational Problems**

Tesla's Two Roadster Recalls And One Model S Recall

54.     Yet, prior to the Class Period, Tesla experienced ***three*** separate product recalls, including the first recall involving its flagship Model S.  They were:

(a)     The first recall occurred in May 2009, when, in Tesla's words, it "determined that a condition caused by insufficient torquing of the rear inner hub flange bolt existed in some of our Tesla Roadsters, as a result of a missed process during the manufacture of the Tesla Roadster glider, which is the partially assembled Tesla Roadster that does not contain our electric powertrain."

(b)     The second recall occurred in October 2010, when, again in Tesla's words, "the 12 volt, low voltage auxiliary cable in a single vehicle chafed against the edge of a carbon fiber panel in the vehicle causing a short, smoke and possible fire behind the right front headlamp of the vehicle."

(c)     The third recall occurred in June 2013 and involved over one thousand Model S vehicles.  As described by Tesla, the recall was "to inspect and repair rear seat strikers that may have been compromised during the assembly process.  Rear strikers are used to retain the rear seat backs in an upright position.  Failure of this component may have resulted in the collapse of the rear seat back during a crash."

55.     These recalls were costly not only financially, but also reputationally, given Tesla's status as a startup automobile company facing significant proof-of-concept hurdles regarding the reliability, value proposition, and safety of its all-electric vehicles, including the Model S.  In this context, Defendants were loathe to endure another product recall during the Class Period.

<u>Tesla's Significant Internal Operational Problems Undisclosed To Investors</u>

56.     Beyond the public recalls, in the lead-up to the Class Period, Tesla was experiencing a rash of operational problems, undisclosed to investors, that were caused in large part by Defendant Musk's edicts regarding stringent design and production deadlines, which in turn caused Tesla employees to operate at a frenetic and exhausting pace while making critical errors.  At times, these circumstances led to compromising of the Model S's safety.

57.     CW7 stated that, in the months prior to the start of Model S production, its body design was still being worked on and many other parts of the car were undergoing changes, including the motor and the battery.  As CW7 put it, "There was a list of 50 different things that had to be resolved."

58.     CW8, whose job was to arrange logistics for shipping Model S parts from suppliers, said that just prior to the Model S's entering production, Tesla had not yet signed off on the majority of its suppliers needed to produce the car.  According to CW8, in May 2012, "We didn't even have the suppliers identified.  We didn't even have the pricing identified."  CW8 explained that when a company builds a product requiring multiple parts and components, a "bill of material" is calculated to determine the cost of all the parts; however, in May 2012, Tesla still did not have a bill of material for the Model S.  As CW8 put it, "We didn't have it, purchasing didn't have it, accounting didn't have it.  Nobody had it."  CW8 said that this meant that Tesla could not know the true cost of producing a Model S, nor from whom or from where the parts they needed to build the

Model S would come, nor if Tesla could even produce the number of Model S cars it was promising in 2012.

59.     CW8 also questioned whether Tesla had adequately tested the parts being used in production Model S cars.  According to CW8, each part used in the Model S had to be "signed off" on for production with each supplier, which usually meant that the part had gone through a few revisions after testing in a prototype to determine the ideal designs and dimensions and material that made it work best in the car.  Per CW8, once the final design of a supplier's part was approved or signed off on by Tesla, only then was it considered a "production part."  At that point, according to CW8, the suppliers could manufacture the production parts in greater numbers.  However, as of May 2012, when CW8 left Tesla, it had only signed off on about thirty percent (30%) of the parts needed in the Model S.  According to CW8, further complicating this problem was the fact that Tesla's engineers were still changing designs of parts just prior to the Model S's production deadline; each time engineers changed the design, Tesla had to go back to the supplier to request a change, which set the sign-off schedule back further.

60.     CW8 also said that Tesla's negotiations with parts suppliers all over the world were complicated not only by its tight production deadlines for the Model S, but also by the difficulties posed by Tesla's unreasonable demands for (a) a low volume of (b) custom-made parts (c) at low prices (d) on very short notice.  CW8 described the difficulties Tesla's employees were having finding suppliers willing to meet these requirements: "It was like pulling teeth.  It was impossible."  As a result, shortly after CW8's departure in May 2012, he was told by a former colleague still at Tesla that it was considering using "test components," demo parts used or made for prototypes that might not be the ideal part for production vehicles, in production Model S cars, to be switched out at the first service call.

61.     CW3, the lead engineer in Tesla's service organization confirmed that test parts were in fact used to manufacture early Model S cars sold to the public.  CW3 said that he was fully aware of this occurrence.  CW3 stated that the first fifty (50) Model S cars to come off the production line had preliminary components in them, such as the dashboard display, which were not the final version of the part ultimately manufactured by the supplier.  CW3 said that when the cars with demo parts came in for their first regular service call or for a mechanical problem, technicians would swap out the preliminary parts for the production parts that were then available.  He said, "I was exposed to retrofitting all of those cars when they came back in.  When one of the cars would come back in for service, they would replace all of those parts with parts that came off the production line later."

62.     CW3 said that technicians did not inform customers that their Model S cars had preliminary parts; instead, they told customers that they were receiving the most "up-to-date" version of the components in question.  As he put it, "We would say the latest component from the production line has come out, and we're installing it in your car so you have the latest version.  'Up-to-date' was the typical phrase."  CW3 received instructions about replacing the preliminary parts from Tesla's Vice President of Worldwide Service, "who would have gotten it from manufacturing."

63.     CW9, the Project Manager who handled all materials and parts coming to Tesla's Fremont, California factory from June 2011 to September 2012, stated that when Tesla entered production of the Model S, it was struggling to obtain sufficient parts to actually build cars.  He and other employees met weekly to discuss what parts were available, how many cars they could attempt to build that week, and whether they had enough parts to run the production line.  CW9 said that Tesla's logistics personnel would at times expedite shipping from a supplier of one part or a

few parts out of a larger batch, so as to be able to build a car.  He described this period as an "ongoing battle," and after working seven days a week, 12 hours a day, for low pay, he was exhausted and quit in September 2012.

64.     CW12, a manufacturing technician on the Model S production line a Tesla's Fremont, California plant until January 2014, was responsible for quality inspections of the Model S cars at the end of the production line ad for diagnosing problems in the Model S and in the production line.  According to CW12, he identified "fitment" issues with the Model S's aluminum parts, meaning how well those parts fit when assembled (*e.g.*, how well the window glass is set within the door).  CW12 said that Tesla did not want to hear his concerns about these issues, stating, "They don't like people telling them there's an issue with their product or parts, because they're trying to push cars out as fast as possible.  The cars could be in better shape than they were."  Noting that Tesla was having problems in this area as it prepared to ramp up production, CW12 added, "The car went into production so fast it was kind of hit and miss in the beginning." Calling Tesla "extremely volatile" internally, CW12 said that he asked himself every day he worked at Tesla whether it could actually meet its production predictions.  CW12 also confirmed the use of preliminary parts in Model S cars sold to the public.

65.     These CW statements explain a later report by the shopping website Edmunds.com, which said that its 2013 Model S – which at the time had less than 11,000 road miles – was "making an ominous noise under acceleration and deceleration.  It originates from the rear of the car and seems to be getting worse."  Tesla replaced the drive unit on the Edmunds.com car, but declined to disclose what caused it.  It also replaced the driver door mechanism for another problem.  Afterward, Edmunds.com's vehicle testing manager, Mike Schmidt, said, "We're not sure what to think about the fact that both of these repairs were completed with just one overnight stay.

Maybe the dealer is really on the ball.  Maybe the supply chain is short.  Or maybe the parts are readily available because they've seen these [problems] before."  This is the exact pattern described by the CWs regarding the swapping of preliminary parts used in production vehicles.

66.     CW3 also said that in spring / summer 2013, nearly a year after the Model S was in production, he worked with the battery manufacturing group at Tesla to determine if the battery pack was performing properly.  One issue they identified was that water intruded into the battery pack when the Model S was driven through deep troughs of water, *e.g.* badly flooded streets.  In these situations, water leaked into the battery, causing "isolation failures," whereby water in the battery conducts electricity and theoretically could electrify the chassis, were it not for sensors within the battery that shut it down.  CW3 designed a solution that improved the issue, while not eliminating it altogether.

67.     Problems like those described above were so obvious, they were even visible to Tesla's third party suppliers.  For instance, CW13, a Program Manager at a Tesla supplier of DC power inverters who had direct dealings with Tesla engineers, described this situation at length.  With over a decade's worth of experience in the automobile industry, he worked with Tesla from March 2011 until August 2012.  His employer, TDI, was contracted by Tesla to provide DC inverters for the Model S, which are connected to the Model S's battery pack by a cable and which convert 400 volts of DC power from the battery pack into 12 volts of AC and then back to 12 volts of DC, for purposes of powering the Model S car cabin and electrical system.

68.     CW13 stated that, during his time with TDI, several shipments of the inverter proved problematic, causing Tesla to return them to TDI for repair on several occasions.  According to CW13, an inverter shipped to Tesla caught on fire during "cycling" tests, which involve turning the inverter on and off to test how it performs when heating up and cooling down.  As he described it,

the heat from the test caused the metal material in the inverter to soften, which led to a bolt losing torque, which in turn led to a loosened connection that caused a short and a fire within the inverter. This defect was found in multiple inverter shipments to Tesla, which had to be returned and remade.

69.     CW13 added that TDI and Tesla made multiple design changes to the inverter after problems were discovered during testing, a process that continued until a few months before the production deadline for the Model S that had been set by Defendant Musk.  At that time, CW13 recalls Tesla's top engineer visiting TDI's office in New Jersey and informing TDI that he had instructed all his engineers at Tesla to "put their pencils down" so that they could meet Defendant Musk's strict production deadlines.

70.     Based on CW13's 10-year experience working at Ford Motor Company, he stated that automobile companies typically conduct validation testing on parts by running them in a car for 120,000 miles so as to properly validate performance through the life of a vehicle.  Alarmingly, however, CW13 stated that the amount of time remaining before Defendant Musk's production deadline following shipment of the last newly-redesigned inverters was insufficient to conduct such validation tests.  CW13 stated, "The design continued to change well into the phase where they were going to be going into production.  The part was not ready to go into production.  There was no way to test it."

71.     CW13's concerns were corroborated by the fact that Tesla never gave feedback regarding the inverter's passing or failing validation and durability tests, which in his experience in the automobile industry was something that auto makers would usually give suppliers.  As CW13 stated, "I did not see the level of testing that I saw when I was at TDI for Chrysler and that I saw

when I was working at Ford Motor Company.  It's not surprising to me that they are having problems.  I think they will continue to have problems."

72.     As a result, CW13 said, hundreds of inverters were shipped to Tesla and were installed in the Model S and the electric Toyota RAV4EV that were not production-ready.  CW13 stated, "The parts they were putting in this car were not ready to go into a vehicle that was going to go out on the road."  He added, "I did not consider it a finished product.  We were still going to have to do two more redesigns" and "I know we were nowhere near ready to ramp up."

73.     More to the point, CW13 stated his belief that the Model S contains "parts that are dangerous right now…parts that I would not consider tested or safe."  He added, "It's not surprising to me it's catching on fire.  The [Tesla] cars out there, as they mature, are going to have more problems."  He also stated, "The testing that needed to be done, was not done.  They are letting the customer test the vehicle, and that's not good."  CW13 believes the Model S is dangerous.

**Defendant Musk Made Engineering Decisions**
**While Causing A Mass Exodus From Among Tesla's Top Engineering Talent**

74.     Despite lacking any advanced engineering degree or background in the automobile industry, Defendant Musk made – or dictated the outcome of – important engineering decisions made during the development of the Model S.  At times, he rejected the recommendations of his top engineers in doing so.

75.     CW1, Tesla's Director of Vehicle and Chassis Engineering at Tesla from January 2010 to January 2012, stated that he and other top engineering team members met weekly with Defendant Musk for two to three hours at a time to discuss the status of multiple ongoing Model S development plans and any issues that were arising.  CW1 stated that during these meetings, Defendant Musk engaged in in-depth discussions with Tesla's engineers about their progress and

the challenges they faced.  He said that, in response, the engineers explained in detail why they were choosing to design aspects of the Model S in certain ways.

76.     According to CW1, if engineers ever told Defendant Musk that they were doing something because "that's the way it's always been done," Musk would not accept it.  Moreover, CW1 recalled multiple occasions when engineers provided Defendant Musk with information about an engineering issue, and Musk made the decision about which way to go.  As stated by CW1, "It wasn't totally uncommon for Elon to ask for information, and then he would make the choice.  He would make engineering decisions."

77.     In this way, Defendant Musk sometimes rejected the recommendations of Tesla's engineers.  According to CW1, while Musk often decided to adhere to the recommendations of Tesla's engineers, at times he would make other decisions or challenge engineers to do things differently or to come up with unconventional solutions they had not proposed.  CW1 stated that, in so doing, Defendant Musk put Tesla's engineers through "a lot of difficulties in achieving what was needed."

78.     These remarks are corroborated by other CWs.  For example, CW7 said that Defendant Musk was heavily involved in development of the Model S and made major decisions about its engineering and design.  As CW7 stated, "[Musk] was very involved with the big technical decisions.  If there was a big question about whether to take Path A or Path B, if there was a significant technical decision, he was involved."  CW4 stated that Defendant Musk "was very involved at quite a detailed level" in the engineering and design of the Model S, and that there were "heated discussions" with Musk about the design issues involving many different aspects of the car, even down to details such as how flush the door handles should be to the doors.

79.     As described by the CWs, Defendant Musk's overbearing style and impetuous management decisions have caused some of Tesla's top engineering talent to depart.  CW1 stated that Defendant Musk put Rawlinson, who was CW1's 25-year colleague and friend, under intense pressure to meet tough manufacturing achievements and launch date schedules, facts that likely contributed to Rawlinson's decision to quit Tesla at the end of 2011.  CW4 confirmed that Defendant Musk and Rawlinson "had disagreements all the time."  Moreover, CW1 said that Rawlinson's resignation angered Musk to such a degree that, just two weeks later, he fired CW1 in January 2012 (just months before the Model S was to go into production), a move that CW1 described as Musk's impetuous way of lashing back at Rawlinson for quitting.  CW1 added that Musk's management style often left engineers with low morale and that many people have left or been fired from Tesla.

80.     These tensions among the Model S's engineering ranks were observed by other CWs, whose statements corroborate those of CW1.  For instance, CW7 stated that perceived delays in the design and engineering of the Model S caused conflict and "bickering" between Defendant Musk and Chief Engineer Rawlinson, due to Musk's concerns that the Model S production timeline would be affected.  CW6 stated that he often heard from engineers frustrated by Defendant Musk's instructions, "They'd say, 'Elon wants it this way or that way.  It doesn't really make sense, but we have to do it because it's his money.'"

### Tesla's Balancing Of Safety Versus Mileage Per Battery Charge Led To The Use Of Higher-Energy, More Volatile Batteries In The Model S

81.     CW1 described in detail how engineering and design decisions were impacted by Defendant Musk's mandate for a 300 mile per battery charge range for the Model S.  According to CW1, in 2011, engineers had designed the Model S battery pack so that the vehicle could reach a

range of 240 miles on a single charge.  CW1 described an initial Model S battery pack design.  As designed, that configuration contained about 7,000 to 8,000 individual battery cells, each about the size of AA batteries.  About 500 individual cells were grouped together in battery modules, which were housed in plastic packs that also contained wiring and water coolant lines.  The twelve to fourteen modules were laid out in one layer under the car floor, separated by metal compartmental walls.  A few modules were stacked two-high in an area under the dashboard.  Then, all of the modules were contained within a metal battery pack.

82.     According to CW1, Defendant Musk did not accept this design and, instead, in 2011, tasked Tesla's engineers with figuring out how to add more batteries to the pack so that the Model S could reach Musk's targeted range of 300 miles.  CW7 corroborated this focus on the battery's range, calling it an important design goal so that the Model S would sell.

83.     CW1 stated that the engineers began plans to add more battery modules to the pack in the area under the dashboard and behind the front wheels to satisfy this mandate.  However, according to CW1, in mid-2011, Tesla's engineers learned that Panasonic, which was working with Tesla to develop batteries for the Model S, had produced  a similarly-sized lithium battery with subtle chemistry differences that gave it more energy than the lithium batteries the Tesla engineers had been using previously.  CW1 said that, by using the higher-energy batteries, the Model S could reach Defendant Musk's required 300-mile range with the same number of batteries, taking up the same amount of AA-battery sized cells, that could previously only deliver a 240-mile range.  CW1 stated that adoption of the higher-energy batteries also meant that Tesla's engineers did not have to figure out how to add more batteries to the battery pack configuration to reach Musk's stated 300-mile range.

84.     However, CW1 stated that the higher-energy batteries were more "volatile."  CW1 said that by packing more power into the same-sized battery cell, each cell was therefore capable of generating greater heat and would have a more violent reaction in a thermal runaway event.  As CW1 put it, "They are the most energy efficient.  More energy is packed in.  They're also more volatile if they are made to go wrong.  Or, if due to a manufacturing fault they go wrong, they go wrong in a bigger way."

85.     In balancing the increased risk of a more volatile, higher-energy battery that could lead to bigger and more violent thermal events against the need to meet Defendant Musk's stated 300-mile battery range, Tesla chose to adopt the higher-energy Panasonic batteries for use in the Model S.  CW1 stated that the decision to use the higher-energy batteries was made by Defendant Musk and senior members of the Model S battery design team.  CW1 did not participate in the decision-making process, but rather was simply told the outcome.

