1   IRELL & MANELLA LLP
    David Siegel (CA SBN 101355)
2   dsiegel@irell.com
    Charles Elder (CA SBN 186524)
3   celder@irell.com
    1800 Avenue of the Stars, Suite 900
4   Los Angeles, California 90067-4276
    Telephone:   (310) 277-1010
5   Facsimile:   (310) 203-7199

6   Attorneys for Defendants
    TESLA MOTORS, INC. and ELON MUSK
7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11                                  )   Case No. 3:13-CV-05216-CRB
                                    )
12                                  )   CLASS ACTION
                                    )
13                                  )   **NOTICE OF MOTION AND MOTION OF**
                                    )   **TESLA MOTORS AND ELON MUSK TO**
14  IN RE TESLA MOTORS, INC.        )   **DISMISS SECOND AMENDED CLASS**
    SECURITIES LITIGATION           )   **ACTION COMPLAINT; MEMORANDUM**
15                                  )   **OF POINTS AND AUTHORITIES**
                                    )
16                                  )   Date:     September 26, 2014
                                    )   Time:     10:00 a.m.
17                                  )   Ctrm:     6
                                    )   Judge:    Hon. Charles R. Breyer
18  _____  )
                                    )   Complaint Filed:   November 8, 2013
19

20

21

22

23

24

25

26

27

28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .......................................................................... v

ISSUES TO BE DECIDED ......................................................................................... v

SUMMARY OF ARGUMENT ...................................................................................... vi

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................... 3

        A.      Background Facts Regarding the Model S ............................................. 3

        B.      Alleged Misrepresentations and Omissions .......................................... 5

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD. ....... 5

        A.      Plaintiffs Fail to Allege Any False Statements, Let Alone Any
                Knowingly or Recklessly False Statements. ......................................... 6

                1.      Plaintiffs Fail to Allege Any False Statements Regarding
                        NHTSA Crash Test Results. ..................................................... 7

                2.      Plaintiffs Have Not Alleged Any Fraudulent Statements
                        About the Three Fires During the Class Period. ..................... 8

                3.      Plaintiffs' Allegations of Fire Incidents During Prototype
                        Testing Do Not Render Tesla's Subsequent Statements
                        Misleading. ................................................................................ 12

                4.      Tesla Disclosed the Risk of Battery Fires and How It
                        Mitigates That Risk. ................................................................ 16

                5.      Allegations of Subsequent Remedial Measures Are Not
                        Sufficient To Plead Securities Fraud. .................................... 17

        B.      Plaintiffs Do Not and Cannot Allege a Strong Inference of Scienter. ... 18

                1.      The Absence of Suspicious Stock Sales Negates Any
                        Inference of Scienter. .............................................................. 18

                2.      Plaintiffs' Confidential Witness Allegations Do Not Establish
                        Scienter. .................................................................................... 19

                3.      Taken as a Whole, Plaintiffs' Scienter Theory Is Implausible. ... 22

IV.     PLAINTIFFS' SECTION 20(A) CLAIM SHOULD ALSO BE DISMISSED .... 23

V.      LEAVE TO AMEND SHOULD BE DENIED .................................................. 24

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. City of Beverly Hills,*
  911 F.2d 367 (9th Cir.1990) ............................................................................ 24

*Allison v. Brooktree Corp.,*
  999 F. Supp. 1342 (S.D. Cal. 1998) ......................................................... vii, 14

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .......................................................................................... 15

*Brody v. Transitional Hospitals Corp.,*
  280 F.3d 997 (9th Cir. 2002) .......................................................................... 12

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.,*
  711 F.3d 754 (7th Cir. 2013) ..................................................................... 13, 20

*Desaigoudar v. Meyercord,*
  223 F.3d 1020 (9th Cir. 2000) ......................................................................... 24

*DSAM Global Value Fund v. Altris Software,*
  288 F.3d 385 (9th Cir. 2002) .......................................................................... 19

*Gallagher v. Abbott Labs.,*
  269 F.3d 806 (7th Cir. 2001) .......................................................................... 14

*Glazer Capital Mgmt., LP v. Magistri,*
  549 F.3d 736 (9th Cir. 2008) ................................................................ 8, 9, 19

*Gompper v. VISX, Inc.,*
  298 F.3d 893 (9th Cir. 2002) ................................................................ 6, 15, 18

*Heliotrope Gen., Inc. v. Ford Motor Co.,*
  189 F.3d 971 (9th Cir. 1999) .......................................................................... 23

*Higginbotham v. Baxter Int'l, Inc.,*
  495 F.3d 753 (7th Cir. 2007) .......................................................................... 17

*In re Allscripts, Inc. Sec. Litig.,*
  2001 WL 743411 (N.D. Ill. June 29, 2001) .................................................. 15

*In re Aspeon, Inc. Sec. Litig.,*
  168 F. App'x 836 (9th Cir. 2006) ................................................................... 18

*In re Dot Hill Sys. Corp. Sec. Litig.,*
  594 F. Supp. 2d 1150 (S.D. Cal. 2008) ......................................................... 17

*In re FVC.COM Sec. Litig.,*
  136 F. Supp. 2d 1031 (N.D. Cal. 2000) (Breyer, J.) *aff'd*, 32 F. App'x 338
  (9th Cir. 2002) ............................................................................................. 3, 6

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- ii -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

**Page(s)**

*In re Lululemon Sec. Litig.*,
    - F. Supp. 2d. -, 2014 WL 1569500 (S.D.N.Y. Apr. 18, 2014).........................................22

*In re Nice Sys., Ltd. Sec. Litig.*,
    135 F. Supp. 2d 551 (D.N.J. 2001) ..................................................................................10

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ...........................................................................18

*In re PMI Group, Inc. Sec. Litig.*,
    2009 WL 1916934 (N.D. Cal. Jul. 1, 2009) .....................................................................19

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012).............................................................................................11

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)....................................................................................6, 7, 19

*In re Software Toolworks Inc. Sec. Litig.*,
    50 F.3d 615 (9th Cir. 1994)...............................................................................................19

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)...........................................................................................19

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994).............................................................................................17

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4478647 (N.D. Cal. Sept. 27, 2012).................................................................19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008)..............................................................................................5

*Philco Investments, Ltd. v. Martin*,
    C-10-02785-CRB, 2011 WL 500694 (N.D. Cal. Feb. 9, 2011) ........................................12

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008).............................................................................................17

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)......................................................................................14, 15

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995).............................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .............................................................................................2, 5, 6, 22

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) .........................................................................................................15

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**Page(s)**

*Wade v. Wellpoint, Inc.*,
  740 F. Supp. 2d 994 (S.D. Ind. 2010) ............................................... 17

*Wozniak v. Align Tech.*, Inc.,
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ......................................... 12

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................ passim

**Statutes and Regulations**

15 U.S.C. § 78t(a) ............................................................................. 23

15 U.S.C. §78u–4(b) ...................................................................... 5, 6

**Other Authorities**

Fed. R. Civ. P. 12(b) .......................................................................... 6

Fed. R. Civ. P. 9(b) .......................................................................... 11

Fed. R. Evid. 407 .............................................................................. 17

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- iv -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT on September 26, 2014, at 10:00 a.m., or as soon

4

thereafter as the matter may be heard, before the Honorable Charles R. Breyer, Courtroom 6, 17th

5

Floor, 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Tesla Motors, Inc.

6

("Tesla") and Elon Musk (collectively, "Defendants") shall and hereby do move to dismiss

7

Plaintiffs' Second Amended Class Action Complaint ("SAC"), with prejudice and without leave to

8

amend, for failure to state a claim upon which relief can be granted.  This Motion is made pursuant

9

to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and the Private Securities Litigation

10

Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995), codified in relevant part

11

at 15 U.S.C. § 78u-4 *et seq*.

12

This Motion is based on this Notice and the attached Memorandum of Points and

13

Authorities, the accompanying Request for Judicial Notice, the papers on file in the action, the

14

argument of counsel, and other materials as may be considered by the Court.

15

**ISSUES TO BE DECIDED**

16

1.      Whether Plaintiffs' claim against Defendants under Section 10(b) of the Securities

17

Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC")

18

Rule 10b-5 should be dismissed on the ground that Plaintiffs failed to plead with particularity that

19

Defendants' public statements were materially false or misleading when made.

20

2.      Whether Plaintiffs' Section 10(b) and Rule 10b-5 claim should be dismissed on the

21

ground that Plaintiffs have failed to plead with particularity facts giving rise to a strong inference

22

(*i.e.*, one that is both cogent and at least as compelling as any opposing inference) that Defendants

23

acted with scienter.

24

3.      Whether Plaintiffs' claim for violation of Section 20(a) of the Exchange Act against

25

Defendant Elon Musk should be dismissed on the ground that Plaintiffs have failed to plead a

26

primary violation of the securities laws, which is a predicate for any violation of Section 20(a).

27

4.      Whether Plaintiffs should be given leave to amend for a third time.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- V -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

**SUMMARY OF ARGUMENT**

Plaintiffs have failed to comply with the heightened pleading requirements of the Private Securities Litigation Reform Act in their claims for securities fraud in connection with Tesla's statements regarding its Model S electric car.  Plaintiffs fail to carry their burden to plead particularized facts showing (i) that Defendants' statements were false or misleading at the time they were made, and (ii) a strong inference of scienter.  15 U.S.C. § 78u-4(b)(1)-(2).  This case should be dismissed with prejudice.

