1   Lionel Z. Glancy  (#134180)
    Michael Goldberg (#188669)
2   Robert V. Prongay (#270796)
    **GLANCY BINKOW & GOLDBERG LLP**
3   1925 Century Park East, Suite 2100
    Los Angeles, California 90067
4   Telephone:     (310) 201-9150
    Facsimile:     (310) 201-9160
5   Email:  lglancy@glancylaw.com
6           mmgoldberg@glancylaw.com
            rprongay@glancylaw.com
7

8   *Liaison Counsel for Lead Plaintiff and the Proposed Class*

9   Jeremy A. Lieberman (*pro hac*)
    Matthew L. Tuccillo (*pro hac*)
10  **POMERANTZ LLP**
    600 Third Avenue, 20th Floor
11  New York, New York 10016
    Telephone:     (212) 661-1100
12  Facsimile:     (212) 661-8665
    Email:  jalieberman@pomlaw.com
13          mltuccillo@pomlaw.com

14
    *Lead Counsel for Lead Plaintiff and the Proposed Class*
15

16                      **UNITED STATES DISTRICT COURT**
                      **NORTHERN DISTRICT OF CALIFORNIA**
17                        **SAN FRANCISCO DIVISION**

18
                                          | Case No. 3:13-CV-05216-CRB
19
20                                        | **LEAD PLAINTIFF'S OPPOSITION TO**
                                          | **MOTION OF TESLA MOTORS AND ELON**
21                                        | **MUSK TO DISMISS SECOND AMENDED**
                                          | **CLASS ACTION COMPLAINT**
22  IN RE TESLA MOTORS, INC.
    SECURITIES LITIGATION
23                                        | Date:   September 26, 2014
24                                        | Time:   10:00 a.m.
                                          | Ctrm:   6
25                                        | Judge:  Hon. Charles R. Breyer
26                                        | Complaint filed: November 8, 2013
27

28

        LEAD PLAINTIFFS' OPPOSITION TO MOTION OF TESLA MOTORS AND ELON MUSK
            TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT
                        Case No. 3:13-cv-05216-CRB

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iv

ISSUES TO BE DECIDED ...................................................................................... viii

SUMMARY OF ARGUMENT ................................................................................... ix

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

INTRODUCTION ...................................................................................................... 1

STATEMENT OF RELEVANT FACTS ................................................................. 3

                Tesla's Financial Pressures Mandated Increased Sales ........................ 3

                Musk Made Engineering Decisions While Driving Off Tesla's Top
                Engineers ................................................................................................. 3

                Musk's 300 Mile-Per-Charge Mandate Dictated Use Of Volatile,
                Higher-Energy Batteries ......................................................................... 4

                Tesla's Pre-Class Period Battery Fires ................................................. 5

                Prioritizing Battery Range, Defendants Rejected Available Safety
                Measures ................................................................................................. 6

                Government Testing Did Not Assess Risks Of Undercarriage
                Damage Or Battery Fires ........................................................................ 7

                Defendants' False And Misleading Statements During The Class
                Period ...................................................................................................... 7

                A Series Of Partial Corrective Events Revealed The Truth ................. 8

ARGUMENT ............................................................................................................ 8

    I.      APPLICABLE LEGAL STANDARDS ...................................................... 8

        A.    Applicable Pleading Standards ................................................... 8

        B.    Defendants Waived Arguments Not Presented In Their Opening
              Brief ............................................................................................. 10

    II.     PLAINTIFFS HAVE ADEQUATELY PLED FALSITY ......................... 10

A.   Defendants Had A Duty To Disclose The Pre-Class Period Fires And The Decisions Compromising Safety ......................................... 10

B.   Misrepresentations Following NHTSA Testing Of The Model S ................... 12

1.   Defendants' Statements On August 19, 2013 ....................................... 12

2.   Defendants' "Safest Car In America" Statement On Tesla's Website ................................................................................................ 14

3.   Defendant Musk's August 20, 2013 Interview .................................... 14

4.   Tesla's September 14, 2013 Investor Presentation .............................. 15

C.   Misrepresentations Following The Three Class Period Fires .......................... 15

1.   Tesla's October 3, 2013 ABC News Interview ................................... 15

2.   Defendant Musk's Blog Post On October 4, 2013 .............................. 15

3.   Defendant Musk's October 22, 2013 And October 24, 2013 Remarks ................................................................................................ 18

4.   Defendant Musk's Three Interviews On November 12, 2013 ...................................................................................................... 19

5.   Defendants' Other Arguments Regarding Purported Truth Lack Merit .......................................................................................... 19

D.   Defendants' Argument That Risk Disclosures Negate Falsity Fails ............... 21

III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED SCIENTER .............................. 22

A.   The SAC Adequately Pleads Defendants' Scienter ......................................... 22

1.   Defendants' Actual Knowledge ........................................................... 23

2.   Defendants' Recklessness .................................................................... 24

3.   Defendants' Motive And Opportunity ................................................. 24

B.   Defendants' Scienter Challenges Regarding Specific Misstatements Fail .............................................................................................. 25

1.   The August 19, 2013 Press Release ..................................................... 25

2.   The October 3, 2013 Interview And October 4, 2013 Blog Post ....................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.      Defendant Musk's October 22, 2013 And October 24, 2013 Remarks ................................................................................ 26

C.     Defendants' Argument That Risk Disclosures Negate Scienter Fails ................................................................................................ 27

D.     The SAC's Confidential Witness Allegations Are Legally Sufficient ............................................................................................ 27

E.     Plaintiffs' Scienter "Theory" Is Cogent And At Least As Compelling As Any Offered By Defendants ................................... 28

IV.     THE §20(A) Claim Should Not Be Dismissed ............................................................. 30

CONCLUSION ..................................................................................................................... 30

## **TABLE OF AUTHORITIES**

### **CASES**

**Page(s)**

*Allison v. Brooktree Corp.*,
   999 F. Supp. 1342 (S.D. Cal. 1998) ..................................................................12

*Anderson v. McGrath*, No. CV-11-01175-PHX-DGC,
   2012 WL 5381406, at *6 (D. Ariz. Nov. 1, 2012) ........................................20, 22

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) .........................................................................................9

*Avila v. Los Angeles Police Dept.*, Nos. 12-55931 and 12-56554,
   2014 WL 3361123 (9th Cir. Feb. 6, 2014) ..........................................................10

*Bell Atl. Cor. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................9

*Berson v. Applied Signal Tech.*,
   527 F.3d 982, 987 (9th Cir. 2008*)* ..............................................19, 22, 23, 24

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) ........................................................................11, 19

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ........................................................................11, 28

*Coble v. Broadvision, Inc.*, No. C 01-01969 CRB,
   2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) .................................................27

*Copperstone v. TCSI Corp.*, No. C, 97-3495 SBA,
   1999 WL 33295869 (N.D. Cal. Jan. 19, 1999) ...................................................22

*Curry v. Hansen Med., Inc.*, No. 5:09-cv-05094-JF (HRL),
   2011 WL 3741238 (N.D. Cal. Aug. 25, 2011) ..............................................9, 30

*Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG (RNBx),
   2013 WL 1947525 (N.D. Cal. May 8, 2013) ................................................24, 28

*Glassman v. Computervision Corp.*,
   90 F.3d 617 (1st Cir. 1996) ................................................................................12

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002) ..............................................................................26

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992),
976 F.2d at 502 .......................................................................................................... *passim*

*In re Allscripts, Inc. Sec. Litig.*,
2001 WL 743411 (N.D. Ill. June 29, 2001) ........................................................................ 12

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .................................................................................. *passim*

*In re Aspeon, Inc. Sec. Litig.*,
168 Fed. Appx. 836, 840 (9th Cir. 2006) ......................................................................... 25

*In re Coinstar, Inc. Sec. Litig.*, No. C11-133 MJP,
2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) .............................................................. 20

*In re Dura Pharm., Inc. Sec. Litig.*, No. 99 CV 0151-L (NLLS),
2000 Wl 33176043 (S.D. Cal. July 11, 2000) ................................................................. 12

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .......................................................................................... 11

*In re HI/FN, Inc. Sec. Litig.*, No. C-99-4531 SI,
2000 WL 33775286 (N.D. Cal. Aug. 9, 2000) ......................................................... xi, 22

*In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW,
2006 WL 726791 (D. Ariz. Jan. 25, 2006) ..................................................................... 24

*In re Marvell Tech. Group Ltd. Sec. Litig.*, No. C-06-06286 RMW,
2008 WL 4544439, at *6-*8 (N.D. Cal. Sept. 29, 2008) ............................................... 30

*In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849,
2003 WL 24051280 (N.D. Cal. Mar. 25, 2003) ............................................................. 22

*In re Nvidia Corp. Sec. Litig.*, No. 08-CV-04260,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ................................................................ 25

*In re Pfizer, Inc. Sec. Litig.*,
584 F. Supp. 2d 621 (S.D.N.Y. 2008) ............................................................................. 12

*In re Secure Computing Corp. Sec. Litig.*,
184 F. Supp. 2d 980 (N.D. Cal. 2001) ............................................................................ 25

*In re Silicon Graphics, Inc. Sec. Litig.*, No. C96-0393,
1996 WL 664639 (N.D. Cal. Sept. 25, 1996) ................................................................ 22

*In re Viropharma, Inc. Sec. Litig.*, No. Civ. A. 02-1627,
2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .................................................................... 12

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011) ...........................................................................................................11, 19

*McKay v. Ingleson*,
    558 F.3d 888 (9th Cir. 2009) .................................................................................................10, 11

*Mulligan v. Impax Labs., Inc.*, No. C-13-1307 EMC,
    2014 WL 1569246 (N.D. Cal. Apr. 18, 2014) ...................................................................9, 25, 28

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ........................................................................................................30

*Philco Investments, Ltd. v. Martin*, C-10-02785-CRB,
    2011 WL 500694 (N.D. Cal. Feb. 9, 2011) ..................................................................................19

*Provenz v. Miller*,
    95 F.3d 1376 (9th Cir. 1996) ...........................................................................................22, 23, 24

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................................................12

*Searls v. Glasser*,
    64 F.3d 1061, 1068 (7th Cir. 1995) ..............................................................................................25

*S.E.C. v. Levin*,
    232 F.R.D. 619 (C.D. Cal. 2005) ..................................................................................................10

*S.E.C. v. Mercury Interactive, LLC*, No. 5:07-cv-02822-JF/PVT,
    2010 WL 3790811 (N.D. Cal. Sept. 27, 2010) .........................................................................9, 10

*Shuster v. Symmetricon, Inc.*, No. C9420024 RMW,
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) .............................................................................24

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ...........................................................................9, 11, 22, 25

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................................................................. xii, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................................................9

*Wozniak v. Align Tech.*, Inc.,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .....................................................................................................1, 28

LEAD PLAINTIFFS' OPPOSITION TO MOTION OF TESLA MOTORS AND ELON MUSK
TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-cv-05216-CRB

1

**RULES**

2

Fed. R. Civ. P. 9(b)...................................................................................................................10, 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ISSUES TO BE DECIDED**

1.      Whether Defendants were under a duty to disclose the Pre-Class Period fires and the Decisions Compromising Safety (both as defined below).

2.      Whether Plaintiffs have adequately alleged falsity of some or all of the alleged misstatements.

3.      Whether Plaintiffs have adequately alleged Defendants' scienter.

4.      Whether Defendants' resort to pre-Class Period "risk disclosures" in separate documents negates falsity or scienter.

