UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

IN RE TESLA MOTORS, INC.          )
SECURITIES LITIGATION,            )
_____)
                                   No. C 13-05216 CRB
                                   San Francisco, California
                                   Friday, September 26, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
**For Plaintiffs:**              POMERANTZ LLP
                                 600 Third Avenue
                                 20th Floor
                                 New York, NY  10016
                                 (212) 661-1100
                          BY:  **MATTEHEW LAURENCE TUCCILLO**


**For Defendants**               Irell & Manella LLP
**Tesla Motors, Inc.;**          1800 Avenue of the Stars
**Elon Musk:**                   Suite 900
                                 Los Angeles, CA  90067
                                 (310) 277-1010
                                 (310) 203-7199 (fax)
                          BY:  **DAVID SIEGEL**
                               **CHARLES E. ELDER**

Reported By:  Lydia Zinn, CSR No. 9223, Official Reporter

1          **THE CLERK:**  Calling Case C. 13-5216 *In Re:*

2    *Tesla Motors*.  Appearances, counsel.

3          **MR. SIEGEL:**  Good morning, Your Honor.  David Siegel

4    and Charles Elder, on behalf of the defendants Tesla and

5    Mr. Elon Musk.

6          **MR. TUCCILLO:**  Good morning, Your Honor.

7    Matthew Tuccillo, Pomerantz, LLP, on behalf of plaintiffs.

8          **THE COURT:**  Good morning.  So this matter's on for a

9    motion to dismiss the Second Amended Complaint.  The Complaint

10   has been amended now twice, so it's actually the third

11   Complaint.

12       At the -- I think it was at the Court's -- whether it was

13   or not doesn't make any difference.  The first time everybody

14   came in here, after reviewing the Complaint, the Court told

15   plaintiffs' counsel that leave to amend will be granted *sua*

16   *sponte*, and that you should place in that Complaint every fact

17   that you were aware of which would justify, under the PSLRA,

18   the case to go forward.  And you then filed the First Amended

19   Complaint.  And then you, on your own, or upon agreement of the

20   parties, amended that Complaint; filed a Second Amended

21   Complaint.  So I think that's a correct chronology of events.

22       So I have before me the Second Amended Complaint, which --

23   by virtue of the Court's suggestions, it has to contain

24   everything that the plaintiff believes is -- that justifies the

25   causes of action that are asserted here.  And upon reviewing

it, I must tell you I have a very difficult time understanding
what's false in what Tesla has said about its vehicles.

There were three fires, two of which were caused by -- I
don't know -- flotsam and jetsam or road -- whatever's in the
road:  Pieces of metal, trailer hitches, whatever it is.  And
the car went over it, and, as a result, the underpinning of the
car was damaged, and the car caught fire.  I think in both of
those cases, the individual -- the driver walked away,
unharmed.

The third case -- and there were only three, to my
knowledge.  The third case was someone was driving a Tesla at
about 100 miles an hour in Mexico; went through a concrete
barrier; and slammed into a wall or a tree or something at
100 miles an hour.  The car caught fire.  And the driver got
out of the car and walked away, unscathed.

So here are three incidences of fires, which is the
underpinning of the lawsuit -- the factual underpinning of the
lawsuit -- in which the Tesla car seemed either not at fault,
or to have contributed to the survival of the driver.

Now, Tesla said that this car was found to be one of the
safest cars ever developed.  That seems to be the case.
There's no evidence that that's not true.  And so Tesla, in
selling their cars, advertised its safety features.  That's
what they should do if they want to sell their cars, I suppose,
at very high cost.  And so they said, "Yes, it's safe."

1    Now you come back and you say, "Well, you know, when they

2  were developing the prototype, they observed in the couple of

3  incidences some overheating or fire" -- whatever it is -- "of

4  the battery."  And I guess they didn't disclose that as they

5  were developing the prototype; or they did, but it doesn't -- I

6  don't know that that really make the difference, because one

7  would expect that when a car is under a development process,

8  part of the process is to see what are the problems, and to see

9  whether or not they are serious; whether they're endemic to the

10  product; whether they can be corrected; what can be done.  And

11  they apparently did that.

