1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE TESLA MOTORS, INC. SECURITIES          No. 3:13-cv-05216-CRB
     LITIGATION
12                                                **MEMORANDUM OF OPINION**

13

14   _____/

15

16          Plaintiffs proposed a class action against Tesla Motors, Inc. and Tesla executive Elon

17   Musk (collectively, "Tesla"), on behalf of all persons who purchased Tesla stock between

18   August 19, 2013, and November 17, 2013 (the "Class Period").  The suit alleged that Tesla

19   violated the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule

20   10(b)-5 by making materially false and misleading statements about the risk of fire caused by

21   the lithium batteries that power the Tesla Model S car.  Tesla moved to dismiss Plaintiffs'

22   Second Amended Class Action Complaint ("SAC") on the grounds that Plaintiffs failed to

23   plead that Tesla's public statements were materially false or misleading.  Mot. Dismiss (dkt.

24   43).  At a hearing on September 26, 2014, this Court GRANTED Tesla's motion to dismiss

25   without leave to amend.  Minute Entry (dkt. 53).  In this memorandum of opinion, the Court

26   more fully explains its reasoning.

     **I.      BACKGROUND**

27          Since its launch in 2012, the Model S's safety and performance records have been

28   exemplary.  It has received, among other laurels, the highest vehicle rating ever awarded by

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

Consumer Reports to any car and the highest possible safety rating from the U.S. National

Highway Traffic Safety Administration ("NHTSA").  Mot. Dismiss at 1.  In more than 275

million miles driven, there has not been a single death or permanent injury suffered by any

occupant.  Id.  Independent testing of the Model S roof crush protection broke the testing

machine at just above 4Gs of force, and normal testing methods were unable to induce a

rollover.  SAC (dkt. 42) Exh. 3.  Tesla shareholders have profited handsomely from the

success, with Tesla stock appreciating over 500% since the Model S launch and standing as

the best performing stock on the NASDAQ in 2013–the class period year.  See Mot. Dismiss

at 1.

### A. Parties and Claims

Plaintiffs are three individuals who purchased Tesla securities during the class period

and allege damages, unspecified in both type and amount, "upon the revelation of the alleged

corrective disclosures and events."  SAC ¶¶ 24–25.  They sought to bring a federal securities

action on behalf of a class consisting of all persons who purchased Tesla securities between

August 19 and November 7, 2013.  SAC ¶ 1.  Their suit alleged claims under Section 10(b)

and Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities

and Exchange Commission ("SEC") Rule 10b-5.  SAC ¶ 1. Defendant Tesla Motors is a

publicly traded company which designs, manufactures, and markets two models of fully

electric automobiles, the Roadster and the Model S.  SAC ¶¶ 26, 46.  Defendant Elon Musk

is Tesla Motors's Chief Executive Officer.  SAC ¶ 27.

### B. Factual Allegations

Tesla began producing the Model S in June 2012.  SAC ¶ 105.  One of the vehicle's

defining and revolutionary features is its battery pack, which carries three times more stored

electrical energy than the Chevy Volt and five times that of a Nissan Leaf.  SAC ¶ 177.  This

engineering feat gives the Model S a battery range that can extend up to 300 miles on a

single charge, in line with the goal that Musk posed to Tesla's engineers during the design

process.  SAC ¶¶ 81-83.  Tesla developed the battery in conjunction with Panasonic, which

in mid-2011 designed a lithium battery with subtle chemistry differences that gave it a higher

2

**United States District Court**
For the Northern District of California

1   energy density than previous designs, thereby allowing the battery to store more energy for a

2   given amount of weight and space.  SAC ¶¶ 83-84.

3         The SAC alleges that up to three battery "fire incidents" occurred in the design and

4   prototype testing process that followed in late 2011 and January 2012.  SAC ¶ 89.  According

5   to a confidential witness, in September or October of 2011 during the prototype battery

6   design process, there was an "internal thermal event within [a] battery pack, which burned

7   itself out and was later discovered."  SAC ¶ 90.  Plaintiffs allege nothing else about this

8   "thermal event."  SAC ¶ 90.  The second fire, in late 2011, was <u>intentionally</u> set by Tesla

9   engineers as part of a test during the prototype design process.  SAC ¶ 91.  To maximize the

10   engineers' ability to determine burn capacities, the fire was induced at the center of the

11   battery pack, rather than at the front or back, as would more typically occur during a crash

12   impact.  SAC ¶ 91.  A Tesla employee confidential witness allegedly stated that the results

13   were "somewhat surprising" in that the fire was "more violent than most of the people were

14   expecting."  SAC ¶ 91.  Another stated that he was "ushered away" when he rode his bike

15   over to building while the fire test was ongoing and the area was "quarantined" after the fire.