86.     This balancing act between safety and battery range was corroborated by CW2, a Dimensional Engineering Manager at Tesla from December 2009 - January 2011 who worked on the Model S's battery encasement and who regularly met with Defendant Musk.  CW2 described Musk's balancing act between increasing the Model S's safety versus maximizing its mileage per battery charge.  CW2 stated, "Number one was always safety.  Number two was aerodynamics more than weight.  Elon's focus was more getting the most charge out of the battery and the car with aerodynamics."  CW2 stated that Defendant Musk regularly met with all the engineers and discussed safety design and engineering, specifically the tradeoff between safety and other engineering considerations.

87.     Likewise, CW6 corroborated that the transition to a higher energy density batter was part of Tesla's effort to increase the mileage range of the Model S.  Noting the inherent tradeoffs in

27

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

that decision, CW6 stated that increasing the energy density of battery cells can cause them to be less stable and more likely to fail.  CW6 added that the Panasonic batteries designed for the Model S are not what the industry refers to as "commercial off the shelf" batteries and are not available for purchase by anyone else.  CW6 noted the challenges of having to fit the Panasonic batteries into the more industry-standard 18mm battery cells that had already been designed into the Model S.

### Tesla's Pre-Class Period Battery Fire Incidents

88.    Tesla's adoption of a more powerful battery led to the revelation that its risk of high-intensity fires had risen dramatically.  Due to a series of very significant, high-intensity battery fires, including ones that occurred spontaneously, Defendants were fully aware of this heightened risk prior to the Class Period.

89.    CW1 described a series of significant battery fire incidents, planned and unplanned, during design and pre-production of the Model S.  He described two particular incidents in detail, both of which occurred at Tesla's factory in Fremont, California using what CW1 believed to be the higher-energy Panasonic batteries.

90.    The first fire incident specifically described by CW1 occurred in or about September or October 2011 during the build-out of a prototype Model S.  According to CW1, this was an internal thermal event within the battery pack, which burned itself out and was later discovered, because no one was at the factory when the fire occurred.

91.    The second fire incident specifically described by CW1 was part of a test in late 2011 to determine what would happen if a part of the battery pack went into a thermal event and began to burn.  According to CW1, this was the first test done on a fully-installed battery pack in a Model S (prior tests had involved small sections of the battery pack, then half the battery pack).  CW1 described the test as involving a thermal event induced at the center of the battery pack, rather

than at the front or back, as would more typically occur during a crash impact.  Nevertheless, CW1 said, "The results were somewhat surprising.  It was more violent than most of the people expected."  Indeed, the fire burned up the entire vehicle.  Added CW1, "It was basically a lot more violent and destroyed more of the car than people were expecting."

92.    The Fremont Fire Department's Incident Report,  #  2011-1112533-000, memorializing the response to this incident, submitted herewith as Exhibit 1, fully corroborates CW1's statements.  This report indicates a dispatch just after 3:30 p.m. on Monday, December 19, 2011 (*id.* at 1) in response to numerous calls for assistance from callers observing "black smoke" and "lrg [large] plume of white smoke that turned drk [dark] gray" emanating from the back of "the testing location at the back of the plan at the general storage area" (*id.* at 5-6).  The report (*id.* at 6) makes crystal clear what occurred:  "This is a test of the Tesla batt [battery] packs" and "Large Tesla test burn to batt [battery] packs doing a crash fire test on a veh [vehicle]."  It continues (*id.* at 6), "Engine 55 arrived on scene and began investigation.  Tesla employees stated they were performing a test and had everything under control."

93.    Clearly, the test had spun gravely out of control.  As the Fire Department's report describes (*id.* at 7):

> The fire was at the Tesla plant where engineers were testing a battery pack in a vehicle.  They intentionally set the vehicle on fire inside a testing building and the fire became larger than they could handle. … We found a mostly extinguished vehicle inside the building with numorous [sic] sprinkler heads operating.  We used an inch and half hoseline to complete extinguishment of the vehicle inside the building.

The report also details how many first responder resources had to be dispatched to get the blaze under control (*id.* at 6-7): "Nine units were assigned to this incident.  Twenty-three personnel responded. … The primary task(s) performed at the scene by responding personnel was

29

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

extinguishment."  The report explains what happened in utterly clear terms: "***Failure of equipment or heat source caused the ignition***."

94.     Moreover, it is clear that Tesla sought to conceal this fire from its employees.  CW8 recalled a Fremont factory fire that broke out prior to his May 11, 2012 departure from Tesla, prompting the local fire department to respond.  CW8 said that the fire was in a Hazmat building on the site, known to employees as the "General Store," in which Model S prototypes were built.  This description matches that of CW1 and the Fremont Fire Department report discussed *supra*.  CW8 said that he rode his bike over to the building upon seeing smoke, but was ushered away by Tesla's Director of Manufacturing.  According to CW8, the area was "quarantined" after the fire and that employees that previously had access to it, no longer did.

95.     CW1 also stated that additional fire testing by Tesla on the Model S battery packs revealed similarly violent results.  As described by CW1, "There were more cases of strong fires as time went on."  CW1 was not clear whether the cause was the higher-powered batteries in and of themselves, or the fact that the test parameters were altered, *e.g.* to have the batteries more fully charged than in previous tests.  That said, CW1 stated, "Knowing other work that's been done on batteries, the higher powered batteries do have a more vigorous way of burning when they do burn."

96.     CW1's description (above) of a spontaneous combustion event in Tesla's Model S batteries at its Fremont, California factory is similar to a later incident that occurred at roughly 1:00 a.m. on Wednesday, January 11, 2012, at Tesla's headquarters complex at 3500 Deer Creek Road in Palo Alto, California, as memorialized in the Palo Alto Fire Department's Incident Report # 2012-0000227-000, submitted herewith as Exhibit 2.  This report, and the first responder narratives it contains, describe their actions and observations on the scene.

(a)     As indicated on the report, the fire occurred in a room with "no occupants" (*id.* at 1) and, when the Fire Department arrived, they were "met by a Tesla employee who was walking the main building to try to determine the nature of the alarm" (*id.* at 5).  It also states that the fire had originated in a "storage cart that had caught on fire" (*id.*), specifically "two items stored on a cart" (*id.* at 6, 7).  These facts indicate that this fire was a spontaneous event.

(b)     The report also states that the fire occurred in "building 23 – the Tesla cell test facility" in a room with "high voltage signs" (*id.* at 5), that "some of the materials that burned may have [had] a hazardous by-product associated with them" (*id.* at 4), and that the water inside the room of origin, from sprinklers that had been triggered by the fire, measured a "10 on the PH test meaning alkaline" (*id.* at 5).  These facts indicate that Tesla batteries were involved.

97.     ***None*** of the above-described fires was disclosed by Defendants to investors.  Tesla did not file any Forms 8-K or issue any press releases disclosing any of these fires.  Nor did Tesla's Form 10-K for the period ended December 31, 2011, which was filed on February 27, 2012, describe any of these fires.

**Tesla's Rejection Of Available Safety Measures That Would Have
Further Safeguarded The Model S's Undercarriage and Battery Pack**

98.     In light of the foregoing, even as they kept investors in the dark, Defendants fully understood the very significant risks posed by the batteries chosen for inclusion in the Model S, including their propensity for high-intensity fires if ignited.  They also fully understood the inherent risks posed by placing the Model S's high-energy batteries along the bottom of the car just inches above the road.

99.     Faced with this reality, Defendants deluded themselves into believing that the Model S was nevertheless what they would later pitch as the "safest car in America" simply because its

technology slowed the *spread* of fires.  In that regard, Tesla put too much stock into the notions that (a) Model S battery fires would be rare and (b) the Model S's notification system would warn drivers of such fires sufficiently early to permit them to pull over and exit.  CW1 stated that the full car fire tests indicated that the warning system would provide adequate time for passengers to exit and that Tesla used a rating system based on the perceived likelihood of certain events happening and the potential for human injury.  However, CW1 noted that Tesla's engineers were on their own, in the sense that there were no government requirements or guidelines for the type of battery pack that Tesla was using in the Model S.

100.    Apparently based on this calculus and guesstimating, as well as Defendant Musk's top-down mandate to prioritize the 300-mile battery range, Tesla knowingly made several critical decisions to reject available technologies and approaches that would have increased the durability of the Model S's undercarriage, increased the fire protection for its battery pack, and/or decreased the risk of a road debris strike during normal driving conditions.

101.    First, Tesla discontinued use of individual protective sleeves for the Model S's batteries, a technology that had been employed in the Roadster.  CW5 stated that in the Roadster battery pack, each individual battery cell had been wrapped in a "sleeve," which served as "an additional propagation barrier" and which helped prevent the spread of fire if something were to go wrong with the cell.  CW5 stated that, initially, such sleeves were going to be used in the Model S battery packs, but that Tesla later determined such sleeves to be unnecessary in light of Panasonic's cell casing.  CW10, who worked on the battery pack for the Roadster, corroborated that the Model S did not use the protective sleeves that had been employed in the Roadster to prevent the spread of fire from one cell to the next.

102.     Second, Tesla opted essentially to preserve its pre-existing battery pack design and configuration, even after it opted to use higher-energy Panasonic batteries.  CW5 could not recall any major changes to the Model S battery pack after Tesla decided, during the Model S engineering process, to use the higher energy Panasonic batteries.   This statement corroborates CW1's description of the higher-energy Panasonic batteries being implemented into the pre-existing battery compartment configuration.  This decision runs counter to the practice of Tesla's competitors in the electric-vehicle space.  For instance, GM had previously redesigned the battery compartment of the Chevy Volt after a crash test resulted in a fire in one of the vehicles, even though no one was injured.

103.     Third, Tesla decided not to implement stronger undercarriage plating that was available for inclusion in the Model S.  CW1 stated that, as of January 2012, Tesla engineers had been exploring the possibility of using military armor material, capable of withstanding bullets and explosive shrapnel, for the Model S underbelly to protect the battery pack.  The final decision on the Model S undercarriage was made after CW1 left Tesla.

104.     CW3 posited that a ballistics shield covering the length of the Model S undercarriage was not implemented due to concerns over the vehicle's weight, because the heavier the car, the less mileage it is able to get out of a single charge of the battery pack.  As he put it, "Of any of the considerations on anything that goes into that vehicle, one of the primary constraints is weight. Adding a couple thousand pounds of casted metal to the car, the range you'd get from the car would drop substantially.  The biggest thing is weight."

105.     Tesla had at least one patent for such a ballistics shield before the Class Period.  The patent application, No. 13311435, was filed on December 5, 2011, bearing the name of Rawlinson, Tesla's Chief Engineer.  The patent, No. 8286743, was granted on October 16, 2012 for a "vehicle

battery pack ballistic shield" and outlines a detailed plan for "an improved protection system for a battery pack mounted between the passenger cabin floor panel of an electric vehicle and the driving surface."  It was published on June 28, 2012, just a week after the first Model S rolled off the production line and into the marketplace.

106.    Fourth, Tesla designed and programmed the Model S to automatically lower its own driving height once the vehicle reached 55 miles per hour, in an effort to reduce drag and increase the battery mileage range.  As described by CW10 and CW6, the Model S released for sale automatically lowered its undercarriage close to the road once its speed reached 55 miles per hour. CW10 and CW6 said that Tesla knowingly configured the Model S this way to reduce drag, thereby reducing battery power required to drive at highway speeds, in turn increasing the mileage range of the battery pack on a single charge.  However, both CW10 and CW6 stated the obvious – that lowering the car increases the likelihood of road debris hitting the undercarriage.  As CW10 put it, "A major problem is if you're driving at a high rate of speed, the vehicle would then lower, causing it to be more susceptible to actually hitting something, which in turn damages the battery and causes a fire."

107.    Notably, as discussed *infra*, after the Class Period, Tesla announced that it was adopting retroactive measures to remedy the third and fourth items above, by issuing an over-the-air software update lifting the Model S's height at highway speeds and by retrofitting already-sold Model S cars with a titanium undercarriage shield that will be standard-issue in future-sold Tesla vehicles.  As discussed below, these necessary remedial steps were tantamount to Defendants' admissions of fault.

**Government Testing Of The Model S Did Not Assess
The Risk Of High-Intensity Battery Fires Caused By Undercarriage Puncture**

108.   The NHTSA's 5-Star Safety Ratings Program employs only limited testing to generate comparative safety ratings among vehicles.   Specifically, the NHTSA performs the following crash tests (in addition to rating the rollover resistance of vehicles):

(a)   Frontal crash test.   NHTSA performs a frontal crash test, in which a vehicle is crashed into a fixed barrier at thirty-five (35) miles per hour.   The test utilizes instruments to measure the impact to various parts of the bodies of two crash test dummies seat belted in the car.

(b)   Side barrier crash test.   In this test, a barrier moving thirty-eight and one-half (38.5) miles per hour is crashed into the side of a vehicle standing still.   The test utilizes instruments to measure the impact to various parts of the bodies of two crash test dummies seat belted in the car.

(c)   Side pole crash test.   This test involves a car being angled at 75 degrees and then pulled sideways at twenty (20) miles per hour into a 25-centimeter pole at the driver's seat location. The test utilizes instruments to measure the impact to various parts of the bodies of one crash test dummy belted in the driver's seat.

109.   Notably, none of the foregoing tests assess the fire risk posed by the battery pack of an electric car under any conditions.   They do not measure the structural integrity of or damage caused to the battery pack of an electric vehicle as a result of the impacts simulated.   They do not evaluate or measure damage to the vehicle or its undercarriage or its protective shield caused by impact with road debris.   Nor do these tests generate any data based on a vehicle travelling at highway speeds.   Moreover, the NHTSA's fire prevention regulations do not apply to electric cars, in that they are written to minimize the amount of gas spilled in a fuel-tank rupture.

110.     Simply put, these tests do not in any way speak to the serious risks posed by the Model S's battery pack design and configuration, in light of its high-energy batteries and its initial rejection of safety enhancements such as a higher highway driving height and a reinforced undercarriage, as discussed herein.

111.     Separate from the NHTSA 5-Star Ratings, the Federal Motor Vehicle Safety Standards require certain testing before a vehicle can be sold to the public.  As explained by CW4, whose job involved direct work on the crash testing of the Model S, only a single test – a rear impact test – is required regarding the battery of an electric vehicle.  CW4 explained that this test simply measures if the Model S battery sustained unacceptable damage from a rear impact to the vehicle.  As confirmed by CW4, neither this test nor any other test examines the safety of the Model S battery pack due to road debris damage to the vehicle undercarriage.

112.     In or about early- to mid-August 2013, the NHTSA notified Tesla of the Model S's test results.  Defendants' actions thereafter gave rise to the fraud at issue.

## Defendants' False And Misleading Statements On August 19, 2013

### False and Misleading August 19, 2013 Press Release

113.     On August 19, 2013, after the markets closed, Defendants issued a press release (the "August 19, 2013 Press Release," submitted herewith as Exhibit 3), in which it touted the Model S's NHTSA test results.  The August 19, 2013 Press Release was intended to satisfy Tesla's most-urgent twin needs of establishing proof-of-concept for its all-electric Model S and of spurring greatly increased sales of the Model S in light of declining ZEV revenues and tapped-out capital and debt markets.

114.     However, the August 19, 2013 Press Release contained numerous materially false and misleading statements and material omissions.

115.    First, the August 19, 2013 Press Release falsely stated, in its title, that the "*Tesla Model S Achieves Best Safety Rating Of Any Car Ever Tested*."   This was materially false because, as described below, NHTSA does not further rank cars among all those that earned the 5-star category.

116.    Second, the August 19, 2013 Press Release falsely stated, "[S]afety levels better than 5 stars are captured in the overall Vehicle Safety Score (VSS) provided to manufacturers, where *the Model S achieved a new combined record of 5.4 stars*."   This was materially false because, as described below, NHTSA does not rate any car above 5 stars.

117.    Third, the August 19, 2013 Press Release falsely touted the location and low height of the Model S battery pack as *enhancing* the vehicle's safety.   Specifically, in touting the Model S's rollover test results, it stated, "The reason for such a good outcome is that *the battery pack is mounted below the floor pan*, providing a very low center of gravity, *which* simultaneously *ensures exceptional* handling and *safety*."

118.    Fourth, the August 19, 2013 Press Release expressly represented that Tesla had redundantly tested the Model S to determine its weakest points and to improve them *all* so that no part of the vehicle would score under 5 stars in a safety rating.   Such a broad, blanket statement necessarily encompassed the undercarriage, the battery pack, and the parts of the car encasing and protecting the battery pack.   Specifically, it stated:

> The above results do not tell the full story.   It is possible to game the regulatory testing score to some degree by strengthening a car at the exact locations used by the regulatory testing machines.   After verifying through internal testing that the Model S would achieve a NHTSA 5-star rating, *Tesla then analyzed the Model S to determine the weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured*.

In other words, Tesla claimed to have gone over the Model S with a fine tooth comb to identify its "weakest points" and did not stop testing until they had *all* achieved a perfect 5-star score. By failing to exclude the undercarriage, the battery pack, and the parts of the car encasing and protecting the battery pack, Tesla falsely stated that those parts, too, had achieved the performance levels of a perfect 5-star score.

119.   Fifth, the August 19, 2013 press release also made specific false and misleading representations as to the safety and reliability of the Model S's battery pack, stating:

> ***The Model S lithium-ion battery did not catch fire at any time before, during, or after NHTSA testing. It is worth mentioning that no production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite several high speed impacts***.

The first sentence is an outright lie. The Model S battery pack caught fire numerous times before the NHTSA testing, including three significant blazes that required first responder intervention, as discussed above. Contemporaneous incident reports prepared by responding fire departments, as corroborated by multiple CWs, specifically describe the fire as occurring in the Model S battery pack. The second sentence is an extremely misleading statement – by qualifying itself as speaking only to "production" batteries, this statement is subtly hedged so as to exclude the three test battery fires discussed above in a way that would be impossible for an investor to independently discover. All of these falsehoods were material.