1.      Plaintiffs fail to plead with particularity that Defendants' statements about the Model S were false or misleading.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading") (quoting 15 U.S.C. §78u–4(b)(1)).

Defendants truthfully represented the Model S safety record, including the National Highway Traffic Safety Administration's ("NHTSA") "5-star" safety rating.  Defendants also accurately explained the basis for its statement that the Model S was safer than all other models tested, while clarifying that NHTSA does not officially distinguish among 5-star rating recipients.

Defendants also truthfully disclosed the facts involved in each of the three fires during the class period, including that all occupants walked away safely before any fire started.  Defendants also truthfully explained the statistical basis for its statements that the Model S poses a much lower risk of fire than conventional gasoline-powered cars.

Plaintiffs do not and cannot allege that the Model S had *ever* experienced a fire before the class period.  Plaintiffs instead allege that many months before the launch of the Model S, prototypes during design, testing and development experienced three fires: one fire *intentionally set* by Tesla engineers to test the effects of fire on a prototype battery pack, a second involving another prototype battery pack more than nine months before the Model S launch, and a third not even alleged to have involved a battery pack at all but vaguely described as a fire occurring on a "storage cart" in a high voltage area.  Plaintiffs now contend Tesla should have disclosed alleged "prototype" and "storage cart" fires, despite their allegation that the design of the Model S,

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

3065591

- vi -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1  including the battery pack, continued to significantly change until shortly before its production

2  launch.

3  Tesla did not need to disclose every event that allegedly occurred during the early design

4  phases of a new technology. *See Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) ("much of

5  any business consists of having problems and dealing with them"); *Allison v. Brooktree Corp.*, 999

6  F. Supp. 1342, 1348 (S.D. Cal. 1998) ("In bringing any high-tech product to market, problems

7  encountered in the early developmental stages are the norm, not the exception"). Plaintiffs do not

8  allege – nor could they – that the alleged prototype and storage cart fires actually took place in a

9  Model S or involved the same battery pack design that is found on the Model S actually sold to

10 customers. These allegations are thus irrelevant to Tesla's public statements about the Model S.

11 In addition, Tesla disclosed in its publicly-filed periodic financial statements that: "Our

12 vehicles make use of lithium-ion battery cells, which have been observed to catch fire or vent

13 smoke and flame." This judicially noticeable disclosure, which Plaintiffs completely ignore,

14 belies their allegations that Tesla failed to disclose the risk of battery fires. This disclosure also

15 negates any inference of scienter, as it shows Defendants did not intend to conceal that risk. *In re*

16 *Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("detailed risk disclosure ...

17 negates an inference of scienter"); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150,

18 1160 (S.D. Cal. 2008) ("Disclosing the precise risks at issue 'negate[s] an inference of scienter.'")

19 (quoting *Worlds of Wonder*).

20 2. Plaintiffs have not alleged facts supporting a strong inference of scienter. *Tellabs*,

21 551 U.S. at 314 ("[A] 'strong' ...inference of scienter ...must be cogent and at least as compelling

22 as any opposing inference of nonfraudulent intent."). Plaintiffs do not allege any facts showing

23 that Musk or any other Tesla representative knew or believed their statements about the safety of

24 the Model S electric car were false.

25 Furthermore, Plaintiffs do not allege any suspicious stock transactions. The opposite is

26 true and indisputable: The only individual defendant, Elon Musk, **did not sell any** Tesla stock

27 during the class period and actually **purchased** Tesla stock worth $100 million shortly before the

28 class period. These facts negate any inference of scienter. *E.g., In re FVC.COM Sec. Litig.*, 136

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- vii -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1  F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (Breyer, J.) *aff'd*, 32 F. App'x 338 (9th Cir. 2002)

2  (absence of stock sales by the company executive who allegedly made misstatements "negates any

3  slight inference of scienter").

4       Although Plaintiffs rely on the alleged statements of certain confidential witnesses

5  ("CWs"), they do not come close to establishing a strong inference of scienter.  Indeed, one of

6  Plaintiffs' CWs strongly negates any inference of scienter at all, stating that *safety was Tesla's and*

7  *Musk's "number one" priority*.  SAC ¶ 86.  Many of the CWs are not even alleged to have been

8  at the Company when the Model S was released.  No CW is alleged to have worked on the design

9  or testing of the Model S battery pack.  No CW is alleged to have said anything about the safety of

10 the battery pack that is actually used in the production version of the Model S.  No CW is alleged

11 to have alerted Musk to any supposed safety risks, much less risks from battery fires or underbody

12 collisions. No CW is alleged to have spoken to any fraudulent motive.

13      Plaintiffs rely on an incoherent motive theory in which they posit that Defendants "could

14 not afford a major glitch in the Model S," SAC ¶¶ 53, 120, yet knowingly released it with a high

15 risk of "catastrophic fires" and then concealed that risk, even though, according to Plaintiffs, the

16 risks were highly likely to materialize and the fixes to reduce those risks were simple to

17 implement.  This makes no sense, and thus does not create an inference of scienter that is "cogent

18 and at least as compelling as any opposing inference of nonfraudulent intent," as *Tellabs* requires.

19 The only plausible inference from the alleged facts is that Tesla and Musk were motivated to make

20 sure the Model S was a high-quality, safe car to avoid a "major glitch" when the car was released.

21      3.    Plaintiffs' Section 20(a) claim against Defendant Elon Musk should also be

22 dismissed because they fail to allege a primary violation of the federal securities laws.

23      4.    Since the filing of this action in November 2013, Plaintiffs have had plenty of time

24 to investigate their claims.  In granting their first request to amend, the Court instructed Plaintiffs

25 to "lay out in as much detail … as much information as you possibly have" in support of their

26 claims. 2/14/2014 Hrg. Tr. at 5-6.  They have amended their pleading twice after this

27 admonishment, and their latest amendment adds allegations that are false on their face.  A third

28 amendment should not be permitted.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591                              - viii -                    DEFENDANTS' MOTION TO DISMISS SECOND
                                                                 AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Tesla's mission is to accelerate the transition to sustainable transport by bringing high-quality electric cars, including the renowned Model S sedan, to the mass market.  The Model S is, by all accounts, a tremendous success.  Since its launch in June 2012, the Model S has received, among other laurels, the highest vehicle rating ever awarded by *Consumer Reports* and the highest possible safety rating from the U.S. National Highway Traffic Safety Administration ("NHTSA").  The safety record of the Model S is exemplary: in more than 275 million miles driven, there has not been a single death or permanent injury suffered by ***any*** of its occupants.  Plaintiffs do not and cannot allege otherwise.  Tesla's shareholders have profited handsomely from the success of the Model S, as Tesla's stock price has appreciated over 500% since the Model S launch.

Plaintiffs initially filed this suit following sensationalist media coverage of three collisions that resulted in fires in the Model S's lithium-ion battery pack.  Two of the fires occurred after collisions at highway speeds with abnormal road debris, and another occurred after a Model S, which was being driven at night down a small street at well over 100 miles per hour, went airborne off a speed bump, slammed into the curb of a roundabout, careened through a concrete wall, and then landed at the foot of a tree.  In all three incidents, the safety features of the Model S performed perfectly:  no fire started until after the car had stopped and alerted the drivers to exit the car.  In each case, the occupants walked away safely (even the driver who put his car through a wall and into a tree), and the drivers immediately expressed a desire for a replacement Model S.

Far from supporting Plaintiffs' thesis of a company unconcerned with safety, these incidents are a powerful testament to the safety of the Model S.  Yet Plaintiffs nonetheless sued Tesla and its CEO, Elon Musk, alleging that they misrepresented the safety of the Model S and the risk of battery fires.  After being warned by this Court that their pleading must comply with the standards of the Private Securities Litigation Reform Act (the "Reform Act"), and after amending their complaint twice, Plaintiffs still fail to satisfy the Reform Act's "exacting" pleading requirements.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations
3065591

- 1 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    Plaintiffs' Second Amended Complaint is fatally deficient in at least two important

2    respects:  (1) it does not allege that Tesla made any false or misleading statements, and (2) it does

3    not allege facts showing a "strong inference" of scienter.

4        **1.  No False Statements.**  Tesla did not make any false or misleading statements, and

5    Plaintiffs have not sufficiently alleged otherwise.  Although their case fundamentally depends on a

6    supposed safety-related defect in the Model S, Plaintiffs fail to allege any specific facts showing

7    the existence of such a defect.  Nor could they, as NHTSA – the government agency responsible

8    for determining whether or not a defect exists – closed its four-month investigation into this matter

9    after determining that ***"[a] defect trend has not been identified."***  SAC ¶ 200.  Moreover, ***NHTSA***

10   ***reaffirmed the Model S across-the-board "5-star" safety rating after the class period fires***.