5.      Whether Plaintiffs have adequately pled their confidential witness allegations.

6.      Whether the §20(A) claim should be dismissed.

**7.**      Whether, if the Court intends to grant Defendants' motion, it should do so without prejudice.

**SUMMARY OF ARGUMENT**

Defendants' arguments seeking dismissal of this action, based only on the required elements of falsity and scienter, fall well short. Plaintiffs' allegations, as set forth in the Second Amended Complaint ("SAC") satisfy all applicable legal standards under §10(b), Rule 10b-5, Rule 9, and the PSLRA.

1.  <u>Falsity</u>. Plaintiffs have adequately alleged the falsity of five broad categories of false and misleading statements, some of which are ignored by Defendants, including ones: (a) mischaracterizing the Model S's government testing results and its stature as the "Safest Car in America"; (b) misrepresenting a lack of prior Model S battery fires, even during crash tests, or calling a Model S fire in Washington the "first fire"; (c) misrepresenting the likelihood of a Model S battery fire, typically by flawed comparisons to gasoline cars or by understating the undercarriage puncture risk; (d) discussing the Washington fire without disclosing that another fire in Mexico had already occurred; and (e) misrepresenting that there was no need for a Model S recall even after a third fire in Tennessee.

Defendants had a duty to disclose the Pre-Class Period fires (as defined below), because, as alleged in the SAC and corroborated by multiple confidential witnesses ("CW"s) , the Model S battery and battery pack were essentially unchanged after Defendants decided to adopt higher-energy Panasonic batteries. This same battery and battery pack were the ones that burned in the Pre-Class Period fires and used in the production Model S.

Defendants also had a duty to disclose the Decisions Compromising Safety (as defined below), which included use of the higher-energy Panasonic batteries in the same pre-existing battery pack configuration (to boost energy), automated lowering of the Model S driving height at highway speeds (to reduce drag), and rejection of increased undercarriage shielding (to avoid added weight) – all sets to satisfy Defendant Musk's 300 mile-per-charge mandate.

All these alleged facts triggered a duty to disclose under applicable law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 812 (2010); *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th

Cir. 2008) (once defendants chose to speak, they "were bound to do so in a manner that wouldn't mislead investors"); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omissions are actionable when they are misleading and "create an impression of a state of affairs that differs in a material way from the one that actually exists"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) ("Rule 10b-5 imposes a duty to disclose material facts…necessary to make disclosed statements, whether mandatory or volunteered, not misleading."); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1052 (9th Cir. 2008) ("Omitting the role of [prohibited] off-label marketing in a press release highlighting the drug's success made a true statement (that demand was strong) also a misleading one.").

This disclosure obligation extends to testing a developmental data.  *See, e.g., Hanon*, 976 F.2d at 502-503 (noting "difference between knowing any product-in-development may run into a few snags, and knowing that a particular product has already developed problems" and rejecting summary judgment because jury could find company's failure to disclose a product's technical problems had material effect on its stock price), *quoting In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) (whether company's internal tests indicating slowness and unreliability of product in development stage rendered public optimistic statements about the product materially misleading is question of fact for jury inappropriate for summary judgment).

It is undisputed that none of the alleged misstatements alleged, many of which were made orally, were accompanied by any cautionary language or risk warning.  Defendants now point only to purported disclosures that (a) were made entirely separately in other documents (b) altogether predate the Class Period and (c) were not identified in the statements at issue as setting forth pertinent risk disclosures.  Courts in this Circuit reject such tactics.  *See, e.g., In re Silicon Graphics, Inc. Sec. Litig.*, No. C96-0393, 1996 WL 664639, at *14 (N.D. Cal. Sept. 25, 1996) (rejecting cautionary statements in various documents to counteract allegedly false and misleading oral statements); *Copperstone v. TCSI Corp.*, No. C 97-3495 SBA, 1999 WL 33295869, at *13 (N.D. Cal. Jan. 19, 1999) (refusing to dismiss complaint where purported cautions, set forth in separate

SEC filings, did not directly address the specific issues implicated in plaintiffs' complaint); *In re HI/FN, Inc. Sec. Litig.*, No. C-99-4531 SI, 2000 WL 33775286, at *5 (N.D. Cal. Aug. 9, 2000) (court cannot conclude as a matter of law that later oral statements protected by general cautionary language found in a prior SEC filing).

The purported risk disclosures also were highly general, facially misleading in warning of a theoretical event that had already occurred, knowingly false when made, and/or became false/obsolete during the Class Period.  They are legally deficient.  *Berson* v. *Applied Signal Tech., Inc.*, 527 F.l3d 982, 987 (9th Cir. 2008) (rejecting argument that federal regulations warned that customers might stop issue stop-work orders because "learning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued."); *Siracusano* v. *Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("the passage in the Form 10-Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition.'").

Defendants raise, at most, disputes of fact.  *See*, *e.g.*, *Anderson v. McGrath*, No. CV-11-01175-PHX-DGC, 2012 WL 5381406, at *6 (D. Ariz. Nov. 1, 2012) (court cannot resolve at motion to dismiss stage factual dispute arising when §10(b) plaintiffs allege specific omissions in a document and defendants cite to cautionary statements in the same document); *In re Coinstar, Inc. Sec. Litig.*, No. C11-133 MJP, 2011 WL 4712206, at *8 (W.D. Wash. Oct. 6, 2011) (where plaintiff otherwise adequately alleged falsity, defendants' counter-factual arguments presented a factual dispute inappropriate for resolution on motion to dismiss).

2.    Scienter.  "Scienter may be established in a number of ways, employing both direct and circumstantial evidence."  *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL 24051280, at *13 (N.D. Cal. Mar. 25, 2003) (citing *Provenz v.* Miller, 95 F.3d 1376, 1388 (9th Cir. 1996)).  "One way to establish scienter is to show motive and opportunity. … Another is to provide evidence of reckless or deliberate behavior."  *Id.* at *13 (internal citations omitted); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1146, 1456 (N.D. Cal. 1996) (same).  The SAC alleges each of these methods.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The SAC alleges Musk's total control over Tesla and close oversight of all operations, including engineering and design functions and vehicle safety issues, which alone are likely sufficient to establish his knowledge of the core facts at issue.  *See, e.g., South Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 785-786 (9th Cir. 2008) ("allegations regarding management's role in a company…may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information")(citations omitted); *Berson*, 527 F.3d at 988 (scienter inference "far stronger" than one approved in *America West* because defendants were directly responsible for day-to-day corporate operations "so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work.").

The SAC goes far further.  Among many other things, it alleges Defendants' actual, contemporaneous knowledge of the Pre-Class Period fires, the Decisions Compromising Safety, and the Class Period fires.

The SAC also alleges Defendants' recklessness, which Defendants ignore.

The SAC also sets forth motive and opportunity allegations, which Defendants do not refute by pointing to pre-Class Period stock purchases.

The SAC pleads a coherent "theory" of the case, and a strong scienter inference.  Defendants offer no credible alternatives, let alone anything more compelling.  They offer no explanation why they used "test" parts on the Model S, delayed the remedial measures made after the Class Period at the behest of government regulators, and ignore the rest of confidential witness statements aside from those they cherry-picked.

3.     The §20(A) claim should not be dismissed.

4.     If the court dismisses, it should be without prejudice.  Curry v. Hansen Medical, Inc., No. 5:09-cv-05094-JF (HRL), 2011 WL 3741238, at *2 (N.D. Cal. Aug. 25, 2011) ((in §10(b) cases, "[l]eave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured

by amendment").  Plaintiffs' second amendment was primarily to remove a plaintiff and reception

the case.  They have not added a "false" allegation.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Lead Plaintiff Kazim Acar ("Lead Plaintiff") and Plaintiffs William Lanrum and Dr. Pankaj Modi, MD, Ph.D. (altogether "Plaintiffs") respectfully submit this opposition to Defendant Tesla Motors, Inc.'s ("Tesla") and Elon Musk's ("Musk") Motion to Dismiss (Dkt. No. 43) (the "Motion") the Second Amended Class Action Complaint ("SAC").

**INTRODUCTION**

Tesla's Model S, as originally introduced to market and sold during the Class Period, was vulnerable to significant, undisclosed risks. Musk, who dominates Tesla, had instituted a 300 mile-per-charge ("MPC") mandate to ensure Model S sales. To meet it, Defendants chose to (1) use higher-energy batteries, (2) arrange them in the same configuration along the length of the undercarriage but without individual battery protective sleeves, (3) not use stronger undercarriage shielding that was patented and available, and (4) program the Model S to automatically lower driving height at highway speeds. These decisions increased its stored energy, while reducing its weight and its drag, thereby enhancing its range. But, they also dramatically increased the risk of undercarriage damage and runaway thermal events that would totally destroy the vehicle.

The risk of such fires was well understood to Defendants, after numerous pre-Class Period fires involving the same batteries and the same battery pack – all at Tesla's headquarters or its sole factory 15 miles away. At least two ignited spontaneously. At least two required significant first responder interventions. Contemporaneous fire department reports indicate at least one occurred during a "crash fire test" "where engineers were testing a battery pack in a vehicle" and caused a blaze "larger than [Tesla] could handle" due to "failure of equipment." Former Tesla employees, as confidential witnesses ("CW"s), described these fires as "violent" and "strong" and having "destroyed more of the car than people were expecting." Tesla's failure to redesign the battery pack afterward ran counter to practices of competitors like GM, which redesigned the Chevy Volt battery compartment after a crash test fire.

Defendants argue that the Model S is "safe," given no deaths or permanent injuries. This is not a product liability case. This is a securities fraud action, premised on the misrepresentation and

concealment of the Model S's risk profile as launched and sold during the Class Period.  By misleading investors as to the undisclosed, increased risks of road debris strikes, undercarriage puncture, and resulting runaway vehicle-destroying thermal events, Defendants artificially inflated Tesla's stock price.  That the Model S would, just prior to being engulfed in flames, first provide drivers a warning and a brief chance (under two minutes) to pull over and exit, does not negate this fraud.  Once fires began to occur in the Class Period, Defendants perpetuated the fraud by misrepresenting the number of fires and the history of fires in the Model S battery pack.

Defendants ask why Tesla would introduce the Model S to the market with such vulnerabilities.  The answer apparent from the pleadings – Tesla needed to bring the Model S expeditiously to market and it needed the Model S to sell.  After 10 years in existence and nearly six years selling cars, Tesla had not sold very many.  It sold only 2,500 Roadsters (its first car) over a four-year run that ended with its discontinuation.  In the 18 months preceding the Class Period, it had sold only 13,000 Model S cars.  Tesla had never earned a profit.  Its alternative revenue stream, Zero Emission Vehicle ("ZEV") credits sellable to competitors, were rapidly declining as they grew their own electric fleets.  By the Class Period, Nissan had sold 70,000 Leafs and GM had sold 50,000 Volts.   Tesla had raised $1 billion in equity and debt just before the Class Period in May 2013 and could not expect to raise more during the Class Period.  Simply put, it needed cash.

Thus, as described by CWs, Musk imposed stringent production deadlines that caused employee exhaustion, engineer resignations, and severe corner cutting that impacted quality and safety.  Model S cars were secretly sold with "test" parts, to be replaced during later service visits, some of which (even those redesigned after fire incidents) were not properly validated before being used in cars sold to the public.  In this context, to satisfy Musk's 300 MPC mandate, Defendants chose to cram the higher-energy Panasonic batteries into the existing battery pack configuration, rather than redesign it to include more lower-energy batteries as Tesla engineers originally planned.