12    So I'm at a total -- I mean "total" -- loss, understanding

13  the basis for this lawsuit.  And I've given you -- you've

14  amended twice.  And I think now is the time that either you can

15  convince me I'm wrong, or it's dismissed without leave to

16  amend.  So go right ahead.

17        MR. TUCCILLO:  Thank you, Your Honor.  I think it

18  would be helpful to focus on a handful of --

19        THE COURT:  I've got it all here.  I've got all of

20  the purported statements right here.

21        MR. TUCCILLO:  That's fine.  So looking back --

22        THE COURT:  You tell me what paragraph, so we have a

23  very specific discussion --

24        MR. TUCCILLO:  Sure.

25        THE COURT:  -- of your Second Amended Complaint that

1  you believe was a false statement made by Tesla.

2      **MR. TUCCILLO:**  Sure.  Let's start with the paragraph

3  130.

4      **THE COURT:**  130.

5      **MR. TUCCILLO:**  Okay.

6      **THE COURT:**  Okay.

7      **MR. TUCCILLO:**  And there, Defendant Musk says,

8  "Throughout all of our crash tests, throughout all similar

9  incidents with vehicles on the road, never once has there been

10  a fire."

11      Now, in the Complaint we detailed the what we've called

12  "the Pre-Class Period fires."  Okay?  And among them is a fire

13  on December 19th, 2011.  It happened right at Tesla's factory.

14  And it involved, as described in an undisputed Fire Department

15  report, a crash fire test.  Okay?  That fire spun wildly out of

16  control, required 23 first responders to come, and was

17  described by confidential witnesses as violent, and destroying

18  far more of the car than had been expected.  It also was done

19  on a fully installed Model S battery pack.

20      Now, one of the points that defendants make is, well, you

21  haven't alleged that the battery pack didn't change after that.

22      So how do we know that the battery pack that caused the

23  inferno on December 2011 was not the same one that was in the

24  car when the vehicle went into production?

25      But we do know that.  Okay?  The December 19th, 2011, fire

1  was basically six months before deliveries of the Model S.  So

2  six months later, people are being handed keys to this vehicle.

3  Okay?  So you have a six-month window in between.

4      Confidential Witness Number 1, who left in January of '12,

5  said that he was unaware of any changes made to the battery

6  pack.  And he described at length -- he was the director of the

7  vehicle-chassis engineering.  He was working right under the

8  number-one engineer on the car.  He said he was unaware of any

9  changes.  That's already in January.

10     Confidential Witness Number 5 -- his job was to take

11  designs by the engineers, work up computer models, and create

12  drawings from them for production.  He left in April of 2013,

13  two months before the car keys were being handed to customers.

14  And he said he was unaware of any major changes that had been

15  made to the battery pack.

16     Moreover, we have other confidential -- we have

17  Confidential Witness Number 13.  He worked at a Tesla supplier.

18  And he said that the number-one engineer -- the guy that

19  designed this car -- told him at some point prior to

20  production, "You know, I've told my engineers to put their

21  pencils down.  We're going to get this thing into production."

22  And that was before production.

23     We also have a list of confidential-witness statements

24  describing sort of the frenzy to get this car out, where test

25  parts were used; corners were cut.  And basically even -- even

parts that had been shown to have a fire -- so, for example,
Confidential Witness 13 described an igniter that had caused a
fire.  When it was replaced, it was never validated.  It was
just put into the car, because they had a tight production
deadline that had been dictated.  So that's an example.

        **THE COURT:**  Can I ask you a question?

        **MR. TUCCILLO:**  Sure.

        **THE COURT:**  And I'll ask the Defense to comment.

  Since the car went into production and the keys handed to
all of these people, how many fires have occurred with this
very dangerous battery?  How many fires have occurred,
independent of either a crash into a wall at a hundred miles an
hour, or metal -- discarded metal -- on the road?

        **MR. TUCCILLO:**  Well, we know of four.  Okay?

        **THE COURT:**  Four?

        **MR. TUCCILLO:**  But the point here is --

        **MR. SIEGEL:**  Zero.

        **MR. TUCCILLO:**  -- what the case is about.  The case
is about the Model S as it was introduced and sold during the
Class Period.  The Class Period ends November 13th.  Major
modification's done to the car.  They rate --

  The things that aren't disclosed --

        **THE COURT:**  Between -- in the Class Period?

        **MR. TUCCILLO:**  The Class Period is four months long.
There are three fires.  Okay?  Two of them are the direct

result of what we described as the decision to compromise

safety that had been made, which included, basically,

Defendant Musk said, "We need a 300-mile-per-charge range for

this car to sell."