16   SAC ¶ 94.  The SAC alleges "additional fire testing" during the prototype design process but

17   does not elaborate.  SAC ¶ 95.  Finally, the SAC alleges that on January 11, 2012, at 1:00

18   a.m., the Palo Alto fire department responded to a fire alarm and reported that a storage cart

19   with two items on it had caught on fire and that "some of the materials that burned may have

20   [had] a hazardous by-product associated with them."  SAC ¶ 96.  Although the SAC

21   speculates that "Tesla batteries were involved," the fire department report neither identified a

22   battery nor identified the source of the fire.  SAC ¶ 96.

23         Tesla launched the Model S in June 2012.  SAC ¶ 4.  By August 2013, Tesla had sold

24   roughly 13,000 Model S cars; by the end of that year, the number had nearly doubled, to

25   25,000.  SAC ¶ 4.  The NHTSA, whose Safety Ratings Program generates comparative

26   safety ratings by performing crash tests, notified Tesla of the Model S's results in August

27   2013.  SAC ¶¶ 108, 112.  The results showed that NHTSA awarded the Model S a 5-star

28   safety rating, the highest possible score, in all tested categories.  SAC ¶ Ex. 3.

Subsequently, the Tesla battery pack caught fire in three instances during the class period. On October 2, 2013, a Model S in Washington State struck a piece of metal road debris, which pierced the car's underbody and lead to a fire in the battery pack. See SAC ¶¶ 136-37. No injuries resulted from the accident or fire. See SAC ¶ 137. On October 18, 2013, in Merida, Mexico, a Model S crashed through a concrete barrier and into a tree, then caught fire. See SAC ¶ 165. News reports noted that the extremely inebriated driver was speeding at over 100 miles per hour when he crashed through the concrete barrier. See SAC ¶ 165 n.3. The driver walked away from the accident unharmed. See SAC ¶ 167; RJN Exh. 5. The third fire involved a Model S in Tennessee that caught fire on November 7, 2013, after striking a steel trailer hitch on the highway. SAC ¶¶ 173-174. Again, there were no injuries.

After the Tennessee fire–and after the conclusion of the class period–the NHTSA opened a "preliminary evaluation to examine the potential risks associated with undercarriage strikes on model year 2013 Tesla Model S vehicles." SAC ¶ 192. During the investigation, on December 20, the NHTSA reaffirmed the Model S's 5-star safety rating "overall and as to all categories." RJN, Ex. 3. Also during the pendency of the investigation, Tesla added a titanium underbody battery shield to the Model S and introduced a software update that raised the car's ground clearance. SAC ¶¶ 187-188, 194-95. The NHTSA closed its investigation into the Model S fires on March 26, 2014, having concluded that no defect trend was identified. SAC ¶ 200. Specifically, the report determined the following:

> [The Office of Defects Investigation] believes impacts with road debris are normal and foreseeable. In this case, Tesla's revision of vehicle ride height and addition of increased underbody protection should reduce both the frequency of underbody strikes and the resultant fire risk. A defect trend has not been identified. Accordingly, the investigation is closed. The closing of the investigation does not constitute a finding by the NHTSA that a safety-related defect does not exist, and the agency reserves the right to take further action if warranted by new circumstances. SAC ¶ 200.