120.   In addition to the specific reasons set forth above, all five of the above-described statements in the August 19, 2013 Press Release were materially false and misleading for the additional reasons that they failed to disclose the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), (b) the fact that the Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its

undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

121.     The August 19, 2013 Press Release was unaccompanied by any warnings or cautionary statements.  On information and belief, given Defendant Musk's total control over Tesla, and his close involvement in day-to-day operations, and given that the Model S was (and still is) Tesla's only vehicle for sale, all as described above, the August 19, 2013 Press Release was written or edited by Defendant Musk and was approved for release by Defendant Musk.

<u>False and Misleading "Safest Car In America" Statement On Tesla's Website</u>

122.     Nearly contemporaneously with the issuance of the August 19, 2013 Press Release, Defendants caused Tesla to retool its corporate website so that the front page  displayed the description "The Safest Car In America" in touting its NHTSA ratings, as per this image:



123.     This image and description remained at the top of the front page of Tesla's corporate website continuously throughout the Class Period, and, for a time, even after this lawsuit was filed. It, too, was unaccompanied by any warnings or cautionary statements.

124.     It was materially false and misleading insofar as Tesla was not "the safest car in America," because the NHTSA's rating system does not rank cars within the 5-star category, as

discussed below, and because the NHTSA does not actually test many of the Model S's direct luxury-car competitors, such as the Audi A8, the BMW 7 series, and the Mercedes-Benz S-class, all of which are loaded with safety-enhancing features.  It was also materially false and misleading because it failed to disclose the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), (b) the fact that the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

125.    The August 19, 2013 Press Release and the simultaneous "Safest Car in America" website campaign had their intended effect.  Not only did Tesla's Model S sales increase, its stock price soared as the market bought into Tesla's spin as having demonstrated proof-of-concept for the Model S.  On August 20, 2013, Tesla's stock opened at $148.65, up from its prior day's closing price of $144.90.  It closed at $149.58 on August 20, 2013 and then opened at $150.00 on August 21, 2013.  In the coming days, weeks, and months, it would skyrocket.

**Partial Corrective Event:  NHTSA Correction Regarding Ratings**

126.    There was just one bump in the road to be cleared first.  On August 21, 2013, the NHTSA issued a rare clarification of its 5-Star Safety Ratings on the frontpage of its website, www.nhtsa.gov,  and  the  companion  website  www.safercar.gov.    While  not  naming  Tesla specifically, the NHTSA pictured a Tesla Model S undergoing crash testing in its message:

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

1

2

3

4

5

6

7

8

9

10

11

12



13    127.    NHTSA's message included the statement: "NHTSA does not rate vehicles beyond 5

14

15  stars and does not rank or order vehicles within the star rating categories."  This statement partially

16  corrected the first two false and misleading statements in the August 19, 2013 Press release outlined

17  above.  Specifically, the Model S could not have achieved a 5.4-star rating, given that NHTSA

18  expressly does not rate vehicles above 5 stars.  Also, the Model S could not have achieved the best

19  safety rating of any car ever tested, given that the NHTSA "does not rank or order" vehicles within

20  the 5-star rating category.

21

22    128.    On this news, Tesla's stock price dropped to $147.86 on August 21, 2013 from its

23  prior day's closing price of $149.58 and its same-day opening price of $150.00.

24    129.    Aside from this hiccup, Tesla's stock price soared, closing at $157.10 on August 22,

25  2013, hitting a Class Period high of $193.00 on October 1, 2013, and not dropping below $150.00

26  again until nearly the end of the Class Period.  This meteoric ascent was the direct result of a

27  campaign of misinformation by Tesla beginning with the August 19, 2013 Press Release and

28

41

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

1   continuing with Defendants' misrepresentations and omissions thereafter, including those set forth

2   below.

3   ### Defendants' False And Misleading Statements
4   ### Between August 20, 2013 – October 2, 2013, Inclusive

5   Defendant Musk's August 20, 2013 Interview

6   130.   On August 20, 2013, Defendant Musk was interviewed by Yahoo! Autos and the

automobile blog Motoramic, during which he discussed the Model S, its battery pack design, its

testing results, and its safety record.  During this interview, Defendant Musk made materially false

and misleading statements, unaccompanied by any warnings or cautionary statements.  Specifically,

in addressing Defendants' statement in the August 19, 2013 Press Release that the Model S battery

pack had no issues before, during or after crash testing, and in light of concerns over lithium-ion

battery packs after the grounding of Boeing's 787 airliner, Defendant Musk stated, "***Throughout all

our crash tests, throughout all similar incidents with vehicles on the road, never once has there

been a fire***."

131.   This statement was a lie.  Tesla's batteries caught fire numerous times before the

Class Period, including three significant events requiring first responder intervention, one of which

occurred during Tesla's own crash testing of the Model S, as discussed above.  Contemporaneous

incident reports prepared by responding fire departments, as corroborated by multiple CWs,

specifically describe the fire as occurring in the Model S battery pack.

132.   This statement was also materially false and misleading because it failed to disclose

the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed

*supra*), some of which *had occurred* during Tesla's crash testing of the Model S, (b) the fact that

the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal

driving conditions due to its undercarriage design and configuration, its lack of protective battery

42

### SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

<u>Tesla's September 14, 2013 Investor Presentation</u>

133.    In a September 14, 2013 "Tesla Motors Investor Presentation"  bearing a Tesla copyright and the name of Jeff Evanson, Tesla's VP of Investor Relations (the "September 14, 2013 Investor Presentation") Tesla again touted the Model S as being the "***Safest Car Ever Tested by NHTSA***."  This statement was false and misleading for the same reasons as Defendants' similar statements in the August 19, 2013 Press Release and the "Safest Car In America" website statements, including, *inter alia*, its misrepresentation of the NHTSA's testing results as explained *supra*.  In addition, this statement, as well as the September 14, 2013 Investor Presentation's discussion of the Model S's "passive safety features" and "high energy density" were also materially false and misleading because they failed to disclose: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), some of which had occurred during Tesla's crash testing of the Model S, (b) the fact that the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

**<u>Partial Corrective Event:  Model S Fire In Washington State</u>**

134.    After the above-described misinformation campaign regarding the Model S being both the safest car ever tested and the safest in America, investors were shocked to learn on October 2, 2013 that a Model S battery pack had burst into flames the prior day, forcing its driver to

1   abandon the vehicle on the side of state Route 167 in Washington State, where it was totally

2   destroyed.  News reports carried the story, along with a shocking video and photos of a Model S

3   smoldering on the shoulder of a major highway.  For example:[2]





[2]  Photographs of Tesla's first Model S fire included herein were taken from Yahoo! Autos,
CNBC, Youtube, Bloomberg and jalopnik.com.  A video of the Model S burning can be found at
http://www.youtube.com/watch?v=q0kjI08n4fg.

1
2
3
4
5
6
7
8
9

135.    The Model S that burst into flames was totally destroyed, after firefighters

encountered significant difficulty extinguishing the blaze.  Indeed, firefighters had to employ a jack

to turn the burning Model S onto its side, then cut a hole into the undercarriage to apply water

directly into the burning battery.  It proved so difficult to extinguish that firefighters had to punch

multiple holes in the battery pack.  After the car *reignited* despite those efforts, they had to employ

chemical fire extinguishers.  Fire crews were on the scene for two and one-half hours.  Their efforts

are documented in these photographs:



1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16

17
18
19
20
21
22
23
24



25
26
27

136.    At first, Tesla admitted that the burning car was a Model S, but initially denied that the fire originated in the battery pack.  After the press reported firefighters' trouble extinguishing

28

the blaze, which accelerated when doused with water and reignited after initial extinguishment, Tesla later admitted that the fire arose in the battery pack.  Tesla stated that a collision with road debris penetrated the undercarriage and battery pack, thereby causing the fire.

137.    However, while the driver had stated that he believed he struck road debris while driving on the highway, a trooper who responded to the scene was unable to locate any objects on the highway and that there was too much damage from the fire to see what damage debris may have caused.

138.    This dangerous incident was a partial corrective event for Defendants' fraud.  On this news, Tesla's stock plummeted.  Tesla's stock declined $12.05 per share - or more than 6% - to close at $180.95 per share on October 2, 2013, on volume of 20,724,600 shares – double the average over the prior three months.

139.    On October 3, 2013, a series of articles served as additional corrective events that helped drive the continuing market reaction to the prior day's Model S fire.  These reports included the following:

(a)    The New York Times published an article entitled "Car Fire a Test for High-Flying Tesla," which quoted a battery consultant as saying that the case shielding around the Model S's lithium-ion battery might not have been strong enough to keep the impact with road debris from causing a short circuit.  The article also quoted Karl Brauer, an analyst with Kelley Blue Book, as noting, "It's a relatively innocuous occurrence to hit something in the road.  But in this case there's a fire, and a fire that's difficult to put out."

(b)    The MIT Technology Review also published an article on October 3, 2013 entitled "What the Tesla Battery Fire Means for Electric Vehicles," which raised concerns about the Model

S's battery pack, even while evidencing the effects of Defendants' fraud regarding the purported lack of any prior testing-related fires:

> [T]he fire illustrated once again how difficult lithium ion battery fires are to put out. Firefighters thought they had it put out, but it reignited. There are a couple of schools of thought among battery experts about why this happens. In a battery fire, the main thing that's burning is the liquid electrolyte, which burns best when it's exposed to air. One school of thought is that even in the absence of air there other oxidants within the battery that can create and sustain a fire. It's thought that the battery electrodes themselves can release oxygen, fueling the fire from within. If this is the case, all firefighters can do is to work to keep the fire from spreading and wait for the reactants to burn up.

> Other research suggests that this isn't the case. Instead, what might happen is that even once the fire is put out, the cells stay very hot and keep releasing more electrolyte in the form of vapor. Once firefighters turn off the water and oxygen can once more come into contact the vapor, it can reignite.

> It seems clear that we need to do more tests and learn the best ways to put out battery fires, especially as battery-powered cars proliferate.

> The second negative is that the accident raises questions about how well protected the battery is. The Tesla battery spreads out over most of the floor of the car. Contrast that to the battery on the Chevy Volt, which is tucked up inside the car, actually taking up space within the passenger compartment to keep it out of harm's way. Was the piece of metal that the driver ran into huge, and likely to cause serious damage to any sort of car? Or was it something you wouldn't think twice about running over in a conventional car? Is the Model S particularly vulnerable to road debris?

> I've seen the protection on the battery, and my sense is that it would take a pretty good chunk of metal to damage [citation omitted]. ***And the fact that no other Model S's have caught fire, even in vigorous safety tests, also seems to be a good sign***. Hopefully, we'll find out more about exactly what caused the accident in the coming days.

140.     On these reports, Tesla's stock continued its fire-related decline, shedding $7.64 per share or 4.2% to close at $173.31 per share on October 3, 2013, on volume of 23,782,200 shares – once again double the average over the preceding three months.  Notably, however (as evidenced by the highlighted portion above), these otherwise negative analyses were impacted by (and softened

by) Defendants' fraud at issue (*e.g.*, the mistaken belief that no Model S had ever caught fire during a safety test).

**Defendants' False And Misleading Statements**
**Between October 3, 2013 – October 22, 2013, Inclusive**

141.    To quell these concerns, and to perpetuate the fraud, thereby reviving Tesla's stock price, Defendants embarked on a misinformation campaign that included additional false and misleading statements.

ABC News Interview of Tesla on October 3, 2013

142.    On October 3, 2013, Tesla company spokesperson Elizabeth Jarvis-Shean was quoted by ABC News as stating that the Washington state fire was the first known fire caused by a Model S battery.  In her interview, she rattled off Tesla's vehicle deliveries and miles driven and stated, "*[T]his is the first fire*."

143.    This statement was a lie.  The Model S batteries caught fire numerous times before the Class Period, including least three occasions that required first responder intervention, including at least once during Tesla's own crash testing of the Model S, as discussed above. Contemporaneous incident reports prepared by responding fire departments, as corroborated by multiple CWs, specifically describe the fire as occurring in the Model S battery pack.

144.    Moreover, this statement was also materially false and misleading because it failed to disclose the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), some of which had occurred during Tesla's crash testing of the Model S, (b) the fact that the   Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at

49

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

<u>Defendant Musk's Blog Post on October 4, 2013</u>

145.    On October 4, 2013, Defendant Musk authored a blog post, submitted herewith as Exhibit 4, published on Tesla's corporate website, which was linked to Tesla's corporate Twitter account and to Defendant Musk's personal Twitter account the same day.  This blog post was unaccompanied by any warnings or cautionary statements.  In it, Defendant Musk characterized the Model S fire incident as follows (with emphasis added):

> Earlier this week, a Model S traveling at highway speed struck a large metal object, causing significant damage to the vehicle. A curved section that fell off a semi-trailer was recovered from the roadway near where the accident occurred and, according to the road crew that was on the scene, appears to be the culprit. ***The geometry of the object caused a powerful lever action as it went under the car, punching upward and impaling the Model S with a peak force on the order of 25 tons***. <u>***Only a force of this magnitude***</u> ***would be strong enough to punch a 3 inch diameter hole through the quarter inch armor plate protecting the base of the vehicle***.

> The Model S owner was nonetheless able to exit the highway as instructed by the onboard alert system, bring the car to a stop and depart the vehicle without injury. A fire caused by the impact began in the front battery module – the battery pack has a total of 16 modules – but was contained to the front section of the car by internal firewalls within the pack. Vents built into the battery pack directed the flames down towards the road and away from the vehicle. …

> It is important to note that the fire in the battery was contained to a small section near the front by the internal firewalls built into the pack structure. At no point did fire enter the passenger compartment.

146.    In addition, Defendant Musk touted the Model S's safety as compared to traditional gasoline-powered automobiles, stating (with emphasis added):

> ***Had a conventional gasoline car encountered the same object on the highway, the result could have been far worse***. A typical gasoline car only has a thin metal sheet protecting the underbody, leaving it vulnerable to destruction of the fuel supply lines or fuel tank, which causes a pool of gasoline to form and often burn the entire car to the ground. In contrast, the combustion energy of our battery pack is only about 10% of the energy contained in a gasoline tank and is divided into 16 modules with

50

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

firewalls in between. As a consequence, ***the effective combustion potential is only about 1% that of the fuel in a comparable gasoline sedan***.

The nationwide driving statistics make this very clear: there are 150,000 car fires per year according to the National Fire Protection Association, and Americans drive about 3 trillion miles per year according to the Department of Transportation. That equates to 1 vehicle fire for every 20 million miles driven, compared to 1 fire in over 100 million miles for Tesla. ***This means you are 5 times more likely to experience a fire in a conventional gasoline car than a Tesla***!

For consumers concerned about fire risk, there should be absolutely zero doubt that it is safer to power a car with a battery than a large tank of highly flammable liquid.

147.    Defendant Musk even went so far as to allocate blame for the fire on the standard operating procedures employed by the first responders, while downplaying the significant difficulties and serious risks these emergency personnel encountered in extinguishing the blaze, stating:

When the fire department arrived, they observed standard procedure, which was to gain access to the source of the fire by puncturing holes in the top of the battery's protective metal plate and applying water. For the Model S lithium-ion battery, it was correct to apply water (vs. dry chemical extinguisher), ***but not to puncture the metal firewall, as the newly created holes allowed the flames to then vent upwards into the front trunk section of the Model S***. Nonetheless, a combination of water followed by dry chemical extinguisher ***quickly brought the fire to an end***.

148.    In the same blog post, Defendant Musk also published an email exchange with the driver of the Model S that burned.  In it, Jerome Guillen, VP WW Sale and Service, stated in relevant part (with emphasis added):

We are following this case extremely closely and we have sent a team of experts to review your vehicle. ***All indications are that your Model S drove over large, oddly-shaped metal object which impacted the leading edge of the vehicle's undercarriage and rotated into the underside of the vehicle ("pole vault" effect). <u>This is a highly uncommon occurrence</u>***.

Based on our review thus far, we believe that the Model S performed as designed by limiting the resulting fire to the affected zones only. ***Given the significant intensity of the impact, which managed to pierce the 1/4 inch bottom plate (<u>something that is extremely hard to do</u>), the Model S energy containment functions operated***

SECOND AMENDED CLASS ACTION COMPLAINT

*correctly*. In particular, the top cover of the battery provided a strong barrier and there was no apparent propagation of the fire into the cabin. This ensured cabin integrity and occupant safety, which remains our most important goal.

149.    These statements from Defendant Musk's October 4, 2013 blog post and the email exchange it published were materially false and misleading, because they overstated how "uncommon" a battery pack fire would be, how "extremely hard" it would be for the Model S undercarriage and battery pack to sustain damage sufficient to ignite such a fire, and how "only a force of this magnitude" (*i.e.* 25 tons) would cause such damage and fire.  These statements are contrary to the facts of Tesla's prior, undisclosed battery fires, as discussed *supra*.  Defendant Musk also misrepresented how "quickly" the first responders were able to extinguish (and re-extinguish) the high-intensity blaze, when in actuality, the intense blaze re-ignited, required extreme measures to extinguish, and occupied first responders for two and one-half hours.  They misrepresented the comparative safety of a Model S as compared to a gas-powered automobile, in terms of the Model S both having only one percent (1%) the combustion potential and being five times less likely to experience a fire – all contrary to Tesla's undisclosed prior battery fires.

150.    These statements were also false and misleading, because, *inter alia*, they failed to disclose the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), some of which had occurred during Tesla's crash testing of the Model S, (b) the fact that the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

151.    Defendants' remarks were able to buoy Tesla's stock price, assisted in part by the fact that the NHTSA was unable to send an investigator to the accident scene, due to the fact that the October 2, 2013 battery fire in Washington State occurred on the first day of a 16-day government shutdown in October.  On October 4, 2013, Tesla's stock opened at $176.80 (up from its prior day's closing price of $173.31), and it closed at $180.95.