11        In their attempt to gin up a theory notwithstanding these conclusive determinations from

12   NHTSA, Plaintiffs resort to allegations that, many months before the Model S was ever produced,

13   Tesla experienced two fires involving early "***prototype***" battery packs (one of which was

14   deliberately set by engineers for testing purposes) and another fire vaguely described as taking

15   place on a "storage cart" in a high-voltage area.  Plaintiffs do not and cannot allege that any of

16   these fires actually took place in a Model S.  Moreover, in light of Plaintiffs' allegation that the

17   design of the Model S battery pack continued to change until just before launch, Plaintiffs are

18   unable to allege that any of these fires is relevant to the battery pack design actually found in the

19   production Model S that Tesla has been selling to customers.  ***Plaintiffs fail to allege a single***

20   ***instance in which the production Model S battery pack caught fire prior to the class period.***

21        Moreover, the notion that Tesla was trying to hide any risk of battery pack fire is

22   demonstrably false.  In every quarterly SEC filing that Tesla has made since its IPO in 2010, it has

23   ***always disclosed*** the risk of battery fires to investors:  "***Our vehicles make use of lithium-ion***

24   ***battery cells, which have been observed to catch fire or vent smoke and flame.*** … [A]ny future

25   incident involving lithium-ion cells such as a vehicle or other fire … could seriously harm our

26   business."  *See, e.g.,* Request for Judicial Notice ("RJN") Ex. 1 (2Q 2013 Form 10-Q) at 3-4 *and*

27   Ex. 2 (2012 Form 10-K) at 7.  This disclosure is fatal to Plaintiffs' claim that Tesla did not disclose

28   the risk of battery fires.  Significantly, Plaintiffs ignore this disclosure altogether.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591                                    - 2 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1       Plaintiffs also do not allege with particularity that Tesla misrepresented NHTSA's across-

2   the-board "5-star" safety rating awarded to the Model S.  Tesla's press release describing this

3   accomplishment accurately disclosed the data behind the 5-star safety rating and accurately

4   explained in statistical detail why that data showed the Model S was the safest car tested.  Tesla

5   also accurately described its own crash tests of the Model S and accurately stated that none of

6   those crash tests resulted in a fire.  Plaintiffs do not contradict those statements.

7   **2. No Scienter.**  Not only have Plaintiffs failed to allege any false or misleading

8   statements, they also fail to allege any facts showing a strong inference of scienter.  Indeed, their

9   allegations actually ***negate*** scienter.  For example, one of Plaintiffs' alleged confidential witnesses

10   affirmed that ***safety was Tesla's and Musk's "number one" priority***.  SAC ¶ 86.  In addition, just

11   before the class period Musk purchased $100 million of Tesla stock, and during the class period he

12   sold ***none*** of his stock while allegedly suffering $2 billion in personal losses.  SAC ¶ 219.  These

13   facts are totally inconsistent with scienter.  *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031,

14   1039 (N.D. Cal. 2000) (Breyer, J.) *aff'd*, 32 F. App'x 338 (9th Cir. 2002).

15       Plaintiffs' other scienter allegations make no sense.  If, as they contend, Tesla "could not

16   afford a major glitch in the Model S," it is implausible that Tesla would have released the Model S

17   allegedly knowing it was "highly vulnerable" to "catastrophic fires" – particularly if, as Plaintiffs

18   allege, implementing a fix was a simple matter.  *See* SAC ¶¶ 53, 120, 177, 188.

19       In sum, Tesla and Musk told the truth about the safety of the Model S, and Plaintiffs do not

20   and cannot allege otherwise.  This case should be dismissed.  Any amendment would be futile, as

21   this Court already admonished Plaintiffs "to lay out in as much detail … as much information as

22   you possibly have."  2/14/2014 Hrg. Tr. at 5-6.  They have amended their complaint twice and still

23   fail to state a claim.  The Court should not grant leave to amend a third time.

24   **II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS**

25      **A.    Background Facts Regarding the Model S**

26       The Model S is a revolutionary electric vehicle designed and built in the United States by

27   Tesla.  Its lithium-ion battery pack can carry it up to 300 miles on a single charge.  SAC ¶ 83.

28   Accomplishing this engineering feat was no easy task; the lengthy design process entailed

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 3 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1  painstaking safety testing and continuous design improvements. Plaintiffs acknowledge that the

2  battery pack was still "undergoing changes" to its design "in the months prior to the start of Model

3  S production" and that Tesla was "still changing designs of parts just prior to the Model S's

4  production deadline." SAC ¶¶ 57, 59.

5        Tesla began Model S production in June 2012. SAC ¶ 105. In August 2013, NHTSA

6  awarded the Model S a 5-star safety rating, the highest possible score, in all tested categories.

7  SAC ¶ Ex. 3.

8        On October 2, 2013, in Washington State, a Model S struck oddly-shaped metal road

9  debris, which pierced the car's underbody and damaged the battery, leading to a fire. No injuries

10  resulted from the accident or ensuing fire. SAC ¶ 137. The owner praised the performance of the

11  Model S's "controlled burn" and bought another Model S after the incident. SAC ¶ 160 & Ex. 4.

12        On October 18, 2013, in Merida, Mexico, a Model S was being driven at a very high rate

13  of speed when it "crash[ed] through a concrete barrier and into a tree," then caught fire. SAC

14  ¶ 165. These allegations only begin to describe the full violence of this crash. Remarkably, the

15  driver walked away safely from the accident. SAC ¶ 167.

16        On November 7, 2013, a third Model S caught fire in Tennessee after striking a large steel

17  trailer hitch at highway speeds, "which damaged the car's undercarriage and ignited a fire in the

18  battery pack." Again, no one was harmed. SAC ¶¶ 173-176.

19        That no serious injuries were sustained in any of these incidents, including the high-speed

20  crash in Mexico, and that all occupants were able to exit their vehicles before any fire even began,

21  is a testament to Model S safety. On December 20, 2013, after these three fire incidents, NHTSA

22  reaffirmed its 5-star safety rating of the Model S "overall and as to all categories." RJN, Ex. 3.

23        Even though the Model S performed well and protected its occupants in all three incidents,

24  and even though the risk of fire in a gasoline car is far greater than in a Model S, Tesla introduced

25  upgrades to further limit the chance for damage from road debris impacts. Tesla issued a firmware

26  update that raised the car's ground clearance and now offers customers an optional underbody

27  battery shield at no additional charge. SAC ¶¶ 187-188, 194-195.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 4 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    On March 26, 2014, NHTSA closed its investigation into the Model S fires without any

2    finding of a defect and without ordering a recall.  SAC ¶¶ 192, 198-200.  NHTSA stated: "A

3    defect trend has not been identified.  Accordingly, the investigation is closed."  SAC ¶ 200; RJN,

4    Ex. 4.

5         **B.**    **Alleged Misrepresentations and Omissions**

6         Plaintiffs generally assert that the Model S battery pack had "significant vulnerabilities to

7    road debris impact, puncture, and catastrophic fire" (*e.g.*, SAC ¶ 18) and that Tesla failed to

8    disclose those alleged risks.  *Id.*  Although they concede that the Model S received the highest

9    possible 5-star safety rating from NHTSA in all categories, Plaintiffs allege that Tesla "twisted"

10   those results when it claimed in a press release that the Model S was the "Safest Car In America,"

11   scored the equivalent of a 5.4 rating, and outscored other "5-star" cars in overall composite score.

12   *E.g.*, SAC ¶¶ 6, 18.  Yet Tesla's press release made clear the factual basis for those claims, which

13   Plaintiffs do not and cannot dispute.  SAC Ex. 3.

14        Plaintiffs also allege "misstatements and omissions about the three Model S fires that

15   occurred during the Class Period," focusing particularly on statements that there had been no prior

16   fires involving the Model S battery pack.  *E.g.*, SAC ¶ 18.  Plaintiffs claim that Tesla failed to

17   disclose fires involving early battery "prototypes," SAC ¶¶ 7, 18, 88-97, but Plaintiffs do not

18   allege any prior fires involving the actual Model S battery pack.  Plaintiffs also claim that Tesla

19   and Musk "downplayed" the first class period fire and, in answering questions about it, failed to

20   disclose that the second fire (the high-speed crash in Mexico) had also occurred.  SAC ¶ 18.

21   **III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD.**

22        To survive a motion to dismiss, a complaint for securities fraud must satisfy the "exacting

23   pleading requirements" of the Reform Act.  *Tellabs*, 551 U.S. at 313.  Plaintiffs must "specify each

24   statement alleged to have been misleading, the reason or reasons why the statement is misleading,

25   and, if an allegation regarding the statement or omission is made on information and belief, the

26   complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §78u–

27   4(b)(1); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008)

28   (quoting statute).  Consistent with these requirements, this Court specifically instructed these

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591                                    - 5 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1   Plaintiffs when granting them leave to amend their first of three complaints that "you are to

2   identify the particular statements that you believe to be untrue and you are to identify the evidence

3   that you have that demonstrates that the statements are untrue."  2/14/2014 Hrg. Tr. at 5.

4          The Reform Act also requires the complaint to "state with particularity facts giving rise to

5   a strong inference that the defendant acted with the required state of mind."  15 U.S.C.

6   § 78u-4(b)(2).  "Congress made it crystal clear that the [Reform Act's] pleading requirements were

7   put in place so that only complaints with particularized facts giving rise to a strong inference of

8   wrongdoing survive a motion to dismiss."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.