Thereafter, Defendants' Class Period fraud was aimed at increasing and sustaining Model S demand (and Tesla's stock price) by misrepresenting its safety credentials and its risk profile and,

after fires began to occur, by misrepresenting the number that had occurred and the likelihood of more. Plaintiffs sufficiently allege both falsity and scienter, as discussed extensively below.

Plaintiffs' allegations are well-supported by publicly-available sources, first responder reports unchallenged by Defendants, and statements from 14 CWs, including, *inter alia*, Tesla's Director of Vehicle and Chassis Engineering responsible for engineering designs of the Model S and ensuring it met safety standards; Tesla engineers, designers, and technicians who worked directly on the Model S, its battery pack, and its crash testing; a former employee of a Tesla parts supplier; and the customer who bought the Model S destroyed in the second Class Period fire. The applicable pleading standards are readily met. Moreover, numerous CWs actually withheld relevant information due to Tesla's Non-Disclosure Agreement and concerns about retaliation by Tesla. Thus, the facts pled, while robust and legally sufficient, are just the tip of the iceberg.

## STATEMENT OF RELEVANT FACTS

### Tesla's Financial Pressures Mandated Increased Sales

Founded in 2003, Tesla is a start-up electric car maker facing large, well-established competitors and a heavy proof-of-concept burden for its battery-operated electric cars. ¶¶2, 9, 48, 55.[1] Musk closely oversees and directs all Tesla design, engineering, and operational functions, despite lacking an advanced engineering degree or prior auto industry experience. ¶¶3, 10, 27, 45.

Tesla has never earned a profit. ¶48. By August 2013, Tesla had sold only 2,500 Roadsters (discontinued in January 2012) and only 13,000 of its flagship Model S. ¶¶4, 48. Entering the Class Period (August 19 - November 17, 2013), Tesla was not in position to raise more funds from equity or debt offerings, and its revenues from ZEV credits, sellable to competitors, were declining sharply. ¶¶9, 49-52. It faced huge pressure to increase sales. ¶¶9, 53.

### Musk Made Engineering Decisions While Driving Off Tesla's Top Engineers

This pressure fueled Musk's production deadline edicts, which caused worker exhaustion,

---

[1] All "¶" references herein, unless otherwise noted, refer to numbered paragraphs in the SAC.

errors, and, compromised safety.  ¶¶9, 56.  Pre-Class Period, Tesla endured operational woes (¶¶54-73) and three recalls (¶¶54-55).  Tesla's Manager of Global Logistics (CW8) and its service organization lead engineer (CW3) said it secretly used test parts in cars sold to consumers.  ¶¶9, 32, 37, 60-62, 64.  Tesla's suppliers lacked time to properly test and validate parts used in production cars, including inverters redesigned after catching fire during tests.  ¶¶9, 67-71.  CW 13, a Program Manager at Tesla's inverter supplier with ten years of auto industry experience, believes the Model S contains "dangerous" parts and that Tesla is "letting the customer test the vehicle."  ¶¶42, 72-73.

Musk dictated engineering decisions and drove off Tesla's top engineers.  ¶¶9, 74-80.  CW1, Tesla's Director of Vehicle and Chassis Engineering and a top engineer who designed the Model S and ensured it satisfied safety standards, described weekly meetings where Musk rejected conventional auto industry methods and Tesla engineer recommendations in deciding engineering issues.  ¶¶30, 75-77.  CW7, Tesla's Director of Vehicle Validation and Quality who reported to Musk, described conflict between Musk and Tesla's Chief Engineer due to Musk's perception of production delays.  ¶¶36, 80.  CW1 believes the Chief Engineer (a 25-year colleague) resigned due to Musk's intense pressure to meet launch dates and that CW1 himself was fired in retaliation.  ¶79.

<u>Musk's 300 Mile-Per-Charge Mandate Dictated Use Of Volatile, Higher-Energy Batteries</u>

Per CW1, Musk dictated an arbitrary required range of 300 MPC.  ¶81.  Tesla's engineers had designed the Model S battery pack to meet a 240 MPC range.  *Id.*  CW2, a Tesla Dimensional Engineering Manager who regularly met with Musk and worked on the Model S battery encasement, said that after safety, the "[n]umber two [priority] was aerodynamics" because Musk's "focus was more getting the most charge out of the battery and the car with aerodynamics."  ¶¶31, 86.  CW7 said battery range was an important design goal to Musk so the Model S would sell.  ¶82.

CW1 said that to meet the 300 MPC mandate, Tesla's engineers had planned to add more batteries to the Model S battery pack.  ¶83.  Panasonic's creation of a similarly-sized battery with different chemistry providing more energy alleviated the need to alter the battery pack.  *Id.*  CW1 and CW6 (a Manager of the Powertrain and Validation Lab in which the Model S powertrain was

tested at Tesla's headquarters (¶35)) confirmed that adoption of the Panasonic batteries was done to increase the Model S range.  ¶¶85, 87.  CW1 confirmed it was Musk's decision and that doing enabled engineers to boost the range to 300 MPC while using the same number of batteries, in the same number of battery cells, housed in the same battery pack setup.  ¶¶83, 85.

Thus, and thereafter, as alleged in the SAC, *the Model S battery pack was not altered*, notwithstanding the inclusion of higher-energy batteries, as confirmed not only by CW1 but also CW5, a Tesla senior CAD designer whose job was to edit and refine engineer computer models and to make drawings of the Model S battery pack and power train for production.[2]  ¶¶34, 83, 102.

CW1 stated that the higher-energy batteries, by packing more energy in the same space, made each cell capable of generating greater heat and a more violent reaction in a thermal runaway event.  ¶84 ("More energy is packed in.  They're also more volatile if they are made to go wrong.")  CW6 said increased energy density can make batteries less stable and more likely to fail.  ¶87.

<u>Tesla's Pre-Class Period Battery Fires</u>

Before the Class Period, Defendants were *fully aware* of the grave, increased risk of high-intensity Model S battery fires.  ¶88.  CW1 described significant fires involving the higher-energy Panasonic batteries.  ¶89.  **First**, CW1 described an internal thermal event in a prototype Model S in September/October 2011, which spontaneously ignited.  ¶90.  **Second**, CW1 described a fire during a late 2011 test (just six months before Model S deliveries began in June 2012 (¶4)) on a fully-installed Model S battery pack, where the entire vehicle burned up, it was "a lot more violent and destroyed more of the car than people were expecting," and 23 first responders in nine units were needed to extinguish the blaze.  ¶¶91, 93.  The fire report (SAC Exh. 1) says a *crash test* on the Model S by Tesla engineers generated a fire "larger than they could handle" caused by "*[f]ailure of equipment*."  ¶¶92-93.  Tesla sought to conceal this fire from employees, per by CW8.

---

[2]  Contrary to Defendant's assertions, *see* Def. Br. at 13 n.2, CW5's job qualified him to have first-hand knowledge of any changes, or lack thereof, to the Tesla battery pack.  ¶34.  At most, Defendants have articulated a dispute of fact inappropriate for resolution at this stage.

¶94.  **Third**, CW1 described additional Tesla fire testing on Model S battery packs that yielded similarly violent results *multiple* times.  ¶95 ("more cases of strong fires as time went on."). (Defendants ignore this third point entirely.)  In addition, **<u>fourth</u>**, another spontaneous battery fire, like the one CW1 described, occurred on January 11, 2012 (less than five months before Model S deliveries began (¶4)).  ¶¶96-97.  The fire report (SAC Exh. 2) states that the fire (a) occurred in Tesla's battery cell test facility building, (b) ignited spontaneously, (c) and involved Tesla batteries insofar as the burned items had a "hazardous by-product" and the sprinkler water triggered by the fire measured a "10 on the PH test meaning alkaline."  *Id.*; ¶96.  It is **<u>undisputed</u>** that *none* of these fires, referred to herein as the "Pre-Class Period Fires," were *ever* disclosed to investors. ¶97.

Prioritizing Battery Range, Defendants Rejected Available Safety Measures

Defendants understood the significant risks posed by using higher-energy batteries, with a propensity for high-intensity fires, placed along the bottom of the car inches above the road.  ¶98. CW1 said there were no government guidelines for the battery pack in the Model S.  ¶99.  Instead, Defendants employed their own risk rating system, which over-relied on technologies to *slow* the *spread* of fires or warn drivers of them.  *Id.*  This flawed guesswork, Musk's tight production deadlines, and his 300 MPC mandate led Defendants to knowingly reject available safety options that would have increased undercarriage durability, increased battery pack fire protection, and/or decreased risk of road debris strikes and fires.  ¶¶10, 100-106.  **First**, they discontinued use of individual battery protective sleeves (used in the Roadster), per CW5 and CW10 (a Tesla Vehicle and Battery Technician who built Model S prototypes and serviced production cars (¶39)).  ¶101. **Second**, per CW1 and CW5, they preserved the existing battery pack design and configuration, despite use of higher-energy batteries and the Pre-Class Period fires.  ¶102.  Failure to redesign the battery pack after those fires ran counter to competitors' practice – *e.g.,* GM redesigned the Volt battery compartment after a crash test fire.  *Id.*  **Third**, per CW1, they considered but decided not to implement patented, available, stronger undercarriage plating, which, per CW3, was rejected due to weight and battery range concerns.  ¶¶103-105.  **Fourth**, per CW10 and CW6, they knowingly

designed and programmed the Model S to automatically lower driving height at highway speed to reduce drag and increase range, *increasing* risk of debris strikes, battery damage, and fires. ¶106. It is ***undisputed*** that **none** of these decisions, referred to as the "Decisions Compromising Safety," were **ever** disclosed to investors. The third and fourth of these measures were implemented post-Class Period, in remedial steps tantamount to an admission of fault. ¶107.

### Government Testing Did Not Assess Risks Of Undercarriage Damage Or Battery Fires

Defendants knew that government tests and regulations do not address the known but undisclosed risks posed by Model S battery fires and the Decisions Compromising Safety. ¶110. It is **undisputed** that: (a) the National Highway Traffic Safety Administration ("NHTSA") testing and 5-Star safety rating system and the Federal Motor Vehicle Safety Standards testing ***do not***: (i) assess fire risks posed by battery packs in electric cars, (ii) measure battery pack integrity or damage from impacts, (iii) evaluate undercarriage damage from road debris impacts, or (iv) generate any data at highway speeds (¶¶108-109, 111); (b) **no** government tests examine the Model S battery pack's safety due to road debris damage to the undercarriage, per CW4, a Tesla engineer who worked on the Model S's crash worthiness and analyzed its crash test results (¶111); and (c) NHTSA's fire prevention regulations do not apply to electric cars (¶109).

### Defendants' False And Misleading Statements During The Class Period

The SAC pleads five broad categories of false and misleading statements, including ones: (a) mischaracterizing the Model S's government testing results and its stature as the "Safest Car in America" (¶¶113-119, 122-124, 133, 157); (b) misrepresenting a lack of prior Model S battery fires, even during crash tests, or calling a Model S fire in Washington the "first fire" (¶¶130, 142, 160); (c) misrepresenting the likelihood of a Model S battery fire, typically by flawed comparisons to gasoline cars or by understating the undercarriage puncture risk (¶¶145-148, 157, 181-183); (d) discussing the Washington fire without disclosing that another fire in Mexico had already occurred (¶¶157, 160); and (e) misrepresenting that there was no need for a Model S recall (¶¶181-18). The falsity of these statements is analyzed in detail below.