**THE COURT:** Yeah.

**MR. TUCCILLO:** That dictated certain outcomes.

Higher-energy batteries were used in the same configuration.

They programmed the vehicle to automatically lower at higher

speeds. The faster the car is going, the lower it's going to

be to the ground. They consciously chose not to use available,

patented undershielding, because of weight concerns. They

lowered it because of drag concerns. They didn't use the

shielding because of weight concerns, so available shielding

isn't used. The car's lowering, the faster it goes. And

higher-energy batteries are crammed into the same compartment.

This also was not disclosed. It's not just the fires; it's

these decisions, as well.

Skip to the Class Period. In four months' time, three

fires. Two of them manifest that exact risk. Okay? And the

Class Period ends when they raise the car up and they send the

car up.

**THE COURT:** Let me hear the response to paragraph

130.

**MR. SIEGEL:** Yes, Your Honor. Paragraph 130,

Mr. Musk's comments were true. Throughout all our crash tests,

1  throughout all similar incidents with vehicles on the road.

2      At that point, the car had been on the road for 15 months.

3  Nearly 90 million miles already driven.  Not a single fire.

4  Never once.  Not once.

5      Why was it true with reference to the crash tests?

6      Counsel refers to the crash fire test of December 19, 2011.

7      There was a fire.  Tesla set that fire as part of the

8  development and testing, to make sure that the car would be

9  safe, so that if there were a fire, recognizing that risk,

10  disclosing there was a risk of battery fires at the time and

11  throughout the entire Class Period and before and after --

12  disclosed a risk of potential for battery fires -- Tesla wanted

13  to test its cars, to make sure they would be safe in the event

14  of a crash and a fire.

15      The fact that somebody wrote down that that was a, quote,

16  "crash fire test" does not mean that it ignited during a crash.

17  We started it.  Plaintiffs know that, because they pleaded in

18  their Complaint -- I think in paragraph 91 they make the point

19  that not only did Tesla start that fire; induced it -- and

20  again in paragraph -- I think it's 93 -- that we intentionally

21  set the fire, but in paragraph 91 they cite one of their

22  confidential witnesses to note that, "We intentionally induced

23  that fire in the center of the battery pack, where it would be

24  most likely to cause the most damage"; not on the edges, the

25  front, or the rear, where damage is most likely to crash; but

1  just to be sure we were making a safe car, we set as hot a fire

2  as we could set, and tested, and continued to develop

3  thereafter the ability to contain fires.  So they know that.

4       To call that a -- to say that because of that, Mr. Musk

5  wasn't telling the truth when he said throughout the crash

6  tests there had been no fires is bordering on dishonest,

7  frankly.  It really does.

8       Second, we set fires throughout the testing.  We're going

9  to put people in these cars.  We wanted them to be safe.

10      Second --

11      I mentioned and interrupted.  For that I apologize.

12      But the Court's question was clear:  How many fires have

13  occurred spontaneously because of the battery pack; because of

14  some defect in the battery, as opposed to through collision?

15      The answer during the Class Period and since is zero.

16  None.  That risk has never realized.  Doesn't mean it can't.

17  There's a clear risk disclosure; but it hadn't realized.

18      Plaintiffs even, in their Complaint, recognize and

19  criticize the company for taking its time to make sure that if

20  there were a fire -- they said we spent too much time on it;

21  gave too much stock to the ability to protect the people

22  inside.

23      We don't think so, Your Honor, because the goal was to make

24  a car that would be safe enough that even if a driver put it

25  through a concrete barrier, a fence, and into a tree at

110 miles an hour, that driver could walk out before the fire

engulfed the car.  That's a testament to our safety; not

evidence of securities fraud.

With respect to these confidential witnesses -- and

unaware -- aware, or not, of changes -- I don't think

Confidential Witness -- at least, I don't recall him speaking

to the issue.  Confidential Witness Number 5 counsel referred

to did say he was unaware of any major changes to the battery

before he left, or during the prototype and testing.