**C. Procedural Background**

Plaintiffs filed their original complaint on November 11, 2013 (dkt. 1), which was later consolidated with related cases (dkt. 15). At a hearing on February 14, 2014, this Court

United States District Court
For the Northern District of California

1    granted Plaintiffs leave to amend their complaint, advising them at length that they must

2    comply with the requirements of the Private Securities Litigation Reform Act (PSLRA), 109

3    Stat. 737, in their amended complaint and include therein all possible facts to support their

4    allegations.  See Hearing Tr. (dkt. 33) at 5-6.  Plaintiffs filed a first amended complaint on

5    April 15, 2014 (dkt. 35), and a second amended class action complaint on June 16, 2014.

6    Defendants then moved to dismiss the SAC on the grounds that it fails to state a claim for

7    securities fraud.  See Mot. Dismiss.  This Court granted Tesla's motion to dismiss without

8    leave to amend at a hearing on September 26, 2014.

9    **II.     LEGAL STANDARD**

10          Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed

11   for failure to state a claim upon which relief may be granted.  Dismissal may be based on

12   either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

13   cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

14   1990).  For purposes of evaluating a motion to dismiss, a Court "must presume all factual

15   allegations of the complaint to be true and draw all reasonable inferences in favor of the

16   nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  A

17   complaint must plead "enough facts to state a claim to relief that is plausible on its face."

18   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550

19   U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that

20   allows the court to draw the reasonable inference that the defendant is liable for the

21   misconduct alleged."  Id.  "Courts must consider the complaint in its entirety, as well as other

22   sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

23   particular, documents incorporated into the complaint by reference, and matters of which a

24   court may take judicial notice."  Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322

25   (2007).

26          Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure

27   9(b), which requires a party "alleging fraud or mistake [to] state with particularity the

28   circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) "requires an

United States District Court
For the Northern District of California

account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).  Security fraud claims must also meet the heightened pleading requirements of the PSLRA, which states that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); Tellabs, 551 U.S. at 321.  The Court shall dismiss any complaint that does not meet these requirements.  See 15 U.S.C. § 78u-4(b)(3)(A).

The PSLRA also requires Plaintiffs to state with particularity facts giving rise to a strong inference of Defendants' scienter.  See 15 U.S.C. § 78u-4(b)(2).  "[A]n inference of scienter must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314. Therefore, a court "must consider plausible nonculpable explanations for the defendant's conduct."  Id.  "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)."  Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001).

If a court does dismiss a complaint for failure to state a claim, the Federal Rules of Civil Procedure state that the court should freely give leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

//

**United States District Court**
For the Northern District of California

## III.    DISCUSSION

The alleged fires during the battery prototype design process do not, without more, establish that the risk of fire in the Model S is "significant," or that the Model S is not a safe car, or that any of Tesla's statements about the Model S's safety are untrue or misleading. The SAC provides nothing more.  It ultimately fails to state a claim because Plaintiffs are unable to plead particularized facts–or even logical inferences–showing that any of Tesla's alleged statements were false at all.

### A. Section 10(b)

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934, a plaintiff must plead: (1) a misrepresentation or the use or employment of any manipulative or deceptive device or contrivance; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).  "SEC Rule 10b–5 implements § 10(b) by declaring it unlawful: '(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'" Tellabs, 551 U.S. at 318 (quoting 17 CFR § 240.10b–5).

Tesla argued that Plaintiffs' 10(b) claim was fatally flawed for two reasons: (1) failure to plead facts sufficient to establish that any defendant made a false or materially misleading statement; and (2) failure to plead facts giving rise to a "strong inference" of scienter. Because this Court found that Plaintiffs utterly failed to plead facts sufficient to establish a false or materially misleading statement, it is unnecessary to reach the issue of scienter.

### 1. False or Misleading Statement

To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was " misleading as to a material fact."  Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988).  In Basic, the Supreme Court held that this materiality requirement is satisfied

when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Id. at 231–232.  Moreover, "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011).  Disclosure is required under these provisions only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." Id. at 1321-22 (citing 17 C.F.R. § 240.10b–5(b); Basic, 485 U.S. at 239 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.")).  "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." Matrixx, 131 S. Ct. at 1322.

To survive a motion to dismiss a § 10(b) claim, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); Tellabs, 551 U.S. at 321.  In general terms, Plaintiffs allege that the Model S battery pack had "significant vulnerabilities to road debris impact, puncture, and catastrophic fire" that Tesla failed to disclose. E.g., SAC at ¶ 18.  But after a careful review of every alleged false statement or omission in the SAC, the Court held that the SAC failed to plead any actionable statement at all.