**Partial Corrective Event:  NHTSA Begins "Gathering Data"**

152.    On October 22, 2013, the NHTSA issued a statement that, while it had not yet decided whether to open a formal investigation, the agency was "gathering data" and "[had] our experts in contact with Tesla right now."  This statement signaled to the market that the fortuity of a government shutdown would not mean that the Model S would escape regulator scrutiny.

153.    This first step by the NHTSA can serve as a prelude to a formal investigation, which often leads to costly – both in financially and reputationally – measures being taken by a car company, either as a result of a recall or (as ultimately occurred with Tesla) to head off a recall. Indeed, formal investigations into GM's Chevy Colt and Fisker Automotive Inc.'s Karma both led to recalls.  In GM's case, a recall of 8,000 Volt vehicles occurred in January 2012 to address concerns that its batteries caught fire weeks after simulated impacts.  In Fisker's case, it recalled some vehicles with A123 Systems battery packs.

154.    On this news, Tesla's stock dropped $1.06 from its October 21, 2013 closing price of $172.60 to close at $171.54 on October 22, 2013 – after trading as low as $166.11 on intra-day trading.  On October 23, 2013, Tesla's stock price opened at $168.91 (down from its October 22, 2013 closing price of $171.54) and fell further to close at $164.50 as the market and analysts digested the possibility of NHTSA action.  For instance, an October 23, 2013 Bank of America

Merrill Lynch analyst note referenced, among other things, "the recent Model S battery fire and potential NHTSA probe" in questioning Tesla's stock.

### Defendants' False And Misleading Statements
### Between October 22, 2013 – October 27, 2013, Inclusive

155.     In light of the NHTSA's opening a formal investigation, Defendants once again sought to quell investor concerns by perpetuating the fraud and issuing additional false and misleading statements.

### Defendant Musk's October 22, 2013 Speech

156.     On October 22, 2013, Defendant Musk gave a speech to Tesla consumers at a Tesla service center in Germany, which was videotaped and widely disseminated on the Internet (the "October 22, 2013 Speech").  The October 22, 2013 Speech was unaccompanied by any warnings or cautionary statements.  After presenting lengthy prepared remarks, Defendant Musk engaged in Q&A and was asked about the recent Tesla fire and what Tesla would do to avoid such incidents in the future.

157.     After referencing his post-fire blog posting (discussed *supra*), Defendant Musk said that the incident gave Tesla an opportunity to explain that "***our electric car is five times less likely to catch fire than a gasoline car***" (a comment Defendant Musk made twice during the Q&A).  He described the Washington state fire as a "***very peculiar accident***" where the Model S drove over "a big curved piece of a fender" that fell off of a truck "that went under the car and then jack-knifed into the battery pack with a huge impact."  Downplaying the severity of the fire, he said that "***just the front portion of the battery pack caught fire***" and he speculated that if it had been a gas car, the driver could have been killed.  In referencing the NHTSA test results, he said that the Model S's "***official score was five star in every category, but in reality it was more like 5.4.***"

54

SECOND AMENDED CLASS ACTION COMPLAINT

158.    Defendant Musks's statements were materially false and misleading.    He mischaracterized the Washington state fire as one in which "just the front portion of the battery pack caught fire," when in reality, the car was engulfed in flames that took two and one-half hours to battle.   He reiterated the "5.4-star" NHTSA rating, which was false and misleading for the reasons described *supra*, *i.e.*, that the NHTSA does not rate any car above 5 stars.   His statement that a Model S was five times less likely to have a fire than a gasoline car understated the true risk of such fires, particularly in light of the undisclosed prior fire incidents that involved Tesla car batteries, as discussed *supra*.

159.    Moreover, these statements also were all false and misleading, because, *inter alia*, they failed to disclose the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), some of which had occurred during Tesla's crash testing of the Model S, (b) the fact that the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

Defendant Musk's Bloomberg TV Interview On October 24, 2013

160.    Defendant Musk gave an interview on Bloomberg TV on October 24, 2013, unaccompanied by any warnings or cautionary statements, in which he reiterated his prior explanations for the Model S fire and downplayed the incident.   Among other things, he stated that a large metal object pierced the six millimeter armor plate on the Model S and that it took several minutes for a few modules in the battery pack to catch fire and burn.   He touted the fact that there were no injuries and that the car owner bought another Model S.   When asked about recent scrutiny

over lithium-ion batteries, due to a high-profile problem with Boeing, Defendant Musk stated, "***The issue with the Boeing lithium-ion pack was not that it caught fire, but that it spontaneously caught fire***, for no reason.  It wasn't as though there was a crash, or anybody shot it, or anything like that.  It was just in a normal flight, and it caught fire.  ***In our case, it was hit by a large piece of metal at high speed***."

161.    Defendant Musk's statement distinguishing the Boeing incident from the Model S fire on the basis of the Boeing fire having been a spontaneous fire was materially misleading, because he omitted the material facts that not only had Tesla experienced prior, undisclosed battery fires, at multiple times those fires started had *also* started spontaneously, as discussed *supra*.  More generally, Defendant Musk's statements also were all false and misleading, because, *inter alia*, they failed to disclose: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), some of which had occurred during Tesla's crash testing of the Model S, (b) the fact that the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

162.    Once again, Defendant Musk's remarks served to buoy Tesla's stock price.  On October 24, 2013, Tesla's stock closed at $173.15, up substantially from its opening price of $165.00 and its prior day closing price of $164.50.

163.    The same day, the NHTSA announced in an email statement that, in reliance upon data provided by Tesla and after consulting with Tesla, it had opted not to open a formal investigation of the Model S fire.  NHTSA had been unable to send its own investigators to the fire

scene to gather evidence due to a government shutdown and had to rely on Tesla for the data that formed the basis of this decision.

164.    Defendant Musk's statements on October 22, 2013 and October 24, 2014 were also materially false and misleading and omitted material information, due to his failure to disclose that, unknownst to investors, a ***second Model S fire had already taken place***, as discussed below.  Given Defendants' knowledge of this fire almost immediately after it occurred, Defendant Musk's failure to disclose it during his October 22, 2013 and October 24, 2013 remarks was deliberate.

### Partial Corrective Event:  Model S Fire In Mexico

165.    On October 28, 2013, media outlets reported that a second Tesla Model S fire had occurred on October 18, 2013 in Merida, Yucatan Peninsula, Mexico.  Once again, a video surfaced of a Model S engulfed in flames, with sporadic explosions occurring, and photos were widely circulated, such as:[3]

---

[3] The photo of the second Model S fire is a still taken from a video shot by Renán Rodríguez as published by Mexican news outlet Progreso Hoy.  The photo of the burned-out Model S after the fire is taken from jalopnik.com.  Video of this Model S burning, on which explosions can be heard, can be found at http://www.businessinsider.com/report-another-tesla-model-s-caught-fire-after-a-crash-video-2013-10.

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24



25    166.    This second fire served as a partial corrective disclosure.   On this news, Tesla's

26  stock price dropped $7.32 (4.3%) on heavy volume to close at $162.86 on October 28, 2013.

27
28

167.    In the wake of these reports, a Tesla spokeswoman said, "We were able to contact the driver quickly and are pleased that he is safe."  She touted the Model's safety and blamed the fire on the vehicle's rate of speed and its crashing through a concrete barrier and into a tree.  Once again, Tesla was able to avoid an NHTSA investigation, this time due to the fact that the Model S fire occurred outside of the United States, and therefore outside its jurisdiction.

168.    There is no question that Tesla and Defendant Musk knew about this second fire immediately after it occurred, and in any event, well before Defendant Musk's remarks on October 22, 2013 and October 24, 2013, discussed *supra*.

169.    CW14 was the consumer who purchased the car that was destroyed by this incident in Mexico (though he was not the driver at the time).  CW14 confirmed that the accident happened on Friday, October 18, 2013.  CW14 stated that he received a call on his cellular phone on either Saturday, October 19, 2013 or Sunday, October 20, 2013 from Jerome Guillum, Tesla Vice President of Sales and Service.  CW14 stated that, following this call, Tesla sent a team of approximately five engineers and technicians on October 21, 2013, which conducted an on-site investigation for two days.  There is no question that Defendants knew not only of the Model S fire, but also of the work conducted by this team and the results of their investigation.

170.    CW14's statements regarding the immediacy of Defendants' knowledge as to major incidents involving a Model S are corroborated by those of CW11.  CW11 was a service technician at Tesla from March 2013 to November 2013, a tenure that includes the Class Period.  CW11 stated that Tesla maintains a network database that records all mechanical and electrical problems that arise with individual Tesla vehicles.  CW11 added that if a part of a Tesla car malfunctions or falls outside normal parameters, the car's computer system triggers a "default code" that is transmitted to

the network via the Internet.  CW11 stated that Tesla keeps these records for each car, which can be accessed in the future.

171.    Both CWs are corroborated by Defendant Musk's own remark, substantially later at the Ignition: Future of Digital Conference on November 12, 2013, where, in describing the Mexico Model S crash and fire, Musk said, "He picked our team up from the airport the next day."

### Partial Corrective Events:  Tesla Q3 2012 Earnings & Model S Fire In Tennessee

172.    Tesla's stock price experienced pressure on November 6, 2013, due to analyst reaction to Tesla's Q3 2013 earnings release after-market the day before.  Among other things, Tesla reported that its ZEV revenues had fallen over 80%, from $51 million in Q2 2013 to just $10 million in Q3 2013, and 5,500 vehicle deliveries.  Analysts expressed concerns that Tesla could not increase deliveries sufficiently to overcome its plummeting ZEV revenues.  The lower-than-expected deliveries were a manifestation of decreased consumer demand due to the prior-reported vehicle fires and safety concerns.  On this news, Tesla's stock opened on November 6, 2013 at $154.81 ($22.00 or 12.44% lower than its prior day's closing price) and fell another $3.65 on heavy volume to close at $151.16 after triggering the NASDAQ "circuit breaker" that slows short-selling.

173.    In this context, disaster struck Tesla when, once again, a Model S operated at normal driving conditions struck road debris and incinerated.  During the morning on November 7, 2013, Tesla confirmed that a third fire in its flagship Model S had occurred, this time in Murfreesboro, Tennessee the previous afternoon, that Tesla was in contact with the driver, and that Tesla had already sent a team to Tennessee to investigate.  This was Tesla's third Model S fire in just five weeks.  It occurred just miles from Nissan's Leaf electric vehicle factory in Smyrna, Tennessee.

174.    According to local authorities, during normal driving conditions at 1:35 p.m. on Interstate 24, the Model S in question hit a metal object in the roadway, though to be a tow hitch,

which damaged the car's undercarriage and ignited a fire in the battery pack.  Rutherford County Fire Chief Larry Farley said that the blaze was so hot and intense that "it pretty much just melted [the vehicle] to the road."[4]



[4] Photographs of the third Model S fire were taken from the Twitter accounts @Nashvillian and @davanh, which were widely republished in news media, as well as from the websites jalopnik.com, valuewalk.com, cleantechnica.com, and dailymail.co.ok, and from the AP.

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23
24



25
26
27
28

1

175.    Once again, the fire damage totally destroyed the Model S.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

176.     Notably, the cause of this third Model S fire – road debris struck during normal driving usage – is **precisely** the same cause articulated by Tesla for the first fire in Washington.  All three fires in the Model S occurred toward the front of the car, in the battery pack.

177.     Not surprisingly, reactions were swift and negative.  For instance:

(a)     As reported by Yahoo! Autos, this raised a "troubling comparison" for Tesla, which at that time had only 19,000 Model S vehicles on the road.  It quoted Clarence Ditlow, director of the Center for Auto Safety as stating, "To have one instance of fire from road debris is a fluke.  To have two road debris fires in a vehicle population that small is highly unusual."

(b)     Yahoo! Autos and Wired reported that, by contrast, a spokesman for Nissan, which had sold nearly 70,000 Leaf electric vehicles worldwide by that point (three and one-half times more than the Model S), stated that, to date, "there have been no fires involving the Nissan Leaf, either through extensive and extreme testing or in the real world."  A spokeswoman for General Motor, whose Chevy Volt uses a gas-powered engine to recharge a lithium-ion battery pack, stated that, "to GM's knowledge the Volt has not experienced a fire on the road," despite 50,000 vehicles sold by that point (two and one-half times more than the Model S).  Yahoo! Autos reported that no other automobile maker has reported a fire connected to an electric vehicle.  Notably, the Model S carries up to three times the stored electrical energy as the Volt and up to five times that of the Leaf.  Moreover, while the Model S battery pack spans the entire undercarriage, the Volt employs a T-shaped pack while the Leaf uses a pack placed toward the rear of the car where the fuel tank would normally reside.

(c)     Mr. Ditlow, in a telephone interview with Bloomberg, said that the NHTSA "absolutely has to investigate" the Tennessee crash.  He added, "It appears there's inadequate shielding on the bottom of these vehicles.  Road debris is a known hazard to the undercarriage of

vehicles." Ditlow added that a possible fix, strengthening the undercarriage protection "is not rocket science" in that "[p]robably the simplest task Tesla has is putting a strong shield on the bottom of the car."

178. The NHTSA said it would contact the Tennessee authorities to determine if there are safety problems that need further action.

179. On this news, Tesla's stock price fell, closing at $139.77, down from its prior day's closing price of $151.16, on heavy volume.

**Defendants' False And Misleading Statements**
**Between November 9, 2013 – November 18, 2013, Inclusive**

180. In the days that followed, the Tesla fires continued to get negative press. In one piece on November 9, 2013, the New York Times quoted Dan Edmunds, director of vehicle testing at Edmunds.com, as questioning whether the Model S's low clearance made it easier for the car to strike road debris. In the same article, Mr. Ditlow said that the Tennessee fire proved that the Washington fire was not a fluke. He said, "The initial failure mode is puncture of the battery pack from road debris. The obvious engineering fix would be to add a safety shield. With Tesla, there is some protection there. They just need a better shield."

Defendant Musk's Interviews On November 12, 2013

181. On November 12, 2013, Defendant Musk was interviewed on CNBC, where he said "*there definitely won't be a Model S recall*." During this interview, he made additional false and misleading statements. Specifically, he called the headlines regarding the Model S fires misleading and the market reaction to them "extremely inaccurate and unreasonable." Even after three publicly-known fires in the prior six weeks, not to mention the undisclosed fires about which Defendant Musk was aware (as discussed *supra*), he stated that the *Model S is less likely to have a fire than a gasoline car.*

182.    Also on November 12, 2013, Defendant Musk was interviewed at the second annual DealBook conference, hosted by the New York Times.  At DealBook, where Defendant Musk once again said *there was no reason for a Model S recall*, he made additional false and misleading statements.  He stated that, at one fire for every 8,000 cars, the Model S is *five times less likely to have a fire than the average car*.  Calling himself a perfectionist, Defendant Musk said *Tesla would do a recall of the Model S if it felt like there was something affecting its safety*.

183.    In addition, on November 12, 2013, Defendant Musk was interviewed at the Ignition: Future of Digital Conference in New York.  Once again, he said, "*If we thought that a recall was warranted, we would do it immediately*."  In addition, he touted the Model S's safety. He stated, "There is one fire for every 1,300 gasoline cars.  In our case, there is one fire for every 8,000 cars.  *So our case is five times less likely to have a fire than a gasoline car*."

184.    Defendant Musk's statements described above in his CNBC interview, at the DealBook conference, and at the Ignition Conference comparing the Model S to gasoline cars were materially false and misleading, because they failed to account for the then-known variables implicated in the publicly-known (not to mention the undisclosed) Model S fires that had actually occurred.  As explained by Dr. Rick Martin, Ph.D. in Mechanical Engineering, from Martin Thermal Engineering, Defendant Musk's comparison "misses two important points," those being: (a) that the three then-recent Model S fires in the news all involved collisions, whereas the baseline rate used by Defendant Musk includes many additional and unrelated causation factors and (b) that, by far, the latest percentage of all vehicle fires occurs in ones over five years old, mostly due to inadequate maintenance, flawed service or operator carelessness.  As Dr. Martin put it, "The more salient electric versus gasoline vehicle comparison would be 'fires per collision exceeding a certain speed differential.'  Although we don't have any actual data, we expect a comparison of collision-

related fires would yield incident rates more similar for the two types of vehicles than the Tesla blog suggests." Thus, according to Dr. Martin, "So the question regarding Tesla's Model S seems to be whether its barriers are adequate to protect its battery cells. It may still turn out that fleets of electric cars experience fewer total fires per mile than fleets of gasoline or diesel cars, over their respective lifetimes."

185. Moreover, his statements in his CNBC interview, at the DealBook conference, and at the Ignition Conference regarding the lack of a recall were false and misleading in that Tesla was on the cusp of taking corrective actions, including the raising of the Model S by an over-the-air software update and the retroactive implementation of enhanced undercarriage shielding, both as discussed *infra*.

186. In addition to the specific reasons set forth above, the above-described statements in Defendant Musk's CNBC interview, at the DealBook conference, and at the Ignition Conference were materially false and misleading for the additional reasons that they failed to disclose the following material information: (a) Tesla's numerous prior battery fire incidents (as discussed *supra*), (b) the fact that the  Model S was highly vulnerable to undercarriage puncture and catastrophic fire at normal driving conditions due to its undercarriage design and configuration, its lack of protective battery sleeves, its lack of reinforced undercarriage plating, and its lowered driving height at highway speeds, and (c) that Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions.