9   2002) ("the court must consider all reasonable inferences to be drawn from the allegations,

10  including inferences unfavorable to the plaintiffs").

11         "To qualify as 'strong' within the intendment of [the Reform Act], we hold, an inference of

12  scienter must be more than merely plausible or reasonable – it must be cogent and at least as

13  compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  "A

14  court must compare the malicious and innocent inferences cognizable from the facts pled in the

15  complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference

16  is at least as compelling as any opposing innocent inference."  *Zucco Partners, LLC v. Digimarc*

17  *Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

18         "The Court ***shall dismiss*** any complaint that does not meet these requirements."  *In re*

19  *FVC.com Securities Litig.*, 136 F. Supp. 2d 1031, 1036 (N. D. Cal. 2000) (Breyer, J.) (citing 15

20  U.S.C. §78u–4(b)(3)(A)) (emphasis added).  "[C]ourts must consider the complaint in its entirety,

21  as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to

22  dismiss, in particular, documents incorporated into the complaint by reference, and matters of

23  which a court may take judicial notice."  *Tellabs*, 551 U.S. at 322.

24         **A.     Plaintiffs Fail to Allege Any False Statements, Let Alone Any Knowingly or**

25                 **Recklessly False Statements.**

26         Plaintiffs fail to allege particularized facts showing any of Tesla's alleged statements were

27  false at all, let alone specific facts showing knowledge of falsity or deliberate recklessness.  *See In*

28  *re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1.     <u>Plaintiffs Fail to Allege Any False Statements Regarding NHTSA Crash</u>
       <u>Test Results.</u>

Plaintiffs' allegations regarding NHTSA's safety testing only underscore the truth of Tesla's statements about the Model S.  Plaintiffs do not dispute Tesla's statement in an August 19, 2013 press release that NHTSA awarded the Model S a "5-star" safety rating (the highest possible rating) overall and in each testing subcategory.  SAC Ex. 3.  Nor do they dispute Tesla's statement that "approximately one percent of all cars tested ... achieve 5 stars across the board."  *Id.*

To further communicate to customers the significance of NHTSA's testing results, Tesla's press release also described the "Vehicle Safety Score" provided by NHTSA:  "NHTSA does not publish a star rating above 5, however safety levels better than 5 stars are captured in the overall Vehicle Safety Score (VSS) provided to manufacturers, where the Model S achieved a new combined record of 5.4 stars."  *Id.*  Tesla also explained precisely how it calculated that figure, with detailed supporting facts and statistics.  *Id*.

Plaintiffs first allege that Tesla's press release was misleading because NHTSA does not officially rate any car above five stars.  SAC ¶ ¶ 116.  But that is ***exactly*** what Tesla's press release said:  "***NHTSA does not publish a star rating above 5***."  SAC Ex. 3.

Tesla also truthfully stated in the press release that, in its own versions of the tests NHTSA conducted, it "analyzed the Model S to determine the weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured."  *Id*.  Plaintiffs argue this statement was false because it implied that the "undercarriage" and "battery pack" were included in the crash testing Tesla described.  SAC ¶ 118.  This argument is wrong for two reasons.  First, Tesla's press release clearly identifies the specific crash tests in question:  "front, side, rear and rollover accidents."  SAC Ex. 3.  No one reading that press release could have understood Tesla to be referring to any other tests.  Plaintiffs thus know their allegation is untrue.  Second, while Tesla made clear that these crash tests did not include underbody collision testing, Plaintiffs do not and cannot allege that Tesla neglected to perform such testing, or that such testing revealed a defect.  These are conspicuous and fatal omissions from a complaint predicated on the supposed risk of fire posed by underbody collisions.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 7 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    Tesla's press release did explain that the battery pack provided a "low center of gravity"

2    that reduced rollover risk.  SAC ¶ 117.  Plaintiffs do not deny this true statement.

3    Plaintiffs also dispute Tesla's statement that "[t]he Model S lithium-ion battery did not

4    catch fire at any time before, during, or after NHTSA testing."  SAC ¶ 119.  They contend this is a

5    "lie" because earlier battery "prototypes" allegedly had been involved in fire incidents six to ten

6    months before the Model S launch.  *Id.*  Tesla's statement was true.  Plaintiffs do not and cannot

7    allege that the Model S vehicles used in the NHTSA tests ever caught fire "before, during, or

8    after" the NHTSA tests described in the press release.  The alleged early "prototype" fires, which

9    are addressed below, are irrelevant.

10   Plaintiffs concede that Tesla's next statement in the press release was also true: "[N]o

11   production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite

12   several high speed impacts."  SAC ¶ 119.  They assert, however, that this statement was

13   misleading in light of their allegation that there were two fires involving earlier "prototypes" – one

14   set deliberately for testing purposes, the other more than nine months prior to the Model S launch

15   – and another fire not even tied to a battery pack and vaguely described as originating on a

16   "storage cart."  SAC ¶¶ 90, 91, 110.  Tesla's press release clearly refers only to the "***production***

17   Tesla lithium-ion battery" involved in the crash testing process.  SAC Ex. 3 (emphasis added).

18   Tesla focused on the "production" Model S battery pack because that is all that matters.  Alleged

19   early pre-production fires in "prototype" battery designs that are not even alleged to have come to

20   market do not render misleading Tesla's statements about the production version of the Model S.

21   Plaintiffs also fail to allege a strong inference of scienter in connection with these

22   statements.  Plaintiffs do not allege specific facts showing that the (unidentified) Tesla employee

23   who prepared this press release had any fraudulent intent.  *Glazer Capital Mgmt., LP v. Magistri*,

24   549 F.3d 736, 745 (9th Cir. 2008).

25                    2.    Plaintiffs Have Not Alleged Any Fraudulent Statements About the Three

26                          Fires During the Class Period.

27   Plaintiffs' case rests on their underlying (and incorrect) assertion that the Model S has

28   "very significant vulnerabilities for high-intensity fires" and for "road debris impact, puncture, and

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591                                    - 8 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1  catastrophic fire at normal driving conditions." SAC ¶¶ 6, 18. Plaintiffs allege that Tesla failed to

2  disclose that risk, "falsely represent[ed] purportedly low probabilities of such fires," and

3  conducted a "campaign to understate the risk of catastrophic damage to Tesla's Model S fleet from

4  undercarriage puncture due to debris strikes." SAC ¶¶ 7, 14. But Plaintiffs have not alleged any

5  specific facts to support either the underlying assertion that the Model S poses a significant fire

6  risk or the allegation that Tesla misrepresented that risk.

7       Putting aside the hyperbolic nature of Plaintiffs' allegations based on three incidents, there

8  is no allegation that there were any injuries in any of those incidents. SAC ¶¶ 160, 167. The

9  Model S performed as Tesla said it would and protected its occupants from harm. *See* SAC Ex. 4.

10  Specifically, Tesla told investors that it "designed the battery pack to passively contain any single

11  cell's release of energy without spreading to neighboring cells." RJN Ex. 1 at 3-4. That is exactly

12  what happened. The photos on pages 45 and 46 of the Second Amended Complaint show that the

13  October 2 Washington fire was contained to the front of the car and did not spread into the

14  passenger compartment. The driver affirmed that "the car performed very well under such an

15  extreme test. The batteries went through a controlled burn which the internet images really

16  exaggerate. Anyway, I am still a big fan of your car and look forward to getting back into one."

17  SAC Ex. 4. Similarly, the photos on pages 62 and 63 show no damage to the passenger

18  compartment in the November 7 Tennessee fire.

19       The October 28 Mexico crash is actually a compelling testimonial to the safety of the

20  Model S. As Plaintiffs allege, a Tesla spokeswoman reported that the Mexico fire resulted after

21  the car crashed at very high speed (more than 100 m.p.h.) through a concrete barrier and then

22  collided with a tree. RJN Ex. 5; SAC ¶ 167. Despite the violence of this collision, the Model S

23  kept the driver completely safe. *Id.*

24       Plaintiffs do not dispute any of these facts. Nor do they allege that there has been a single

25  fatality or permanent injury involving a Model S – at any time ever.

26       Tellingly, NHTSA closed its investigation into these fires, expressly concluding that ***"[a]***

27  ***defect trend has not been identified."*** SAC ¶ 200; RJN Ex. 4 (emphasis added). This conclusion

28  belies Plaintiffs' unsupported assertion that the Model S has "very significant vulnerabilities for

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 9 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

high-intensity fires" and fatally undermines Plaintiffs' allegation that Tesla concealed these purported vulnerabilities.  Plaintiffs misleadingly imply that NHTSA would not have closed its investigation but for its finding that "Tesla's revision of vehicle ride height and addition of increased underbody protection should reduce both the frequency of underbody strikes and the resultant fire risk."  SAC ¶ 200.  But the NHTSA report does not say that – rather, it expressly says NHTSA did not identify any defects.  Moreover, even before Tesla implemented those measures (but after the three class period fires), NHTSA in December 2013 *reaffirmed* its 5-star safety rating of the Model S.  RJN, Ex. 3.