A Series Of Partial Corrective Events Revealed The Truth

The SAC pleads a series of partial corrective events incrementally revealing the truth to investors, each time causing a drop in Tesla's stock price,[3] none of which Defendants challenge. Among them were three Class Period fires, two manifesting the *exact* risks posed by the Decisions Compromising Safety – a Model S travelling at highway speeds, lowered to the roadway, striking road debris that punctured the battery pack and ignited a fire that destroyed the car.  The last corrective event was Tesla's decision to issue a software update raising the Model S driving height.

Post-Class Period, Tesla agreed to retrofit all Model S cars with a titanium undercarriage shield (¶¶194-198) and removed the "Safest Car in America" banner from its website (¶201). Defendants had engaged in prolonged negotiations with NHTSA to avoid a recall.  ¶193; Def. RJN Exh. 4.  Only *after* Tesla agreed to these remedial measures did the NHTSA close its investigation, in a report stating, "***The closing of the investigation does not constitute a finding by NHTSA that a safety-related defect does not exist***, and the agency reserve the right to take further action if warranted by new circumstances."  ¶¶198-200; Def. RJN Exh. 4.

## ARGUMENT

## I.   APPLICABLE LEGAL STANDARDS

### A.   Applicable Pleading Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial

---

[3] They are: (a) NHTSA's rebuke regarding Tesla's characterization of its testing scores (¶¶126-128); (b) a Model S fire in Washington on October 2, 2013 and analyst/press coverage on October 3, 2013 (¶¶11-12, 134-140); (c) NHTSA's October 22, 2013 statement that it had "experts in contact with Tesla" and was "gathering data" (¶¶152-154); (d) the October 28, 2013 revelation that a Model S fire had occurred (but initially gone unreported) in Mexico 10 days prior (¶¶13, 165-171); (e) Tesla's Q3 2012 earnings release on November 6, 2013 and analyst concerns (¶172); (f) a Model S fire in Tennessee on November 7, 2013, analyst and press coverage, and an NHTSA statement that it would seek to determine if safety issues require further action (¶¶14, 173-179); and (g) Musk's November 18, 2013 post on Tesla's website stating that Tesla had issued an over-the-air software update raising the Model S height at highway speeds, had requested (a false statement) a full NHTSA investigation, and was expanding its warranty to cover fire damage (¶¶15-16, 187-191).

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Curry v. Hansen Med., Inc.*, No. 5:09-cv-05094-JF (HRL), 2011 WL 3741238, at *2 (N.D. Cal. Aug. 25, 2011), *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) *and Bell Atl. Cor. v. Twombly*, 550 U.S. 544, 556 (2007).  Rule 12(b)(6) dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Id.* at *2 (quotation omitted).

To state a claim for securities fraud under §10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss." *Mulligan v. Impax Labs., Inc.*, No. C-13-1307 EMC, 2014 WL 1569246, at *9 (N.D. Cal. Apr. 18, 2014).  Of these, Defendants challenge ***only*** falsity and scienter.  "To properly plead falsity, a securities fraud complaint "must 'specify each statement alleged to have been misleading, the…reasons why…, and if an allegation…is made on information and belief, state with particularity all facts on which that belief is formed.'" *Mulligan*, 2014 WL 1569246 at *10 (quotation omitted).  A plaintiff "must allege the 'who, what, where, when, and how' of the fraudulent conduct." *S.E.C. v. Mercury Interactive, LLC*, No. 5:07-cv-02822-JF/PVT, 2010 WL 3790811, at *2 (N.D. Cal. Sept. 27, 2010).  "To properly plead scienter, the complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'' *Id.* (quotation omitted).  A strong inference exists if "a reasonable person would deem the inference cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*, *quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In other words, "a tie goes to the plaintiff." *Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).  In making this determination, the court will examine the allegations holistically. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009).  Moreover, "'[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally.' … Thus, scienter may be alleged in conclusory fashion." *Mercury*

*Interactive*, 2010 WL 3790811 at *2, *quoting* Fed. R. Civ. P. 9(b) *and citing S.E.C. v. Levin*, 232 F.R.D. 619, 623 (C.D. Cal. 2005).

### B.   Defendants Waived Arguments Not Presented In Their Opening Brief

It is black-letter law that arguments that could have been raised in Defendants' opening brief, but were not, are waived.[4] Here, waived arguments include, *inter alia*, potential challenges to the SAC based on: (a) any element of a §10(b) and Rule 10b-5 claim (*e.g.*, loss causation) other than falsity or scienter; (b) any particular misstatement or omission alleged in the SAC, or any portion(s) thereof, other than those specifically addressed in Defendants' opening brief; (c) authenticity of fire department reports the SAC attaches and discusses; (d) Defendants' failure to disclose the Decisions Compromising Safety everywhere they limited their attacks only to the failure to disclose the Pre-Class Period Fires; and (e) Defendants' recklessness everywhere they limited scienter arguments only to a purported failure to adequately plead knowledge.

## II.   PLAINTIFFS HAVE ADEQUATELY PLED FALSITY

Defendants challenge the falsity of some, but not all, misstatements alleged in the SAC.

### A.   Defendants Had A Duty To Disclose The Pre-Class Period Fires And The Decisions Compromising Safety

Defendants argue the Pre-Class Period Fires are irrelevant, because:  (1) there was some difference (which they fail to explain) between the "production" Model S "battery pack" and the version in the Pre-Class Period Fires and (2) the "battery" itself was changing (in unexplained ways) until just before the Model S launch.  *See* Def. Br. at 12-13.  Defendants mischaracterize the SAC on both counts.  Once Musk dictated the arbitrary 300 MPC requirement so the Model S would sell (¶¶81-82), he decided to employ a higher-energy Panasonic battery (¶85), the use of which enabled engineers to increase the Model S range while using the same number of batteries, in

---

[4] *See, e.g., Avila v. Los Angeles Police Dept.*, Nos. 12-55931 and 12-56554, 2014 WL 3361123, at *3 (9th Cir. Feb. 6, 2014) ("Arguments 'not raised clearly and distinctly in the opening brief' are waived."), *quoting McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009).

the same number of battery cells, housed in the same battery pack configuration.  ¶83.  From then on, ***the Model S battery pack <u>was not altered</u>***, notwithstanding inclusion of higher-energy Panasonic batteries, as per CW1 and CW5.  ¶¶83, 102.  Thus, the same "battery pack" and "battery" were used, essentially ***<u>unchanged</u>***, as the Model S was further tested and went into production.

This same "battery pack" and "battery" were burned in the multiple Pre-Class Period Fires alleged in the SAC (¶¶89-97) and discussed *supra*.  While Defendants seek to discredit the CW allegations about these fires, *see* Def. Br. at 13-14, their arguments raise, at most, disputes of fact inappropriate for resolution now.[5]  Defendants do not dispute the authenticity or contents of the multiple fire department reports discussed in and attached to the SAC, which corroborate the CW allegations, and have waived such arguments.  *See* §I.B., *supra*.

Defendants are also wrong on the law.  In *Matrixx*, the Supreme Court held that a securities plaintiff had adequately pled material omissions in the form of adverse event reports about a drug and third party studies linking it to an adverse effect, which, even absent statistical significance, had to be disclosed where "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'" and "when necessary 'to make … statements made, in the light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-1323 (2011).  This holding is consistent with longstanding duties recognized by the Ninth Circuit to ensure that statements made, whether required or voluntary, are not misleading by omission.[6]

---

[5] For reasons set forth in footnote 33, *infra*, Defendants' cited cases, *Livonia* and *Zucco* do not even remotely support the proposition that CW1's statements need be "discounted completely."
[6] *See Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008) (once defendants chose to speak, they "were bound to do so in a manner that wouldn't mislead investors"); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omissions are actionable when they are misleading and "create an impression of a state of affairs that differs in a material way from the one that actually exists"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) ("Rule 10b-5 imposes a duty to disclose material facts…necessary to make disclosed statements, whether mandatory or volunteered, not misleading."); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1052 (9th

In accord with these standards, courts in the Ninth Circuit and nationwide have long held that a duty to disclose testing and developmental data can and often does arise under circumstances like those at bar. *See*, *e.g.*, *Hanon*, 976 F.2d at 502-503 (noting "difference between knowing any product-in-development may run into a few snags, and knowing that a particular product has already developed problems" and rejecting summary judgment because jury could find company's failure to disclose a product's technical problems had material effect on its stock price), *quoting In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) (whether company's internal tests indicating slowness and unreliability of product in development stage rendered public optimistic statements about the product materially misleading is question of fact for jury inappropriate for summary judgment).[7]   Defendants' cited cases do not counsel otherwise.[8]

Defendants ignore the SAC's allegations that their statements were false and misleading for the additional reason that they failed to disclose the Decisions Compromising Safety. *See*, *e.g.*, ¶¶10, 18, 100-106, 120, 124, 132-133, 144, 150, 159, 161, 186, 214-215.  Defendants have waived any challenges to such allegations by not raising them in their opening brief. *See* §I.B., *supra*.

### B.    Misrepresentations Following NHTSA Testing Of The Model S

#### 1.    Defendants' Statements On August 19, 2013

The SAC alleges five distinct misstatements in an August 19, 2013 press release (¶¶113-

---

Cir. 2008) ("Omitting the role of [prohibited] off-label marketing in a press release highlighting the drug's success made a true statement (that demand was strong) also a misleading one.").

[7]   *Cf. also In re Pfizer, Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 629-630, 635-636 (S.D.N.Y. 2008) (motion to dismiss a complaint is not an appropriate vehicle for determining weight of evidence, expert or otherwise, such as the statistical significance of three studies alleged to have alerted defendants to adverse drug effects from a very early date); *In re Viropharma, Inc. Sec. Litig.*, No. Civ. A. 02-1627, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003) (rejecting defendants' argument that they had no duty to disclose drug interaction data from a 2001 study they claimed was "preliminary" and statistically insignificant); *Glassman v. Computervision Corp.*, 90 F.3d 617, 635 (1st Cir. 1996) ("A duty to disclose technical or developmental problems with a product may arise where a company makes strongly optimistic or concrete statements about that product that are in stark contrast to its internal reports."), *quoted in In re Dura Pharm., Inc. Sec. Litig.*, No. 99 CV 0151-L (NLLS), 2000 Wl 33176043, at *8 (S.D. Cal. July 11, 2000).

[8]   The SAC alleges far worse than "problems" (*Ronconi*, *Allison*, and *Allscripts*) or "trivial" issues (*TSC*) and Plaintiffs do not advocate "continuous disclosure" (*Gallagher*).  *See* Def. Br. at 14-15.

120), which Musk wrote or edited and approved for release.  ¶121.[9]  Defendants challenge some on grounds of falsity.[10]  *See* Def. Br. at 7-8.  Their scienter arguments are addressed in §III.B.1., *infra*.

The SAC alleges that Defendants misrepresented that "the Model S achieved a new combined record of 5.4 stars."  ¶116.  The fact that, shortly afterward, the NHTSA issued a rare rebuke, showing a Model S undergoing crash tests while making clear it does not rate cars above 5 stars, establishes this statement was false or misleading when made.  ¶¶126-127.