Confidential Witness Number 7, however, makes clear that

changes to the battery continued to occur through the months

leading up to production.  And it makes sense.  We were testing

it to configure the underpinnings to make it safer.  And

changes continued throughout the development period.

I want to speak briefly to the decisions compromising

safety, and the ease with which the company could have fixed

and did ultimately address the underbody-collision issue.

Yeah.  Their term -- not ours:  The decisions "compromising

safety."  I think we know that.

The vehicle was designed to lower its profile at speed;

something that was advertised; considered desirable by the

people who were buying a high-performance vehicle.

High-performance vehicles sit lower to the road.  They do that

both because of reducing drag, but also because it's safer.

That is a safety judgment.  You can handle the car faster.

Look at Formula Ones with the wings.  Pushing the front end
down at high speeds makes the car perform better.

     But we did raise it after the first -- after these three
incidents.  And now we give the driver the option.  Now the
driver can set it manually, if they want to go faster and lower
it; but that's a risk they'd be taking with respect to the
debris on the road.

     Shielding was available.  That's right.  We've added to the
shield because not only -- we're not content that the car was
safe; we want to make it better.  That's all the plaintiffs
have managed to show.  But I want to comment on both of those
points, because they were easy fixes.

     The Complaint make the point that the raising or lowering
of the profile was as easy a fix as pushing a button, and that
adding the additional shielding -- titanium base in addition to
the quarter inch of armor on the underplate -- was not only
obvious, but available during and throughout the Class Period;
and, once added, decreased our miles-per-charge range by less
than 1/10 of 1 percent.  So with such easy fixes available, had
the company and Mr. Musk recognized this risk of underbody
collision causing fires prior to the Class Period, we would
have fixed it.

     Not only is this evidence not consistent with securities
fraud; it disproves any cogent theory, much less a strong
inference of *scienter*.  Plaintiffs throughout their Complaint

make the point that safety was the number-one priority for this

company.  Plaintiffs throughout their Complaint make the point

that this company needed the Model S to succeed.  And it has.

So why would we put a car out on the road, knowing of this

risk, when the fix was as simple as pressing a button?

There are no stock sales alleged by Mr. Musk.  To the

contrary, he purchased more shares -- $100 million, right

before the start of the Class Period -- while supposedly fully

aware of these undisclosed risks.  And he held all of his

shares through the Class Period.  Plaintiffs assert as a

proposition of law that the fact that he held stock through the

Period actually is evidence of *scienter*.  The Court knows

that's not the law.  *FVC.com* gets that clear.

What happened here, Your Honor, is there were some fires --

two -- due to collisions with road debris.  The market hit the

pause button because we had warned --

**THE COURT:**  Well, that happens.  But look.  I'm not

at the *scienter* stage; and I'm not there because I don't see

what was false.

**MR. SIEGEL:**  That's it.

**THE COURT:**  You know, I mean, I start with the

proposition that this is a series of allegations that lies were

made or false statements were made.

I don't see any false statements in here.  And so I don't

think I go to the next step of *scienter*:  What did they know,

1  and when did they know it, and that sort of thing, and did they

2  buy stock, didn't they buy stock, and so forth.

3        **MR. TUCCILLO:**  Your Honor, if I may --

4        **MR. SIEGEL:**  We agree.

5        **MR. TUCCILLO:**  I had said that I'd like to focus on

6  three misstatements.  I got through one before --

7        **THE COURT:**  Okay.  Go to your next misstatement.

8        **MR. TUCCILLO:**  And I'll direct Your Honor.  Our

9  opposition, at 10 to 12, talks about the Supreme Court's

10  decision in *Matrixx* --

11        **THE COURT:**  I have everything in mind.

12        **MR. TUCCILLO:**  -- *Berson*, et cetera; really false,

13  misleading statements, because of omissions.  Let's take the

14  Mexico fire.  Okay?  Because everybody --

15        **THE COURT:**  What paragraph do you want me to look at?

16        **MR. TUCCILLO:**  So the Mexico fire -- the

17  misstatements at issue are paragraphs 157 to 159, and then 160

18  to 161.

19        **THE COURT:**  Okay.

20        **MR. TUCCILLO:**  So what happens is --

21        **THE COURT:**  Five times less likely to catch fire than

22  gasoline car, the Washington fire was a very peculiar accident.