### a. August 19, 2013 Statements

The SAC challenges a press release issued on August 19, 2013, as containing numerous materially false and misleading statements and material omissions because it failed to disclose a boilerplate list that the SAC repeats for nearly every allegation: the "numerous prior battery fire incidents [in prototype testing before the Model S's release]," "the fact that the Model S was highly vulnerable to undercarriage puncture and catastrophic fire," and that "Tesla's stock price was at significant risk due to the foregoing" misstatements and omissions.  SAC ¶ 120.  As discussed below, Plaintiffs' allegations regarding the Press

United States District Court
For the Northern District of California

1   Release are insufficient to survive a motion to dismiss because they fail to identify any false

2   statements or omissions.

3        Plaintiffs first allege that the Press Release falsely stated that the "Tesla Model S

4   Achieves Best Safety Rating of Any Car Ever Tested," and that "safety levels better than 5

5   stars are captured in the overall Vehicle Safety Score (VSS) provided to manufacturers,

6   where the Model S achieved a new combined record of 5.4 stars." SAC ¶¶ 115-16. The

7   SAC alleges these statements to be false because the "NHTSA does not further rank cars

8   among all those that earned the 5-star category." SAC ¶ 115-16. But as Tesla argued, the

9   Press Release explicitly explained that the "NHTSA does not publish a star rating above 5,"

10  and that the 5.4 rating appeared in the Vehicle Safety Score provided to manufacturers. SAC

11  Ex. 3. The SAC goes on to allege that on August 21, the NHTSA posted a message on its

12  website, not naming Tesla or any other manufacturer, that "NHTSA does not rate vehicles

13  beyond 5 stars and does not rank or order vehicles within the star rating categories." SAC

14  ¶ 127. Tesla's stock price dropped slightly, from the prior day's close of $149.58 to $147.86,

15  then soared the next day to close at $157.10. SAC ¶¶ 128-29. The allegation's obvious

16  materiality and causation problem aside, nothing in the NHTSA's clarification or in the SAC

17  suggested that Tesla did not, in fact, receive a 5.4 rating in the Vehicle Safety Score provided

18  to manufacturers.

19       Next, the SAC faults the Press Release's claim that the good results on the Model S's

20  rollover tests can be explained by the battery pack being mounted below the floor pan, which

21  creates a very low center of gravity that "simultaneously ensures exceptional handling and

22  safety." SAC ¶ 117. But Plaintiffs do not deny this true statement, and are unable to refute

23  the likely obvious proposition that a low center of gravity makes a car safer by reducing the

24  risk of rollover. Even if it were the case, as Plaintiffs appear to allege, that the battery pack

25  being mounted below the floor pan contributed to the battery fires by putting it within

26  striking distance of road debris, that does not plead that the Press Release's statement

27  regarding rollover risk was false or misleading.

28       The SAC goes on to challenge the following statement in the Press Release:

United States District Court
For the Northern District of California

1
2
3
4

> The above results do not tell the full story.  It is possible to game the regulatory testing score to some degree by strengthening a car at the exact locations used by the regulatory testing machines.  After verifying through internal testing that the Model S would achieve a NHTSA 5-start rating, Tesla then analyzed the Model S to determine the weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured.  SAC ¶ 118 (quoting Press Release, SAC Exh. 3).

The SAC claims that "[b]y failing to exclude the undercarriage, the battery pack, and the parts of the car encasing and protecting the battery pack, Tesla falsely stated that those parts, too, had achieved the performance levels of a perfect 5-star score."  SAC ¶ 118.  But the Press Release clearly stated that the NHTSA's rating score "takes into account the probability of injury from front, side, rear, and rollover accidents," negating the SAC's ability to plausibly plead that a reader would have been misled into thinking the battery itself received an independent NHTSA 5-star safety rating.  Nor is the SAC able to allege that the battery assembly was unfit for a 5-star safety rating, that Tesla did not in fact retest the car's weakest points, or that the Model S did not achieve 5 stars in Tesla's internal testing when the testing equipment was configured differently. That the NHTSA reaffirmed Tesla's 5-star rating after all three vehicle fires (and before Tesla implemented any changes to the battery pack cover) reinforces the failure of this allegation to plead a false or misleading statement. See RJN, Ex. 3.