**Partial Corrective Event:  Tesla Raises The Model S Driving Height
And Extends Its Warranty To Cover Fire Damage**

187. On November 18, 2013, Defendant Musk wrote a blog piece posted on Tesla's corporate website, entitled "The Mission of Tesla." After railing against the media coverage of the three then-recent Model S fires, and repeating many of the statistics he had previously stated in

68

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

public comments, Defendant Musk outlined corrective measures to address the problem of Model S

fires under normal driving conditions at highway speeds.  Specifically, Defendant Musk stated:

Further Actions

While we believe the evidence is clear that there is no safer car on the road than the Model S, we are taking three specific actions.

First, we have rolled out an over-the-air update to the air suspension that will result in greater ground clearance at highway speeds. To be clear, this is about reducing the chances of underbody impact damage, not improving safety. The theoretical probability of a fire injury is already vanishingly small and the actual number to date is zero. Another software update expected in January will give the driver direct control of the air suspension ride height transitions.

Second, we have requested that the National Highway Traffic Safety Administration conduct a full investigation as soon as possible into the fire incidents. While we think it is highly unlikely, if something is discovered that would result in a material improvement in occupant fire safety, we will immediately apply that change to new cars and offer it as a free retrofit to all existing cars. Given that the incidence of fires in the Model S is far lower than combustion cars and that there have been no resulting injuries, this did not at first seem like a good use of NHTSA's time compared to the hundreds of gasoline fire deaths per year that warrant their attention. However, there is a larger issue at stake: if a false perception about the safety of electric cars is allowed to linger, it will delay the advent of sustainable transport and increase the risk of global climate change, with potentially disastrous consequences worldwide. That cannot be allowed to happen.

Third, to reinforce how strongly we feel about the low risk of fire in our cars, we will be amending our warranty policy to cover damage due to a fire, even if due to driver error. Unless a Model S owner actively tries to destroy the car, they are covered. Our goal here is to eliminate any concern about the cost of such an event and ensure that over time the Model S has the lowest insurance cost of any car at our price point. Either our belief in the safety of our car is correct and this is a minor cost or we are wrong, in which case the right thing is for Tesla to bear the cost rather than the car buyer.

All of these actions are taken in order to make clear the confidence we have in our product and to eliminate any misperceptions regarding the integrity of our technology and the safety of our cars.

188.    Raising the highway driving height of all Model S's in existence was apparently as

easy as pushing a button.  It was one of the specific safety measures that auto experts had called on

Tesla to do.  Moreover, as CW10 said, "After the fires, Tesla sent out a firmware package which raised the ride height of the vehicle.  That's essentially accepting fault."  CW10 stated that he interpreted the software update as an admission by Tesla that it erred in selling cars that automatically lowered to a height that made the battery pack susceptible to road debris penetration and subsequent fires.  In other words, raising the car's height was an admission that the Model S was, as originally sold, not "the safest car in America" because it was highly vulnerable to the specific issue of an undercarriage collision that could ignite a battery fire.

189.     Similarly, expanding the warranty to cover fires was a tacit admission that their probability in a Model S is in actuality significantly higher than had been represented during the Class Period.

190.     On this news, Tesla's stock plummeted, closing at $121.58 on November 18, 2013, down from its $135.45 closing price the prior trading day, November 15, 2013.  To the extent that the stock price drop preceded the posting of Defendant Musk's blog piece, it was due to leakage of the corrective steps being taken by Tesla.

191.     As a result of Defendants' wrongful acts and omissions, and the resultant declines in the market value of Tesla stock, Lead Plaintiff and other Class members have suffered significant losses and damages in excess of $1 billion.

**Post-Class-Period Facts Of Relevance**

192.     On November 19, 2013, the NHTSA opened its investigation of the Model S fires. NHTSA Administrator David Strickland denied Defendant Musk's claim that it was Tesla who asked the NHTSA to do so.  As reported by Forbes and the Detroit News, Strickland told the U.S. Congress that Tesla "did not ask for the investigation."  The NHTSA's investigation letter stated that, based on the Washington and Tennessee incidents (the Mexico incident is outside its

jurisdiction), it was opening a "preliminary evaluation to examine the potential risks associated with undercarriage strikes on model year 2013 Tesla Model S vehicles."

193.    Following the Tennessee fire, CW12 described a "hurried" effort within Tesla, staffed by a team of employees including ones personally known to CW12, to work on Model S design features to better protect the battery pack.  CW12 said that it was known, company-wide, that Defendant Musk was driving these employees to address this issue "as fast as possible."  It turns out this effort took less than four months.

194.    On March 28, 2014, Defendant Musk authored a blog piece posted on social blogging platform Medium and on Tesla's corporate website entitled "Tesla Adds Titanium Underbody Shield and Aluminum Deflector Plates to Model S."  In it, he stated, "Starting with vehicle bodies manufactured as of March 6, all cars have been outfitted with a triple underbody shield.  Tesla service will also retrofit the shields, free of charge, to existing cars upon request or as part of a normally scheduled service."  Despite Defendant Musk's characterizations to the contrary, the retrofitting of prior-sold Model S cars in this way is tantamount to a recall.

195.    In describing the undercarriage protection, Defendant Musk's blog included three short video clips illustrating the shields at work crushing or deflecting road debris.  He added:

> The first of the three shields is a rounded, hollow aluminum bar that is designed to either deflect objects entirely or, in the case of a self-stabilizing, ultra high strength object, like a three ball steel tow hitch, absorb the impact and force it to pike upwards well forward of the battery pack. This pierces the plastic aeroshield and front trunk liner, but causes no damage affecting safety and the car remains in control and driveable before, during and after the impact.
>
> This is followed by a titanium plate, which has exceptional strength-to-weight properties and is more commonly seen in aerospace or military applications. The titanium plate prevents sensitive front underbody components from being damaged and aids in neutralizing the road debris.

71
SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

By this point, the vast majority of objects will have been deflected or crushed. For the rare piece of debris that remains intact, we added a third shield, which is a shallow angle, solid aluminum extrusion that further absorbs impact energy, provides another layer of deflection and finally causes the Model S to ramp up and over the object if it is essentially incompressible and immovable.

196.     Significantly, Defendant Musk's blog posting makes clear that the implementation of this technology did *not* impair the Model S battery range.  Specifically, he said, "The protective qualities of the underbody shields are substantial, but their effect on the overall structure of the vehicle is minimal.  In total, the shields only have a 0.1 percent impact on range and don't affect ride or handling.  Wind tunnel testing shows no discernible change in drag or lift on the car."

197.     Thus, there was no reason this or similar technology could not have been implemented before or during the Class Period, even assuming that Defendant Musk's battery range mandate applied to the Model S's development.

198.     ***After*** Tesla implemented the over-the-air software upgrade raising the Model S's highway driving height and the retrofitting of all Model S cars with the reinforced undercarriage shields, only then did NHTSA close its investigation, on March 26, 2014.  The NHTSA's report makes clear that it required these measures in order to alleviate regulator concerns stemming from the Washington and Tennessee fires (the Mexico fire is outside of NHTSA's jurisdiction).

199.     Specifically, the NHTSA report indicates that it examined only Model S cars in model years 2012 and 2013, a vehicle population of 15,805, about two-thirds of which had been manufactured with an air-assisted suspension system that automatically lowered the vehicle at higher speeds.  It noted that in both the Washington and the Tennessee fires, active suspension Model S cars operating at highway speeds and lowered driving heights ran over roadway debris, which struck and penetrated the aluminum pan at the forward area of the battery pack.  This

1   penetration damaged the high voltage batteries, causing a fire, and then thermal runaway in the high

2   voltage battery cells.  In both cases, the fires destroyed the vehicles.

3         200.     The NHTSA noted that Tesla's telematic software update raising the Model S riding

4   height mitigates the risk of battery compartment penetration by the object (a three-ball hitch) that

5   struck the car in Tennessee.  However, the NHTSA's report indicated that the greater damage and

6   unknown shape of the object in the Washington fire "raised concerns regarding the effectiveness of

7   raising the ride height for objects other than a three-ball hitch."   In a March 10, 2014 meeting

8   between Tesla and the Office of Defects Investigation ("ODI"), Tesla stated that it would provide

9   the free-of-charge retrofitting with enhanced undercarriage shielding.  The report concludes:

> ODI believes impacts with road debris are normal and foreseeable.  In this case, Tesla's revision of vehicle ride height and addition of increased underbody protection should reduce both the frequency of underbody strikes and the resultant fire risk.  A defect trend has not been identified.  Accordingly, the investigation is closed.  ***The closing of the investigation does not constitute a finding by NHTSA that a safety-related defect does not exist, and the agency reserves the right to take further action if warranted by new circumstances.***

        201.     Today, Tesla's corporate website no longer bears the "Safest Car in America"

banner.  Instead, it appears like this:



SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

1

**CLASS ACTION ALLEGATIONS**

2

3        202.    Lead Plaintiff brings this acti1on as a class action pursuant to Federal Rule of Civil

4    Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

5    acquired Tesla securities during the Class Period (the "Class"); and were damaged thereby.

6    Excluded from the Class are Defendants herein, the officers and directors of the Company, at all

7    relevant times, members of their immediate families and their legal representatives, heirs,

8    successors or assigns and any entity in which Defendants have or had a controlling interest.

9        203.    The members of the Class are so numerous that joinder of all members is

10   impracticable.  Throughout the Class Period, Tesla securities were actively traded on the NASDAQ.

11   While the exact number of Class members is unknown to Lead Plaintiff at this time and can be

12   ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or

13   thousands of members in the proposed Class.  Record owners and other members of the Class may

14   be identified from records maintained by Tesla or its transfer agent and may be notified of the

15   pendency of this action by mail, using the form of notice similar to that customarily used in

16   securities class actions.

17

18       204.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

19   members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

20   law that is complained of herein.

21

22       205.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

23   Class and has retained counsel competent and experienced in class and securities litigation.  Lead

24   Plaintiff has no interests antagonistic to or in conflict with those of the Class.

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

206. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tesla;

- whether the non-corporate Defendants caused Tesla to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Tesla securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

207. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **FRAUD ON THE MARKET PRESUMPTION**

208. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

75
SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

- Tesla securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased and/or sold Tesla securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

209. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## **NO SAFE HARBOR**

210. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

211. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

212. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

1

## SCIENTER

2

213.    Defendants' scienter is readily apparent.

3

214.    It is clear that, at all relevant times, Defendants acted knowingly and intentionally.

4

5 As alleged in greater detail *supra*, Defendants made the materially false and misleading statement

6 and omissions constituting the fraud at issue with full knowledge of their falsity due to contrary

7 facts, evidenced by numerous CWs and documentary evidence, which were undisclosed to

8 investors.  Defendants knew the circumstances and severity of the several pre-Class-Period fires

9 discussed herein.  They also knew about the deleterious effects that Defendant Musk's aggressive

10 deadlines were having on Tesla's operations, its engineering, and its testing, as described above.

11 Defendants also knew of the balancing between the Model S's safety and its battery range that was

12 necessitated by Defendant Musk's demand for a 300-mile range for the Model S.  In particular, they

13 knew what safety measures were available before the Class Period (*e.g.*, a higher highway driving

14 height, stronger undercarriage plating, protective sleeves for the batteries, a potential redesign of the

15 battery pack in light of the adoption of high voltage batteries) but not adopted.  Moreover, in

16 discussing the Washington state fire, Defendants had full knowledge that a second fire in Mexico,

17 undisclosed to investors, had already occurred.

18

19 215.    At minimum, Defendants' recklessness is clear.  As evidenced by the documents and

20 confidential witness statements summarized above, Defendants knew or should have known that

21 their Class Period statements regarding, *inter alia*, the Model S's safety generally, the NHTSA's

22 ratings of the Model S, the lack of prior fire incidents, the vulnerability of the Model S's battery

23 pack to undercarriage impact damage and fires, and the Washington fire being the first and only fire

24 were false and misleading when made.  Defendants had a duty to monitor the information indicating

25 that these statements were false, such that their failure to do so could only have been through their

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**
Case No. 3:13-CV-05216-CRB

recklessness.  Moreover, this information is imputable to Tesla's Chairman and CEO, Defendant Musk, whether he actually knew it or not.

216.    Defendants also had the motive and opportunity to lie.  Defendants' opportunity is indisputable, as they possessed unique access to and control over adverse facts not publicly known to investors that rendered their public statements false and misleading.

217.    As for motive, Tesla had already tapped the capital and debt markets for $1 billion, had already taken out (and repaid) a massive and politically unpopular government loan in excess of $450 million, and was seeing its ZEV revenues decline by 80% during the Class Period.  On an existential level, Tesla needed its flagship product, the Model S, to establish proof of concept, gain acceptance, and sell.  Defendants simply could not afford any major public setback that would risk either delaying the Model S's rollout or, once it was launched, risk causing it to fall flat with consumers.  There was no margin of error, given Tesla's precarious financial footing and its reliance on essentially a single product.  As news broke of a Model S catching fire under normal driving conditions, Tesla saw a drop in consumer demand.  Defendant Musk, in his own words, explained that drop and how the fraud at issue reversed it, during Tesla's Q4 2013 Earnings Call:

> Q:    I think it will be helpful if you could address the effect on demand that was caused by the vehicle fires last fall and the subsequent media firestorm regarding all that.  And then is it measurable?  What did you see?
>
> Musk: Yes.  So, at first, we saw a significant drop in demand, and we were quite worried about it.  And then as consumers came to understand that this was really kind of a media-driven thing and not a real danger with the car, they – our sales improved steadily since then and have continued to improve since that initial news.   And, basically, consumers have come to understand that, actually, our car has a far lower propensity of fire than a gasoline car and by at least a half order of magnitude.  And so as consumers became aware of that, their fears subsided.

218.    Defendants' scienter in this regard is further evidenced by their manipulation of Tesla's reported financial results, in violation of applicable rules and standards.  In order to boost

sales, Tesla implemented a guaranteed resale value program in April 2013, whereby Tesla ensured consumers that Tesla would buy back their car at roughly 50% of its value about three years after it was first sold.  In reality, this program virtually ensured that Tesla would bear this liability, since its entire business plan is to halve the price of its vehicle offerings.  Moreover, however titled, the program amounted, in essence, to a lease.  Dissatisfied with the requirements of lease accounting under GAAP, though, Defendants employed misleading shareholder letters for Q2 2013 and Q3 2013 (the latter filed with the SEC during the Class Period) that violated SEC Regulation G and Item 12 of Form 8-K.  The SEC Regulation G violation stems from the comparison of non-GAAP revenues in Q2 and Q3 2013, adjusted to exclude the effects of the resale guarantees, with GAAP-based revenues for Q1 2013 – amounts which are not comparable.  The Item 12 of Form 8-K violation stems from the failure to present comparable GAAP-based figures, which are presented in separate consolidated financials, with equal or greater prominence as non-GAAP figures, which appeared on the first page of the shareholder letters.   Violations of SEC regulations and GAAP buttress the scienter allegations.

219.    Defendant Musk also personally had motive and opportunity to commit the fraud alleged herein, both financially and reputationally.

(a)    Financially, an absolutely massive portion of his personal fortune has been put into Tesla.  During the Class Period, Defendant Musk owned over 28 million shares of Tesla (net of shares pledged for loans).  The various stock drops discussed herein, at times in the Class Period, represented singular losses to Defendant Musk personally in the hundreds of millions of dollars.  Altogether, given Tesla's Class Period high of $193.00 and its closing price on November 18, 2013 of $121.58 (a difference of $71.42), Defendant Musk had paper losses of nearly $2 billion personally.  He was enormously incentivized to commit the fraud alleged herein.

(b)     Reputationally, Defendant Musk is thought of synonymously with his three companies – Tesla, SolarCity and SpaceX.  If any of those three fails spectacularly, it would represent an enormous blight on the record of someone who is considered (by himself and others) a peer of Thomas Edison.  It is on the strength of Tesla and the Model S that Musk has been given a slew of prestigious accolades, including:  TIME's 100 list of 100 people who most affected the world; Esquire Magazine's list of 75 Most Influential People of the 21st Century; Forbes Magazine's recognition of his being one of America's 20 Most Powerful CEOs 40 and Under; Research and Development Magazine's Innovator of the Year; Inc. Magazine's Entrepreneur of the Year; MarketWatch's CEO of the Year; Askmen.com's Most Influential Man; and shared top billing with former President Clinton at the 2012 Clean Energy Summit.

220.    Defendants' motive and opportunity scienter is further evidenced by the insider sales that occurred during the Class Period.  Altogether, Tesla insiders sold 163,994 shares for total proceeds of $24,500,312.00 during the Class Period.  Such sales included:

(a)     During the early Class Period, prior to the Model S fire in Washington State, Tesla ranked in the top 30 values of U.S. companies sold by insiders, as reported by Bloomberg. Specifically, for the week ended August, 30, 2013, Bloomberg reported insider sales of 70,052 shares at an average price of $163.15, for total proceeds of $11,429,077.00.  These included Tesla Director Brad W. Buss's sale of 10,000 shares at $158.31/share and total proceeds of $1,583,080.00 on August 23, 2013, as well as Tesla Director Ira Matthew Ehrenpreis's sales of: (i) 10,000 shares for $158.31/share and total proceeds of $1,583,060.00 on August 23, 2013 and (ii) 16,436 shares for $163.10/share and total proceeds of $2,680,712.00, 36,136 shares for $164.18/share and total proceeds of $5,932,808.00, and 7,480 shares for $164.77/share and total proceeds of $1,232,480.00, all on August 29, 2013.

(b)      In November 2013, just prior to Tesla's announcement that it was issuing an over-the-air software update to lift the Model S, as discussed above, another run of insider sales occurred.  Specifically: (i) Vice President Gregory Reichow sold 15,000 shares at $133.28/share and total proceeds of $1,999,215.00 on November 8, 2013, and (ii) Director Stephen T. Jurvetson sold 77,942 shares at $140.31/share and total proceeds of $10,936,120.00 and 1,000 shares at $141.11/share and total proceeds of $141,106.00 on November 13, 2013.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

221.      Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

222.      This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

223.      During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tesla securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Tesla securities and

options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

224.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tesla securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tesla's finances and business prospects.