The mere fact that there were three Model S fires does not establish that the risk of fire is "significant," as Plaintiffs assert.  Plaintiffs must allege a specific factual basis for that assertion, such as a statistical comparison with the risk of fire in gasoline vehicles.  *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577-78 (D.N.J. 2001) (allegation that "four customers … allegedly experienced problems with a new and highly technical product, especially without any allegation as to the relative fraction of [the] total business they comprised, does not equal 'widespread' failure of the product and cannot support a fraud claim").  Plaintiffs skip this necessary step.

As Plaintiffs' own allegations show, Tesla did the statistical work that Plaintiffs did not.  In an October 4, 2013 blog post following the Washington fire, Musk compared the Model S to gasoline vehicles on the rate of fires per mile driven:

> "The nationwide driving statistics make this very clear:  there are 150,000 car fires per year according to the National Fire Protection Association, and Americans drive about 3 trillion miles per year according to the Department of Transportation.  That equates to 1 vehicle fire for every 20 million miles driven, compared to 1 fire in over 100 million miles for Tesla.  This means you are 5 times more likely to experience a fire in a conventional gasoline car than a Tesla!"

SAC ¶ 146.  Mr. Musk made a similar comparison after the Tennessee fire:  "There is one fire for every 1,300 gasoline cars.  In our case, there is one fire for every 8,000 cars.  So our case is five times less likely to have a fire than a gasoline car."  SAC ¶ 183.  These statistical comparisons show that the Model S is much *less* vulnerable to fire than other cars.

This data supports Tesla's statements that Model S battery fires are "uncommon" and "extremely hard" to ignite.  *See* SAC ¶ 48.  Plaintiffs do not allege any specific facts to show that

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 10 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1   these statements or Tesla's statistical calculations were false.  Although Plaintiffs quibble that

2   Tesla's statistical comparisons are inapt, SAC ¶ 184, that is not enough to allege that the

3   statements were *false*.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012)

4   ("disagreements over statistical methodology … are insufficient to allege a materially false

5   statement").

6        Plaintiffs' other challenges to Musk's October 4, 2013 blog post are equally devoid of

7   factual support.  They fail to allege any specific facts contradicting his statement that "only a force

8   of this [25-ton] magnitude would be strong enough to punch a 3 inch diameter hole through the

9   quarter inch armor plate protecting the base of the vehicle."  SAC ¶ 145.  They also attempt to

10  contradict Musk's alleged statement that the Washington fire was "quickly" extinguished by

11  alleging that the fire lasted 2½ hours.  SAC ¶ 149.  This misrepresents what they allege Musk

12  actually said – namely, that the fire was exacerbated when the fire department punctured the metal

13  firewall, and that the fire was only extinguished after a "combination of water followed by dry

14  chemical extinguisher."  SAC ¶ 147.  Plaintiffs plead no specific facts to contradict Musk's actual

15  statements.  Plaintiffs also assert that Tesla "initially denied that the [Washington] fire originated

16  in the battery pack," SAC ¶ 136, but they provide zero factual support for that assertion.  They do

17  not and cannot allege what was said, who said it, or when.  This falls far short of the basic

18  pleading requirement for fraud under Rule 9(b).

19       Plaintiffs do not allege that Tesla misstated the factual circumstances of the Mexico or

20  Tennessee fires.  They contend, however, that Musk's verbal remarks about the Washington fire on

21  October 22 and 24, 2013, were misleading because he allegedly should have disclosed that the

22  Mexico fire had already taken place.  SAC ¶¶ 156-164.  Yet Plaintiffs do not specifically allege

23  that Musk knew about the Mexico fire at the time of his remarks.  They allege only that the

24  crashed car's owner received a call from a Tesla Vice President on October 19 or 20, that Tesla

25  sent a team to Mexico on October 21 to investigate, and that Tesla cars send a "default code" to

26  Tesla when they malfunction.  SAC ¶¶ 168-170.  None of these allegations shows that Musk

27  personally learned of the Mexico fire before his remarks.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 11 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1      In any event, there would have been no reason to mention the Mexico accident because it

2  involved very different circumstances – a high-speed crash into a concrete barrier and then a tree –

3  than a collision with road debris under "normal driving conditions," as Plaintiffs allege was the

4  case in the Washington fire.  SAC ¶ 11.  Moreover, Plaintiffs allege that Musk was asked

5  specifically about the circumstances of the Washington fire only.  SAC ¶ 156.  His response

6  therefore focused on the specifics of the Washington fire, noting its peculiarity and reiterating

7  prior statements about Tesla's statistical analyses.  SAC ¶ 157, RJN Ex. 6.  Plaintiffs do not

8  explain why, in light of the striking differences in the two incidents and the question posed, it was

9  misleading to answer a question about one fire without mentioning the other.[1]  Musk had no duty

10  to discuss the Mexico fire in response to specific questions about the Washington fire.  *See*

11  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (no duty to disclose all

12  facts unless statement "affirmatively create[s] an impression of a state of affairs that differs in a

13  material way from the one that actually exists"); *Philco Investments, Ltd. v. Martin*, C-10-02785-

14  CRB, 2011 WL 500694, *7-*8 (N.D. Cal. Feb. 9, 2011) (Breyer, J.) ("'Rule 10b-5 ... prohibit[s]

15  *only* misleading and untrue statements, not statements that are incomplete.' ... Though the

16  [statement] did not contain all of the detail Plaintiffs would have liked, it was not misleading.")

17  (quoting *Brody*) (emphasis in original); *Wozniak v. Align Tech.*, Inc., 850 F. Supp. 2d 1029, 1040

18  (N.D. Cal. 2012) (citing *Brody* and dismissing Section 10(b) claim for software company's

19  nondisclosure of software problems where challenged statements did not create a misleading

20  impression of the software's efficacy).

21                      3.    <u>Plaintiffs' Allegations of Fire Incidents During Prototype Testing Do Not</u>

22                          <u>Render Tesla's Subsequent Statements Misleading.</u>

23      Plaintiffs' allegations that there were three fire incidents in late 2011 and early 2012, at

24  least six to ten months before the commercial launch of the Model S, misleadingly conflate the

---

26  [1] Plaintiffs also challenge Musk's October 24 statements distinguishing the Washington fire from a "spontaneous" battery fire experienced by Boeing.  SAC ¶ 160.  There is an enormous difference between a spontaneous fire and a fire caused by a collision with metal debris at highway speed.  There is no allegation that any Model S has ever experienced a spontaneous battery fire.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 12 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1   battery pack design on the **production** Model S with obsolete **prototype** battery designs.  This is an

2   enormous flaw in Plaintiffs' case because Tesla's statements expressly pertained only to the

3   production Model S.  Plaintiffs specifically allege that Tesla's engineers were still changing

4   designs "just prior to the Model S's production deadline," and shortly before the June 2012 launch

5   date, "many other parts of the car were undergoing changes, **including the motor and the battery**."

6   SAC ¶¶ 57, 59 (emphasis added).[2]  Given their own allegations that the design was continuously

7   changing, Plaintiffs bear the burden of showing that these early prototypes are the same as the

8   battery pack found on the production Model S.  They do not even attempt to carry that burden.

9        Plaintiffs first allege a fire incident that supposedly happened in "September or October

10  2011," **over nine months before the Model S launch** in June 2012.  Although Plaintiffs rely on

11  vague statements attributed to CW1, they do not allege that he had any personal knowledge about

12  the source of the fire, the cause of the fire, or any other relevant circumstances.  SAC ¶ 89.  CW1's

13  only specific allegation about this incident is that it involved a "prototype," *i.e.*, an early non-

14  production battery design not found on the Model S.  SAC ¶ 90.  This is a critical point, as CW1 –

15  who was not part of the battery design team (SAC ¶ 85) and who left Tesla in January 2012, six

16  months before the Model S launched (SAC ¶ 30) – could not possibly have known whether the

17  "prototype" battery allegedly involved in this fire bore any resemblance to the battery pack found

18  on the production Model S.  These allegations must therefore be discounted completely.  *See*

19  *Zucco Partners*, 552 F.3d at 996; *City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v.*

20  *Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013).

21

22

23        [2] Plaintiffs vaguely allege that, after upgrading to higher-energy batteries, Tesla
    "essentially" preserved its battery design without any "major" changes.  SAC ¶ 102.  But, their
24  only source for this statement is CW5, purportedly a "senior CAD designer" who worked on
    "drawings" of the battery pack and who "could not recall" subsequent design changes to the
25  battery pack.  SAC ¶ 34.  CW5 does not affirmatively say the design did not change, and there is
    no alleged factual basis to assume that a CAD (computer aided design) employee without any
26  alleged engineering experience would personally know whether the battery went through "major"
    changes or understand the safety implications of battery changes and design decisions.  Even if he
27  had, that would contradict Plaintiffs' explicit **admission** that the Model S design, including the
    battery design, changed continuously until just before launch in June 2012.  SAC ¶¶ 57, 59.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 13 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    Plaintiffs next allege an incident in December 2011, this time seven months prior to

2   launch, in which Tesla engineers *deliberately set a fire* to test its effects on a prototype battery

3   pack.  SAC ¶ 91.  Plaintiffs once again rely on a statement by CW1, who describes the incident as

4   a "test" involving a "thermal event *induced* at the center of the battery pack, *rather than at the*

5   *front or back, as would more typically occur during a crash impact.*"  SAC ¶ 91 (emphasis

6   added).  Again, CW1 could not have known how the battery involved in this incident compares to

7   the battery pack in the production Model S because he had already left the company long before

8   production began.  The fact that Tesla was able to deliberately "induce" this fire says nothing

9   whatsoever about the risk of the production Model S battery pack catching fire accidentally during

10   a crash, which is the risk that Plaintiffs accuse Tesla of concealing.