The SAC alleges the broad statement "Tesla then analyzed the Model S to determine the weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured" was false and misleading for falsely encompassing the undercarriage, the battery pack, and the parts encasing and protecting the battery pack (¶118) and failing to disclose the Pre-Class Period Fires, the Decisions Compromising Safety, and Tesla's stock price vulnerability to these misstatements and omissions.  ¶120.  Defendants claim that no reader would think the misstatement could encompass the undercarriage and battery.  *See* Def. Br. at 7.  They are wrong, given that the press release specifically references the battery pack and battery multiple times, including a (false) statement about the battery never having caught fire.  *See* SAC Exh. 3.  They also claim that "Plaintiffs do not and cannot allege that Tesla neglected to perform [underbody collision] testing or that such testing revealed a defect."  *See* Def. Br. at 7.  To the contrary, as discussed *supra*, the SAC alleges that Defendants *did* perform such tests in late 2011 and that they *did* reveal a defect – a "violent" (CW1's description) fire requiring intervention by 23 first responders, whose contemporaneous report described a "crash test on a veh[icle]" that due to "*failure of equipment*" caused a "fire…larger than they could handle."  ¶¶92-93.

---

[9]  Defendants ignore the allegations of Musk's control over this press release, focusing instead on the purported "(unidentified) Tesla employee who prepared" it.  This argument lacks merit and is contrary to the SAC's allegations.
[10]  Defendants do not challenge the statement "Tesla Model S Achieves Best Safety Rating Of Any Car Ever Tested" (¶¶115, 126-127) or the highlighted portions of the statement "The reason for such a good outcome is that **the battery pack is mounted below the floor pan**, providing a very low center of gravity, **which** simultaneously **ensures exceptional** handling and **safety**" (¶¶117, 120).

The SAC also alleges the statement "The Model S lithium-ion battery did not catch fire at any time before, during, or after NHTSA testing" was false due to the Pre-Class Period Fires, as corroborated by fire fighter reports and numerous CWs.  ¶¶119-120.  Defendants counter that the SAC does not allege that "the Model S vehicles *used in the NHTSA tests* ever caught fire" (*see* Def. Br. at 8), but this argument fails because the press release's statement is not so qualified.  They also claim that the Pre-Class Period Fires are "irrelevant," which is the same mistake they repeatedly made during the Class Period.  Simply put, the market thought otherwise, and responded with a massive decline each and every time it learned of a Model S fire.  ¶¶138, 140, 166, 179.  The SAC also alleges that the statement "It is worth mentioning that no production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite several high speed impacts" was false and misleading because it was subtly hedged to exclude the Pre-Class Period fires in a way that an investor could not independently discover.  ¶119.  Defendants claim, incorrectly, that the "production" battery pack "is all that matters" and that the "'prototype' battery designs…are not even alleged to have come to market."  *See* Def. Br. at 8.  This is incorrect.  As discussed *supra*, and as corroborated by multiple CWs, after adoption of higher-energy Panasonic batteries, the Model S battery pack went essentially unchanged, through the testing that yielded the Pre-Class Period Fires and into production (contrary to the practices of competitors like GM).  ¶¶83, 102.

### 2.    Defendants' "Safest Car In America" Statement On Tesla's Website

Defendants do not challenge the SAC's allegations that the "Safest Car in America" image and statement on Tesla's website was false and misleading.  ¶¶122-124.

### 3.    Defendant Musk's August 20, 2013 Interview

The SAC alleges that during an August 20, 2013 interview, Defendant Musk falsely stated, "Throughout all our crash tests, throughout all similar incidents with vehicles on the road, never once has there been a fire."  ¶130.  It alleges that this statement was false and misleading because it failed to disclose, *inter alia*, the Decisions Compromising Safety and the Pre-Class Period Fires (¶¶131-132), which, as discussed *supra*, included the late 2011 test on a fully-installed Model S

battery pack, described by CW1 as "violent" and having "destroyed more of the car than people were expecting" and described by the fire department's contemporaneous report as a "crash fire test" that generated a fire "larger than they could handle" due to "[f]ailure of equipment or heat source" and that required 23 first responders in nine units to extinguish.  ¶¶91-94; SAC Exh. 1.

### 4.    Tesla's September 14, 2013 Investor Presentation

Defendants do not challenge the SAC's allegations that a September 14, 2013 "Tesla Motors Presentation" contained false and misleading statements.

### C.    Misrepresentations Following The Three Class Period Fires

### 1.    Tesla's October 3, 2013 ABC News Interview

The SAC alleges that a Tesla company spokesperson's statement, made immediately after the first Class Period Model S fire in Washington, that "[t]his is the first fire" was false, because it failed to disclose the Pre-Class Period Fires, the Decisions Compromising Safety, and Tesla's stock price vulnerability to these misstatements and omissions.  ¶¶142-144; Def. RJN Exh. 7.  Defendants counter that the statement was true, because it "clearly referred to fires in the *production* Model S." *See* Def. Br. at 15.  This argument fails, because: (a) the word "production" does not appear anywhere in her statement (as it does in other statements at issue), (b) the spokesperson also stated, immediately before, that "[t]his is the first known fire caused by a Model S battery," which was another broad, unqualified reference, and (c) following adoption of higher-energy Panasonic batteries, the Model S battery pack remained essentially unchanged during the remainder of the testing period and into production, as discussed *supra*.  ¶¶34, 83, 102.  Also, analysts were persuaded that the Model S had not experienced fires even during the testing phase.  ¶139 (quoting article on October 3, 2013 analyzing the Washington fire stated "the fact that no other Model S's have caught fire, even in vigorous safety tests, also seems to be a good sign").  Defendants' scienter arguments regarding the October 3, 2013 interview are addressed in §III.B.2., *infra*.

### 2.    Defendant Musk's Blog Post On October 4, 2013

The SAC alleges that Defendant Musk's October 4, 2013 blog post contained seven distinct

misstatements (as illustrated by highlighted text in the SAC).  ¶¶145-148.  Defendants challenge some on grounds of falsity.[11]   (Their scienter arguments are addressed in §III.B.2., *infra*.

Defendants challenge the SAC's allegation that Musk misrepresented that firefighters who battled the Model S fire in Washington "quickly brought the fire to an end," claiming the SAC misrepresents what Musk said.  *See* Def. Br. at 11 (citing ¶147).  That is incorrect, as Musk's remarks are block-quoted.  ¶147.  They also claim that the SAC pleads no specific facts to contradict Musk's statement.  *See* Def. Br. at 11.  This claim is absurd, and quite honestly minimizes the danger to first responders.  The SAC contains a link to a video showing the Model S engulfed in flames (¶134 n.2) and seven still photos showing firefighters battling the blaze (¶¶134-135), and it describes in detail the difficulties they encountered trying to subdue the fire, which reignited and required multiple methods of extinguishment deployed over two and one-half hours. ¶¶135-136.  These allegations are entirely consistent with those regarding the late 2011 crash test fire, as described by CW1 and a contemporaneous fire department report.  ¶¶91-92; SAC Exh. 1.

Defendants also challenge parts of four alleged misstatements regarding the ***likelihood*** of a Model S battery fire like the one in Washington, *i.e.*, those misstatements encompassing the phrases: (1) the Model S in Washington was impaled by an object with a peak force of 25 tons and "only a force of that magnitude" would be strong enough to puncture the undercarriage, (2) this was a "highly uncommon occurrence," (3) piercing the undercarriage is "extremely hard to do," and (4) "you are 5 times more likely to experience a fire in a conventional gasoline car than a Tesla."  *See* Def. Br. at 10-11.[12]   The SAC alleges these statements were false and misleading, *inter alia*, because they were counter to lessons of the Pre-Class Period Fires and they failed to disclose both the Decisions Compromising Safety (which increased risks of an undercarriage puncture and

---

[11] Defendants do not challenge two of the alleged misstatements – "Had a conventional gasoline car encountered the same object on the highway, the result could have been far worse" and "the effective combustion potential [of the Model S battery pack] is only about 1% that of the fuel in a comparable gasoline sedan." ¶¶146, 149.

[12] Defendants challenge the same type of probability statements from Musk's November 12, 2013 interviews, discussed in §II.C.4., *infra*.

battery fire) and the Pre-Class Period Fires (which demonstrated the elevated risks).  ¶¶149-150.

Defendants' argument (*see* Def. Br. at 10-11) fails.  <u>First</u>, while Plaintiffs do not concede it necessary, the SAC ***does*** set forth allegations, ignored by Defendants, permitting comparative analysis, including Tesla's total vehicle fleet (¶4), the portion of the fleet evaluated by NHTSA in the wake of the three Class Period fires (¶199), the number (three) of Class Period fires (¶¶11, 13-14, 134-138, 165-171, 173-176) and the number (three specific plus an allegation of "more cases of strong fires as time went on," as discussed *supra*) of Pre-Class Period Fires (¶¶89-97).[13]  Thus, the SAC does not "skip" any "necessary step."  <u>Second</u>, as Defendants concede (*see* Def. Br. at 11), the SAC also contains allegations, based on the analysis of a Ph.D. in mechanical engineering (a degree that Defendant Musk lacks), that their statements of statistical probabilities are flawed for many reasons – *e.g.*, inclusion of additional, unrelated causation factors like vehicle age (all Model S's were less than 18 months old in the Class Period) and the relative levels of maintenance, service quality, and driver care – rendering them false.  ¶184.  This is far more than a "quibble" (Defendants' term) and satisfies *In re Rigel Pharm., Inc. Sec. Litig.*, 697 f.3d 869, 877 (9th Cir. 2012).  <u>Third</u>, Defendants also concede that they articulated the *exact same* probability of a Model S fire – five times less likely than a gas-powered car – after the Washington fire (the first Class Period fire) as they did after the Tennessee fire (the third Class Period fire).  *See* Def. Br. at 10 (citing ¶¶146 and 183).  This concession alone illustrates the inaccuracy of this figure, which ***failed to adjust*** despite the occurrence of two Model S fires in the interim.

---

[13] It also sets forth analyses by Yahoo! Autos and Wired, ignored by Defendants, comparing the Model S against peer vehicles: (a) the Nissan Leaf, which carries five times less stored energy than the Model S and which, despite having sold 70,000 vehicles by that point (3.5 times as many as the Model S) had experienced zero fires "either through extensive and extreme testing or in the real world" and (b) the GM Volt, which carries three times less stored energy than the Model S and which had not experienced any fires on the road despite having sold 50,000 vehicles by that point (2.5 times more than the Model S).  ¶177(b).  It also includes the director of the Center for Auto Safety's view that, given the Model S's fleet size, "[t]o have two road debris fires in a vehicle population that small is highly unusual."  ¶177(a).

### 3.     Defendant Musk's October 22, 2013 And October 24, 2013 Remarks

The SAC alleges that after news that the NHTSA had begun gathering data and putting experts into contact with Tesla, thereby driving down Tesla's stock price (¶¶152-154), Defendants made additional misstatements.  ¶155.  In an October 22, 2013 speech, Defendant Musk made four alleged misrepresentations (¶157 (highlighting text)),[14] including reiterating that the Model S being "five times less likely to catch fire than a gasoline car," the Washington fire being a "very peculiar accident," and the Model S scoring a 5.4  in NHTSA testing.  ¶157.  These were false, misleading, and actionable for reasons set forth above in §§II.B.1, II.B.3, II.C.1 and II.C.2, respectively.

In an October 24, 2013 interview, Defendant Musk made materially misleading statements in comparing a Boeing lithium-ion battery fire with the Model S fire in Washington:  "The issue with the Boeing lithium-ion pack was not that it caught fire, but that it spontaneously caught fire, for no reason" and "In our case, it was hit by a large piece of metal at high speed." ¶160. Defendants challenge these allegations by pointing out that "[t]here is an enormous difference between a spontaneous fire and a fire caused by a collision at highway speed" and "[t]here is no allegation that any Model S has ever experienced a spontaneous battery fire."  *See* Def. Br. at 12 n.1.  This argument fails to account for the fact that at least **two** Pre-Class Period Fires are alleged to have started spontaneously (¶¶90, 96-97) and a production Model S **has** spontaneously caught fire.  *See* Pl. Exh. 2 (Yahoo! / Business Insider article about a spontaneous Toronto fire) and Pl. Exh. 1 (a "Tesla Forums" thread posting the article on Tesla's corporate website).