23        **MR. TUCCILLO:**  If I may?

24        **THE COURT:**  Yes.  I think pointing to it.  Right?

25        **MR. TUCCILLO:**  Stepping back for a second, the Mexico

1    fire happened on October 18th.  Okay?  We know conclusively

2    that Tesla knew about it immediately; and the reason we know is

3    because Musk, himself, as quoted in the Complaint, says that

4    the driver picked up our investigative team the next day.  The

5    Tesla spokesperson ultimately says we were able to contact him

6    immediately.  We have a confidential witness who was the

7    purchaser of that car who said he got a call from Tesla the

8    next day.  And --

9              THE COURT:  Yeah, but let me just focus on it.

10   You're saying the lie in here was that he knew about it earlier

11   than when he said he knew about it?  That's the lie?

12             MR. TUCCILLO:  He never said he knew about it.

13             THE COURT:  Okay.  He lied when he -- or omitted the

14   fact that he knew about this?

15             MR. TUCCILLO:  That's right.  So he gives interviews

16   four days later.

17             THE COURT:  And he knew about it.

18      Are we focused on the right thing?

19             MR. TUCCILLO:  Yes.

20             THE COURT:  You're saying he knew about the fact that

21   the Tesla, driven at 100 miles an hour through a concrete

22   barrier, hitting a tree, and then caught fire, and the driver

23   walked out -- he knew about that?

24             MR. TUCCILLO:  Correct.

25             THE COURT:  And didn't tell people about that?  Is

1    that right?

2              MR. TUCCILLO:  That's right.

3              THE COURT:  So which I say, "So what?"

4              MR. TUCCILLO:  Well, the market thought differently,

5    because when the --

6         Look.  I understand.

7              THE COURT:  The market.  The market.  I know about

8    the market.

9         Yeah.  Go ahead.

10             MR. TUCCILLO:  I understand what the defendants have

11   argued, and you're repeating it back to me.  And I understand

12   the point.  Musk is saying, "You know, these seem very

13   dissimilar to me, so I need not disclose it," but that's just

14   not the law.  It's not his job to be the arbiter --

15             THE COURT:  Whatever he knows, for whatever reason,

16   his job is to make sure that he says everything in his mind;

17   whatever he knows for whatever reason?  You're saying that's

18   his job?

19             MR. TUCCILLO:  No.

20             THE COURT:  That's an amazing job.  Who has that job?

21             MR. TUCCILLO:  Under *Berson*, when he chooses to

22   speak, he's bound to do so in a manner --

23             THE COURT:  I'm well aware of that.  And everybody in

24   this courtroom is well aware of that --

25             MR. TUCCILLO:  So --

1    **THE COURT:** -- and well aware of my attitude towards

2  that.  And I agree with you that when you speak on a matter

3  that's material, you have an obligation to speak truthfully

4  about it.  That's fine.  I understand that, but I don't know

5  whether this is --

6    The PSLRA isn't sort of codifying a stream-of-consciousness

7  disgorgement of everything everybody knows about everything,

8  even if there's no rational tie to whatever you are engaged in

9  doing.

10    **MR. TUCCILLO:**  That's right, but when he's being

11  asked about the Washington fire -- we quoted some of the

12  statements he made.  He talks for multiple minutes about the

13  Washington fire, saying the entire time, "This is the only

14  fire."  Okay?  The Washington fire shaved 10 percent off

15  Tesla's stock price; 10 percent over two days.  He knows that

16  there's another fire that's occurred.

17    Now, in his mind, he's saying, "Well, this one's very

18  different.  You know.  I'll just keep one in the vest pocket."

19    It then gets disclosed after his time talking, and another

20  four-and-a-half percent comes off.

21    **THE COURT:**  Okay.  Now let me ask the Defense.  What

22  do you say about Mr. Musk's failure to disclose the fire when

23  he spoke about the Mexican fire -- or the Washington fire?

24    **MR. SIEGEL:**  Well, Mr. Musk -- the first occasion was

25  when he traveled to Germany, just days after the Mexico fire.