The SAC then faults the following statement in the Press Release:

> The Model S lithium-ion battery did not catch fire at any time before, during, or after NHTSA testing.  It is worth mentioning that no production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite several high speed impacts.  SAC ¶ 119, quoting Press Release, SAC Exh. 3.

But again, the SAC fails to plead any facts establishing a false statement.  Plaintiffs concede that the statement is true, but assert it was misleading in light of their allegation that three fires occurred in prototype batteries six to ten months before the launch of the Model S. SAC ¶¶ 90, 91, 110.  As Tesla argued, the statement explicitly referred to production batteries, and Plaintiffs plead no plausible allegation that the statement is thereby false or misleading.  The SAC admits that Tesla's engineers were still changing designs "just prior to the Model S's production deadline," and that shortly before the June 2012 launch date,

United States District Court
For the Northern District of California

"many other parts of the car were undergoing changes, including the motor and the battery." SAC ¶¶ 57, 59.  Although Plaintiffs vaguely assert that a confidential witness "could not recall any major changes to the Model S battery pack after Tesla decided, during the Model S engineering process, to use the higher energy Panasonic batteries," SAC ¶ 102, this is wholly insufficient to plead the materiality of the alleged prototype fires.  The confidential witness did not affirmatively allege that the battery design did not change, nor offer any time line relative to the alleged prototype fires.  Id.  Basic established that in order to satisfy the materiality requirement, a plaintiff must plead "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  485 U.S. at 231–232.  But on these facts, the complaint fails to plead any inference tending to show that the market would have viewed as material the three fires that occurred during the early design phases of its prototype batteries–including one that was deliberately set by Tesla engineers in the design process, and another that was never established to have involved a battery pack at all, SAC ¶¶ 91, 96.

### b. "The Safest Car in America" Statement on Tesla's Website

Relatedly, and for the same reasons inadequately, the SAC challenges a front page display on Tesla's website that pictured a Model S with the caption "The Safest Car in America" and a subcaption showing 5 stars and stating "5-star Safety Rating in All Categories."  SAC ¶ 122.  The SAC repeats that this was materially false and misleading because the NHTSA's rating system does not rank cars within the 5-star category; the NHTSA did not test some other luxury cars at all; and the web page display failed to disclose Tesla's "numerious prior battery incidents," that the Model S was "highly vulnerable" to "catastrophic fire," and that "Tesla's stock price was at significant risk due to the foregoing material misstatements and omissions."  SAC ¶ 124.  But again, the SAC is unable even to allege any false statements: it alleges no facts that the Model S was not the safest car in America, or that it did not receive a 5-star safety rating in every category and a record 5.4 star Vehicle Safety Score, and thus fails to specify any coherent reason why the statement was false or misleading as required by 15 U.S.C. § 78u-4(b)(1).

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c. Interviews and Presentations during the Class Period

The SAC spills more ink to no avail on a series of similar statements made in interviews and in an investor presentation in August through October of 2013.  Two of these statements are alleged to have occurred before any of the three class period fires.  The first was an interview with an automobile blog in which Elon Musk stated, "Throughout all our crash tests, throughout all similar incidents with vehicles on the road, never once has there been a fire."  SAC ¶ 130.  Second, an investor presentation dated September 14, 2013, characterized the Model S as the "Safest Car in America" and discussed the Model S's "passive safety features" and "high energy density."  SAC ¶ 133.  Again, the SAC fails to identify any false statement, since it does not and cannot allege that other cars are safer than the Model S, or that the Model S does not in fact have "passive safety features" or "high energy density," or that reasonable investors were thereby misled.

Nor is the SAC able to allege with particularity any false statements after any of the three Model S fires that occurred during the class period.  The SAC first points to several allegedly false statements made in the wake of the October 2, 2013, Model S fire in Washington State.  It challenges a statement by alleged "Tesla company spokesperson" Elizabeth Jarvis-Shean in an interview with ABC News that the Washington fire was the first known fire caused by a Model S battery.  SAC ¶ 142.  The SAC's stated reason for the alleged falsity of this statement–the three prototype fires that occurred prior to the Model S's launch–again fails to plead that a fire had in fact occurred in a Model S battery such that the alleged statement is rendered materially false, for the same reasons already discussed.  SAC ¶¶ 143-44.