225.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

226.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As Tesla's CEO and Chairman, and given his high level of involvement in Tesla's day-to-day operations and the engineering work done on the Model S, Defendant Musk had knowledge of the details of Tesla's Model S engineering, testing, and design; Tesla's prior fire incidents; the Model S's vehicle integrity and

safety vulnerabilities as configured for sale during the Class Period; and Defendants' statements regarding the Model S and its level of safety.

227.   Defendant Musk is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Musk was were able to and did, directly or indirectly, control the content of the statements of Tesla.  As CEO and Chairman of a publicly-held company, Defendant Musk had a duty to disseminate timely, accurate, and truthful information with respect to Tesla's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tesla securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Tesla's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased Tesla securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

228.   During the Class Period, Tesla securities were traded on an active and efficient market.  Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Tesla securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Lead Plaintiff and the Class, the true value of Tesla securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class.  The market price of Tesla securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

229.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

230.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered substantial damages in connection with their respective purchases and sales of Tesla's securities during the Class Period, upon the corrective events outlined herein that revealed that Defendants had been disseminating misrepresented financial statements to the investing public.

### COUNT II
### (Violations of Section 20(a) of the
### Exchange Act Against Defendant Musk)

231.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

232.    During the Class Period, Defendant Musk oversaw the operation and management of Tesla, and conducted and participated, directly and indirectly, in the conduct of Tesla's business affairs.  As Tesla's CEO and Chairman, and given his high level of involvement in Tesla's day-to-day operations and in the engineering decisions on the Model S, Defendant Muck knew the adverse non-public information regarding Tesla's operational and safety issues, including without limitation its pre-Class-Period fire incidents and the measures Tesla did not adopt before the Class Period to safeguard against future Model S fires due to road debris strikes that could puncture the car's undercarriage and damage its battery pack.

233.     As CEO and Chairman of a publicly owned company, Defendant Musk had a duty to disseminate accurate and truthful information with respect to Tesla's operations, the Model S, and the results of testing by Tesla and the government on the Model S and its component parts, and to correct promptly any public statements issued by Defendants which had become materially false or misleading.

234.     As CEO and Chairman with clear control over Tesla, Defendant Musk was able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace during the Class Period concerning the facts at issue.  Throughout the Class Period, Defendant Musk exercised his power and authority to cause Tesla to engage in the wrongful acts complained of herein.  Therefore, Defendant Musk was a "controlling person" of Tesla within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Tesla securities.

235.     Thus, Defendant Musk acted as a controlling person of Tesla, for purposes of liability under the federal securities laws.  As alleged herein, Defendant Musk had the power to direct the actions of, and exercised the same to cause, Tesla to engage in the unlawful acts and conduct complained of herein.  Defendant Musk exercised control over the general operations of Tesla and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

236.     By reason of the above conduct, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tesla.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated: June 16, 2014

                                                 **GLANCY BINKOW & GOLDBERG LLP**

                                                  _/s/ Robert V. Prongay_____
                                                 Lionel Glancy (#134180)
                                                 Michael Goldberg (#188669)
                                                 Robert V. Prongay (#270796)
                                                 1925 Century Park East, Suite 2100
                                                 Los Angeles, California  90067
                                                 Telephone: (310) 201-9150
                                                 Facsimile: (888) 773-9224
                                                 Email:  lglancy@glancylaw.com
                                                          mmgoldberg@glancylaw.com
                                                          rprongay@glancylaw.com

                                                 *Liaison Counsel for Lead Plaintiff, Plaintiffs*
                                                 *and the Proposed Class*

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

**POMERANTZ LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:  jalieberman@pomlaw.com
           mltuccillo@pomlaw.com

-and-

Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Lead Counsel for Lead Plaintiff, Plaintiffs and the Proposed Class***

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-CV-05216-CRB

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _Kazim Z. Acar_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Tesla Motors, Inc. ("Tesla" or the "Company") and, authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3. I did not purchase or acquire Tesla securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Tesla securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Tesla securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed _____6 / 9 / 14_____
                    **(Date)**

_____
                **(Signature)**

_____
            **(Type or Print Name)**

**TESLA MOTORS (TSLA)**                                    **Acar, Kazim**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 08/27/2013 | PUR | 280 | $165.1300 |
| Common Stk | 08/27/2013 | PUR | 1,500 | $164.7940 |
| Common Stk | 08/28/2013 | PUR | 4,300 | $166.8923 |
| Common Stk | 08/28/2013 | PUR | 412 | $166.8164 |
| Common Stk | 08/28/2013 | PUR | 188 | $166.8164 |
| Common Stk | 08/28/2013 | PUR | 100 | $166.8164 |
| Common Stk | 08/28/2013 | PUR | 1,000 | $167.2581 |
| Common Stk | 08/28/2013 | PUR | 725 | $167.6533 |
| Common Stk | 08/28/2013 | PUR | 2,000 | $167.6533 |
| Common Stk | 08/28/2013 | PUR | 339 | $167.6533 |
| Common Stk | 08/28/2013 | PUR | 836 | $167.6320 |
| Common Stk | 08/28/2013 | PUR | 100 | $167.6000 |
| Common Stk | 08/28/2013 | SLD | 280 | $171.1251 |
| Common Stk | 08/28/2013 | SLD | 1,500 | $171.1251 |
| Common Stk | 08/28/2013 | SLD | 4,300 | $167.0451 |
| Common Stk | 08/28/2013 | SLD | 412 | $167.0451 |
| Common Stk | 08/28/2013 | SLD | 188 | $167.0640 |
| Common Stk | 08/28/2013 | SLD | 100 | $167.1170 |
| Common Stk | 08/29/2013 | PUR | 725 | $166.7137 |
| Common Stk | 08/29/2013 | SLD | 1,000 | $167.5659 |
| Common Stk | 08/29/2013 | SLD | 725 | $167.5659 |
| Common Stk | 08/30/2013 | SLD | 2,000 | $166.8821 |
| Common Stk | 08/30/2013 | SLD | 339 | $166.4921 |
| Common Stk | 08/30/2013 | SLD | 836 | $166.4921 |
| Common Stk | 08/30/2013 | SLD | 100 | $166.4921 |
| Common Stk | 08/30/2013 | SLD | 725 | $166.4921 |
| Common Stk | 09/03/2013 | PUR | 500 | $169.2999 |
| Common Stk | 09/03/2013 | PUR | 247 | $169.2999 |
| Common Stk | 09/03/2013 | PUR | 100 | $169.2999 |
| Common Stk | 09/03/2013 | PUR | 153 | $169.2999 |
| Common Stk | 09/04/2013 | SLD | 500 | $170.4170 |
| Common Stk | 09/04/2013 | SLD | 247 | $170.2766 |
| Common Stk | 09/04/2013 | SLD | 100 | $170.3070 |
| Common Stk | 09/04/2013 | SLD | 153 | $170.2970 |
| Common Stk | 09/10/2013 | PUR | 200 | $167.0082 |
| Common Stk | 09/10/2013 | PUR | 800 | $167.0082 |
| Common Stk | 09/11/2013 | SLD | 200 | $165.1272 |
| Common Stk | 09/11/2013 | SLD | 800 | $165.1571 |

**TESLA MOTORS (TSLA)**                                                    **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 09/18/2013 | PUR | 1,000 | $166.3100 |
| Common Stk | 09/18/2013 | SLD | 1,000 | $166.6601 |
| Common Stk | 09/19/2013 | PUR | 104 | $180.1460 |
| Common Stk | 09/19/2013 | PUR | 396 | $180.0488 |
| Common Stk | 09/20/2013 | SLD | 104 | $180.8291 |
| Common Stk | 09/20/2013 | SLD | 396 | $180.8291 |
| Common Stk | 09/23/2013 | PUR | 88 | $178.6234 |
| Common Stk | 09/23/2013 | PUR | 12 | $178.5083 |
| Common Stk | 09/23/2013 | PUR | 400 | $178.5085 |
| Common Stk | 09/23/2013 | PUR | 500 | $180.2300 |
| Common Stk | 09/23/2013 | PUR | 500 | $181.4078 |
| Common Stk | 09/23/2013 | PUR | 500 | $181.4078 |
| Common Stk | 09/23/2013 | PUR | 500 | $182.0199 |
| Common Stk | 09/24/2013 | SLD | 88 | $181.6569 |
| Common Stk | 09/24/2013 | SLD | 12 | $181.6567 |
| Common Stk | 09/24/2013 | SLD | 400 | $181.6875 |
| Common Stk | 09/24/2013 | SLD | 500 | $181.6875 |
| Common Stk | 09/24/2013 | SLD | 500 | $182.2469 |
| Common Stk | 09/25/2013 | PUR | 500 | $181.8374 |
| Common Stk | 09/25/2013 | SLD | 500 | $182.6269 |
| Common Stk | 09/27/2013 | PUR | 300 | $189.2432 |
| Common Stk | 09/27/2013 | PUR | 300 | $189.2029 |
| Common Stk | 09/27/2013 | PUR | 400 | $189.2029 |
| Common Stk | 09/27/2013 | PUR | 1,000 | $189.6099 |
| Common Stk | 09/27/2013 | PUR | 167 | $189.3398 |
| Common Stk | 09/27/2013 | SLD | 300 | $188.9133 |
| Common Stk | 09/27/2013 | SLD | 300 | $188.9134 |
| Common Stk | 09/27/2013 | SLD | 400 | $188.9267 |
| Common Stk | 09/27/2013 | SLD | 1,000 | $190.7881 |
| Common Stk | 09/27/2013 | SLD | 167 | $190.7881 |
| Common Stk | 09/27/2013 | SLD | 500 | $187.3890 |
| Common Stk | 09/27/2013 | SLD | 500 | $187.3890 |
| Common Stk | 10/01/2013 | PUR | 200 | $190.4133 |
| Common Stk | 10/01/2013 | PUR | 100 | $190.4133 |
| Common Stk | 10/01/2013 | PUR | 200 | $190.7150 |
| Common Stk | 10/01/2013 | PUR | 500 | $191.8600 |
| Common Stk | 10/01/2013 | PUR | 1,000 | $192.9599 |
| Common Stk | 10/01/2013 | SLD | 200 | $193.2108 |

**TESLA MOTORS (TSLA)**                                                      **Acar, Kazim**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 10/01/2013 | SLD | 100 | $193.2566 |
| Common Stk | 10/01/2013 | SLD | 200 | $193.2567 |
| Common Stk | 10/01/2013 | SLD | 500 | $193.7575 |
| Common Stk | 10/01/2013 | SLD | 1,000 | $193.7575 |
| Common Stk | 10/04/2013 | PUR | 875 | $177.5085 |
| Common Stk | 10/04/2013 | PUR | 125 | $178.8100 |
| Common Stk | 10/04/2013 | PUR | 125 | $177.5085 |
| Common Stk | 10/04/2013 | PUR | 275 | $178.8100 |
| Common Stk | 10/04/2013 | PUR | 600 | $178.8100 |
| Common Stk | 10/04/2013 | SLD | 875 | $177.5670 |
| Common Stk | 10/04/2013 | SLD | 125 | $177.5670 |
| Common Stk | 10/04/2013 | SLD | 125 | $179.0181 |
| Common Stk | 10/04/2013 | SLD | 275 | $179.0181 |
| Common Stk | 10/04/2013 | SLD | 600 | $179.0370 |
| Common Stk | 10/07/2013 | PUR | 484 | $184.0073 |
| Common Stk | 10/07/2013 | PUR | 500 | $186.1096 |
| Common Stk | 10/07/2013 | PUR | 16 | $184.7644 |
| Common Stk | 10/07/2013 | PUR | 16 | $184.0069 |
| Common Stk | 10/07/2013 | PUR | 684 | $184.7642 |
| Common Stk | 10/07/2013 | PUR | 300 | $184.7433 |
| Common Stk | 10/07/2013 | SLD | 484 | $185.0668 |
| Common Stk | 10/07/2013 | SLD | 500 | $185.0668 |
| Common Stk | 10/07/2013 | SLD | 16 | $185.0669 |
| Common Stk | 10/08/2013 | SLD | 16 | $184.8969 |
| Common Stk | 10/08/2013 | SLD | 684 | $184.8968 |
| Common Stk | 10/08/2013 | SLD | 300 | $184.8968 |
| Common Stk | 10/09/2013 | PUR | 200 | $170.7696 |
| Common Stk | 10/09/2013 | PUR | 200 | $171.7833 |
| Common Stk | 10/09/2013 | SLD | 200 | $169.1271 |
| Common Stk | 10/10/2013 | PUR | 200 | $171.8500 |
| Common Stk | 10/10/2013 | PUR | 100 | $171.7833 |
| Common Stk | 10/10/2013 | PUR | 200 | $171.2333 |
| Common Stk | 10/10/2013 | PUR | 100 | $171.2333 |
| Common Stk | 10/10/2013 | SLD | 200 | $173.6637 |
| Common Stk | 10/11/2013 | SLD | 200 | $169.0272 |
| Common Stk | 10/11/2013 | SLD | 100 | $170.5238 |
| Common Stk | 10/11/2013 | SLD | 200 | $170.5238 |
| Common Stk | 10/11/2013 | SLD | 100 | $173.6637 |

**TESLA MOTORS (TSLA)**                                              **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 10/14/2013 | PUR | 500 | $177.4799 |
| Common Stk | 10/14/2013 | SLD | 500 | $176.3909 |
| Common Stk | 10/15/2013 | PUR | 500 | $187.7796 |
| Common Stk | 10/15/2013 | PUR | 200 | $187.6566 |
| Common Stk | 10/15/2013 | PUR | 400 | $187.6566 |
| Common Stk | 10/15/2013 | PUR | 400 | $187.6386 |
| Common Stk | 10/15/2013 | PUR | 301 | $187.5431 |
| Common Stk | 10/15/2013 | PUR | 699 | $187.5078 |
| Common Stk | 10/15/2013 | SLD | 500 | $187.7068 |
| Common Stk | 10/15/2013 | SLD | 200 | $188.2918 |
| Common Stk | 10/15/2013 | SLD | 400 | $188.2867 |
| Common Stk | 10/15/2013 | SLD | 400 | $188.2867 |
| Common Stk | 10/15/2013 | SLD | 301 | $187.5683 |
| Common Stk | 10/15/2013 | SLD | 699 | $187.5683 |
| Common Stk | 10/16/2013 | PUR | 624 | $185.6359 |
| Common Stk | 10/16/2013 | PUR | 376 | $185.6182 |
| Common Stk | 10/16/2013 | PUR | 600 | $185.4099 |
| Common Stk | 10/16/2013 | PUR | 400 | $185.4099 |
| Common Stk | 10/17/2013 | SLD | 624 | $184.5305 |
| Common Stk | 10/17/2013 | SLD | 376 | $184.5305 |
| Common Stk | 10/17/2013 | SLD | 600 | $184.5306 |
| Common Stk | 10/17/2013 | SLD | 400 | $184.5268 |
| Common Stk | 10/22/2013 | PUR | 400 | $175.9599 |
| Common Stk | 10/22/2013 | PUR | 600 | $175.9599 |
| Common Stk | 10/22/2013 | SLD | 400 | $176.8519 |
| Common Stk | 10/22/2013 | SLD | 600 | $176.8670 |
| Common Stk | 10/24/2013 | PUR | 148 | $168.2732 |
| Common Stk | 10/24/2013 | PUR | 100 | $168.2732 |
| Common Stk | 10/24/2013 | PUR | 52 | $168.2733 |
| Common Stk | 10/24/2013 | SLD | 148 | $170.6423 |
| Common Stk | 10/24/2013 | SLD | 100 | $170.7091 |
| Common Stk | 10/24/2013 | SLD | 52 | $170.7071 |
| Common Stk | 11/04/2013 | PUR | 37 | $167.3438 |
| Common Stk | 11/04/2013 | PUR | 707 | $167.3438 |
| Common Stk | 11/04/2013 | PUR | 1,463 | $168.4699 |
| Common Stk | 11/04/2013 | PUR | 2,193 | $168.7025 |
| Common Stk | 11/04/2013 | PUR | 200 | $168.2600 |
| Common Stk | 11/04/2013 | PUR | 400 | $168.2000 |

**TESLA MOTORS (TSLA)**                                                     **Acar, Kazim**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/04/2013 | PUR | 300 | $168.7025 |
| Common Stk | 11/04/2013 | PUR | 700 | $168.7025 |
| Common Stk | 11/04/2013 | PUR | 600 | $168.7025 |
| Common Stk | 11/04/2013 | PUR | 150 | $168.7025 |
| Common Stk | 11/04/2013 | PUR | 75 | $167.3439 |
| Common Stk | 11/04/2013 | PUR | 57 | $168.7025 |
| Common Stk | 11/04/2013 | PUR | 18 | $169.0950 |
| Common Stk | 11/04/2013 | PUR | 400 | $169.0950 |
| Common Stk | 11/04/2013 | PUR | 1,300 | $169.0950 |
| Common Stk | 11/04/2013 | PUR | 200 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 10 | $167.3430 |
| Common Stk | 11/04/2013 | PUR | 282 | $169.0950 |
| Common Stk | 11/04/2013 | PUR | 415 | $169.3294 |
| Common Stk | 11/04/2013 | PUR | 207 | $169.4396 |
| Common Stk | 11/04/2013 | PUR | 200 | $169.3295 |
| Common Stk | 11/04/2013 | PUR | 143 | $169.4085 |
| Common Stk | 11/04/2013 | PUR | 242 | $169.3294 |
| Common Stk | 11/04/2013 | PUR | 793 | $169.4396 |
| Common Stk | 11/04/2013 | PUR | 222 | $171.4296 |
| Common Stk | 11/04/2013 | PUR | 300 | $171.4296 |
| Common Stk | 11/04/2013 | PUR | 100 | $171.4295 |
| Common Stk | 11/04/2013 | PUR | 378 | $171.4296 |
| Common Stk | 11/04/2013 | PUR | 106 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 668 | $167.3849 |
| Common Stk | 11/04/2013 | PUR | 207 | $167.3438 |
| Common Stk | 11/04/2013 | PUR | 27 | $165.9459 |
| Common Stk | 11/04/2013 | PUR | 100 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 6 | $165.9467 |
| Common Stk | 11/04/2013 | PUR | 300 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 100 | $165.9459 |
| Common Stk | 11/04/2013 | PUR | 369 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 296 | $167.3438 |
| Common Stk | 11/04/2013 | PUR | 329 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 114 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 225 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 61 | $168.4698 |
| Common Stk | 11/04/2013 | PUR | 180 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 109 | $168.3239 |