11    Plaintiffs also vaguely describe a January 2012 fire originating on a "storage cart" in a

12   room with high voltage signs.  SAC ¶ 96.  This allegation illustrates how far Plaintiffs will stretch

13   to concoct a theory, as there is *no allegation* that this fire involved a *battery pack at all*, let alone a

14   production Model S battery pack.

15    In short, Plaintiffs do not and cannot allege that *any* production Model S battery pack *ever*

16   caught fire before the class period.  Tesla's statements about the *production* Model S were not

17   misleading simply because there were alleged problems involving early *pre-production*

18   "prototypes."  *See, e.g., Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (affirming dismissal

19   of securities fraud claim and recognizing that "much of any business consists of having problems

20   and dealing with them"); *Allison v. Brooktree Corp*., 999 F. Supp. 1342, 1348 (S.D. Cal. 1998)

21   ("In bringing any high-tech product to market, problems encountered in [development]…are the

22   norm, not the exception" and do not support a securities fraud claim).  Tesla had no duty to

23   provide additional detail about early battery pack "prototypes."  To hold otherwise would require

24   innovative companies like Tesla to disclose every twist and turn in the design and testing process,

25   an unmanageable duty the securities laws do not impose.  *Gallagher v. Abbott Labs.*, 269 F.3d

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 14 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    806, 808 (7th Cir. 2001) (securities laws do not create "a system of continuous disclosure," and

2    "firms are entitled to keep silent … unless positive law creates a duty to disclose").**3**

3           Plaintiffs nonetheless assert that the alleged "prototype" fires contradict Musk's August 20,

4    2013 statement that, "[t]hroughout all our ***crash tests***, throughout all similar incidents with

5    ***vehicles on the road***, never once has there been a fire."  SAC ¶¶ 7, 130 (emphasis added).  Yet

6    Plaintiffs do not and cannot allege any fires involving "crash tests" or any fires involving "vehicles

7    on the road" prior to the Washington fire.  Musk's statement was therefore true.

8           Also true is the statement by "Tesla spokesperson" Elizabeth Jarvis-Shean that the

9    Washington fire was "the first fire."  SAC ¶ 142.  Plaintiffs claim this statement was false in light

10   of the alleged pre-production fires, but when read in its entirety, her statement clearly referred to

11   fires in the ***production*** Model S:  "Tesla has delivered more than 13,000 [Model S] vehicles since

12   June 2012.  Those cars have driven over 83 million miles, and this is the first fire."  RJN Ex. 7.

13   The Washington fire was, in fact, the first fire involving a Model S.

14          Plaintiffs not only fail to show that these statements were inaccurate, Plaintiffs also fail to

15   allege facts showing that Mr. Musk or Ms. Jarvis-Shean ***knew*** they were inaccurate.  The Reform

16   Act requires Plaintiffs to plead "particularized facts" showing that the speakers knowingly or

17   recklessly made false statements.  *Gompper*, 298 F.3d at 897.  Plaintiffs do not allege any

18   particular facts showing that Mr. Musk or Ms. Jarvis-Shean knew information that contradicted

19   their statements.  Nor is there any specific allegation that they were aware of any prior fires.  At

20   most, Plaintiffs allege that Mr. Musk was involved in the design of the Model S, but that is far

21   from sufficient to establish scienter.  *Metzler*, 540 F.3d at 1068 ("[C]orporate management's

22   general awareness of the day-to-day workings of the company's business does not establish

23

24   _____

25          **3** *See also Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (silence is not actionable absent a
     duty to disclose); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) ("If the standard of
26   materiality is unnecessarily low … management's fear of exposing itself to substantial liability
     may cause it simply to bury the shareholders in avalanche of trivial information."); *Ronconi*, 253
27   F.3d at 430; *Allison*, 999 F. Supp. at 1348; *In re Allscripts, Inc. Sec. Litig.*, No. 00-C-6796, 2001
     WL 743411, *9 (N.D. Ill. June 29, 2001) ("Corporate executives have no general duty to disclose
28   every problem that arises in selling a Company's products.").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 15 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    scienter – at least absent some additional allegation of specific information conveyed to

2    management and related to the fraud.").

3                        4.        Tesla Disclosed the Risk of Battery Fires and How It Mitigates That Risk.

4            Insofar as Plaintiffs' allegations about early prototype battery fires have any relevance

5    whatsoever, they support only the unremarkable proposition that there is at least some risk,

6    however small, of lithium-ion battery fires – a risk that Tesla has consistently disclosed to

7    investors.  Plaintiffs' allegations that Tesla concealed the risk of battery fires (*e.g.*, SAC ¶¶ 6, 11)

8    are belied by those disclosures.

9            Tesla has included disclosures regarding the risk of battery fires in all of its periodic SEC

10   filings, including its Form 10-Q for the second quarter of 2013, which was filed on August 9,

11   2013, only two months before the first alleged Model S fire:  **"Our vehicles make use of lithium-**

12   **ion battery cells, which have been observed to catch fire or vent smoke and flame, and such**

13   **events have raised concerns, and future events may lead to additional concerns, about the**

14   **batteries used in automotive applications."**  RJN Ex. 1 at 3-4 (emphasis in original).

15           Tesla also disclosed how it designed the Model S battery pack to address that risk: "We

16   have designed the battery pack to passively contain any single cell's release of energy without

17   spreading to neighboring cells and we are not aware of any such incident in our customers'

18   vehicles."  *Id*.  Nevertheless, Tesla cautioned that "there can be no assurance that a field or testing

19   failure of our Model S or other battery packs that we produce will not occur, which could damage

20   the vehicle or lead to personal injury or death," and that "negative public perceptions regarding the

21   suitability of lithium-ion cells for automotive applications or ***any future incident involving***

22   ***lithium-ion cells such as a vehicle or other fire … could seriously harm our business***."  *Id.; see*

23   *also, e.g.,* RJN Ex. 2 (2012 Form 10-K) at 7 (identical disclosures).

24           These judicially noticeable disclosures disintegrate the allegations that the risks of lithium-

25   ion battery fires "were unknown to Lead Plaintiff and the Class members," SAC ¶ 11, and that

26   Tesla "omitt[ed] to disclose" the risk of battery fires, SAC ¶ 18.  Perhaps that is why Plaintiffs

27   ignore those disclosures in their Second Amended Complaint.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 16 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    Moreover, these disclosures negate any inference of scienter.  *In re Worlds of Wonder Sec.*

2    *Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("detailed risk disclosure ... negates an inference of

3    scienter"); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1160 (S.D. Cal. 2008)

4    ("Disclosing the precise risks at issue 'negate[s] an inference of scienter.'") (quoting *Worlds of*

5    *Wonder*).  Tesla plainly was not trying to defraud investors by concealing the risk of battery fires.

6    　　　　　　　　5.    Allegations of Subsequent Remedial Measures Are Not Sufficient To Plead

7    　　　　　　　　　　　Securities Fraud.

8    　　　Plaintiffs cannot adequately plead fraud by alleging that, after learning of the Washington

9    and Tennessee fires, Tesla decided to implement so-called "remedial measures" by increasing the

10   Model S's ground clearance and offering an optional underbody shield upgrade.  SAC ¶¶ 15, 17.

11   Making a design enhancement is a far cry from an admission that the product was ever "unsafe,"

12   much less that Tesla or Musk knew it was unsafe.  To the contrary, NHTSA expressly found no

13   flaws in the car's design when it closed its investigation in March 2014, and it reaffirmed its

14   highest possible safety rating for the Model S.  RJN Exs. 3 & 4.[4]

15   　　　In addition, it is black-letter law that subsequent remedial measures cannot be used to show

16   an alleged product defect, Fed. R. Evid. 407, and therefore cannot be used to show the falsity of

17   Tesla's alleged statements.  *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007)

18   (granting motion to dismiss in securities fraud case because, in part, "[d]rawing any inference

19   from [a subsequent remedial measure] would be incompatible with [Rule] 407, which provides

20   that subsequent remedial measures may not be used as evidence of liability"); *Pugh v. Tribune*

21   *Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (same).

22   　　　These alleged subsequent measures also cannot support an inference of scienter.  *Id.*; *see*

23   *also Wade v. Wellpoint, Inc.*, 740 F. Supp. 2d 994, 1010 (S.D. Ind. 2010).  They are not probative

24

25   　　　　　[4] Plaintiffs also allege, once again in hindsight, that certain design decisions may have
     affected the likelihood of collisions with road debris. SAC ¶¶ 100-107. But Plaintiffs plead no
26   specific facts to show how these alleged decisions created a "significant vulnerability" of fires in
     the Model S, nor do they allege that Defendants knew about yet consciously concealed that
27   "vulnerability."  These allegations show nothing more than typical design decisions involved in
     conceiving and constructing any new piece of technology.
28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 17 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

of Tesla's intent or knowledge during the class period.  Plaintiffs' attempt to imply *ex ante* scienter

based on *ex post* product improvements is akin to pleading "fraud by hindsight," which is

improper as a matter of law.  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F. 3d 970, 988 (9th Cir.