Defendants also dispute, on falsity, Plaintiffs' allegations that Defendant Musk's October 22, 2013 speech and October 24, 2013 interview failed to disclose, when speaking about the Model S fire in Washington, that a **second** Model S Class Period fire had **already** occurred in Mexico. ¶164.[15]  This argument boils down to Musk's unilateral – and incorrect – decision that the two fires were so different that there was "no reason" to disclose the Mexico fire when talking about the

---

[14] Defendants ignore the misstatement that "just the front portion of the battery pack caught fire" in the Washington fire (¶¶157-158).

[15] Defendants' scienter arguments are addressed in §III.B.3., *infra*.

Washington fire as if it was the only one to occur. *See* Def. Br. at 12. They argue Musk "was asked specifically about the circumstances of the Washington fire only," which is disingenuous, insofar as it is inconceivable that he would face a question about a Mexican fire that no one else knew about. Moreover, they concede that Musk "reiterate[ed] prior statements about Tesla's statistical analyses" (*id.*), without acknowledging that his failure to adjust and update those statistics to account for the Mexico fire rendered them inaccurate. They also fail to acknowledge the market's reaction to the belated news of the Mexico fire, a single-day drop of $7.32 (4.3%) in Tesla's stock price on heavy volume, which objectively evidences importance of the disclosure to investors. ¶166. Lastly, they ignore the bedrock principal, discussed in §II.A. *supra*, that a speaker's choice to discuss a topic (the first Model S Class Period fire) gives rise to a duty to not omit disclosure of facts (*all* Model S fires including the Mexico fire) necessary to make the remarks not misleading. *Matrixx*, 131 S. Ct. at 1318-1323; *Berson*, 527 F.3d at 987; *Brody*, 280 F.3d at 1006; *Hanon*, 976 F.2d at 504.[16]

### 4.     Defendant Musk's Three Interviews On November 12, 2013

Defendant Musk gave three interviews on November 12, 2013, in which he made two kinds of false and misleading statements. ¶¶180-186. In all three interviews, he reiterated the same "likelihood" made in his October 4, 2013 blog post (just after the first Class Period fire), *i.e.*, that the Model S was "five times less likely to have a fire than a gasoline car." ¶¶181-183. These statements were false and misleading for all the reasons already discussed in §II.C.2., *supra*. Moreover, Musk's failure to adjust his "five times less likely" figure, despite the occurrence of ***two additional*** Class Period fires, facially demonstrates its inaccuracy. ¶184. They ignore the other set of misstatements, made in all three interview, regarding the lack of need for a recall.¶¶181-183.

### 5.     Defendants' Other Arguments Regarding Purported Truth Lack Merit

Defendants' arguments about purported truth (*see* Def. Br. at 8-10) are readily refuted and,

---

[16] Defendants' cited cases (*Brody*, *Philco*, and *Wozniak*) do not counsel a different result. *See* Def. Br. at 12. In fact, *Brody* and its progeny support the SAC's allegations, insofar as Musk's discussion of the Washington fire as if it was the only one did "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *See* Def. Br. at 12.

at most, raise disputes of fact inappropriate for resolution on a motion to dismiss.[17]  First, they characterize the SAC as asserting the Model S "*has*" (present tense) certain risks or defects and tout its lack of fatalities and serious injuries.  *See* Def. Br. at 8-9 (quoting SAC ¶¶6, 7, 14, 18).  In actuality, the SAC alleges safety-related misrepresentations about the Model S *as it was sold before and during the Class Period*.[18]  After the Class Period, Tesla implemented remedial measures, both for future-sold and prior-sold Model S cars.  ¶15, 17, 107, 187-188, 194-195, 200.  Thus, the Model S today is very different from the one at issue; its *post*-Class Period track record of battery fires or fatalities (or lack thereof) is truly irrelevant.  Plaintiffs need not prove that the Model S *today* suffers from *any* design defect in order to succeed on their securities fraud claims.

Second, Defendants highlight a lack of driver injuries or fatalities.  *See* Def. Br. at 9.  This is irrelevant to the securities fraud claims at issue.  The SAC does not allege that Defendants misstated the human injury rate of the three Class-Period crashes.  Rather, it alleges they made false and misleading statements about *other* issues following these fires (¶¶142-150, 156-161, 164, 168-171, 181-186), *e.g.*, whether or not the Washington fire was Tesla's "first fire," which allegations are neither proven nor disproven based on whether or not the three drivers were injured.[19]

---

[17] *See, e.g.*, *Anderson v. McGrath*, No. CV-11-01175-PHX-DGC, 2012 WL 5381406, at *6 (D. Ariz. Nov. 1, 2012) (court cannot resolve at motion to dismiss stage factual dispute arising when §10(b) plaintiffs allege specific omissions in a document and defendants cite to cautionary statements in the same document); *In re Coinstar, Inc. Sec. Litig.*, No. C11-133 MJP, 2011 WL 4712206, at *8 (W.D. Wash. Oct. 6, 2011) (where plaintiff otherwise adequately alleged falsity, defendants' counter-factual arguments presented a factual dispute inappropriate for resolution on motion to dismiss).

[18]  *See, e.g.*, ¶6 (Defendants failed to disclose "its very significant vulnerabilities for high-intensity fires *as introduced into the marketplace*"), ¶106 ("the Model S *released for sale* automatically lowered its undercarriage close to the road once its speed reached 55 miles per hour"), ¶15 (Defendants "effectively admitted the vulnerabilities of the Model S *as it had been introduced to the marketplace*" when they issued a software update raising its driving height).

[19]  Defendants' facile position that a lack of reported injuries from these fires means that the Model S was categorically "safe" and the SAC must be dismissed lacks merit.  It completely discounts the fact that *any* propensity for high-intensity, car-engulfing fires, ignitable by simple debris strikes under normal driving conditions, whether or not followed by a warning and a brief evacuation period, is anything but "safe" to not only rational drivers and passengers (who may include persons with heart conditions or disabilities making rapid exit from the vehicle difficult) and first responders, but also, as shown by the stock price movement alleged in the SAC, to investors.

LEAD PLAINTIFFS' OPPOSITION TO MOTION OF TESLA MOTORS AND ELON MUSK
TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 3:13-cv-05216-CRB

Finally, Defendants mischaracterize the NHTSA investigation outcome as exonerating Tesla by deeming the Model S defect-free.  *See* Def. Br. at 9-10.  NHTSA's "preliminary evaluation" on the Model S (¶192) was limited by numerous factors.[20]  The SAC describes a frenzy at Tesla to implement remedial measures "as fast as possible" (¶193, citing CW12) while negotiations and meetings were ongoing with the NHTSA (¶200; Def. RJN Exh. 4) and Defendants feared a recall (¶¶17, 55, 153).  Only *after* Tesla enacted remedial measures did NHTSA agreed to close its investigation, expressly stating, "***The closing of the investigation <u>does not</u> constitute a finding by NHTSA that a safety-related defect does not exist***, and the agency reserves the right to take further action if warranted by new circumstances."  ¶¶199-200; Def. RJN Exh. 4.  These actions were tantamount to a recall (¶194) and headed off a formal recall (¶153).  It is irrelevant that NHTSA reiterated its five-star rating on the Model S in December 2013 (*see* Def. Br. at 10; Def. RJN Exh. 3), because, as discussed *supra*, those tests do not cover the battery or undercarriage.  ¶¶108-111.

### D.      Defendants' Argument That Risk Disclosures Negate Falsity Fails

It is <u>**undisputed**</u> that <u>***none***</u> of the statements alleged in the SAC to have been false and misleading, many made orally, were accompanied by any cautionary language or risk warning.  Defendants now point *only* to purported disclosures that (a) were made *entirely separately* in other documents (b) altogether *predate* the Class Period and (c) *were not identified* in the statements at issue as setting forth pertinent risk disclosures.  *See* Def. Br. at 16-17 (referencing Tesla SEC filings made March 7, 2013 and August 9, 2013).  Courts in this Circuit have long rejected such a tactic, drawing a distinction with instances allegedly false or misleading statements in documents that themselves *also contained* the purported cautionary language.[21]  The risk disclosures to which

---

[20] Specifically, NHTSA: (a) was unable to send an investigator to the October 2, 2013 Washington fire, which occurred on the first day of a 16-day government shutdown (¶151), (b) did not investigate the Mexico fire because it was outside the agency's jurisdiction (¶167), and (c) only examined 15,805 Model S cars in model years 2012 and 2013.  ¶199.

[21] *See, e.g., In re Silicon Graphics, Inc. Sec. Litig.*, No. C96-0393, 1996 WL 664639, at *14 (N.D. Cal. Sept. 25, 1996) (rejecting cautionary statements in various documents to counteract allegedly false and misleading oral statements); *Copperstone v. TCSI Corp.*, No. C 97-3495 SBA, 1999 WL 33295869, at *13 (N.D. Cal. Jan. 19, 1999) (refusing to dismiss complaint where purported cautions,

Defendants point are also inadequate as a matter of law.[22]  In addition, none speak to the increased risks created by the Decisions Compromising Safety.  In any event, Defendants, at most, raise a question of fact entirely inappropriate for resolution on a motion to dismiss.  *See, e.g.*, *Hanon*, 976 F.2d at 503-504 (such disputes for trier of fact; *Anderson*, 2012 WL 5381406 at \*6 (court cannot resolve at motion to dismiss stage factual dispute arising when plaintiffs allege specific absence of any mention of bankruptcy in a letter and defendants counter by citing to cautionary statements).

## III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED SCIENTER

### A.   The SAC Adequately Pleads Defendants' Scienter

"Scienter may be established in a number of ways, employing both direct and circumstantial evidence."  *In re Network Assocs., Inc. II Sec. Litig.*, No. C 00-CV-4849, 2003 WL 24051280, at \*13 (N.D. Cal. Mar. 25, 2003) (citing *Provenz v.* Miller, 95 F.3d 1376, 1388 (9th Cir. 1996)).  "One way to establish scienter is to show motive and opportunity. … Another is to provide evidence of reckless or deliberate behavior."  *Id.* at \*13 (internal citations omitted); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1146, 1456 (N.D. Cal. 1996) (same).  The SAC sets forth extensive, particularized allegations, buttressed by detailed statements from 14 CWs and by undisputed documentary evidence, revealing a strong inference of scienter that is cogent and as compelling as any proposed by Defendants.

---

set forth in separate SEC filings, did not directly address the specific issues implicated in plaintiffs' complaint); *In re HI/FN, Inc. Sec. Litig.*, No. C-99-4531 SI, 2000 WL 33775286, at \*5 (N.D. Cal. Aug. 9, 2000) (court cannot conclude as a matter of law that later oral statements protected by general cautionary language found in a prior SEC filing).

[22]  The purported disclosures were: (a) highly general ("Our vehicles make use of lithium-ion battery cells, which have been observed to catch fire…"); (b) facially misleading in warning of a theoretical event ("there can be no assurance that a field or testing failure of our Model S or other battery packs that we produce will not occur, which could damage the vehicle…") that had *already occurred* in the Pre-Class Period Fires; (c) knowingly false when made ("we have designed the battery pack to passively contain any single cell's release of energy without spreading to neighboring cells") as disproven by the Pre-Class Period Fires; and/or (d) became false/obsolete during the Class Period ("we are not aware of any such incident in our customers' vehicles") once the first Class Period fire occurred.  These fall short.  *See, e.g., Berson* v. *Applied Signal Tech., Inc.*, 527 F.l3d 982, 987 (9th Cir. 2008) (rejecting argument that federal regulations warned that customers might stop issue stop-work orders because "learning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued."); *Siracusano* v. *Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("the passage in the Form 10-Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition.'").