There's nothing in the Complaint pointing to the fact that Mr. Musk personally was advised about the fire, but that truly is a quibble here, because the law doesn't impose on him a duty to show up in Germany and, when answering a question about the Washington fire and discussing quite a different circumstance and concern with this underbody protection, needing to get that right, and comparing that honestly and truthfully to fires and the count of fires with respect to the gasoline engines, combustible engines versus electric engine, Mr. Musk did not volunteer nor was he required to volunteer information about the Mexican fire. It was being investigated. It had only just happened. And within days that information became public and known.

In fact, we point to the Mexican fire as a testament to the car's safety; but there was no duty under -- no duty of completeness. No statement.

Counsel says, well, he said there had not been any other fires; only this one.

That's not in the record. There's no such statement.

He commented and was asked to comment on the Washington fire, and he did.

**THE COURT:** Okay. Do you have your -- what is your third?

**MR. TUCCILLO:** Well, Your Honor, one last point on that. It is untrue. It is untrue that the investigation was

still going on when he was talking.  That is factually untrue.

Confidential Witness 14 -- the purchaser of the vehicle -- said it took two days, and that they were there the next day. It was done.

If you look at their papers, their arguments are:  Well, he didn't know about it.

Then:  They're so different, you don't have to disclose.

And finally they say, well, look.  He had a right to investigate; but the investigation was concluded before he made his first remarks.

THE COURT:  Okay.  What's your third point?

MR. TUCCILLO:  The third one, you know, to have some variety --

THE COURT:  Well, variety is a good idea, but I don't think it's the test; is it?

MR. TUCCILLO:  If you look late in the Class Period, Defendant Musk is -- on November 12th he does a series of interviews.

THE COURT:  Where are we?

MR. TUCCILLO:  Paragraphs 181, 182, 183.

THE COURT:  Pardon me?  So he says, in 181, "The Model S is less likely to have a fire than a gasoline car."

MR. TUCCILLO:  No.  I'm talking about the recall.

THE COURT:  I'm looking at 181.  Doesn't he say that in 181?

1    **MR. SIEGEL:**  Yes.  And he also says there won't be --

2         **THE COURT:**  Okay.  So 181, the statement -- when he

3    says the Model S is less likely to have a fire than a gasoline

4    car, that's true?

5         **MR. TUCCILLO:**  I don't know that that's true.

6      And he says, by the way --

7         **THE COURT:**  You're not alleging that that's false?

8         **MR. TUCCILLO:**  He says it's five times less likely.

9    Each time one of the Model S catches fire, he reiterates it's

10   five times less likely.  He never did any comparative analysis.

11        **THE COURT:**  Well, is it true?  I mean --

12        **MR. TUCCILLO:**  That it's five times less likely?

13        **THE COURT:**  No.  Are you saying --

14        **MR. TUCCILLO:**  We allege in the Complaint that that

15   is a false and misleading statement, because the -- not only

16   was the analysis done incorrectly -- there's an MIT Ph.D. that

17   points out all of the flaws in the analysis -- but frankly, the

18   standard that they've articulated is, well, you have to show

19   that he did his own methodology incorrectly.

20     There's no greater evidence of that than each time a Tesla

21   catches fire, he keeps repeating the same number.  It never

22   changes.  Three fires later, it's still five times less likely.

23        **THE COURT:**  Yeah.  Well, how many cars have been

24   sold?

25        **MR. TUCCILLO:**  At that point, going into the

1  Class Period, 13,000.

2       **THE COURT:**  What are the statistics showing the

3  likelihood of combustible engines catching fire?  Because he's

4  making a comparison.  Do you have any evidence at all that

5  that's untrue?

6       **MR. TUCCILLO:**  One would think that when the vehicle

7  fleet size goes from 13,000 to 20,000 or so over the

8  Class Period, and it goes from zero fires out of 13,000 to 3

9  fires out of 20, that the five-times-less-likely number would

10  adjust.

11       **THE COURT:**  Let me say one thing.  So you're saying

12  statistically that that statement that he gave was not true.

13  That's what you're saying; but you don't allege it as a false

14  statement.

15       **MR. TUCCILLO:**  We do.  We do allege it's a false,

16  misleading statement.

17     And we alleged methodology issues that were pointed out by

18  an MIT Ph.D.; that he doesn't account for age of vehicle.

19       **THE COURT:**  Well, an MIT Ph.D.  That's very good.