The SAC also faults a blog post authored by Elon Musk that discussed the Washington State fire and that appeared on Tesla's corporate web page on October 4, 2013.  Specifically, Plaintiffs challenge a statement that the undercarriage of the Washington State Model S was struck by a peak force on the order of 25 tons, and "[o]nly a force of this magnitude would be strong enough" to cause the damage seen there; that "[h]ad a conventional gasoline car encountered the same object on the highway, the result could have

**United States District Court**
For the Northern District of California

1  been far worse," as a gasoline car has thin underbody protection and a concentrated fuel

2  source; that the Tesla battery pack has only 10% the combustion energy contained in a

3  gasoline tank, divided in 16 modules, such that "the effective combustion potential is only

4  about 1% that of the fuel in a comparable gasoline sedan;" and that reliable data sources

5  show that nationwide there are 150,000 car fires per year among 3 trillion miles driven,

6  which "equates to 1 vehicle fire for every 20 million miles driven, compared to 1 fire in over

7  100 million miles for Tesla," which "means you are 5 times more likely to experience a fire

8  in a conventional gasoline car than a Tesla!"  SAC ¶¶ 145-146.  The SAC goes on to

9  highlight statements in the same blog post that a large metal object rotating into the underside

10  of the vehicle, as occurred in the Washington fire, "is a highly uncommon occurrence;" that

11  piercing the 1/4 inch undercarriage plate "is extremely hard to do," and that "the Model S

12  energy containment functions operated correctly" by preventing the fire from entering the

13  passenger cabin.  SAC ¶ 148.

14        But none of these statements is false, or even alleged to be so.  The SAC instead

15  claims these statements"overstated how 'uncommon' a battery pack fire would be, how

16  'extremely hard' it would be for the Model S undercarriage and battery pack to sustain

17  damage sufficient to ignite such a fire, and how 'only a force of this magnitude' (i.e. 25 tons)

18  would cause such damage and fire," and "misrepresented the comparative safety of a Model

19  S as compared to a gas-powered automobile, in terms of the Model S both having only one

20  percent (1%) the combustion potential and being five times less likely to experience a fire–all

21  contrary to Tesla's undisclosed prior [alleged prototype] battery fires."  But the SAC pleads

22  no facts that damage would have been less severe in a gasoline car, or that Musk's statistics

23  or math are faulty, or anything else that explains the reason why the statement is alleged to

24  be false or misleading.  Instead, it repeats that there were up to three fires (one deliberately

25  set in testing) in the design and development stages of prototype batteries prior to the Model

26  S's release.  Plaintiffs offer no coherent pleading that can survive a motion to dismiss

27  because, even if the prototype fires occurred and even if they were relevant, they would not

28  make it false or misleading for Tesla to state that battery fires in the Model S are

United States District Court
For the Northern District of California

"uncommon" and to do simple math about the ratios of fires to road miles among conventional cars and the Model S.

### d. October Interviews

In a similar series of equally deficient claims, the SAC discusses a speech and television interview given by Elon Musk on October 22 and October 24, 2013. On October 22, Musk again stated that the Model S "is five times less likely to catch fire than a gasoline car," that the Washington fire was a "very peculiar accident" because "a big curved piece of a fender . . . jackknifed into the battery back with a huge impact" which caused "just the front portion of the battery pack" to catch fire, and again explained that the Model S's official NHTSA score was five stars in every category but that in reality it was more like 5.4. SAC ¶ 157. Similarly, Musk is alleged to have stated in a Bloomberg TV interview on October 24 that a large metal object pierced the undercarriage plate of the Washington State Model S; that there were no injuries and the car owner bought another Model S; and that the Washington fire was distinguishable from a recent fire in a Boeing battery [unrelated to Tesla Motors] because the Boeing battery caught fire spontaneously while the Washington battery caught fire due to being "hit by a large piece of metal at high speed." SAC ¶ 160.