**TESLA MOTORS (TSLA)**                                        **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 11/04/2013 | PUR | 11 | $168.5700 |
| Common Stk | 11/04/2013 | PUR | 160 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 89 | $168.5699 |
| Common Stk | 11/04/2013 | PUR | 351 | $168.4699 |
| Common Stk | 11/04/2013 | PUR | 47 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 53 | $168.4700 |
| Common Stk | 11/04/2013 | PUR | 167 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 33 | $168.4700 |
| Common Stk | 11/04/2013 | PUR | 180 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 6 | $168.3250 |
| Common Stk | 11/04/2013 | PUR | 133 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 147 | $168.4699 |
| Common Stk | 11/04/2013 | PUR | 1,498 | $165.9458 |
| Common Stk | 11/04/2013 | PUR | 1,144 | $168.3240 |
| Common Stk | 11/04/2013 | PUR | 292 | $168.4699 |
| Common Stk | 11/04/2013 | SLD | 37 | $168.2970 |
| Common Stk | 11/04/2013 | SLD | 707 | $168.5471 |
| Common Stk | 11/04/2013 | SLD | 1,463 | $168.5471 |
| Common Stk | 11/04/2013 | SLD | 2,193 | $168.5471 |
| Common Stk | 11/04/2013 | SLD | 200 | $168.5471 |
| Common Stk | 11/04/2013 | SLD | 400 | $168.5471 |
| Common Stk | 11/04/2013 | SLD | 300 | $168.4957 |
| Common Stk | 11/04/2013 | SLD | 700 | $168.5272 |
| Common Stk | 11/04/2013 | SLD | 600 | $168.3908 |
| Common Stk | 11/05/2013 | PUR | 808 | $175.0499 |
| Common Stk | 11/05/2013 | PUR | 200 | $175.0400 |
| Common Stk | 11/05/2013 | PUR | 500 | $175.0250 |
| Common Stk | 11/05/2013 | PUR | 75 | $175.0499 |
| Common Stk | 11/05/2013 | PUR | 350 | $175.0499 |
| Common Stk | 11/05/2013 | PUR | 27 | $180.8600 |
| Common Stk | 11/05/2013 | PUR | 500 | $180.7900 |
| Common Stk | 11/05/2013 | PUR | 800 | $175.0625 |
| Common Stk | 11/05/2013 | PUR | 2,267 | $175.0499 |
| Common Stk | 11/05/2013 | PUR | 27 | $180.8800 |
| Common Stk | 11/05/2013 | PUR | 73 | $180.8600 |
| Common Stk | 11/05/2013 | PUR | 367 | $180.9535 |
| Common Stk | 11/05/2013 | PUR | 100 | $180.9300 |
| Common Stk | 11/05/2013 | PUR | 460 | $180.9000 |

**TESLA MOTORS (TSLA)**                                              **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/05/2013 | PUR | 73 | $180.8800 |
| Common Stk | 11/05/2013 | PUR | 100 | $180.9535 |
| Common Stk | 11/05/2013 | PUR | 100 | $180.9535 |
| Common Stk | 11/05/2013 | PUR | 173 | $180.9535 |
| Common Stk | 11/05/2013 | SLD | 150 | $175.9405 |
| Common Stk | 11/05/2013 | SLD | 75 | $176.0069 |
| Common Stk | 11/05/2013 | SLD | 57 | $176.0070 |
| Common Stk | 11/05/2013 | SLD | 18 | $176.0067 |
| Common Stk | 11/05/2013 | SLD | 400 | $175.9979 |
| Common Stk | 11/05/2013 | SLD | 1,300 | $175.9969 |
| Common Stk | 11/05/2013 | SLD | 200 | $175.9981 |
| Common Stk | 11/05/2013 | SLD | 10 | $175.9980 |
| Common Stk | 11/05/2013 | SLD | 282 | $175.9980 |
| Common Stk | 11/05/2013 | SLD | 415 | $175.9981 |
| Common Stk | 11/05/2013 | SLD | 207 | $175.9980 |
| Common Stk | 11/05/2013 | SLD | 200 | $176.0894 |
| Common Stk | 11/05/2013 | SLD | 143 | $176.1385 |
| Common Stk | 11/05/2013 | SLD | 242 | $176.1385 |
| Common Stk | 11/05/2013 | SLD | 793 | $176.1385 |
| Common Stk | 11/05/2013 | SLD | 222 | $176.1385 |
| Common Stk | 11/05/2013 | SLD | 300 | $176.1370 |
| Common Stk | 11/05/2013 | SLD | 100 | $176.1369 |
| Common Stk | 11/05/2013 | SLD | 378 | $175.8416 |
| Common Stk | 11/05/2013 | SLD | 808 | $175.8416 |
| Common Stk | 11/05/2013 | SLD | 200 | $175.8417 |
| Common Stk | 11/05/2013 | SLD | 500 | $175.8416 |
| Common Stk | 11/05/2013 | SLD | 75 | $154.9840 |
| Common Stk | 11/05/2013 | SLD | 350 | $155.0073 |
| Common Stk | 11/05/2013 | SLD | 106 | $154.9973 |
| Common Stk | 11/05/2013 | SLD | 668 | $154.9973 |
| Common Stk | 11/05/2013 | SLD | 207 | $154.9973 |
| Common Stk | 11/05/2013 | SLD | 27 | $154.9974 |
| Common Stk | 11/05/2013 | SLD | 500 | $154.9973 |
| Common Stk | 11/05/2013 | SLD | 800 | $154.9973 |
| Common Stk | 11/05/2013 | SLD | 2,267 | $154.9973 |
| Common Stk | 11/06/2013 | PUR | 34 | $152.0021 |
| Common Stk | 11/06/2013 | PUR | 200 | $152.0023 |
| Common Stk | 11/06/2013 | PUR | 100 | $152.0022 |

**TESLA MOTORS (TSLA)**                                                    **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 11/06/2013 | PUR | 200 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 174 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 822 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 75 | $152.0023 |
| Common Stk | 11/06/2013 | PUR | 100 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 25 | $152.0024 |
| Common Stk | 11/06/2013 | PUR | 800 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 1,000 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 1,000 | $152.0022 |
| Common Stk | 11/06/2013 | PUR | 200 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 16 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 25 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 125 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 4 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 300 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 150 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 400 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 400 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9900 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9750 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9499 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9496 |
| Common Stk | 11/06/2013 | PUR | 50 | $151.9450 |
| Common Stk | 11/06/2013 | PUR | 100 | $151.9450 |
| Common Stk | 11/06/2013 | PUR | 2,000 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 100 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 100 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 100 | $150.7015 |
| Common Stk | 11/06/2013 | PUR | 100 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 1,700 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 1,055 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 1,000 | $150.7014 |
| Common Stk | 11/06/2013 | PUR | 845 | $150.7014 |
| Common Stk | 11/06/2013 | SLD | 27 | $155.1174 |
| Common Stk | 11/06/2013 | SLD | 73 | $155.1173 |

**TESLA MOTORS (TSLA)**                                                    **Acar, Kazim**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/06/2013 | SLD | 367 | $155.1973 |
| Common Stk | 11/06/2013 | SLD | 100 | $155.1972 |
| Common Stk | 11/06/2013 | SLD | 460 | $155.1973 |
| Common Stk | 11/06/2013 | SLD | 73 | $155.1973 |
| Common Stk | 11/06/2013 | SLD | 100 | $155.1673 |
| Common Stk | 11/06/2013 | SLD | 100 | $155.1273 |
| Common Stk | 11/06/2013 | SLD | 27 | $155.0774 |
| Common Stk | 11/06/2013 | SLD | 173 | $155.0773 |
| Common Stk | 11/06/2013 | SLD | 100 | $155.0673 |
| Common Stk | 11/06/2013 | SLD | 6 | $155.0567 |
| Common Stk | 11/06/2013 | SLD | 300 | $155.0473 |
| Common Stk | 11/06/2013 | SLD | 100 | $155.0373 |
| Common Stk | 11/06/2013 | SLD | 369 | $155.0273 |
| Common Stk | 11/06/2013 | SLD | 296 | $155.0273 |
| Common Stk | 11/06/2013 | SLD | 329 | $155.0273 |
| Common Stk | 11/06/2013 | SLD | 114 | $154.7624 |
| Common Stk | 11/06/2013 | SLD | 225 | $154.7623 |
| Common Stk | 11/06/2013 | SLD | 61 | $154.7623 |
| Common Stk | 11/06/2013 | SLD | 180 | $154.7673 |
| Common Stk | 11/06/2013 | SLD | 109 | $154.7672 |
| Common Stk | 11/06/2013 | SLD | 11 | $154.7673 |
| Common Stk | 11/06/2013 | SLD | 160 | $154.7573 |
| Common Stk | 11/06/2013 | SLD | 89 | $154.7573 |
| Common Stk | 11/06/2013 | SLD | 351 | $154.7573 |
| Common Stk | 11/06/2013 | SLD | 47 | $154.7472 |
| Common Stk | 11/06/2013 | SLD | 53 | $154.7474 |
| Common Stk | 11/06/2013 | SLD | 167 | $154.7173 |
| Common Stk | 11/06/2013 | SLD | 33 | $154.7173 |
| Common Stk | 11/06/2013 | SLD | 180 | $154.6673 |
| Common Stk | 11/06/2013 | SLD | 6 | $154.6067 |
| Common Stk | 11/06/2013 | SLD | 133 | $154.5973 |
| Common Stk | 11/06/2013 | SLD | 147 | $154.5973 |
| Common Stk | 11/06/2013 | SLD | 1,498 | $154.5473 |
| Common Stk | 11/06/2013 | SLD | 1,144 | $154.5473 |
| Common Stk | 11/06/2013 | SLD | 292 | $154.5473 |
| Common Stk | 11/06/2013 | SLD | 34 | $156.2471 |
| Common Stk | 11/06/2013 | SLD | 200 | $156.3173 |
| Common Stk | 11/06/2013 | SLD | 100 | $156.3572 |

**TESLA MOTORS (TSLA)**                                                **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/06/2013 | SLD | 200 | $156.3473 |
| Common Stk | 11/06/2013 | SLD | 174 | $157.8148 |
| Common Stk | 11/06/2013 | SLD | 822 | $157.8073 |
| Common Stk | 11/06/2013 | SLD | 75 | $159.8091 |
| Common Stk | 11/06/2013 | SLD | 100 | $159.9097 |
| Common Stk | 11/06/2013 | SLD | 25 | $159.9048 |
| Common Stk | 11/06/2013 | SLD | 800 | $159.8973 |
| Common Stk | 11/06/2013 | SLD | 1,000 | $159.2873 |
| Common Stk | 11/06/2013 | SLD | 1,000 | $158.7073 |
| Common Stk | 11/06/2013 | SLD | 200 | $156.2073 |
| Common Stk | 11/06/2013 | SLD | 16 | $156.2475 |
| Common Stk | 11/06/2013 | SLD | 100 | $156.2272 |
| Common Stk | 11/06/2013 | SLD | 25 | $156.2172 |
| Common Stk | 11/06/2013 | SLD | 125 | $156.2073 |
| Common Stk | 11/06/2013 | SLD | 4 | $155.3175 |
| Common Stk | 11/06/2013 | SLD | 100 | $151.0053 |
| Common Stk | 11/06/2013 | SLD | 300 | $151.0034 |
| Common Stk | 11/06/2013 | SLD | 150 | $150.9975 |
| Common Stk | 11/06/2013 | SLD | 100 | $151.1474 |
| Common Stk | 11/06/2013 | SLD | 400 | $151.2274 |
| Common Stk | 11/06/2013 | SLD | 400 | $151.2174 |
| Common Stk | 11/06/2013 | SLD | 100 | $151.2123 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.9974 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.9975 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.9975 |
| Common Stk | 11/06/2013 | SLD | 50 | $150.9974 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.9968 |
| Common Stk | 11/06/2013 | SLD | 2,000 | $150.2924 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.9274 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.0049 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.1033 |
| Common Stk | 11/06/2013 | SLD | 100 | $150.1013 |
| Common Stk | 11/06/2013 | SLD | 1,700 | $150.0975 |
| Common Stk | 11/06/2013 | SLD | 1,055 | $150.6480 |
| Common Stk | 11/06/2013 | SLD | 1,000 | $149.9874 |
| Common Stk | 11/06/2013 | SLD | 845 | $150.9968 |
| Common Stk | 11/11/2013 | PUR | 55 | $141.7564 |
| Common Stk | 11/11/2013 | PUR | 45 | $141.7562 |

**TESLA MOTORS (TSLA)** **Acar, Kazim**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 11/11/2013 | PUR | 500 | $141.7562 |
| Common Stk | 11/11/2013 | PUR | 945 | $141.7157 |
| Common Stk | 11/11/2013 | PUR | 350 | $141.7157 |
| Common Stk | 11/11/2013 | PUR | 105 | $141.7157 |
| Common Stk | 11/11/2013 | PUR | 150 | $141.5838 |
| Common Stk | 11/11/2013 | PUR | 300 | $141.5838 |
| Common Stk | 11/11/2013 | PUR | 200 | $141.5838 |
| Common Stk | 11/11/2013 | PUR | 55 | $141.5838 |
| Common Stk | 11/11/2013 | PUR | 295 | $141.5838 |
| Common Stk | 11/11/2013 | PUR | 745 | $141.8748 |
| Common Stk | 11/11/2013 | PUR | 200 | $141.8748 |
| Common Stk | 11/11/2013 | PUR | 55 | $141.8747 |
| Common Stk | 11/11/2013 | PUR | 100 | $141.8748 |
| Common Stk | 11/11/2013 | PUR | 450 | $141.8747 |
| Common Stk | 11/11/2013 | PUR | 45 | $141.8600 |
| Common Stk | 11/11/2013 | PUR | 745 | $141.8100 |
| Common Stk | 11/11/2013 | PUR | 660 | $141.8100 |
| Common Stk | 11/11/2013 | PUR | 800 | $136.8387 |
| Common Stk | 11/11/2013 | PUR | 100 | $137.3400 |
| Common Stk | 11/11/2013 | PUR | 100 | $140.2529 |
| Common Stk | 11/12/2013 | PUR | 100 | $141.7562 |
| Common Stk | 11/12/2013 | PUR | 117 | $141.7562 |
| Common Stk | 11/12/2013 | PUR | 183 | $141.7563 |
| Common Stk | 11/12/2013 | PUR | 360 | $141.7562 |
| Common Stk | 11/12/2013 | PUR | 100 | $141.7563 |
| Common Stk | 11/12/2013 | PUR | 40 | $141.7563 |
| Common Stk | 11/12/2013 | PUR | 100 | $141.7562 |
| Common Stk | 11/12/2013 | PUR | 445 | $141.8748 |
| Common Stk | 11/12/2013 | PUR | 105 | $141.8748 |
| Common Stk | 11/12/2013 | PUR | 55 | $141.8600 |
| Common Stk | 11/12/2013 | PUR | 195 | $141.8100 |
| Common Stk | 11/12/2013 | PUR | 200 | $141.8100 |
| Common Stk | 11/12/2013 | PUR | 100 | $139.0020 |
| Common Stk | 11/12/2013 | PUR | 100 | $139.0020 |
| Common Stk | 11/12/2013 | PUR | 800 | $139.0020 |
| Common Stk | 11/12/2013 | PUR | 600 | $139.0020 |
| Common Stk | 11/12/2013 | PUR | 2,400 | $139.0020 |
| Common Stk | 11/12/2013 | PUR | 1,000 | $139.0020 |