1999) ("Congress enacted the [Reform Act] to put an end to the practice of pleading 'fraud by

hindsight.'").

**B.     Plaintiffs Do Not and Cannot Allege a Strong Inference of Scienter.**

Independent of their failure to allege any actionable misrepresentations, Plaintiffs also fail

to plead particular facts giving rise to a strong inference that Defendants ***knowingly*** misled

investors about the Model S.  *Gompper*, 298 F.3d at 895.

1.     The Absence of Suspicious Stock Sales Negates Any Inference of Scienter.

Conspicuously missing from the Second Amended Complaint is any allegation that Mr.

Musk, the only individual defendant, engaged in any sales of Tesla stock during the class period.

The absence of any stock sales is a strong factor in finding a lack of scienter.  *In re FVC.COM

Sec. Litig.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (Breyer, J.) *aff'd*, 32 F. App'x 338 (9th

Cir. 2002) (dismissing securities fraud claim, holding that the absence of stock sales by the

company's CEO, who allegedly made misstatements, "negates any slight inference of scienter"); *In

re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1106 (N.D. Cal. 2006) (fact that insiders retained

nearly all of their stock "undermines any inference of scienter").

Here, ***Musk sold no Tesla stock during the class period***.  Rather, he ***acquired shares

worth $100 million*** shortly before the class period, on May 30, 2013.  RJN Ex. 8.  Plaintiffs

concede that Musk suffered paper losses of $2 billion during the class period.  SAC ¶ 219.  These

facts are devastating to Plaintiffs' scienter allegations, as Musk's lack of sales combined with

significant acquisitions are inconsistent with any intent to defraud.  *See Searls v. Glasser*, 64 F.3d

1061, 1068 (7th Cir. 1995) (rejecting inference of scienter where defendant had a positive net

acquisition of stock over the class period, noting that this was "a position unlikely to be taken by

an insider who has unpublished knowledge of the company's slowdown"); *In re Aspeon, Inc. Sec.

Litig.*, 168 F. App'x 836, 840 (9th Cir. 2006) (affirming dismissal of securities fraud claim where

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations
3065591
- 18 -
DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1   "[t]he purchase of stock by [defendant's] CEO tends to negate the inference of scienter"); *In re*

2   *PMI Group, Inc. Sec. Litig.*, 2009 WL 1916934, at *10 (N.D. Cal. Jul. 1, 2009).

3       Plaintiffs try to sidestep these devastating facts by pointing to stock sales by three outside

4   directors and a single officer.  SAC ¶ 220.  Yet Plaintiffs allege no specific facts about these

5   individuals' prior trading histories.  Allegations of insider stock sales do not support an inference

6   of scienter unless they are "dramatically out of line with prior trading practices at times calculated

7   to maximize personal benefit."  *Zucco*, 552 F.3d at 1005; *Kovtun v. VIVUS, Inc.*, No. 10-c-4957,

8   2012 WL 4478647, at *21 (N.D. Cal. Sept. 27, 2012) (same).  Plaintiffs fail to allege that these

9   stock sales were "dramatically out of line" with those individuals' prior trading practices.

10      Plaintiffs do not allege that any of these four individuals made any false or misleading

11  statements.  Their stock trades cannot support an inference that the other Tesla representatives to

12  whom Plaintiffs attribute allegedly false statements possessed scienter.  *Glazer*, 549 F.3d at 745

13  (9th Cir. 2008) (holding Reform Act required plaintiff "to plead scienter with respect to those

14  individuals who actually made the false statements"); *Silicon Graphics*, 183 F.3d at 987–88 (fact

15  that Plaintiffs alleged no false statements by insider who sold stock dispelled an inference of

16  fraud); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-94 (9th Cir. 2002) (rejecting inference

17  of fraud where selling insiders were not alleged to have made misleading statements).[5]

18          2.   Plaintiffs' Confidential Witness Allegations Do Not Establish Scienter.

19      Plaintiffs rely on cobbled-together bits and pieces of CW interviews in an attempt to

20  suggest that Tesla had reason to think the Model S was supposedly unsafe.  Courts give a "heavy

21

22          [5] Out of left field, Plaintiffs also suggest that Tesla did not properly apply lease accounting
    rules to a resale guarantee program, and that Tesla should not have compared GAAP revenues to
23  non-GAAP revenues in connection with that sales program.  SAC ¶ 218.  The allegation is false—
    Tesla clearly disclosed that GAAP required it to account for sales through the resale program as
24  leases, and, as required by Regulation G, it reconciled its non-GAAP and GAAP-based figures.
    RJN, Ex. 9 at 21-22, Ex. 10 at 36-37.  This allegation is also completely irrelevant to the alleged
25  misstatements and omissions here.  Plaintiffs never explain why an alleged manipulation of lease
    accounting rules suggests that Defendants misrepresented the risk of fire in the Model S.  In any
26  event, a mere allegation of a technical GAAP violation is not sufficient to plead scienter.  *In re
    Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627-28 (9th Cir. 1994); *DSAM Global Value
27  Fund v. Altris Software*, 288 F.3d 385, 390 (9th Cir. 2002) (mere allegations of failure to follow
    GAAP "cannot raise a strong inference of scienter") (citing *Software Toolworks*).

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591                                          - 19 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1   discount" to CW allegations.  *City of Livonia*, 711 F.3d at 759.  Here, the alleged statements

2   attributed to the CWs are not even close to sufficient to give rise to a strong inference of fraud.

3       Most of the CW allegations have nothing at all to do with the alleged risk of battery fires.

4   No CW alleges that any battery pack, including the one found on the Model S, was defective or

5   significantly vulnerable to fires.  No CW describes any fires involving the Model S prior to the

6   class period.  No CW is alleged to have personal knowledge of the production Model S battery

7   pack design or testing.  No CW informed Musk or any other Tesla employee of any belief that the

8   Model S battery pack was unsafe.  No CW mentioned any motivation whatsoever to commit fraud.

9       Only two alleged witnesses, CW1 and CW2, say anything about the battery pack's design.

10  But CW1 concedes he "did not participate in the [battery] decision-making process," SAC ¶ 85,

11  and CW2 affirmed that Tesla's and Musk's "***Number one [priority] was always safety***."  SAC ¶ 86

12  (emphasis added).  Neither is alleged to have believed that any design decisions created excessive

13  risk.  Both left Tesla well before Model S production began.  SAC ¶¶ 30-31.  As they were not

14  present for the alleged battery design changes leading up to production, SAC ¶¶ 57, 59, they could

15  not possibly have personal knowledge of any risks involving the production Model S, nor could

16  they have conveyed such knowledge to Musk or anyone else.  Plaintiffs do not allege that they did.

17      Two witnesses lacking engineering expertise, CW6 and CW10, mention the risk of

18  underbody collisions, but only in hindsight.  *See* SAC ¶ 106.  Neither is alleged to have had

19  personal knowledge of such a risk, let alone to have communicated about that risk to anyone else

20  at Tesla, prior to the class period.  CW6 was allegedly a building manager who left Tesla in

21  October 2011 – long before the final design and June 2012 launch of the Model S.  SAC ¶ 35.

22  CW10 allegedly was a "Vehicle and Battery Technician" who "help[ed] engineers build the Model

23  S prototypes" and then worked as a "service technician."  There is no specific allegation he had

24  any engineering knowledge regarding the Model S battery or underbody.  SAC ¶ 39.

25      Plaintiffs also rely heavily on CW13, who allegedly worked at TDI, a third-party supplier

26  of "inverters" to Tesla.  SAC ¶¶ 67-73.  Plaintiffs do not explain the basis for CW13's supposed

27  knowledge, only that he was a "Program Manager" at TDI.  He is not alleged to have any

28  knowledge of the Model S battery design, and he conceded his ignorance of Tesla's test results.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 20 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

SAC ¶ 71.  CW13 allegedly believes the "inverters" TDI sold to Tesla were not "a finished product" or "safe."  SAC ¶¶ 72-73.  But Plaintiffs do not allege that he informed Tesla of that belief.  Nor do they allege that TDI's "inverters" are at all relevant to the alleged battery fires.

All of Plaintiffs' other CW allegations fail to support a strong inference of scienter:

- CW3 allegedly worked in the "service organization," but not the design division.  SAC ¶ 32.  Though CW3 alleges that Tesla used "preliminary components" in a few production Model S cars, SAC ¶¶ 61-62, this has no relevance to the alleged risk of fire or scienter.

- CW4, described as a "Tesla engineer who worked on the crash worthiness of the Model S," SAC ¶ 33, allegedly said only that a particular government crash test does not examine underbody collisions.  SAC ¶ 111.  But this is irrelevant – Plaintiffs allege no misrepresentations about that particular test.  Although CW4 alleges he worked with Musk, he never mentions discussions with Musk about any risk, much less risk of fire from underbody collisions.  SAC ¶¶ 78-79.