### 1.   Defendants' Actual Knowledge

The SAC contains detailed allegations regarding Defendants' knowledge (¶214), including:

• Musk's total control over Tesla and close oversight of all operations, including engineering and design functions and vehicle safety issues,[23] which alone are likely sufficient to establish his knowledge of the core facts at issue;[24]

• Musk's dictating aggressive production deadlines with internally apparent consequences in the form of recalls (¶¶54-55), secret use of "test" parts in vehicles sold to consumers (¶¶9, 60-62, 64) including parts redesigned after catching fire (¶¶9, 67-71), and worker exhaustion, resignations and firings (¶¶9, 56, 79, 81), among other pre-Class Period operational woes (¶¶54-73);

• Musk's dictating the 300 MPC mandate (¶81) and the engineering needed to achieve it (¶82), including Decisions Compromising Safety like use of the higher-energy Panasonic batteries (¶¶85, 87), rejection of stronger undercarriage shielding due to aerodynamics and weight concerns (¶¶86, 103), and programming the Model S to lower its driving height to reduce drag (¶106);

• Facts evidencing Defendants' actual, contemporaneous knowledge of all of the Pre-Class Period Fires, all of which (a) involved higher-energy Panasonic batteries Musk decided to use to reach 300 MPC without redesigning the battery pack (¶¶83, 85, 87-88, 102); (b) occurred either at Tesla's headquarters (¶96) or at its only factory (¶¶89-95) 15 miles away; (c) involved interventions by local fire departments (¶¶92-93, 96); and (d) involved spontaneous ignitions (¶¶90, 96) or "violent" and "strong" fires (¶¶91, 95) including during "a crash fire test on a veh [vehicle]" (¶92);

• Defendants' attempts to conceal the Pre-Class Period Fires from employees (¶94); and

• Defendants' statements and actions immediately following the three Class Period fires in Washington, Mexico, and Tennessee evidencing their actual, contemporaneous knowledge thereof by

---

[23]   *See, e.g.*, ¶¶3, 45 (Musk had operational control over Tesla and oversaw its daily operations); ¶¶28, 30-31, 36 (Tesla's Chief Engineer, CW1, CW2, and CW7 all reported directly to Musk); ¶¶1, 75 (CW1 described weekly multi-hour meetings where Musk engaged in in-depth discussions with Tesla engineers); ¶31 (CW 2 described regular meetings between Musk and Tesla engineers regarding safety design and engineering); ¶¶10, 78 (Musk was involved in all key engineering decisions over which he exercised "close oversight and direction"); ¶76-77, 80, 82 (Musk made engineering decisions even when counter to the recommendations of Tesla engineers); ¶9 (Musk dictated the 300 mile per charge battery range requirement and the Model S production timelines); ¶85 (Musk made decision to adopt higher-energy Panasonic batteries with senior battery team).

[24]   *See, e.g., South Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 785-786 (9th Cir. 2008) ("allegations regarding management's role in a company…may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information")(citations omitted); *Berson*, 527 F.3d at 988 (scienter inference "far stronger" than one approved in *America West* because defendants were directly responsible for day-to-day corporate operations "so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work.").

their immediate public reactions,[25] while their actual knowledge of the Mexico fire is evidenced by the statements of CW14 and Musk himself, as described in greater detail in §III.B.3. *infra*.

Aside from a handful of specific misstatements (addressed in §III.B. *infra*) and the SAC's use of certain CWs (addressed in §III.B. *infra*), Defendants do not dispute the rest of these allegations.

### 2.    Defendants' Recklessness

The foregoing allegations also evidence Defendants' recklessness, which the SAC expressly alleges (¶215) based on their duty to monitor information rendering their Class Period statements false and misleading and the fact that they knew or should have known that such statements were false and misleading when made.  Defendants do not challenge recklessness.

### 3.    Defendants' Motive And Opportunity

"A motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general."  *Shuster v. Symmetricon, Inc.*, No. C9420024 RMW, 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000); *see also Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG (RNBx), 2013 WL 1947525, at *21 (N.D. Cal. May 8, 2013) (motive not required to adequately plead scienter).  However, allegations of motive contribute to scienter.  *In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 WL 726791, at *9 (D. Ariz. Jan. 25, 2006).[26]  Thus, to bolster the scienter inference, the SAC details Defendants' motive and opportunity (¶216-220).[27] Defendants' primary challenge is that (a) Musk acquired Tesla shares *before* the Class Period and (b) did not sell it.  *See* Def. Br. at 18-19.  It is undisputed that Musk, despite his considerable net worth, did not acquire any Tesla stock *during* the Class Period.  Therefore, Defendants' cited cases (*See* Def. Br. at 18, *citing Searls*, *Aspeon*, *PMI Group*), which involved defendants' stock acquisitions *during*

---

[25]  *See* ¶¶141-150 (public statements by Tesla spokesperson and Musk about the Washington fire the day after it occurred); Pl. Exh. 3 (Value Walk article cited in SAC (¶174 n.4) quoting a Tesla spokesperson as confirming contact with fire driver and dispatch of an investigative team the same day as the Tennessee fire); §III.B.3 *infra* (quotes by a Tesla spokesperson, Musk, and the Model S purchaser indicating knowledge and dispatch of an investigative team the day after the Mexico fire).
[26]  Defendants do not contest that they had opportunity to commit the fraud at issue.
[27]  Violations of GAAP and SEC regulations, such as those pled in the SAC (¶218), *can* bolster a scienter inference.  *See Siracusano*, 585 F.3d at 1183 n.8; *In re Nvidia Corp. Sec. Litig.*, No. 08-CV-04260, 2010 WL 4117561, at *4 n.7 (N.D. Cal. Oct. 19, 2010).

the class periods at issue, are inapposite.  Instead, as alleged in the SAC, Musk's large stock purchases *predating* the Class Period and his holdings during it incentivized him to *commit* the fraud so as to undo his tremendous paper losses that topped $2 billion.[28]

## B. Defendants' Scienter Challenges Regarding Specific Misstatements Fail

### 1. The August 19, 2013 Press Release

Defendants argue that the SAC fails to allege a strong inference of scienter regarding the August 19, 2013 press release, because "Plaintiffs do not allege specific facts showing that the (unidentified) Tesla employee who prepared this press release had any fraudulent intent."  *See* Def. Br. at 8.  Not so.  The SAC alleges, on information and belief, that "given Defendant Musk's total control over Tesla, and his close involvement in day-to-day operations, and given that the Model S was (and still is) Tesla's only vehicle for sale, all as described above, the August 19, 2013 Press Release was written or edited by Defendant Musk and was approved for release by Defendant Musk."  ¶121.  These allegations suffice.[29]

### 2. The October 3, 2013 Interview And October 4, 2013 Blog Post

Defendants argue the SAC fails to allege the Tesla spokesperson's "knowledge."  *See* Def. Br. at 15.  While Defendants cite the legal standard for scienter as encompassing both knowledge and recklessness (*see id.*, citing *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002)), they do not argue that the SAC fails to adequately plead recklessness, as opposed to knowledge, and have waived such argument.  *See* §I.B., *supra*.  (Her recklessness is apparent, given that the Pre-Class

---

[28]  Moreover, as a practical matter, Musk could not have sold his shares during the Class Period.  As the face of Tesla, its largest shareholder, and someone with total control over its operations, any stock sales Musk engaged in would have massively driven down its stock price, which would have reduced his sale proceeds as he was selling, gutted the value of his remaining holdings, and substantially undermined Tesla's ability to seek future infusions of capital.

[29]  *See, e.g., Mulligan*, 2014 WL 1569246 at *10 ("if an allegation…is made on information and belief, state with particularity all facts on which that belief is formed"); *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 987-988 (N.D. Cal. 2001) (Rule 9(b) and the PSLRA satisfied by information and belief pleading that provides details all relevant facts forming basis of belief, *e.g.*, proper identification of reports and witnesses on which allegations are based).

1   Period Fires, many requiring first responder intervention, occurred at Tesla's headquarters and at its

2   only factory 15 miles away.  *See* §III.A.1., *supra*.).  They also argue the SAC fails to allege that

3   Musk "knew" that his October 4, 2013 blog post misstatements (discussed for falsity in §II.C.2.,

4   *supra*) were "inaccurate."  *See* Def. Br. at 15-16.  Musk's blog includes an email exchange with the

5   driver indicating that Tesla was "following this case extremely closely" and had already "sent a

6   team of experts" and conducted a "review."  ¶148.  Thus, Musk knew that first responders did not

7   extinguish the blaze "quickly" and battled it for two and one-half hours.  As for Musk's many

8   statements regarding the likelihood of Model S battery fires (discussed in §II.C.2. *supra*), the SAC

9   sets forth extensive allegations as to his knowledge of the Pre-Class Period Fires and his knowledge

10  of and control over the Decisions Compromising Safety (*see* §III.A.1., *supra*).  ¶¶149-150.

11          3.      **Defendant Musk's October 22, 2013 And October 24, 2013 Remarks**

12          Defendants argue the SAC fails to allege that Defendant Musk "knew" or "personally

13  learned of" the Mexico fire before he misleadingly omitted to discuss it during remarks about the

14  Washington fire made on October 22, 2013 and October 24, 2013.  *See* Def. Br. at 11.  That is false.

15  The following alleged facts are **underlined undisputed**.  The Model S fire in Mexico occurred on October 18,

16  2013.  ¶165.  Numerous witnesses, including Musk himself, confirmed ***immediate*** knowledge of the

17  crash and fire.  ¶¶167-171.  The SAC also alleges: (a) Musk's total control over Tesla and his close

18  watch over its operations, including its engineering and design and vehicle safety functions (*see*

19  §III.A. and n. 23, *supra*) and (b) that news of the Washington Model S fire sliced $19.69 (or 10.2%)

20  from Tesla's stock price in two days, on huge volume.  ¶¶138, 140.  It simply defies credulity to

21  suggest that Musk had not learned of the Mexico fire in the four days that elapsed after it occurred.

22  Even assuming, *arguendo*, the Court agrees that all the foregoing facts, viewed holistically, fail to

23  adequately plead Musk's *knowledge* of the Mexico fire, they most certainly suffice to plead his

24  recklessness in the event that he did not know of it.  Defendants fail to argue otherwise.  Moreover,

25  Musk was most certainly under a duty to correct his October 22 and October 24, 2013 statements

26

27

28

once he learned of the Mexico fire.[30]  If Musk somehow had not learned of the Mexico fire by October 22nd (or October 24th), he certainly must have learned of it before October 28th – a full ***ten days*** after the Mexico fire had occurred.

### C.    Defendants' Argument That Risk Disclosures Negate Scienter Fails

Defendants also argue that their purported risk disclosures "negate any inference of scienter." *See* Def. Br. at 17.  As discussed in §II.D., *supra*, these disclosures are legally deficient and fail to negate falsity.  For the same reasons, they do not negate scienter.  The SAC details Defendants' specific knowledge as to their misstatements and omissions, which generic risk disclosures made in wholly separate documents do not undermine.  Moreover, the risk disclosures to which Defendants point *predate* the Class Period.  Their argument cannot be credited, lest they (and companies and executives more broadly) be given a free pass to commit future frauds after first issuing pre-class period, generic warnings in separate filings.