20       **MR. TUCCILLO:**  In any event, what I was directing the

21  Court to was the recall statements.  Okay?  So on

22  November 12th, in three different interviews -- paragraph 181,

23  182, 183 -- Musk is saying -- first he says, "Look.  There's no

24  need for recall," but he goes further than that.  He says, "If

25  there was anything that we could do to improve safety, we would

1  do it.  Tesla would do a recall of the Model S if it felt there

2  was something affecting its safety."  Quote, "If we thought a

3  recall was warranted, we would do it immediately."  Okay?

4  That's a Tuesday.

5      On Monday of the following week, they do the over-the-air

6  software update, raising the car up and extending the fire

7  warranty.  And 10 percent more of the company's market cap gets

8  shaved off in a day.  Okay?

9      The problem is:  He's saying this at a point where he knows

10  that's going to happen.  They're engaged with the NHTSA, trying

11  to avoid a recall.  The steps they take are tantamount to an

12  informal recall.

13      And defendants are incorrect that we did not cite case law

14  that those remedial measures can be considered as evidence of

15  securities fraud.  We do.

16      **MR. SIEGEL:**  It's not a recall.  It's not a recall.

17      He did exactly what he told the market he would do if

18  there's any cause.  And we don't see a cause for safety

19  concern.  There was no cause for safety concern, even after all

20  of the fires and all of the evidence is in; but if we did, we

21  would do anything that needs to be done.  That's what the

22  company did.  The company improved its car.  That's what he

23  said it would do.  He said there wouldn't be a recall.

24      There's no conceivable measure or argument that can

25  plausibly be made in good faith that sending out the firmware

1  to raise the car constituted a recall.

2      THE COURT:  Well, did the National Transportation

3  Safety Board order a recall?

4      MR. SIEGEL:  Never.  Post Class Period we know that

5  this allegation of falsity also misses the mark.

6      MR. TUCCILLO:  Your Honor, defendants' own exhibit,

7  though, makes clear that the NHTSA, as it was having ongoing

8  negotiations with Tesla, essentially required these steps.

9  First they did the software upgrade, raising up the car.

10      THE COURT:  Well, wait a minute.  Wait a minute.

11      MR. TUCCILLO:  Yes.

12      THE COURT:  Now, you're saying they actually required

13  Tesla to do this?

14      MR. TUCCILLO:  This is -- if you look at the exhibit

15  -- I think it's their R.J.N. Exhibit 11 -- and you read the

16  description in the NHTSA Report they say, "Tesla raised the car

17  up and extended the warranty."

18    Then the conversation continued with NHTSA.  And we have

19  confidential witnesses saying that Tesla was in a frenzy to get

20  enough measures out to stem off a --

21      THE COURT:  I don't know what "frenzy" means.

22  Frenzy?

23      MR. TUCCILLO:  Only after -- only after -- only after

24  they put the undercarriage shielding that had been available up

25  front.  Then NHTSA said, "We will close the investigation

without any determination that no defect exists."

      **MR. SIEGEL:**  And no direct trend found, and no recall required.

    You know, I've been doing this a long time, Your Honor. And we're used to plaintiffs trying to hang on, and, in their last amended complaint, throwing something in that, you know, seems odd; and we have to take the time and burden the Court to track it down.

    But to stand here today and say that the NHTSA document that's in the public record which we provided to the Court is tantamount or consistent with the allegation that there was a recall is beyond the pale.  That is beyond the pale.

      **THE COURT:**  No, no.  I read it.  I read it.

    Okay.  Very well.  I'm dismissing the Complaint without leave to amend.  I'm going to write a formal Order.  So if you -- certainly, you have your appellate rights.

      **MR. TUCCILLO:**  Thank you.

      **THE COURT:**  And I just wanted to go through an analysis of all of the allegations.  Thank you.

      **MR. TUCCILLO:**  Thank you, Your Honor.

      **MR. SIEGEL:**  Thank you, Your Honor.

      **THE COURT:**  And now I want to take a recess until 11:00 o'clock, and then we'll call the *Hewlett-Packard* case.

(At 10:54 a.m. the proceedings were adjourned.)

1  I certify that the foregoing is a correct transcript from the

2  record of proceedings in the above-entitled matter.

3

4

5  _____  September 30, 2014
   Signature of Court Reporter/Transcriber   Date

6  Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25