And so it was. The SAC cannot and does not allege otherwise. Instead, it reiterates that these statements "understated the true risk" of battery fires by omitting reference to the prototype battery fires–a claim that simply fails to identify any falsity in Musk's statements, since it cannot plead any facts that the Model S is not in fact five times less likely to catch fire or that the Washington fire did not happen as described, or that reasonable investors were thereby misled.

The SAC also alleges that Musk's statements of October 22 and October 24 were materially false and misleading because they failed to disclose that, "unknownst to investors, a second Model S fire had already taken place," on October 18 in Merida, Mexico, and that Musk knew of this fire "almost immediately after it occurred." SAC ¶¶ 164-65. Tesla argues that there would have been no reason to mention the Mexico accident because, as Plaintiffs admit, Musk was answering a question about the Washington fire specifically.

14

United States District Court
For the Northern District of California

SAC ¶ 156.  Nothing in Musk's statements, which were answering specific questions about the Washington State fire, is rendered false by the occurrence of the fire in Mexico.  And Plaintiffs' claim that the statement was misleading because it failed to discuss the Mexico fire is insufficient even at the generous pleading stage.  "Rule 10b–5 . . . in terms prohibit[s] only misleading and untrue statements, not statements that are incomplete."  Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  Rule 10b–5 does not contain "a freestanding completeness requirement; the requirement is that any public statements companies make that could affect security sales or tender offers not be misleading or untrue."  Id.  "Thus, in order to survive a motion to dismiss under the heightened pleading standards of the [PSLRA], the plaintiffs' complaint must specify the reason or reasons why the statements made by [the company] were misleading or untrue, not simply why the statements were incomplete."

Here, Plaintiffs fail to plead with particularity any reasons supporting an inference that Musk's answers to questions about the Washington fire misled investors about the Mexico fire.  Nor is it even facially plausible that the October 18 Mexico fire was "unknownst to investors" until "media outlets reported" it on October 28.  A fiery crash on a public street is not secret insider knowledge.  Indeed, the SAC includes a still shot of the Mexico fire it attributes to a video published by Mexican news outlet Progreso Hoy, SAC ¶ 165 & n.3–but both the cited news article and the video were published on Progreso Hoy's news site and on Youtube.com on October 18, with "Tesla" prominently in the headline.[1]  This Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."  Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998).  Indeed, by October 29–the period when the SAC claims the Mexico fire was "unknownst to investors"–the Youtube.com video of the crash had amassed more than

---

[1]The news article and video appears on Progreso Hoy's website dated October 18, 2013. http://progresohoy.com/noticias/guiador-fantasma-choca-lujoso-vehiculo-tesla-glorieta-del-pocito-m erida-13156/.  The video also appears on Youtube with a published date of October 18, 2013. http://www.youtube.com/watch?v=RCn1CufaCYc

15

1    92,000 views.[2]

2    **e.  November Interviews**

3    Finally, the SAC alleges that a series of statements made on November 12, 2013, in

4    the wake of a third Model S fire that occurred in Tennessee, were false and misleading.

5    Again, the SAC challenges Musk's statement that the Model S is less likely to experience a

6    fire than a gasoline car, on the grounds that the statement was made "even after three

7    publicly-known fires in the prior six weeks."  SAC ¶¶ 181-183.  This allegation does not

8    establish falsity, even facially, because nothing in the SAC suggests that a Model S actually

9    is more likely to catch fire than a gasoline car.  The SAC cited a Dr. Rick Martin, Ph.D. in

10   Mechanical Engineering, who stated that a more "salient" comparison would be "fires per

11   collision exceeding a certain speed differential," but even Dr. Martin conceded he has no

12   actual data and "[i]t may still turn out that fleets of electric cars experience fewer total fires

13   per mile" than gasoline cars.  SAC ¶ 184.