**TESLA MOTORS (TSLA)**                                      **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 11/12/2013 | PUR | 500 | $136.5200 |
| Common Stk | 11/12/2013 | PUR | 500 | $136.6100 |
| Common Stk | 11/12/2013 | PUR | 1,724 | $136.8457 |
| Common Stk | 11/12/2013 | PUR | 1,276 | $136.8387 |
| Common Stk | 11/12/2013 | PUR | 400 | $137.3400 |
| Common Stk | 11/12/2013 | PUR | 200 | $137.2000 |
| Common Stk | 11/12/2013 | PUR | 600 | $139.5050 |
| Common Stk | 11/12/2013 | PUR | 400 | $139.5050 |
| Common Stk | 11/12/2013 | PUR | 1,000 | $139.9849 |
| Common Stk | 11/12/2013 | PUR | 1,000 | $139.9849 |
| Common Stk | 11/12/2013 | PUR | 58 | $140.2529 |
| Common Stk | 11/12/2013 | PUR | 600 | $140.2529 |
| Common Stk | 11/12/2013 | PUR | 900 | $140.2529 |
| Common Stk | 11/12/2013 | PUR | 200 | $140.2300 |
| Common Stk | 11/12/2013 | PUR | 160 | $140.1850 |
| Common Stk | 11/12/2013 | PUR | 240 | $140.1850 |
| Common Stk | 11/12/2013 | PUR | 1,800 | $139.7256 |
| Common Stk | 11/12/2013 | PUR | 20 | $139.6900 |
| Common Stk | 11/12/2013 | PUR | 50 | $139.6900 |
| Common Stk | 11/12/2013 | PUR | 390 | $139.6900 |
| Common Stk | 11/12/2013 | PUR | 40 | $139.6900 |
| Common Stk | 11/12/2013 | PUR | 40 | $139.6655 |
| Common Stk | 11/12/2013 | PUR | 460 | $139.6654 |
| Common Stk | 11/12/2013 | PUR | 200 | $139.6654 |
| Common Stk | 11/12/2013 | PUR | 5 | $135.4800 |
| Common Stk | 11/12/2013 | PUR | 359 | $135.4815 |
| Common Stk | 11/12/2013 | PUR | 300 | $135.6731 |
| Common Stk | 11/12/2013 | PUR | 36 | $135.6731 |
| Common Stk | 11/12/2013 | PUR | 1,400 | $135.6731 |
| Common Stk | 11/12/2013 | PUR | 200 | $135.6732 |
| Common Stk | 11/12/2013 | PUR | 500 | $135.6699 |
| Common Stk | 11/12/2013 | PUR | 800 | $135.5899 |
| Common Stk | 11/12/2013 | PUR | 100 | $135.5859 |
| Common Stk | 11/12/2013 | PUR | 100 | $135.5849 |
| Common Stk | 11/12/2013 | PUR | 103 | $135.5799 |
| Common Stk | 11/12/2013 | PUR | 97 | $135.6520 |
| Common Stk | 11/12/2013 | PUR | 1,000 | $135.6519 |
| Common Stk | 11/12/2013 | PUR | 742 | $135.6519 |

**TESLA MOTORS (TSLA)**                                                    **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/12/2013 | SLD | 55 | $143.2175 |
| Common Stk | 11/12/2013 | SLD | 45 | $142.7509 |
| Common Stk | 11/12/2013 | SLD | 500 | $142.7975 |
| Common Stk | 11/12/2013 | SLD | 100 | $143.3276 |
| Common Stk | 11/12/2013 | SLD | 117 | $143.4174 |
| Common Stk | 11/12/2013 | SLD | 183 | $143.3775 |
| Common Stk | 11/12/2013 | SLD | 360 | $143.2698 |
| Common Stk | 11/12/2013 | SLD | 100 | $143.2775 |
| Common Stk | 11/12/2013 | SLD | 40 | $143.2475 |
| Common Stk | 11/12/2013 | SLD | 100 | $143.5676 |
| Common Stk | 11/12/2013 | SLD | 945 | $143.2175 |
| Common Stk | 11/12/2013 | SLD | 350 | $143.1076 |
| Common Stk | 11/12/2013 | SLD | 105 | $142.7509 |
| Common Stk | 11/12/2013 | SLD | 150 | $143.1076 |
| Common Stk | 11/12/2013 | SLD | 300 | $142.4342 |
| Common Stk | 11/12/2013 | SLD | 200 | $142.3980 |
| Common Stk | 11/12/2013 | SLD | 55 | $142.1251 |
| Common Stk | 11/12/2013 | SLD | 295 | $142.2375 |
| Common Stk | 11/12/2013 | SLD | 745 | $142.1250 |
| Common Stk | 11/12/2013 | SLD | 200 | $142.0979 |
| Common Stk | 11/12/2013 | SLD | 55 | $141.9751 |
| Common Stk | 11/12/2013 | SLD | 100 | $142.4976 |
| Common Stk | 11/12/2013 | SLD | 450 | $142.5675 |
| Common Stk | 11/12/2013 | SLD | 445 | $141.1788 |
| Common Stk | 11/12/2013 | SLD | 105 | $141.1075 |
| Common Stk | 11/12/2013 | SLD | 45 | $142.2376 |
| Common Stk | 11/12/2013 | SLD | 55 | $141.1787 |
| Common Stk | 11/12/2013 | SLD | 745 | $141.9751 |
| Common Stk | 11/12/2013 | SLD | 660 | $142.2375 |
| Common Stk | 11/12/2013 | SLD | 195 | $141.1075 |
| Common Stk | 11/12/2013 | SLD | 200 | $141.0678 |
| Common Stk | 11/12/2013 | SLD | 100 | $140.9476 |
| Common Stk | 11/12/2013 | SLD | 100 | $141.0175 |
| Common Stk | 11/12/2013 | SLD | 800 | $141.0075 |
| Common Stk | 11/12/2013 | SLD | 600 | $140.4259 |
| Common Stk | 11/12/2013 | SLD | 2,400 | $140.3976 |
| Common Stk | 11/12/2013 | SLD | 1,000 | $138.9956 |
| Common Stk | 11/12/2013 | SLD | 500 | $138.9956 |

**TESLA MOTORS (TSLA)**                                      **Acar, Kazim**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/12/2013 | SLD | 500 | $138.9956 |
| Common Stk | 11/12/2013 | SLD | 1,724 | $138.9956 |
| Common Stk | 11/12/2013 | SLD | 800 | $138.1365 |
| Common Stk | 11/12/2013 | SLD | 1,276 | $138.9956 |
| Common Stk | 11/12/2013 | SLD | 100 | $138.1365 |
| Common Stk | 11/12/2013 | SLD | 400 | $138.0693 |
| Common Stk | 11/12/2013 | SLD | 200 | $138.0693 |
| Common Stk | 11/13/2013 | PUR | 1,000 | $139.5050 |
| Common Stk | 11/13/2013 | PUR | 3,000 | $139.9522 |
| Common Stk | 11/13/2013 | PUR | 1,742 | $140.2529 |
| Common Stk | 11/13/2013 | PUR | 258 | $135.6519 |
| Common Stk | 11/13/2013 | SLD | 600 | $138.0693 |
| Common Stk | 11/13/2013 | SLD | 400 | $138.0442 |
| Common Stk | 11/13/2013 | SLD | 1,000 | $138.4976 |
| Common Stk | 11/13/2013 | SLD | 1,000 | $138.0076 |
| Common Stk | 11/13/2013 | SLD | 1,000 | $138.0376 |
| Common Stk | 11/13/2013 | SLD | 3,000 | $137.9943 |
| Common Stk | 11/13/2013 | SLD | 100 | $137.9376 |
| Common Stk | 11/13/2013 | SLD | 58 | $137.2278 |
| Common Stk | 11/13/2013 | SLD | 600 | $137.5210 |
| Common Stk | 11/13/2013 | SLD | 900 | $137.5277 |
| Common Stk | 11/13/2013 | SLD | 1,742 | $137.2576 |
| Common Stk | 11/13/2013 | SLD | 200 | $138.0442 |
| Common Stk | 11/13/2013 | SLD | 160 | $138.0442 |
| Common Stk | 11/13/2013 | SLD | 240 | $138.0076 |
| Common Stk | 11/13/2013 | SLD | 1,800 | $138.0076 |
| Common Stk | 11/13/2013 | SLD | 20 | $137.6775 |
| Common Stk | 11/13/2013 | SLD | 50 | $137.6280 |
| Common Stk | 11/13/2013 | SLD | 390 | $137.6080 |
| Common Stk | 11/13/2013 | SLD | 40 | $137.6075 |
| Common Stk | 11/13/2013 | SLD | 40 | $137.4528 |
| Common Stk | 11/13/2013 | SLD | 460 | $137.6076 |
| Common Stk | 11/13/2013 | SLD | 200 | $137.1276 |
| Common Stk | 11/14/2013 | PUR | 1,200 | $136.6820 |
| Common Stk | 11/14/2013 | PUR | 600 | $136.6820 |
| Common Stk | 11/14/2013 | PUR | 400 | $136.6820 |
| Common Stk | 11/14/2013 | PUR | 200 | $136.6820 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.6821 |

**TESLA MOTORS (TSLA)**                                    **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/14/2013 | PUR | 500 | $136.6820 |
| Common Stk | 11/14/2013 | PUR | 2,700 | $136.8037 |
| Common Stk | 11/14/2013 | PUR | 300 | $136.7900 |
| Common Stk | 11/14/2013 | PUR | 200 | $136.7800 |
| Common Stk | 11/14/2013 | PUR | 200 | $136.7799 |
| Common Stk | 11/14/2013 | PUR | 300 | $136.7700 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.7699 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.7699 |
| Common Stk | 11/14/2013 | PUR | 400 | $136.7399 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.7199 |
| Common Stk | 11/14/2013 | PUR | 500 | $136.7100 |
| Common Stk | 11/14/2013 | PUR | 500 | $136.6699 |
| Common Stk | 11/14/2013 | PUR | 1,800 | $136.6699 |
| Common Stk | 11/14/2013 | PUR | 500 | $136.6699 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.6679 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.6674 |
| Common Stk | 11/14/2013 | PUR | 100 | $136.6399 |
| Common Stk | 11/14/2013 | PUR | 900 | $135.4815 |
| Common Stk | 11/14/2013 | PUR | 1,536 | $135.4815 |
| Common Stk | 11/14/2013 | PUR | 200 | $135.4816 |
| Common Stk | 11/14/2013 | PUR | 300 | $135.6731 |
| Common Stk | 11/14/2013 | PUR | 464 | $135.6731 |
| Common Stk | 11/14/2013 | PUR | 500 | $135.6731 |
| Common Stk | 11/14/2013 | PUR | 97 | $135.5799 |
| Common Stk | 11/14/2013 | PUR | 93 | $135.4699 |
| Common Stk | 11/14/2013 | PUR | 7 | $135.4700 |
| Common Stk | 11/14/2013 | PUR | 100 | $135.6519 |
| Common Stk | 11/14/2013 | PUR | 93 | $135.6519 |
| Common Stk | 11/14/2013 | PUR | 100 | $135.6519 |
| Common Stk | 11/14/2013 | PUR | 10 | $135.6520 |
| Common Stk | 11/14/2013 | PUR | 1,600 | $135.6519 |
| Common Stk | 11/14/2013 | PUR | 200 | $135.6519 |
| Common Stk | 11/14/2013 | PUR | 425 | $135.6519 |
| Common Stk | 11/14/2013 | PUR | 375 | $135.6519 |
| Common Stk | 11/14/2013 | SLD | 1,200 | $139.4427 |
| Common Stk | 11/14/2013 | SLD | 600 | $137.4176 |
| Common Stk | 11/14/2013 | SLD | 400 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 200 | $136.3677 |

**TESLA MOTORS (TSLA)**                                                      **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|---|
| Common Stk | 11/14/2013 | SLD | 100 | $136.4076 |
| Common Stk | 11/14/2013 | SLD | 500 | $136.3676 |
| Common Stk | 11/14/2013 | SLD | 2,700 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 300 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 200 | $139.4427 |
| Common Stk | 11/14/2013 | SLD | 200 | $139.4427 |
| Common Stk | 11/14/2013 | SLD | 300 | $139.4427 |
| Common Stk | 11/14/2013 | SLD | 100 | $139.4426 |
| Common Stk | 11/14/2013 | SLD | 100 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 400 | $136.3257 |
| Common Stk | 11/14/2013 | SLD | 100 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 500 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 500 | $136.3256 |
| Common Stk | 11/14/2013 | SLD | 1,800 | $136.2744 |
| Common Stk | 11/14/2013 | SLD | 500 | $135.8256 |
| Common Stk | 11/14/2013 | SLD | 100 | $136.2744 |
| Common Stk | 11/14/2013 | SLD | 100 | $136.2744 |
| Common Stk | 11/14/2013 | SLD | 100 | $136.2744 |
| Common Stk | 11/15/2013 | SLD | 5 | $137.1280 |
| Common Stk | 11/15/2013 | SLD | 359 | $137.1176 |
| Common Stk | 11/15/2013 | SLD | 900 | $136.2744 |
| Common Stk | 11/15/2013 | SLD | 1,536 | $135.6027 |
| Common Stk | 11/15/2013 | SLD | 200 | $135.7634 |
| Common Stk | 11/15/2013 | SLD | 300 | $136.2476 |
| Common Stk | 11/15/2013 | SLD | 36 | $136.8550 |
| Common Stk | 11/15/2013 | SLD | 1,400 | $137.1176 |
| Common Stk | 11/15/2013 | SLD | 200 | $137.2277 |
| Common Stk | 11/15/2013 | SLD | 300 | $137.4676 |
| Common Stk | 11/15/2013 | SLD | 464 | $135.6028 |
| Common Stk | 11/15/2013 | SLD | 500 | $135.7634 |
| Common Stk | 11/15/2013 | SLD | 500 | $136.2476 |
| Common Stk | 11/15/2013 | SLD | 800 | $136.2476 |
| Common Stk | 11/15/2013 | SLD | 100 | $136.2476 |
| Common Stk | 11/15/2013 | SLD | 100 | $136.2476 |
| Common Stk | 11/15/2013 | SLD | 103 | $136.2477 |
| Common Stk | 11/15/2013 | SLD | 97 | $137.4675 |
| Common Stk | 11/15/2013 | SLD | 93 | $137.4676 |
| Common Stk | 11/15/2013 | SLD | 7 | $137.4571 |

**TESLA MOTORS (TSLA)**                                              **Acar, Kazim**

## LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 11/15/2013 | SLD | 97 | $136.1447 |
| Common Stk | 11/15/2013 | SLD | 1,000 | $136.2476 |
| Common Stk | 11/15/2013 | SLD | 742 | $137.2277 |
| Common Stk | 11/15/2013 | SLD | 258 | $137.2190 |
| Common Stk | 11/15/2013 | SLD | 100 | $137.3757 |
| Common Stk | 11/15/2013 | SLD | 93 | $137.4576 |
| Common Stk | 11/15/2013 | SLD | 100 | $137.4196 |
| Common Stk | 11/15/2013 | SLD | 10 | $137.4170 |
| Common Stk | 11/15/2013 | SLD | 1,600 | $137.4176 |
| Common Stk | 11/15/2013 | SLD | 200 | $134.7878 |
| Common Stk | 11/15/2013 | SLD | 425 | $134.8077 |
| Common Stk | 11/15/2013 | SLD | 375 | $134.8077 |
| Call-Oct 2013 $190 | 10/16/2013 | SLD | 20 | $1.5100 |
| Call-Oct 2013 $190 | 10/17/2013 | PUR | 16 | $0.7300 |
| Call-Oct 2013 $190 | 10/17/2013 | PUR | 4 | $0.7200 |
| Call-Sep 2013 $165 | 09/10/2013 | SLD | 10 | $6.1000 |
| Call-Sep 2013 $165 | 09/11/2013 | PUR | 8 | $5.8100 |
| Call-Sep 2013 $165 | 09/11/2013 | PUR | 2 | $5.7500 |
| Call-Sep 2013 $180 | 08/23/2013 | PUR | 8 | $3.6500 |
| Call-Sep 2013 $180 | 08/23/2013 | PUR | 12 | $3.6000 |
| Call-Sep 2013 $180 | 08/26/2013 | SLD | 20 | $5.6500 |
| Call-Sep 2013 $180 | 09/19/2013 | SLD | 5 | $0.9000 |
| Call-Sep 2013 $180 | 09/24/2013 | PUR | 5 | Assigned |

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1.   I, William Landrum          , make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Tesla Motors, Inc. ("Tesla" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Tesla securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Testa securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Tesla securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed  6/9/2014
           **(Date)**


_William Landrum_
**(Signature)**

_William Landrum_
**(Type or Print Name)**

**TESLA MOTORS (TSLA)**                                    **Landrum, William**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 09/18/2013 | PUR | 2,000 | $167.9330 |
| Common Stk | 11/12/2013 | SLD | 250 | $136.3960 |
| Common Stk | 11/12/2013 | SLD | 600 | $136.1820 |
| Common Stk | 11/13/2013 | SLD | 90 | $138.1860 |
| Common Stk | 11/20/2013 | SLD | 500 | $123.8350 |

**CERTIFICATION PURSUANT
TO FEDERAL SECURITIES LAWS**

1.  I, ___Dr. Pankaj Modi_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Tesla Motors, Inc. ("Tesla" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Tesla securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Testa securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Tesla securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed _____June 10, 2014_____
                 (Date)



                                    _Tomy modi_____
                                           (Signature)

                                    _Dr. Pankaj Modi_____
                                         (Type or Print Name)

**TESLA MOTORS (TSLA)**                                          **Modi, Pankaj**

### LIST OF PURCHASES AND SALES

| SECURITY | DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|----------|------|------------------|-------------------|-----------------|
| Common Stk | 08/29/2013 | PUR | 300 | $169.0000 |
| Common Stk | 09/30/2013 | PUR | 500 | $193.3700 |

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On June 16, 2014, I served the following document:

**SECOND AMENDED CLASS ACTION COMPLAINT**

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as listed on the attached Court's ECF Service List.

And on any non-ECF registered parties:

By U.S. Mail:  By placing true and correct copies thereof in individual sealed envelope: with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence or mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 16, 2014, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:13-cv-05216-CRB Rahimi v. Tesla Motors, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph M. Barton**
  jbarton@glancylaw.com

- **Charles Edward Elder**
  celder@irell.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Lesley F. Portnoy**
  lfportnoy@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,mmgoldberg@glancylaw.com,echang@glancylaw.com

- **Mark Punzalan**
  markp@punzalanlaw.com,smutschall@zlk.com,nporritt@zlk.com,office@punzalanlaw.com

- **David Siegel**
  dsiegel@irell.com,kschmidt@irell.com,rgrazziani@irell.com

- **Matthew Laurence Tuccillo**
  mltuccillo@pomlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)