- CW7, allegedly a "Director of Vehicle Validation and Quality," SAC ¶ 36, also makes generic claims about Musk's involvement in Model S design, SAC ¶¶ 78, 80, 82, but provides no specifics about Musk's decisions regarding the Model S battery or Musk's alleged knowledge of purported risks.

- CW8, allegedly a "Manager of Global Logistics," SAC ¶ 37, presents only irrelevant allegations about Model S part supply issues.  SAC ¶¶ 59-60.  CW8 also claims to know the location of the same "induced" pre-production fire mentioned by CW1, which took place six months before the Model S launch.  SAC ¶ 94.  None of these allegations is relevant to scienter.

- CW9, a so-called "Project Manager," SAC ¶ 38, also makes irrelevant allegations about problems obtaining Model S parts.  SAC ¶ 63.

- CW11 purportedly was a Tesla "service technician," SAC ¶ 40, who provides only a generic description of a Tesla database that is purportedly updated sometime after Tesla cars experience problems.  SAC ¶ 170.  He says nothing about scienter.

- CW12, allegedly a "manufacturing technician on the Model S production line," SAC ¶ 41, claims he identified "fitment" issues in the production Model S, such as how the window fit within the door.  SAC ¶ 64.  CW12 alleges nothing about battery or fire risk issues, or that anyone at Tesla knew about such purported issues.

Given that none of the CWs is alleged to have information actually relevant to the alleged fraud, Plaintiffs' CW allegations cannot support an inference of scienter.  *Zucco*, 552 F.3d at 996 (refusing to infer scienter from CW allegations where complaint lacked "the requisite particularity to establish that certain statements of these confidential witnesses are based on the witnesses'

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 21 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1    personal knowledge" and simply alleged "conclusory assertions of scienter," as this

2    "demonstrate[d] that the confidential witnesses [were] not reliable").

3                3.    Taken as a Whole, Plaintiffs' Scienter Theory Is Implausible.

4        This Court, in addition to examining each specific allegation regarding scienter, should

5    view the allegations "holistically" to determine whether they give rise to a strong inference of

6    scienter.  *Tellabs*, 551 U.S. at 326, *Zucco*, 552 F.3d at 992.  "[T]he court must consider **all**

7    reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

8    plaintiffs."  *Gompper*, 298 F.3d at 897 (emphasis in original).  Here, Plaintiffs' allegations strongly

9    show the absence of scienter.

10       Plaintiffs contend that Tesla was motivated to defraud investors because, "[o]n an

11   existential level, Tesla needed its flagship product, the Model S, to establish proof of concept, gain

12   acceptance, and sell."  SAC ¶ 216.  Tesla supposedly "could not afford a major glitch in the

13   Model S, its only product available for sale."  SAC ¶ 53.  Plaintiffs speculate that Musk was

14   similarly motivated, as failure would allegedly "represent an enormous blight on the record of

15   someone who is considered … a peer of Thomas Edison."  SAC ¶ 219.  Therefore, according to

16   Plaintiffs, Tesla rushed the Model S into production despite allegedly known "significant

17   vulnerabilities" to "catastrophic fire" from road debris impacts.  SAC ¶ 18.  Plaintiffs further

18   allege that implementing a fix for these supposed "vulnerabilities" was a simple matter – "as easy

19   as pushing a button."  *E.g.*, SAC ¶¶ 6, 188.  This theory makes no sense.

20       In one breath, Plaintiffs allege the paramount importance to Tesla and Musk of avoiding a

21   public failure that would have a catastrophic effect on their finances and reputation.  In the next,

22   Plaintiffs allege that Tesla and Musk knowingly set themselves up for public failure by designing

23   the Model S with fundamental flaws and rushing it to market despite allegedly knowing there was

24   a high risk of fire and a simple way to fix it.  But it is completely implausible that Tesla and Musk

25   would do such a thing – particularly given Musk's huge personal investment in the company.  The

26   only plausible inference is that Tesla and Musk were highly motivated to make the Model S as

27   safe as possible.  *See In re Lululemon Sec. Litig.*, No. 13-CIV-4596, - F. Supp. 2d. -, 2014 WL

28   1569500 at *21 (S.D.N.Y. Apr. 18, 2014) (finding it "certainly not cogent and compelling [] that

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591                                            - 22 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

1  the need for quality in order to maintain [a company's] brand would lead a company to make

2  intentionally false statements regarding its remediation of quality problems, since doing so could

3  only result in inevitable discovery with defective products on the shelves").

4      Plaintiffs admit that, according to CW2, "Number one was always safety."  SAC ¶ 86.

5  This allegation alone eviscerates Plaintiffs' entire scienter theory.

6      In a failed attempt to allege a financial motive, Plaintiffs claim that Tesla was supposedly

7  on "precarious financial footing," as it had supposedly "tapped the capital and debt markets"

8  during the class period and therefore needed to prop up demand after the class period fires.  SAC

9  ¶ 217.  This assertion is belied by the judicially noticeable fact that in February 2014, only three

10  months after the class period, Tesla raised approximately $2.3 billion from the capital markets.

11  *See* RJN Ex. 11 at 48.  Clearly, Tesla had not come close to exhausting its ability to raise

12  additional capital, which negates Plaintiffs' proffered financial motivation to commit fraud.

13      Plaintiffs' allegations regarding Tesla's supposed "remedial measures" likewise illustrate

14  the implausibility of their scienter theory.  They claim that two upgrades Tesla subsequently

15  implemented – raised suspension and an optional underbody shield – were simple fixes of which

16  Tesla was supposedly aware.  SAC ¶¶ 188, 193.  Plaintiffs' theory, then, is that Musk and Tesla

17  chose not to implement these simple technological fixes and chose instead to unnecessarily risk

18  Tesla's very existence by releasing the Model S despite the supposed likelihood of "catastrophic

19  fires."  Again, this makes no sense.

20      Also inconsistent with any inference of scienter is the fact that, as noted above, Tesla

21  candidly disclosed the risk of lithium-ion battery fires, the potential impact of such fires on its

22  business, and its design choices to address that risk.  (*See* Section III.A.5, *supra*.)  This disclosure

23  alone shows that Tesla and Musk did not intend to conceal the risk of fires from investors.

24  **IV.   PLAINTIFFS' SECTION 20(A) CLAIM SHOULD ALSO BE DISMISSED.**

25      Because Plaintiffs fail to state a claim under Section 10(b), their "control person" claim

26  against Musk under Section 20(a) must also be dismissed.  *See* 15 U.S.C. § 78t(a); *Heliotrope*

27  *Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999) ("To be liable under section 20(a),

28  the defendants must be liable under another section of the Exchange Act.").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations
3065591
- 23 -
DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)

## V.      LEAVE TO AMEND SHOULD BE DENIED.

This case should be dismissed with prejudice.  This Court already granted Plaintiffs leave to amend two times – the first accompanied by a clear admonition to comply with the Reform Act's exacting pleading standards.  *See* 2/14/2014 Hrg. Tr. at 5-6 ("I want you to lay out in as much detail as can be – in your possession, because you're not entitled to discovery on this, as much information as you possibly have that supports those allegations. And I want to see them in the amended complaint.").  Plaintiffs' counsel is experienced in securities litigation and would have met these rigorous standards if they could.  They have had over seven months since filing their initial complaint to investigate their claims and interview over a dozen confidential witnesses.  *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1026 (9th Cir. 2000) (affirming dismissal of second amended complaint with prejudice for failure to comply with Reform Act); *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir.1990) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

Plaintiffs' most recent request for leave amend so they can add a ***facially false*** allegation demonstrates that any further amendment would be futile.  On June 11, 2014, Plaintiffs filed a motion for leave to amend yet again, claiming that they "reviewed the Amended Class Action Complaint … to see whether there were any other issues that would benefit from an amendment" and found only a single paragraph to modify.  Tuccillo Decl. ¶ 5 (Dkt. 40).  Yet their new allegations are demonstrably false:  Plaintiffs allege that Tesla's 5,500 Model S deliveries in the third quarter of 2013 were "lower-than-expected" due to a dip in demand caused by the "prior-reported vehicle fires."  SAC ¶ 172.  But ***none*** of the class period fires occurred until the fourth quarter – in October and November 2013 – so the allegation that they impacted third quarter deliveries is ***patently false***.  And, in fact, Tesla ***beat*** its pre-class-period projection of 5,000 deliveries for the third quarter.  RJN Ex. 9 at 22, Ex. 10 at 34.  That Plaintiffs would file another amendment just to add an allegation that is so obviously false is a stunning testament to their desperation to save a fatally weak case, and it certainly shows that  "no [further] amendment could save" this case.  *Desaigoudar*, 223 F.3d at 1026.  They should not be given further leave to amend.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

1 | Dated:  June 16, 2014                               Respectfully submitted,

2 |                                                      IRELL & MANELLA LLP

3 |

4 |

5 |                                                      By:  */s/ Charles Elder*
                                                              _____
6 |                                                           Charles Elder
                                                              Attorneys for Defendants
7 |                                                           TESLA MOTORS, INC. and ELON MUSK

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

3065591

- 25 -

DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT (Case No. 3:13-CV-05216-CRB)