### D.    The SAC's Confidential Witness Allegations Are Legally Sufficient

Defendants challenge the SAC's reliance upon CWs to bolster the scienter inference (while not challenging its use of CWs to establish falsity).  *See* Def. Br. at 19-22.  In doing so, they ignore the operative legal standards governing CW allegations in this Circuit.  *See Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG (RNBx), 2013 WL 1947525, at * 11 (C.D. Cal. May 8, 2013) (listing the *Daou* and *Zucco* factors); *Mulligan v. Impax Labs., Inc.*, No. C-13-1037 EMC, 2014 WL 1569246, at *14-*15 (N.D. Cal. Apr. 18, 2014) (same).  The SAC readily satisfies these standards.  Regarding the *Daou* factors, for each of the 12 CWs who are former Tesla employees (CWs 1 through 12), the SAC alleges their job description and responsibilities, their exact title, and the person to which they directly reported.  ¶¶30-41.  It also alleges each witness's tenure at Tesla (*id.*) and, where applicable, their direct contacts with Defendant Musk.  ¶¶30, 31, 36, 75, 86.  For CW13, the

---

[30] *See, e.g., Coble v. Broadvision, Inc.*, No. C 01-01969 CRB, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) (Breyer, J.) ("A duty to disclose may arise when a company makes a statement that it believes is true but later discovers that the statement was untrue or misleading when the statement was made. … This duty of disclosure is known as the 'duty to correct.'").

SAC provides his title, job description, professional background, employer, description of his employer's role in Tesla's supply chain, and the high-ranking Tesla employee with whom he interacted.  ¶42.  The SAC also adequately identifies CW14, the customer who purchased the Model S destroyed by the Mexico fire during the Class Period.  ¶43.  Regarding the *Zucco* factors, the SAC includes 14 CW sources, all of whom provided extensive detail in their statements, all of which were coherent and plausible and based on personal knowledge.[31]  The SAC also notes the many instances where CWs were corroborated either by other CWs or by documentary or other evidence sources.[32]

Defendants' main attack, unsupported by case citation,[33] focuses on what any given CW *did not* say, rather than what he or she *did* say.  Courts routinely reject such arguments.  *See, e.g., Mulligan*, 2014 WL 1569246 at *14-*15 (defendants viewed inquiry "too narrowly").  Also, as alleged in the SAC (¶44), numerous CWs were impaired by Tesla's Non-Disclosure Agreement and/or fears of Tesla's retaliation.  Such barriers negate the inference Defendants ask this Court to draw, *i.e.*, that any purported deficiency in the SAC's allegations regarding the topics at issue is due to a lack of *information* as opposed to a Tesla-orchestrated lack of *access* to that information.

## E.  Plaintiffs' Scienter "Theory" Is Cogent And At Least As Compelling As Any Offered By Defendants

Defendants' challenge to the "theory of scienter" (*see* Def. Br. at 22-23) fails.  As discussed *supra*, the SAC pleads a strong inference of scienter.  In summary:
- Heading into the Class Period, Tesla's faced financial pressures that it was left with no

---

[31] *See* ¶¶30, 75-77, 79, 81-85, 89-91, 95, 99, 103 (CW1); ¶¶31, 86 (CW2); ¶¶32, 61-62, 66, 104 (CW3); ¶¶33, 78-79, 111 (CW4); ¶¶34, 101-102 (CW5); ¶¶35, 80, 87, 106 (CW6); ¶¶36, 57, 78, 80, 82 (CW7); ¶¶37, 58-60, 94 (CW8); ¶¶38, 63 (CW9); ¶¶39, 101, 106, 188 (CW10); ¶¶40, 170 (CW11); ¶¶41, 64, 193 (CW12); ¶¶42, 67-73 (CW13); ¶¶13, 43, 169 (CW14).

[32] *See* ¶¶60-62, 64-65, 70-73 (CW3, CW8, CW12, CW13, and Edmunds.com); ¶¶58-60, 63 (CW8 and CW9); ¶¶42, 70-71 (CW13, lack of pass/fail feedback from Tesla, his experience working at Ford and working with Chrysler); ¶¶75-77, 78, 86 (CW1, CW2, CW4, CW7); ¶¶79-80 (CW1, CW4, CW6, and CW7); ¶¶81-82 (CW1 and CW7); ¶¶85-87 (CW1, CW2, and CW6); ¶¶91-94 (CW1, CW8 and a Fremont Fire Department report); ¶¶90, 96 (CW1 and a Palo Alto Fire Department report); ¶101 (CW5 and CW10); ¶83, 102 (CW1 and CW5); ¶¶103-105 (CW1, CW3, and a Tesla Patent); ¶¶106, 199 (CW6, CW10, and a NHTSA report); ¶¶169-171 (CW14, CW11 and by Musk's own admission).

[33]  *City of Livonia* only said a citation to "internal emails" unattributed to any identifiable person "require a heavy discount" (though are not to be disregarded altogether).  711 F.3d  at 759.

choice other than boosting sales of its only product – the Model S. As a result, Musk implemented strict production deadlines that caused operating difficulties and cars sold with "test" parts.

• To ensure Model S sales, Musk also imposed the 300 MPC mandate, which necessitated the Decisions Compromising Safety, which Musk either made or authorized, including use of higher-energy Panasonic batteries in the same pre-existing battery pack configuration (to boost energy), automated lowering of the Model S driving height at highway speeds (to reduce drag), and rejection of increased undercarriage shielding (to avoid added weight). Once the decision was made to use the Panasonic batteries, the Model S battery and battery pack remained virtually unchanged through remaining testing and into production. The Pre-Class Period Fires, including at least one during a crash test, revealed a higher propensity for "violent" runaway thermal events requiring significant first responder intervention. Defendants concealed the Decisions Compromising Safety and the Pre-Class Period Fires from investors.

• After limited government testing of the Model S, which does not assess its battery pack or undercarriage, Defendants falsely touted it as the "Safest Car in America" while misrepresenting government test results and their own supplemental testing, while concealing the Pre-Class Period Fires and Decisions Compromising Safety. Tesla's sales increased and its stock price soared.

• When three Class Period fires occurred, two were practically identical and manifested the undisclosed risks, causing Tesla to suffer an admitted decrease in demand for the Model S. Defendants countered misrepresentations of the likelihood of such fires and the number that had occurred, while continuing to conceal Decisions Compromising Safety and Pre-Class Period Fires.

• Once NHTSA opened an investigation, Tesla feared a recall, which it could not afford financially or reputationally. Defendants publicly downplayed the need for a recall, while privately negotiating with NHTSA to avoid one. The result was a *de facto* recall, pursuant to which Tesla instituted remedial measures directly addressing the undisclosed risks, which were tantamount to an admission over the Model S's vulnerabilities as originally released to the market.[34] Only then did NHTSA close its investigation, without a finding of no defect.

Defendants do not propose opposing inferences, let alone ones that are *more* compelling, that actually address the facts pled in the SAC. They offer no explanation why they used "test" parts on the Model S, delayed the remedial measures, and ignore the rest of CW2's statement about the tradeoffs between safety and aerodynamics/weight. They try to use a post-Period offering to negate pre-Period financial motivations. These tactics do not hold water.

---

[34] Defendants are wrong that subsequent remedial measures cannot evidence falsity or scienter. *See* Def. Br. at 17-18. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (district court erred in failing to accept as true and construe in plaintiffs' favor allegations including "remedial actions"); *In re Marvell Tech. Group Ltd. Sec. Litig.*, No. C-06-06286 RMW, 2008 WL 4544439, at *6-*8 (N.D. Cal. Sept. 29, 2008) ("remedial actions," taken together, sufficiently pled scienter for director/COO and for CEO).

1

**IV.     THE §20(A) Claim Should Not Be Dismissed**

2

As presented, Defendants' §20(A) argument simply rises and falls with their §10(b) argument,

3

apparently conceding the factual issue of Musk's control of Tesla.  *See* Def. Br. at 23.  If the Court

4

should decide that the SAC's §10(b) claim survives, in whole or part, so too will its §20(a) claim.

5

## <u>CONCLUSION</u>

6

If the Court is inclined to grant Defendants' Motion, Plaintiffs respectfully request it be

7

without prejudice.  *Curry v. Hansen Medical, Inc.*, No. 5:09-cv-05094-JF (HRL), 2011 WL

8

3741238, at *2 (N.D. Cal. Aug. 25, 2011) ((in §10(b) cases, "[l]eave to amend must be granted

9

unless it is clear that the complaint's deficiencies cannot be cured by amendment").  Their second

10

amendment was done principally to effectuate removal of former plaintiff Rahimi and the re-

11

captioning of the action to *In re Tesla Motors, Inc. Securities Litigation*.  *See* Dkt. No. 39.[35]

12

13

14

15

16

17

18

19

20

21

22

---

23

[35]     Defendants argue that this amendment added a "facially false" allegation regarding Tesla's Q3 2013 earnings announcement and low reported Q3 2013 Model S deliveries, such that the Court should make any dismissal with prejudice.  *See* Def. Br. at 24 (discussing ¶172).  This argument lacks

24

merit.  First, the SAC quotes Musk that Tesla was "quite worried" over "a significant drop in demand" due to the Model S fires during the Class Period (¶217), over a span of just 36 days.  Second, it alleges

25

Defendants manipulated Tesla's Q3 2013 earnings announcement, in violation of GAAP and SEC regulations, to conceal future liabilities from a guaranteed buyback program used to artificially boost

26

sales.  ¶218.  Given these two points, it is a dispute of fact whether Tesla properly recorded its deliverables during Q3 and Q4 2013.  Third, it alleges that ***analyst reaction*** to Tesla's Q3 2013

27

earnings release drove a stock drop on November 6, 2013.  ¶172.  Analysts covering Tesla were cognizant of and influenced by, Tesla's Model S fires as of November 6, 2013.

28

Dated: August 7, 2014

**GLANCY BINKOW & GOLDBERG LLP**

By: */s/ Robert V. Prongay*
Lionel Glancy  (#134180)
Michael Goldberg (#188669)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, California  90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:  lglancy@glancylaw.com
        mmgoldberg@glancylaw.com
        rprongay@glancylaw.com

*Liaison Counsel for Lead Plaintiff
and the Proposed Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
Matthew L. Tuccillo
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:  jalieberman@pomlaw.com
        mltuccillo@pomlaw.com

-and-

Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiff
and the Proposed Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On August 7, 2014, I served the following document:

**LEAD PLAINTIFF'S OPPOSITION TO MOTION OF TESLA MOTORS AND ELON MUSK TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as listed on the attached Court's ECF Service List.

And on any non-ECF registered parties:

By U.S. Mail:  By placing true and correct copies thereof in individual sealed envelope: with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence or mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 7, 2014, at Los Angeles, California.


*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:13-cv-05216-CRB In Re Tesla Motors, Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph M. Barton**
  jbarton@glancylaw.com

- **Charles Edward Elder**
  celder@irell.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Lesley F. Portnoy**
  lfportnoy@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,mmgoldberg@glancylaw.com,echang@glancylaw.com

- **Mark Punzalan**
  markp@punzalanlaw.com,smutschall@zlk.com,nporritt@zlk.com,office@punzalanlaw.com

- **David Siegel**
  dsiegel@irell.com,kschmidt@irell.com,rgrazziani@irell.com

- **Matthew Laurence Tuccillo**
  mltuccillo@pomlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)