14   The SAC also challenges another statement by Musk the same day, that "there

15   definitely won't be a Model S recall," and that if Tesla "thought a recall was warranted, we

16   would do it immediately."  SAC ¶¶ 181-183.  But the SAC fails to state a plausible reason

17   why this was false, as there never was a Model S recall.  The SAC claims that Tesla

18   subsequently raised the ground clearance of the Model S by an over-the-air software update

19   and implemented an enhanced undercarriage shield, SAC ¶¶ 185, 187, 194, but these

20   improvements are not "tantamount to a recall," nor is SAC able to allege that the Model S

21   was unsafe, or less safe than a gasoline car.  The SAC makes a conclusory claim that "raising

22   the car's height was an admission that the Model S was, as originally sold, not 'the safest car

23   in America' because it was highly vulnerable to the specific issue of an undercarriage

24   collision that could ignite a battery fire."  SAC ¶ 188.  But alleging a software update that

25   reduces the chances of underbody impact says nothing about the Model S's safety relative to

26   other cars.  The SAC claims "there was no reason" the changes to the underbody shield and

27   _____

28   [2] Accidente de un vehiculo Tesla en Merida, acrecenta la polemica mundial en torno a esa firma de autos, Progreso Hoy (Oct. 29, 2013), http://progresohoy.com/noticias/accidente-vehiculo-tesla-merida-acrecenta-polemica-mundial-torno-esa-firma-autos-13423/.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    ground clearance "could not have been implemented before or during the class period," and

2    alleges at length that based on "calculus and guesstimating," Tesla made design decisions

3    that chose to balance engineering tradeoffs in a way contrary to what Plaintiffs presumably

4    think wise.  See SAC ¶¶ 56-87, 99-107, 197.  But these claims fail to carry any of Plaintiffs'

5    pleading burden in this federal securities action, where the issue is not the Model S's design

6    but rather the information provided to investors.  This Court therefore rejected Plaintiffs'

7    invitation to second-guess Tesla's engineering decisions, both because the Model S's stellar

8    success surely indicates it would be a losing proposition and, more importantly, it is

9    irrelevant for the present purposes.  The Court looked instead for materially false or

10   misleading statements pleaded with particularity, and looked in vain here.

11           **B. Rule 20(b) Claim**

12           Because Plaintiffs fail to state a claim under Section 10(b), their "control person"

13   claim against Musk under 20(a) must also be dismissed.  See U.S.C. § 78t(a); Heliotrope

14   Gen. Inc. v. Ford Motor Co., 189 F.3d 971, 978 (9th Cir. 1999) ("To be liable under section

15   20(a), the defendants must be liable under another section of the Exchange Act.").

16   **IV.    LEAVE TO AMEND**

17           Despite having experienced trial counsel compile a lengthy and detailed complaint

18   that includes extensive confidential witness interviews, and twice being granted leave to

19   amend, Plaintiffs have woefully failed to allege even the false statements at the core of their

20   cause of action.  Indeed, this Court admonished Plaintiffs at a hearing held on February 14,

21   2014, that the amended complaint should "comply with the requirements of the [PSLRA]" by

22   identifying in as much detail as possible the particular statements alleged to be untrue and

23   providing "as much information as you possibly have that supports those allegations."  See

24   Hearing Tr. at 5-6.  Plaintiffs have amended their complaint twice since that hearing,

25   including a second amendment made after Plaintiffs claimed they "reviewed the Amended

26   Class Action Complaint . . . to see whether there were any other issues that would benefit

27   from an amendment." Tuccillo Decl. ¶ 5 (dkt. 40).

28           This Court's "discretion to deny leave to amend is particularly broad where plaintiff

17

**United States District Court**
For the Northern District of California

has previously amended the complaint." <u>Allen v. City of Beverly Hills</u>, 911 F.2d 367, 373 (9th Cir. 1990). Yet "even after three attempts," Plaintiffs "failed to heed [this Court's] warning to comply with Rule 9(b) and the PSLRA[, subjecting] the complaint to the distinct possibility of dismissal with prejudice." <u>See</u> <u>Desaigoudar v. Meyercord</u>, 223 F.3d 1020, 1026 (9th Cir. 2000) (citing <u>Allen</u>, 911 F.2d at 373). Because it is clear at this stage that "the complaint could not be saved by any amendment," this Court DENIED LEAVE TO AMEND. <u>See</u> <u>Desaigoudar</u>, 223 F.3d at 1026 (citing <u>Griggs v. Pace Am. Group, Inc.</u>, 170 F.3d 877, 879 (9th Cir. 1999)).

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss was GRANTED, WITHOUT LEAVE TO AMEND.

**IT IS SO ORDERED.**

Dated: December 7, 2014

_____
CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE